**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

FILED

SEP 0 1 2015

CLERK, U.S.D.C. .
CHEYENNE, WYOMING

INTERSTATE FIRE & CASUALTY COMPANY
and FIREMAN'S FUND INSURANCE COMPANY,

      Plaintiffs,

      vs.                                    Case No. 13-CV-278-J

APARTMENT MANAGEMENT CONSULTANTS
LLC, and SUNRIDGE PARTNERS LLC,

      Defendants.

---

**ORDER GRANTING "APARTMENT MANAGEMENT CONSULTANTS, LLC'S, AND
SUNRIDGE PARTNERS, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT
PURSUANT TO FRCP RULE 56"
and
ORDER DENYING "INTERSTATE FIRE & CASUALTY COMPANY AND FIREMAN'S
FUND INSURANCE COMPANY'S MOTION FOR JUDGMENT ON THE PLEADINGS
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(c)"**

---

      This matter comes before the Court on "Apartment Management Consultants, LLC's, and

Sunridge Partners, LLC's Motion for Partial Summary Judgment Pursuant to FRCP Rule 56" (Doc.

51) and plaintiffs' opposition thereto (Doc. 57), and "Interstate Fire & Casualty Company and

Fireman's Fund Insurance Company's Motion for Judgment on the Pleadings Pursuant to Federal

Rule of Civil Procedure 12(c)" (Doc. 53) and the defendants' opposition thereto (Doc. 55).  The

Court has reviewed the motions, all matters of record, the applicable law and is fully advised, and

now FINDS and ORDERS that the defendants' motion for partial summary judgment should be

1

GRANTED and that the plaintiffs' motion for judgment on the pleadings should be DENIED.

## FACTS

1.   Interstate Fire & Casualty Company ("Interstate") issued a Comprehensive General Liability Insurance policy to Commercial Industrial Building Owner's Alliance, Inc. d/b/a CIBA, policy number SGL 1002220 ("Primary Policy"), for a two year term, March 31, 2010 to March 31, 2012, with a $1,000,000 per occurrence, and a $2,000,000 General Aggregate limit for the policy term.  Doc. 6, Amended Complaint, ¶ 12.[1]

2.   The Primary Policy contains a "Named Insured Endorsement" identifying CIBA as a named insured, as well as any associate of CIBA "to whom an Evidence of Certificate of Insurance has been issued and which describes the specific location coverage is limited to."  Doc. 6, ¶ 13.

3. CIBA issued Certificates of Insurance to Sunridge and AMC, identifying them as named insureds under the Primary Policy. Doc. 6, ¶ 14.

4. The Primary Policy includes an exclusion relied upon by the plaintiffs' in the Amended Complaint, which states:

> **EXCLUSION -- PUNITIVE OR EXEMPLARY DAMAGES**
>
> This insurance does not apply to fines, penalties, punitive damages, exemplary damages, treble damages or the multiplication of compensatory damages.

Doc. 6, ¶ 36.

---

[1] Unless otherwise stated, all "Doc. __" references are to docket entries in this case, 13-CV-278. Docket entries in the underlying *Lompe* action will be identified as "12-CV-88, Doc. ___".

5. Interstate issued an Excess Liability Policy (which is in excess of the Primary Policy) to CIBA, bearing policy number PFX73097172 ("Interstate Excess Policy"), for a two year term, from March 31, 2010 to March 31, 2012, with a limit of $10,000,00 per occurrence, with a $10,000,000 aggregate for the policy term. Doc. 6, ¶ 15.

6. The Interstate Excess Policy contains a "Schedule of Named Insureds" identifying, among others, CIBA as a named insured, as well as any associate of CIBA "to whom an Evidence or Certificate of Insurance has been issued and which describes the specific location coverage is limited to." Doc. 6, ¶ 16.

7. Sunridge and AMC are considered named insureds under the Interstate Excess Policy. Doc. 6, ¶ 17.

8. Fireman's Fund issued an Excess Liability Policy (which is in excess of the Interstate Excess Policy) to "CIBA, et al as per First Underlying Insurance," bearing policy number SHX-000-7262-3879 ("Fireman's Fund Excess Policy") for a two-year term, from March 31, 2010 to March 31, 2012, with a limit of $15,000,000 per occurrence, with a $15,000,000 aggregate for the policy term. The Fireman's Fund Excess Policy identifies "underlying insurance" as the Interstate Excess Policy. Doc. 6, ¶ 18, and n. 1.

9. As Sunridge and AMC are named insureds under the Interstate Excess Policy, they are also considered named insureds under the Fireman's Fund Excess Policy. Doc. 6, ¶ 20.

10. The Primary Policy, the Interstate Excess Policy, and the Fireman's Fund Excess Policy have been collectively referred to as the "Insurance Policies" in the plaintiffs' amended complaint. Doc. 6, ¶ 20.

11.     Sunridge Partners, LLC ("Sunridge") owns the Sunridge Apartments in Casper, Wyoming and from at least February 2011 to the present, Robert Ctvrlik has been the Managing Member of Sunridge.   Doc. 6, ¶ 6, Doc. 51, Ex. B (Robert Ctvrlik affidavit).

12.     Apartment Management Consultants, LLC ("AMC") operates and manages these Wyoming apartments. Doc. 6, ¶¶ 8, 8. From July 2010 to present, Martha Knudson has served as the General Counsel for AMC.   Doc. 51, Ex. C (Knudson affidavit).

13.     Amber Lompe was a tenant in the Sunridge Apartments, Apartment #436, in Casper, Wyoming.

14.     On May 2, 2012, Amber Lompe filed a Complaint naming AMC and Sunridge as defendants in a lawsuit filed by Amber Nicole Lompe in the United States District Court for the District of Wyoming, Case No. 12-CV-88-J, *Amber Nicole Lompe v. Sunridge Partners, LLC and Apartment Management Consultants, LLC* ("*Lompe* action"). In her complaint, Lompe alleged she was poisoned by carbon monoxide gas in her apartment in Casper, Wyoming causing her serious injuries and damages. The complaint alleged the defendants' negligent, grossly negligent, reckless, willful and wanton acts and omissions directly, legally, and proximately caused serious injuries to the plaintiff, and stated that she sought to recover, in addition to other compensatory damages, exemplary and punitive damages, "in a reasonable amount to be proved at trial, sufficient to adequately punish the defendants and to serve as a deterrent and warning against future conduct of the type alleged in this complaint[. ]" 12-CV-88, Doc. 1.

15.     Shortly after being served with the complaint in the *Lompe* action, AMC tendered defense of the matter to its insurer, Interstate, "one of the Fireman's Fund Companies." Doc. 51, Ex.

4

C, Knudson Affidavit.

16. By letter dated April 12, 2012[2] addressed to Knudson and LLC Members, Kelly Lemoine, Senior Coverage Analyst, "on behalf of Interstate Fire and Casualty Company, one of the Fireman's Fund Companies" wrote:

> On behalf of Interstate Fire and Casualty Company (hereafter IFCC), one of the Fireman's Fund Companies, Claims Adjusting Group handles claims in connection with the Commercial Industrial Building Owner's Alliance Insurance Program. This correspondence shall serve to confirm receipt of the lawsuit entitled *Lompe v. Sunridge Partners, et al. Marie Schwarz v. BRC Real Estate et al.,* filed in Wyoming District Court, case number 12CV88J.
>
> CIBA Insurance Services, via a policy written through IFCC, has agreed to participate in the defense of Sunridge Partners, LLC and Apartment Management Consultants, LLC. The case has been referred to Peter Dusbabek of Montgomery, Kolodny, Amatuzio & Dusbabek. Mr. Dusbabek's office is located at 2625 Redwing Road, Suite 200 in Fort Collins, CO 80526. You may reach Dusbabek telephonically at 970-221-2800.
>
> We would also like to take this opportunity to advise you that your liability policy carries a $1,000 per loss deductible that applies to this loss.
>
> Should you have any questions or concerns regarding any of the above, please feel free to contact me at 818-638-8534.

Doc. 51, Ex. 3, Ex. C (Knudson affidavit). This letter did not expressly include any reservation of rights, disclosure of any exclusions, or assert any other basis for denying or limiting coverage.

17. Peter Dusbabek wrote Bob and Jeff Ctvrlik and Martha Knudson on May 21, 2012, regarding the complaint that had been filed. Dusbabek had been engaged by the insurer to represent AMC and Sunridge in the *Lompe* litigation. In that letter he states:

---

[2]This date appears to be incorrect, as it references the complaint filed in this Court, by case number, 12-CV-88, which was filed May 2, 2012.

The insurance information we have for Sunridge indicates that there is a $1 million per occurrence primary liability limit with $75 million in excess liability (schedule attached). These limits are far in excess of any anticipated damages in this case. Whether the damage claim presents an exposure that would exceed the primary $1 million limit is unknown, however, any excess carrier whose policy may come into play should be placed on notice of the claim immediately. Notably, the complaint contains a punitive damage claim. We do not view this as a punitive damage case, but liability policies generally do not cover punitive damages.

Doc. 57-7. In that letter, Dusbabek requests that the defendants both consent to dual representation of Sunridge and AMC. There is no reservation of rights with respect to punitive damages referenced by Dusbabek nor anything that suggests he would have the authority to make such a reservation at the time he was actively defending AMC and Sunridge at Interstate's behest.

18. On March 25, 2013, Dusbabek, for Sunridge and AMC, filed a motion for summary judgment in 12-CV-88, Doc. 27, seeking judgment in defendants' favor on all claims asserted against them. In that motion, the defendants simply said the following with respect to punitive damages:

Plaintiff asserts that she is entitled to an award of various forms of damages including punitive damages. A claim for punitive damages is not a separate cause of action and cannot stand without an underlying claim. *See, e.g. Barham v. Town of Greybull*, 2011 U.S. Dist. LEXIS 74484 (W. Wyo. July 11, 2011) para. 52, *aff'd* 483 Fed. Appx. 506, 2012 U.S. App. LEXIS 11306 (10th Cir. 2012). Accordingly, summary judgment for the Defendants on the Plaintiff's negligence claim disposes of her entire claim for relief.

12-CV-88, Doc. 27.

19. May 17, 2013, in a letter to Baker, Knudson wrote, on behalf of AMC and Sunridge:

I am writing on behalf of AMC, LLC and our client, Sunridge Partners, LLC. We are in receipt of Mr. Dusbabek's May 16, 2013 status letter addressed to you that discusses the opinions of plaintiff's experts, and I have reviewed their disclosures. Our review has raised serious concerns that the economic risk to both AMC and Sunridge Partners from this case is greater than our initial evaluation.

6

We appreciate and understand our defense counsel's opinion and assessment of these expert disclosures. However, it is AMC and Sunridge that are the ones at risk for an excess judgment in this case, and the detrimental effects that any judgment would have on our business reputation and credit rating.

AMC and Sunridge Partners want to make sure that you understand, as our carrier, that it is our position that the only reasonable course of action is for this case to be settled within policy limits. As there has already been a settlement demand from the plaintiffs that is within the policy limits, we urge CIBA to settle this case.

Doc. 57-8.

20. Plaintiffs have offered the affidavit of Robert Baker, commencing at Doc. 57-6, in which he avers that he is an attorney for Claims Adjusting Group and was involved in the *Lompe* action. He offers several letters in which punitive damages are mentioned. The plaintiffs here have argued that the correspondence explicitly acknowledges that "they did not have coverage for punitive damages and were at risk for an excess verdict."

21. Knudson wrote Baker again on October 24, 2013:

I am writing on behalf of AMC, LLC and our client, Sunridge Partners, LLC. We have been monitoring this case very closely, and our concerns about the economic risk to both AMC and Sunridge Partners have only increased since my letter to you of May 27, 2013.

We are aware that plaintiff made a prior demand within policy limits. Accordingly, we made a demand on May 17, 2013 that this case be settled. Nevertheless, this did not happen and we are now rapidly approaching trial and the risk of a punitive damages award. While we appreciate and understand our defense counsel's opinion and assessment of Ms. Lompe's credibility and liability issues in this matter, it is AMC and Sunridge that are the ones at risk for a punitive damage and an excess judgment in this case. I don't think that I need to explain to you the detrimental effects that any such judgment would have on our business reputation and credit rating.

AMC and Sunridge Partners want to make sure that you understand, as our carrier, that it is our position that the only reasonable course of action is for this case

7

> to be settled.  As there has already been a settlement demand from the plaintiffs that
> is within the policy limits, we urge CIBA to settle this case.

Doc. 57-9.

22.   On October 25, 2013, this Court entered its Order Denying Motion for Summary

Judgment, finding there were genuine issues of material fact to be determined by the jury at trial.

12-CV-88, Doc. 77.

23.  On November 20, 2013, after entry of the summary judgment motion denial on October

25, 2012, Kelly Lemoine wrote a letter addressed to Sunridge Partners, LLC, c/o AMC, LLC, to the

attention of Martha Knudson, referencing the *Lompe* action, stating:

> On behalf of Interstate Fire and Casualty Company (hereafter IFCC), one of the
> Fireman's Fund Companies, Claims Adjusting Group handles claims in connection
> with the Commercial Industrial Building Owner's Alliance Insurance Program.
>
> As you are aware, CIBA Insurance Services, via a policy written through IFCC, has
> been providing a defense to Sunridge Partners, LLC and Apartment Management
> Consultants, LLC utilizing Peter Dusbabek of Montgomery, Kolodny, Amatuzio &
> Dusbabek.
>
> Please note that the Complaint against the LLC prays for punitive damages and exemplary
> damages. An exclusionary provision to the IFCC policy expressly negates coverage for those
> types of damages.  In this respect the policy provides:
>
>> "This insurance does not apply to fines, penalties, punitive damages,
>> exemplary damages, treble damages or the multiplication of
>> compensatory damages."
>
> While we will continue to provide Sunridge Partners, LLC and Apartment
> Management Consultants, LLC with a full and complete defense, any award or
> judgment for punitive or exemplary damages will be the sole responsibility of
> Sunridge Partners, LLC and Apartment Management Consultants, LLC. As such,
> those entities may wish, at their own expense, to hire an attorney to represent them
> for that portion of the suit.

> Should you have any questions or concerns regarding any of the above, please feel free to contact me at 818-638-8534.

This letter was signed by Kelly Lemoine, Senior Coverage Analyst, on behalf of Interstate Fire and Casualty Company, one of the Fireman's Fund Companies.  Doc. 51, Ex. H; Ex. C (Knudson affidavit).

24.  Knudson wrote Kelly Lemoine on November 21, 2013 as follows:

> I am in receipt of your letter dated November 20, 2013.  We are aware of the exclusion for punitive damages under the policy.  However, as I'm sure you understand, when you undertook defense of the above referenced matter, the duty to defend ran and continues to run to all claims both covered or uncovered.  The mere presence of a claim for punitive damages does not abrogate your duty to act in good faith to protect the interests of your insureds.

> Furthermore, your refusal to settle within the policy limits when you had both the opportunity and a demand from your insureds to do so is troubling.  Even putting the possibility of punitive damages aside, the compensatory damage claims here present a reasonable probability that a judgment in excess of policy limits could occur. Accordingly, we renew our repeated demands that you place policy limits on the table and settle the matter.

Doc. 57-10, Ex. D.

25.  It cannot be meaningfully disputed that plaintiffs were on notice that punitive damages would be sought by Lompe from the time that May 2, 2012 complaint was filed.  The sole express reservation of rights, relying on the punitive damages exclusion, was made on November 20, 2013.

26.  The *Lompe* jury trial commenced on December 2, 2013, 12-CV-88, Doc. 126, eleven calendar days after the November 20, 2013 letter that included an express reservation of rights with respect to punitive damages was sent by Kelly Lemoine.  That letter also suggested that Sunridge and AMC retain separate counsel as to that issue.  The first express written reservation of rights from the

insurer came nearly 19 months after the complaint asserting a claim for punitive damages was filed on May 2, 2012.

27. After 14 days of trial, a jury verdict in favor of Amber Lompe awarding punitive damages was returned December 20, 2013 after two and one-quarter hours of deliberation. 12-CV-88, Doc. 150, 148.

28. On December 26, 2013, this Court entered judgment in favor of Lompe, against Sunridge, in the sum of $750,000.00, punitive damages in the amount of $3,000,000.00, and post judgment interest at the statutory rate. Judgment was also entered in favor of Lompe against AMC in the sum of $1,950,000.00, and punitive damages in the sum of $22,500,000.00 and post judgment interest at the statutory rate. 12-CV-88, Doc. 151.

29. Defendants argue that the plaintiffs are estopped from denying coverage for punitive damages in this case. To the contrary, plaintiffs seek a declaration that the insurance policies provide no coverage for punitive damages award and contend that the plaintiffs cannot be estopped from relying on the punitive damages exclusion because of the failure to reserve the right to deny coverage for punitive damages.

## Standard of Review

Fed. R. Civ. Rule 56(a) provides that summary judgment may be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. See also *Yousuf v. Cohlmia*, 741 F.3d 31, 37 (10th Cir. 2014). Because this is a diversity case, the Court must apply the substantive law of the state of Wyoming. *Mid-Continent*

*Casualty Company v. Circle S Feed Store, LLC*, 754 F.3d 1175, 1178 (10th Cir. 2014). See also

*Macon v. United Parcel Service, Inc.*, 743 F.3d 708, 713 (10th Cir. 2014).

The standard of review for a motion for judgment on the pleadings pursuant to Rule 12(c)

is the same as that for Rule 12(b)(6) motions to dismiss:

> We review a dismissal granted under Fed. R. Civ. P. 12(c) "under the
> standard of review applicable to a Rule 12(b)(6) motion to dismiss." *Nelson v. State
> Farm Mut. Auto. Ins. Co.*, 419 F.3d 1117, 1119 (10th Cir. 2005)(internal quotations
> omitted). "This court reviews de novo the district court's grant of a motion to dismiss
> pursuant to Rule 12(b)(6), applying the same legal standard applicable in the district
> court." *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007). "In reviewing a
> motion to dismiss, this court must look for plausibility in the complaint." *Id.* (internal
> quotations omitted). "Under this standard, a complaint must include 'enough facts
> to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v.
> Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)). "The
> allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just
> speculatively) has a claim for relief." [FN2 omitted] *Robbins v. Oklahoma*, 519 F.3d
> 1242, 1247 (10th Cir. 2008).

*Corder v. Lewis Palmer School Dist. No. 38*, 566 F.3d 1219, 1223-1224 (10th Cir. 2009); see also

*Bixler v. Foster*, 596 F.3d 751, 755 (n.2)-756 (10th Cir. 2010). This standard is far less demanding

than that for summary judgment motions. The Court is guided by the summary judgment standard

here in making this decision.

## Discussion

The defendants' motion for summary judgment asks the Court to determine whether plaintiffs

are estopped from denying coverage for the punitive damages claim asserted against them in the

underlying *Lompe* litigation. The Court concludes they are.

Defendants have asserted that Interstate assumed an unconditional defense in the underlying

*Lompe* case with knowledge of the grounds for non-coverage (i.e., the policy exclusion for punitive and exemplary damages). Plaintiffs argue that the doctrine cannot be invoked to expand coverage of the policies by failing to reserve their rights.

Plaintiffs correctly state that Wyoming's default rule is that the doctrines of estoppel and waiver cannot be employed to expand policy coverage. *Cornhusker Casualty Company v. Skaj*, 786 F.3d 842, 852 (10th Cir. 2015). But, as the Tenth Circuit stated, rules are frequently subject to exceptions, as discussed in the following lengthy excerpt from the *Cornhusker* opinion.

> But rules applied by courts are frequently subject to exceptions, and we conclude that the same holds true here. We have recognized and applied such an exception in *Pendleton v. Pan American Fire & Casualty Co.*, 317 F.2d 96 (10th Cir. 1963), a diversity lawsuit involving New Mexico's substantive law. Citing, *inter alia*, a decision rendered by this court in 1930 wherein we *allowed* estoppel to expand coverage under a policy—*New Jersey Fidelity & Plate Glass Insurance Co. v. McGillis*, 42 F.2d 789, 791 (10th Cir. 1930) (applying Utah law)—we said that
>
>> a liability insurance carrier, which assumes and conducts the defense of an   action ... with knowledge of a ground of forfeiture or noncoverage under the policy, and without disclaiming liability or giving notice of a reservation of its right to deny coverage, is thereafter precluded in an action upon the policy from setting up the ground of forfeiture or noncoverage as a defense. In other words, the insurer's unconditional defense of an action ... constitutes a waiver of the terms of the policy and an estoppel of the insurer to assert the defense of noncoverage.... [I]t is not necessary for the [defended party] to show prejudice in such a situation because he is presumed to have been prejudiced by virtue of the insurer's assumption of the defense.
>
> 317 F.2d at 99 (citations omitted).
>
> In other words, in *Pendleton*, we concluded that the insurer was estopped from denying coverage to the ostensible insured by its conduct in unconditionally assuming the defense without a reservation of rights, and that prejudice was presumed to flow from the insurer's actions. *Id.* at 100–01 (noting that "this situation

12

falls within the rule of estoppel" and that "the insurer is estopped to now deny liability upon the insurance policy in question"). Notably, we reached this conclusion notwithstanding our agreement with the insurer that there was not in fact coverage under the policy. *See id.* at 100 (noting that "it is clear that the insurer at no time had an obligation under the questioned policy to defend" the ostensible insured). We seemed to reason that, irrespective of the actuality of noncoverage, the insurer must accept the equitable consequences of its deliberate choice to "assume[ ] full control of the litigation," without a reservation of rights, because the ostensible insured was "induced to, and did, relinquish control of his defense ... to the insurer." *Id.* And those equitable consequences involved shouldering the burdens of any liability arising from the litigation that it deliberately elected to control. *See id.* at 100–01.

Nearly thirty years later, we had occasion to revisit the so-called "*Pendleton* exception" in resolving a dispute under Oklahoma law. In *Braun v. Annesley,* 936 F.2d 1105 (10th Cir. 1991), we noted that Oklahoma's highest court had not yet opined on whether it would apply an estoppel exception, of the type that we announced in *Pendleton,* to a similar set of facts. We were consequently mindful of Oklahoma's general rule that "estoppel cannot be used to create a contract." *Braun,* 936 F.2d at 1110 (citing *Sec. Ins. Co. of New Haven v. Greer,* 437 P.2d 243, 246 (Okla. 1968)). Even so, we determined that the logic employed in *Pendleton* transposed to the situation at hand:

> Tri–State defended Mr. Bradley *without* a reservation of rights. In addition, Tri–State stated at trial that it was "unclear" whether Tri–State would be liable for Mr. Bradley.... Thus, Tri–State acknowledged that Mr. Bradley might be covered under its policy. Given that the insurers in [*inter alia* ] *Pendleton*... were estopped from denying coverage after providing a defense without a reservation of rights when the claimant was not even arguably covered, Tri–State is also estopped when Mr. Bradley is arguably covered, and, like the circumstances in *Pendleton...the basis of estoppel is Tri–State's defense of Mr. Bradley without a reservation of rights.*

*Id.* at 1110–11 (citations omitted) (emphases added).

The *Pendleton* exception, we observed in *Braun,* has the potential to produce fair and correct results. We explained that it provided "a better rule" to resolve the issues presented therein—"one that encourages an insurer to thoroughly investigate its policy and notify persons *before* assuming their defense that it is reserving its right to later contest coverage." *Id.* at 1111. Likewise, we found that *not* applying the

13

*Pendleton* exception to the particular facts before us would constitute error—that is, we "[did] not believe the Supreme Court of Oklahoma would allow an insurer to defend an individual who might be covered [without a reservation of rights] and then permit the insurer to deny coverage after the individual is found liable." *Id.* This was so, we reasoned, because "[s]uch a result [would] grant [ ] the insurer the unfettered right to induce an individual to relinquish control of his or her defense." *Id.* Ultimately, we were satisfied that "[t]he inequitable consequences of a contrary ruling provide[d] support for our conclusion." *Id.*

So too, here. We face substantially the same factual setting that we confronted in *Pendleton* and *Braun:* that is, the insurer's (Cornhusker's) full assumption of control of the ostensible insured's (Vincent's) defense in a lawsuit seeking to impose liability on the ostensible insured (brought by the Skajs) *and* the insurer's (Cornhusker's) complete failure to provide any notice to the ostensible insured (Vincent) that it sought to reserve its right to deny him coverage. Indeed, even the attorney that Cornhusker retained to represent Vincent acknowledged these key aspects of Cornhusker's posture toward the Skajs' suit in communications with a Cornhusker representative. As he put it, "my role is to fully defend Vincent ... since Cornhusker has agreed (properly) to fully defend him." J. App. at 1122 (Email, dated Nov. 5, 2010). Yet, he noted, while "[t]ypically, a carrier sends a reservation of rights letter which says the carrier is defending but reserves its rights ... to determine whether coverage exists or not," neither of Cornhusker's October 2010 communications with Vincent (i.e., the October 1 and 7 letters) "can reasonably be construed as reservation of rights letters." *Id.*

To be sure, Vincent's lawyer "found it odd that Cornhusker would take this approach," given its position that Vincent was not entitled to coverage. *Id.* But *Pendleton* and *Braun* make clear that this is not the first time that insurers have followed such a path. And these cases also indicate that insurers should bear a specific consequence of such conduct: *viz.,* they should be estopped from later denying coverage to an ostensible insured to escape liability stemming from litigation over which they deliberately assumed control without a reservation of rights. Given their factual similarity to the instant case, we believe that *Pendleton* and *Braun* counsel in favor of applying estoppel to prevent Cornhusker from disputing coverage.

Furthermore, our study of relevant decisions of "other ... federal courts" strongly suggests that "the general weight and trend of authority," *Dittmar,* 618 F.3d at 1204 (internal quotation marks omitted), is to recognize an exception such as the one we articulated in *Pendleton. See, e.g., City of Carter Lake v. Aetna Cas. & Sur. Co.,* 604 F.2d 1052, 1060–62 (8th Cir. 1979); *Pac. Index. Co. v. Abel Delivery Serv., Inc.,* 485 F.2d 1169, 1173 (5th Cir. 1973); *Peerless Ins. Co. v. Travelers Ins. Co.,* 393

14

F.2d 636, 639–40 (9th Cir. 1968); *Natal Union Fire Ins. Co. of Pittsburgh v. Aetna Cas. & Sur. Co.*, 384 F.2d 316, 318 (D.C.Cir. 1967); *Claverie v. Am. Cas. Co. of Reading*, 76 F.2d 570, 571–72 (4th Cir. 1935).

Based on federal authorities, then—most notably our own—we would be inclined to predict that the Wyoming Supreme Court would adopt an estoppel doctrine like *Pendleton* on these facts. Our examination of germane Wyoming caselaw confirms our inclination and leads us to definitively predict that the Wyoming Supreme Court would apply a *Pendleton*-type estoppel exception here.

*Cornhusker Casualty Company v. Skaj*, 786 F.3d at 852-855.

The *Cornhusker* court also noted that "[f]airness undergirds Wyoming's general approach to estoppel." *Id.*, citing and quoting *Birt v. Wells Fargo Home Mortg., Inc.*, 75 P.3d 640, 654 (Wyo. 2003) (stating that estoppel "is to be applied to . . . promote the end of justice, where it would be inequitable not to do so") and *B & W Glass, Inc. v. Weather Shield Mfg, Inc.*, 829 P.2d 809, 817 (Wyo. 1992) (recognizing that "the principle of fairness [is] implicit in recognizing the doctrine of . . . estoppel"). The *Cornhusker* court continued, again with a rather lengthy excerpt from that opinion:

> The Wyoming Supreme Court has delineated estoppel as a remedy that "flows from the actual consequences produced by the conduct of A on B regardless of whether A intended those consequences or not," and the court has clarified that "[t]he [insurer] is estopped when the [individual] is deceived; the deception occurs when the [individual] is lulled into a false sense of security." *Bauer v. State ex rel. Wyo. Worker's Comp. Div.*, 695 P.2d 1048, 1051 (Wyo. 1985); accord *Parkhurst v. Boykin*, 94 P.3d 450, 460–61 (Wyo. 2004).

> Wyoming's general estoppel principles support our conclusion that a *Pendleton*-type estoppel exception should be applied to Cornhusker on these facts. Cornhusker's conduct had the effect of lulling Vincent into the belief that Cornhusker was representing him pursuant to the Policy. Cornhusker specifically retained counsel to represent him in state court and subsequently rendered a defense. During that time period, when Cornhusker had a plausible basis for reserving its rights (due, inter alia, to the dispute concerning whether Vincent was a "permissive user" under the Policy),

it never took that critical step.

In particular, prior to the court's imposition of liability on Vincent, Cornhusker did not "make specific reference to the policy defense[,] which the insurer [i.e., Cornhusker] [could] assert," in any communication with him—which was a necessary predicate under Wyoming law for a finding that Cornhusker had reserved its rights. *Doctors' Co. v. Ins. Corp. of Am.*, 864 P.2d 1018, 1030 (Wyo. 1993). Based upon Cornhusker's silence in that regard, Vincent effectively ceded control of his defense to Cornhusker. And he cannot be viewed as unreasonable for doing so. Yet, later, upon entry of judgment, Cornhusker elected not to provide coverage. We cannot ignore the possibility (even if arguably remote) that, under these circumstances, Vincent "[had] a valid claim [which was] lost because of some action by ... the insurance provider ... reasonably relied upon by [him] to [his] detriment." *Picozzi v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 304 P.3d 977, 981 (Wyo. 2013) (internal quotation marks omitted); accord *Bauer*, 695 P.2d at 1052. This sort of unfairness, we predict, would be of significant concern to the Wyoming Supreme Court when considering the possible application of a *Pendleton*-type estoppel to Cornhusker. See *Bauer*, 695 P.2d at 1052 (concluding that analogous unfairness signaled that "relief should be granted" in the form of estoppel).

Further, in assaying the relevant Wyoming caselaw, we find unavailing Cornhusker's contention that "[t]he Wyoming Supreme Court has rejected the estoppel theory advanced" here, Cornhusker Opening Br. at 25 (emphasis added), in *Albany County School District No. 1*. No doubt Cornhusker hopes we will seize upon language in that case discussing the baseline rule that "coverage afforded by [a] policy cannot be expanded by estoppel." [footnote omitted] *Albany Cnty. Sch. Dist. No. 1*, 763 P.2d at 1262. However, we regard *Albany County School District No. 1* as readily distinguishable. That case concerned an insurance policy that required the insurer to indemnify a county school district for any judgment entered against the "insureds," a term which was defined not to include the school district itself. See *id.* at 1259. To be sure, Cornhusker is arguably correct that "[t]here, as here, the party claiming coverage was not an 'insured' as defined by the policy." Cornhusker Opening Br. at 27. But Cornhusker misstates *Albany County School District No. 1* as "parallel[ing] the theory of estoppel," *id.*, advanced here in one vital respect: the existence of a reservation of rights.

Notably, after an Albany County employee sued the school district, the insurer "agreed to defend the suit while retaining its full reservation of rights with respect to coverage." *Albany Cnty. Sch. Dist. No. 1*, 763 P.2d at 1256 (emphasis added) (internal quotation marks omitted). Judgment was entered against the school district, at which time the insurer denied coverage to the district and withdrew its

16

defense of the action. The trial court ruled that the insurer was estopped from denying coverage, but the Wyoming Supreme Court reversed.

In so doing, the court held that Wyoming's basic rule—i.e., that estoppel cannot expand or create coverage where none exists—applied with equal force under those circumstances because

> [i]n a letter to the School District dated March 8, 1985, St. Paul [i.e., the insurer,] advised that it conditionally agreed to provide a defense for the School District in the underlying case. In this letter St. Paul also stated: "Furthermore we have advised you that The St. Paul is reserving all its rights as to the issues of coverage ... under the terms and conditions of your policy." St. Paul, in this letter, further advised the School District of several possible grounds upon which it might deny coverage....

*Id.* at 1262 (emphases added). That reservation-of-rights letter, the court reasoned, placed the school district on notice that it might not be covered under the policy notwithstanding the insurer's assumption of its defense. See *id.* ("St. Paul's agreement to accept the defense of the case with 'a full reservation of rights' negates any intent to waive any objection to coverage."). Thus, we conclude with no difficulty that the insurer's conduct in *Albany County School District No. 1*—which counseled against invoking estoppel—stands in stark relief to Cornhusker's conduct here, which we have concluded strongly militates in favor of applying estoppel.

In sum, our review of relevant Wyoming authorities strongly confirms, and establishes the soundness of, the provisional judgment that we formed from examining our own precedent (as well as other federal caselaw)—viz., under facts such as these, we predict that the Wyoming Supreme Court would apply a *Pendleton*-type estoppel exception to preclude Cornhusker from asserting Vincent's alleged lack of coverage under the Policy. Consequently, we hold that the district court was correct in its invocation of the *Pendleton* exception to estop Cornhusker here. Like the district court, we believe that the facts before us present a "compelling" justification for using such an exception, J. App. at 1351, and we predict that the Wyoming Supreme Court would agree. Consequently, we uphold this aspect of the district court's judgment.

*Cornhusker Casualty Company v. Skaj*, 786 F.3d at 855-857.

In this case, as in *Cornhusker,* the Court has little difficulty in applying the *Pendleton*-like

estoppel exception to preclude plaintiffs from asserting lack of coverage under the policies. There is, indisputably, little question that everyone involved in this matter on the defense side in the *Lompe* action, including the insurer, was aware that punitive damages were being sought and were aware of the potential for an award punitive damages in favor of Lompe in that underlying litigation. However, not until the eve of trial was a reservation of rights invoked by Interstate. Sunridge's and AMC's repeated pleas to settle the case within policy limits were rejected by the plaintiffs here, demonstrating a complete disregard of the insureds' exposure to punitive damages, without a timely reservation of rights and with knowledge of facts that would bring the claim outside the policy. Interstate assumed full control of the defense in the *Lompe* case and did not inform AMC and Sunridge that it sought to reserve the right to deny coverage under the policy. Giving effect to the November 20, 2013 letter asserting non-coverage and reservation of rights in reliance on the punitive damages exclusion, sent after nearly 19 months of lurking in the bushes after the May 2, 2012 *Lompe* complaint was filed would be, and is, manifestly unfair and egregious. Sunridge and AMC were lulled into a false sense of security when Interstate defended without a reservation of rights, although it could have made an explicit reservation of rights and agreed to provide a conditional defense as early as May of 2012.

The letters outlined above do mention punitive damages, but there is no reservation of rights or indication of any express intention to rely on the punitive damages exclusion. It appears that the defense of AMC and Sunridge was unconditional. This is not unlike *Doctors' Company v. Insurance Corporation of America,* 864 P.2d 1018, 1030 (Wyo. 1993), where the insurer sent the insured letters which failed to provide "even a bare notice of a reservation of rights." The insurer

might have invoked and relied on the punitive damages exclusion; the insurer may not have invoked and relied on the punitive damages exclusion. It was anyone's guess what might occur. Even if the punitive damages exclusion was mentioned and discussed, no one knew Interstate's specific intention to actually invoke the exclusion and defend under a reservation of rights until November 20, 2013, eleven days before trial in the *Lompe* case. Mention and discussion in correspondence did not constitute a reservation of rights. It is plain that Interstate did not defend AMC and Sunridge under a reservation of rights. It is equally plain that Interstate exercised full control of the *Lompe* litigation, even to the extent that it refused to settle within the policy limits contrary to the insureds' repeated requests to do so. After trial, a judgment in favor of Amber Lompe awarding substantial punitive damages against both Sunridge and AMC was entered. It is not necessary for AMC and Sunridge to show prejudice because it is assumed they have been prejudiced by the insurer's assumption of the defense. *Cornhusker*, 786 F.3d at 853. Even so, in the Court's view, the prejudice to AMC and Sunridge in these circumstances cannot be missed and is writ large in the Judgment against the two defendants in the *Lompe* action.

The Court finds that plaintiffs here assumed the unconditional defense of AMC and Sunridge in the *Lompe* action knowing potential grounds for denial of coverage, with no disclaimer of liability or reservation of rights to deny coverage prior to assumption and complete control of the defense. A concomitant component of this determination also results in a finding that the excess policies cannot exclude coverage for the *Lompe* punitive damages award, in that the policies "follow form,"

policies adopting terms and conditions in the underlying policy.[3] It is undisputed that these excess

policies are "follow form" policies. The excess insuring agreements both provide that the excess

insurers will pay on behalf of any insured those sums in excess of all underlying insurance that the

insured becomes legally obligated to pay as damages after the primary policy of insurance has been

exhausted. The first level excess policy (Interstate's) includes by way of example specific exclusions

for fungi and bacteria, silica particles, movement of land or earth, other acts of terrorism committed

outside of the United States, punitive damages related to a certified act of terrorism, medical

expense/payments, discrimination, employment practices pollution, asbestos, lead, war or military

action, damage to property, damage to intangible property, and contractual liability for employee

injury. Doc. 53-2. The second level excess policy (Fireman's Fund's) does not include a specific

exclusion with respect to punitive damages; this policy includes specific exclusions for asbestos,

E.R.I.S.A., damage to property, employment practices, war, nuclear energy liability, pollution, acts

---

[3]15 Couch on Insurance (Third Edition), § 220:32, discusses excess policies. "Both true excess and umbrella policies require the existence of a primary policy as a condition of coverage." Note 29 states, "As with true excess policies, umbrella policies are parasitic in that they require that the insured maintain and exhaust an underlying primary policy[,]" citing *Dickau v. Vermont Mut. Ins. Co.*, 107 A.3d 621 (Me. 2014), in turn citing *Peerless Indem. Ins. Co. v. Frost*, 723 F.3d 12, 18 (1st Cir. 2013). Note 33 states: "A 'following-form policy' of excess liability insurance follows, or adopts, the conditions and agreements of the underlying primary liability insurance policy. *State ex rel. Div. of Admin., Office of Risk Management v. National Union Fire Ins. Co. of Louisiana*, 56 So. 3d 1236 (La. Ct. App. 1st Cir. 2011), *writ denied*, 63 So. 3d 1023 (La. 2011). Unless there is an express exception to the form of the underlying policy, the excess insurer under a following-form policy is governed by the underlying policy's terms. *State ex rel. Div. of Admin., Office of Risk Management v. National Union Fire Ins. Co. of Louisiana*, 56 So. 3d 1236 (La. Ct. App. 1st Cir. 2011), *writ denied*, 63 So. 3d 1023 (La. 2011). A 'following form" excess policy incorporates by reference all terms and conditions of the primary insurance policy. *Bayou Steel Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 642 F.3d 506, 2011 A.M.C. 1491 (5th Cir. 2011)."

of terrorism committed outside the United States, and a specific exclusion of punitive damages related to a certified act of terrorism. Doc. 53-4. The Court has determined that Interstate under the Primary Policy must provide coverage and indemnification, having failed to defend with a timely reservation of rights, for sums the insured is legally obligated to pay. Once the policy limits of the Underlying Policy of insurance have been exhausted, the excess insurers' obligations are triggered and they must provide the agreed-upon excess liability coverage. The excess policies contain no specific exclusion applicable to the facts here; the judgment in favor of Amber Lompe for punitive damages will clearly exceed policy limits. The excess insurers are not excused from providing coverage pursuant to the excess insurance agreements that do provide coverage for amounts in excess of the underlying Primary Policy limits.

Thus, the Court finds that plaintiffs may not assert noncoverage as a defense to the claim and they are precluded from raising the punitive damages exclusion as a means of avoiding or denying indemnity. The Court finds AMC and Sunridge are entitled to summary judgment on their claim for coverage and indemnification.

Correspondingly, the Court will deny the plaintiffs' motion for judgment on the pleadings (Doc. 53) for the same reasons stated above, finding that the doctrine of estoppel bars plaintiffs from asserting non-coverage under the policy. The entirety of that motion is based upon the argument that AMC and Sunridge may not recover punitive damages of Interstate in this action because the policy unambiguously excluded coverage for punitive damages. The foregoing portions of this Order put that argument to rest and the Court will not elaborate further.

Accordingly, it is therefore

21

**ORDERED** that "Apartment Management Consultants, LLC's, and Sunridge Partners, LLC's Motion for Partial Summary Judgment Pursuant to FRCP Rule 56" (Doc. 51) shall be, and is, **GRANTED. It is further**

**ORDERED** that "Interstate Fire & Casualty Company and Fireman's Fund Insurance Company's Motion for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c)" shall be, and is, **DENIED.**

Dated this 27th day of August 2015.

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE