1   MICHAEL J. BIDART #60582
    RICARDO ECHEVERRIA #166049
2   STEVEN MESSNER #259606
    **SHERNOFF BIDART**
3   **ECHEVERRIA BENTLEY LLP**
4   600 South Indian Hill Boulevard
    Claremont, CA  91710
5   Phone: (909) 621-4935
    Fax:  (909) 625-6915
6   MBidart@shernoff.com
7   SMessner@shernoff.com
    REcheverria@shernoff.com
8

9   ROBERT TIEDEKEN #5-1948
    **WOLF TIEDEKEN & WOODARD P.C.**
10   401 West 19th Street, Suite 300
     P.O. Box 491
11   Cheyenne, WY 82003-0491
     Phone: (307) 635-2876
12   Fax:  (307) 632-4902
13   robert@wolftiedeken.com

14
15   Attorneys for Defendants Apartment Management
     Consultants, LLC, and Sunridge Partners, LLC

16            UNITED STATES DISTRICT COURT

17             FOR THE DISTRICT OF WYOMING

18

| | |
|---|---|
| 19   INTERSTATE FIRE & CASUALTY COMPANY, AND FIREMAN'S FUND INSURANCE COMPANY, | Case No.: 13-CV-278J |
| 21         Plaintiff, | **APARTMENT MANAGEMENT CONSULTANTS LLC'S AND SUNRIDGE PARTNERS LLC'S OPPOSITION TO INTERSTATE'S AND FFIC'S MOTION FOR SUMMARY JUDGMENT** |
| 22     vs. | |
| 23   APARTMENT MANAGEMENT CONSULTANTS, LLC, AND SUNRIDGE PARTNERS, LLC, | Date:       December 3, 2015 |
| 25         Defendant | Time:       9:30 a.m.<br>Place:      Courtroom 2 |

27

28

- 1 -

APARTMENT MANAGEMENT CONSULTANTS LLC'S AND SUNRIDGE PARTNERS LLC'S OPPOSITION TO INTERSTATE'S AND
FFIC'S MOTION FOR SUMMARY JUDGMENT

SHERNOFF BIDART ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1

TABLE OF CONTENTS

2  MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

3  I.   INTRODUCTION ....................................................................................... 1

4
   II.  STANDARD OF REVIEW ......................................................................... 3
5
   III. STATEMENT OF FACTS .......................................................................... 4
6
7  UNDISPUTED FACTS ................................................................................................. 4

8      A.   The insurance policies at issue ....................................................... 4

9      B.   Background of Sunridge and AMC ................................................. 5

10 DISPUTED FACTS ....................................................................................................... 6

11 AMC's AND SUNRIDGE'S ADDITIONAL MATERIAL FACTS ........................... 9

12
       A.   The *Lompe* action and the insurers' failure to timely and properly issue
13          a reservation of rights ..................................................................... 9

14     B.   The instant action, and the Court's summary judgment ruling
           estopping Interstate and FFIC from denying coverage for the punitive
15          damage award against AMC and Sunridge ..................................... 12
16
17 IV.  ARGUMENT .............................................................................................. 13

18     A.   Under Wyoming's choice of law analysis, Wyoming law controls ............................... 13

19     B.   Breach of the implied covenant of good faith and fair dealing in Wyoming ................. 14

20     C.   Interstate and FFIC breached the implied covenant of good faith and
           fair dealing in their handling of the claim—failing to reserve rights,
21          failing to warn its insureds about their exposure, and ignoring their
           insureds' pleas to settle the case ................................................... 15
22
23     D.   Interstate and FFIC breached the implied covenant of good faith and
           fair dealing by failing to settle the claims against their insureds within
24          the Primary Policy limits ............................................................... 17

25     E.   The "dual agency" argument contradicts the evidence and does not relieve
           the insurer of the obligation of good faith and fair dealing ........... 23
26
27         i.   CAG was the agent of Interstate ........................................... 23

28         ii.  CAG was *not* AMC/Sunridge's agent ................................. 24



SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

- i -

APARTMENT MANAGEMENT CONSULTANTS LLC'S AND SUNRIDGE PARTNERS LLC'S OPPOSITION TO INTERSTATE'S AND
FFIC'S MOTION FOR SUMMARY JUDGMENT

iii. The agency arguments raised by Interstate are irrelevant to the insurers' failure to settle the *Lompe* Action within policy limits........................ 25

F. The mediation privilege does not shield Interstate/FFIC from bad faith liability for their failure to settle within the Primary Policy limits.............................. 25

G. The insurers' claims regarding breach of contract and punitive damages are merely derivate of their other arguments—and must be denied for the same reason ................................................................................................................... 30

V. CONCLUSION .................................................................................................................. 30

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1

TABLE OF AUTHORITIES

2

**Cases**

3

*Anderson v. Continental Ins. Co.*,
    271 N.W.2d 368, 276-77 (Wis. 1978) ................................................ 15

4

*Archuleta v. Valencia*
    871 P.2d 198, 200 (Wyo. 1994) ....................................................... 13

5

6

*Austin v. Kaness*
    950 P.2d 561 (Wyo. 1997) .............................................................. 24

7

8

*Avary v. Bank of America, N.A.*,
    72 S.W.3d 779, 798-800 (Tex. App. 2002) ..................................... 28

9

10

*Bauer v. State ex rel. Wyo. Worker's Comp. Div.*,
    695 P.2d 1048, 1051 (Wyo. 1985) .................................................. 16

11

12

*Birt v. Wells Fargo Home Mortg., Inc.*,
    75 P.3d 640, 654 (Wyo. 2003) ........................................................ 16

13

14

*Brown v. Nationwide Mutual Insurance Company*,
    2015 WL 71485 (M.D. N. Car. Jan. 6, 2015) ............................ 27, 28

15

*Carles Construction Inc. v. Travelers Casualty & Surety Company of America*,
    56 F. Supp. 3d 1259 (S.D. Fla. 2014) ............................................. 28

16

17

*Carpenter v. Automobile Club Interinsurance Exchange*,
    58 F.3d 1296 (8th Cir. 1995) .......................................................... 21

18

19

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 323 (1986) ................................................................. 4

20

*Cooperman v. David*,
    214 F.3d 1162, 1164 (10th Cir. 2000) .............................................. 4

21

22

*Cornhusker Cas. Co. v. Skaj*,
    786 F.3d 842, 858 (10th Cir. 2015) ........................................... 15, 17

23

24

*Crisci v. Sec. Ins. Co. of New Haven, Conn.*,
    426 P.2d 173, 177 (Cal. 1967) ....................................................... 20

25

*Dietz & Watson, Inc. v. Liberty Mutual Insurance Company*,
    2015 WL 356949 (E.D. Pa. 2015) ............................................ 26, 27

26

27

28

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

*Erie R.R. v. Tompkins*,
   304 U.S. 64 (1938) ................................................................................ 4

*Farmers Ins. Exch. v. Shirley*,
   958 P.2d 1040, 1046 (Wyo. 1998) ................................................. 20, 28

*Gainsco Ins. Co. v. Amoco Prod. Co.*,
   53 P.3d 1051, 1062 (Wyo. 2002) ............................................. 1, 15, 18

*Gelinas v. Metropolitan Property Liability Insurance Co.*,
   551 A.2d 962, 969 (N.H. 1988) ............................................................ 28

*Green v. Donahoe*,
   760 F.3d 1135, 1146 (10th Cir. 2014) ................................................... 3

*Hanna v. Plumer*,
   380 U.S. 460, 471-74 (1965) ................................................................. 4

Hatch v. State Farm Fire & Cas. Co.,
   842 P.2d 1089, 1099 (Wyo. 1992) ...................................................... 14

*Henderson v. Coleman*,
   115 P. 439, 445 (1911) ........................................................................ 23

*Mangum Foods, Inc. v. Continental Cas. Co.*,
   36 F.3d 1491 (10th Cir. 1994) ............................................................ 22

Marathon Ashland Pipe Line LLC v. Md. Cas. Co.,
   243 F.3d 1232, 1246 (10th Cir. 2001) ................................................. 14

*McCullough v. Golden Rule Ins. Co.*
   789 P.2d 855, 855 (Wyo. 1990) .......................................................... 13

New York Life Ins. Co. v. K N Energy, Inc.,
   80 F.3d 405, 409 (10th Cir. 1996) ...................................................... 13

*Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*
   431 F.3d 1241, 1255 (10th Cir. 2005) ................................................. 13

*Sinclair Oil Corp. v. Columbia Cas. Co.*,
   682 P.2d 975, 981 (Wyo. 1984) .......................................................... 22

*Sonnett v. First Am. Title Ins. Co.*,
   309 P.3d 799, 806–07 (Wyo. 2013) ..................................................... 14

*Starrett v. Shepard*,
   606 P.2d 1247, 1249 (Wyo. 1980) ...................................................... 23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

- iv -

*State Farm Mut. Auto. Ins. Co. v. Shrader*,
    882 P.2d 813, 825 (Wyo. 1994) ........................................................................ 14, 15

*Tolman v. Stryker Corp*
    926 F.Supp.2d 1255 (Wyo. Dist. Ct. 2013) ............................................................ 13

*W. Cas. & Sur. Co. v. Fowler*,
    390 P.2d 602, 606 (Wyo. 1964) ............................................................................ 20

*Wardell v. McMillan,*
    844 P.2d 1052, 1066 (Wyo. 1992) ........................................................................ 29

*Wimsatt v. Superior Court,*
    152 Cal. App. 4th 137 (Cal.Ct.App. 2007) ............................................................ 26

**Statutes**

Federal Rules of Civil Procedure 56(a) ........................................................................ 3

Federal Rules of Civil Procedure 408 ........................................................................ 28

**Other Authorities**

Wright & Miller, Federal Practice & Procedure §5314 ................................................ 28

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

### INTRODUCTION

The obligation of good faith and fair dealing inherent in every insurance contract requires that an insurer give *equal consideration* to the insureds' interests as it gives its own. To this end, Wyoming has recognized two different forms of insurance bad faith: substantive bad faith, requiring an insurer to have a fairly debatable reason to deny a claim; and procedural bad faith, implied in how an insurer investigates, handles, or denies a claim. That standard also involves the insurers' conduct and "whether the facts necessary to evaluate the claim are properly investigated and developed or recklessly ignored and disregarded." *Gainsco Ins. Co. v. Amoco Prod. Co.,* 53 P.3d 1051, 1062 (Wyo. 2002).

In this case, there are two separate avenues for the imposition of bad faith liability on the insurers. The first relates to their handling and investigation of the claim with respect to punitive damages. Interstate and FFIC ignored their obligation under Wyoming Stat. §26-15-124 to issue a reservation of rights within 45 days of the tender of the *Lompe* Action. Instead, they defended unconditionally for nearly 19 months, put up only a token resistance to the ever-present punitive damage claims, controlled every aspect of the litigation, and then, only after summary judgment was denied, advised AMC and Sunridge that punitive damages would not be covered on the eve of trial. After a staggering punitive damage award against the insureds, Interstate and FFIC refused to indemnify the punitive portion of the judgment or even provide a bond to stay execution during the *Lompe* appeal. The insurers then filed this action barely a week after permitting a more than $25 million punitive damage judgment against their insureds—forcing AMC to retain counsel to pursue coverage and defend them in this action.

The actions of Interstate and FFIC are precisely the type that presents a triable issue of material fact for procedural bad faith. This Court has even found that the insurers "demonstrate[ed] a complete disregard of the insureds' exposure to punitive damages," they spent "nearly 19 months of lurking in the bushes after the May 2, 2012 *Lompe* complaint was filed," and that they "lulled [the insureds] into a false sense of security." Then, after a crippling

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1  punitive damage award was rendered against AMC and Sunridge, the insurers refused to

2  indemnify the judgment, refused to bond the judgment to stay execution during the appeal, and

3  abandoned AMC and Sunridge to their fate.

4        Second, Wyoming imposes upon insurers a duty to attempt to effectuate prompt, fair, and

5  equitable settlements of claims in which liability has become reasonably clear. Wy. Stat. § 26-

6  13-124. Failure to do so is, by its very nature, an *unfair* claims settlement practice on behalf of

7  the insurer. Insurers also must settle a case against their insured when presented with a

8  reasonably opportunity to do so. Here, the *Lompe* Action was proceeding for nearly a year before

9  the March 2013 mediation. In that time, Interstate's retained counsel had completed the liability

10  depositions, recognized that excess insurers should be placed on notice of the claim, felt the case

11  was one of "serious exposure," and knew that Lompe's counsel only took cases they felt were

12  valued in the seven-figure to multiple seven-figure range. Months before the mediation, he even

13  admitted that "[t]here is little dispute that Ms. Lompe did suffer CO poisoning and that the

14  source of the carbon monoxide was the furnace in her apartment." In the weeks leading up to the

15  mediation, Lompe's counsel indicated that, despite the brain injury and severity of the matter, it

16  could be settled within the $1 million policy limit. But Interstate never made an offer to settle

17  before the mediation, and provided its representatives only $400,000 in authority for the

18  mediation. Despite Lompe's *three* opportunities to settle within the $1 million Primary Policy

19  limits, Interstate refused, offering only $325,000. In May 2013, when the matter could still be

20  settled within policy limits, the insureds even sent a letter requesting that Interstate settle the

21  *Lompe* Action, believing "that the only reasonable course of action is for this case to be settled

22  within policy limits." But the insurers did nothing. And even as late as November 2013,

23  following the defeat of the summary judgment motion, with discovery completed, trial looming,

24  punitive damages going to the jury, and with its insureds *begging* for the matter to settle,

25  Interstate only offered $425,000—less than half of the Primary Policy limit.

26        The result of the continued refusal to entertain settlement or even offer the Primary

27  Policy limit was predictable. AMC and Sunridge suffered a multi-million dollar compensatory

28

1   and punitive judgment in the *Lompe* Action. The failure to settle was due to procedural misstep

2   after misstep—gambling with the fortunes of the insureds on a bet only the insureds might lose.

3       In addition, the insurers' arguments regarding dual agency and the mediation privilege

4   are easily put to rest. First, the existence of agency is a *question of fact* for the jury—that alone is

5   enough to warrant denial of this motion. CAG also repeatedly represented that it was acting on

6   behalf of Interstate/FFIC, and signed a contract with the insurers where they delegated their

7   claims handling and evaluation to CAG. Nothing in the evidence establishes the rather odd

8   theory of "dual agency" to negate bad faith.

9       And as to the Wyoming mediation privilege, three points are worth considering: (1) the

10  privilege can only be claimed by a *party* to the mediation—AMC, Sunridge, and Amber Lompe;

11  (2) the Wyoming statute, unlike other jurisdictions, does not bar mediation

12  communications/information from admissibility, instead it is silent on that point and will not

13  prohibit introduction here; and (3) even privileged communications are routinely found

14  admissible in courts across the country when challenging insurer conduct for failure to settle or

15  when an entity places its conduct at issue in litigation—such as the bad faith conduct by

16  Interstate/FFIC at issue here. The mediation privilege cannot function to shield the insurers from

17  claims of bad faith.

18      Interstate and FFIC repeatedly disregarded their insureds' exposure to the *Lompe*

19  Action—both in how they dealt with punitive damages and in their failure to settle the action

20  when presented with reasonable opportunities to do so. These actions present a triable issue of

21  material fact on the duty of good faith and fair dealing—necessitating denial of this motion.

22                          **II.**

23                  **STANDARD OF REVIEW**

24      Summary judgment is only appropriate "if the movant shows that there is no genuine

25  dispute as to any material fact and the movant is entitled to judgment as a matter of law."

26  Fed.R.Civ.P. 56(a). The Court must "examine the record and all reasonable inferences that might

27  be drawn from it in the light most favorable to the non-moving party." *Green v. Donahoe*, 760

28  F.3d 1135, 1146 (10th Cir. 2014). The moving party bears the "initial responsibility" to identify

- 3 -

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1  the basis for its motion, and demonstrate the "absence of a genuine issue of material fact."

2  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

3       District Courts of the United States sitting in diversity jurisdiction must apply state

4  substantive law and federal procedural law. *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938); *Hanna v.*

5  *Plumer*, 380 U.S. 460, 471-74 (1965). A federal court sitting in diversity must ascertain and

6  apply state law to reach the result the Wyoming Supreme Court would reach if faced with the

7  same question. *Cooperman v. David*, 214 F.3d 1162, 1164 (10th Cir. 2000).

8       Although Interstate's/FFIC's motion is titled as one for "summary judgment," even

9  granting the motion would not resolve AMC's and Sunridge claims for consequential contractual

10  damages incurred as a result of the insurers' conduct. (See Dkt. No. 139.) The motion relates

11  *only* to bad faith, tortious damages, and punitive damages.

12  **III.**

13  **STATEMENT OF FACTS**

14  **UNDISPUTED FACTS**

15  **A.     The insurance policies at issue**

16       Interstate Fire & Casualty Company ("Interstate") issued a Commercial General Liability

17  insurance policy to Commercial Industrial Building Owner's Alliance, Inc. d/b/a CIBA, bearing

18  policy number SGL 1002220 (the "Primary Policy"), for a two-year term, from March 31, 2010

19  to March 31, 2012, with a limit of $1,000,000 per occurrence, and a $2,000,000 General

20  Aggregate limit for the policy term. (Exhibit A, Interstate's and FFIC's "Amended Complaint for

21  Declaratory Relief" (the "Insurers' Complaint"), Dkt. No. 6, 13-CV-278 J, ¶ 12; Plaintiffs'

22  Undisputed Fact ("UF") 2.)

23       The Primary Policy includes as a named insured any associate of CIBA "to whom an

24  Evidence or a Certificate of Insurance has been issued and which describes the specific location

25  coverage is limited to." (Exhibit A, Insurers' Complaint, ¶ 13.) And CIBA issued Certificates of

26  Insurance to both Sunridge Partners, LLC, and Apartment Management Consultants, LLC,

27  naming them as named insureds under the Primary Policy. Both Sunridge and AMC are thus

28  insured under the Primary Policy. (Exhibit A, Insurers' Complaint, ¶ 14.)

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

- 4 -

1   The Primary Policy includes an exclusion—which is the only exclusion raised in the

2   Insurers' Complaint—for punitive damages, stating:

3   **EXCLUSION – PUNITIVE OR EXEMPLARY DAMAGES**

4
5   > This insurance does not apply to fines, penalties, punitive damages, exemplary
    > damages, treble damages or the multiplication of compensatory damages.
    > (Exhibit A, Insurers' Complaint, ¶ 36; UF 3.)

6   Interstate also issued an Excess Liability Policy, excess over the primary policy, bearing

7   Policy No. PFX73097172 (Interstate Excess Policy), with the same two year term, and with a

8   limit of $10,000,000 per occurrence and $10,000,000 aggregate. (Exhibit A, Insurers' Complaint,

9   ¶ 15.) Sunridge and AMC are considered named insureds under the Interstate Excess Policy.

10  (Exhibit A, Insurers' Complaint, ¶ 17.)

11  Fireman's Fund Insurance Company issued the next layer of excess coverage, providing

12  excess liability coverage under policy no. SXH-000-7262-3879 (FFIC Excess Policy), with the

13  same coverage term. The FFIC Excess Policy provided a policy limit of $15,000,000 per

14  occurrence, and $15,000,000 aggregate. (Insurers' Complaint, ¶ 18.) Sunridge and AMC are also

15  insureds under the FFIC Excess Policy. (Exhibit A, Insurer's Complaint, ¶ 19.)

16  Both the Interstate Excess Policy and the FFIC Excess Policy "follow form" of the

17  Primary Policy. (UF 4.)

18  **B.     Background of Sunridge and AMC**

19  Sunridge Partners, LLC, owns Sunridge Apartments in Casper, Wyoming. (Exhibit A,

20  Insurer's Complaint, ¶ 6.) From at least February 2011 to the present, Robert Ctvrtlik has been

21  the Managing Member of Sunridge. (Exhibit B, Ctvrtlik Affidavit, ¶ 2; UF 1.) Apartment

22  Management Consultants, LLC operates and manages those Wyoming apartments. (Exhibit A,

23  Insurers' Complaint, ¶¶ 6, 8.) From July 2010 to the present, Martha Knudson has served as the

24  General Counsel for AMC. (Exhibit C, Knudson Affidavit, ¶ 2; UF 1.) Finally, Amber Lompe

25  was a tenant in the Sunridge Apartments, Apartment # 436, located at 3900 E. 12th Street,

26  Casper, Wyoming 82609. (UF 8.)

27

28



**DISPUTED FACTS**

With the following exceptions, and for the purposes of Interstate's/FFIC's Motion for Summary Judgment *only*, AMC and Sunridge accept as true the facts outlined in the Plaintiffs' Statement of Undisputed Facts. But AMC and Sunridge dispute the following facts:

Section "B" and Fact No. 7: Interstate and FFIC claim that "CAG adjusted the Lompe Claim as Interstate, AMC, and Sunridge's Dual Agent," but this is belied by the evidence. Instead, CAG and Mr. Baker were acting solely as the *insurers'* agents. The insurers gave up their normal claims adjusting duties and allowed CIBA members to make claims directly to CIBA or CAG, delegating claims adjusting and even claims evaluation to CAG. (Exhibit P, Hull Deposition, pp. 26:11-20, 75:15-19; Exhibit M, Declaration of Timothy Walker, p. 3.) CAG had contracted with Interstate/FFIC to "function as the claims adjuster" for claims under its policy. (Plaintiffs' Exhibit 58 ("Whereas, the Insurer is willing to permit the Servicing Company to function as the claims adjuster for such Claims . . ." and delegating claims review, investigation, adjustment, and settlement authority to CAG on behalf of FFIC and Interstate).) CAG and CIBA were thus acting on behalf of the insurers, who had delegated their responsibility to conduct a prompt, fair, and thorough investigation and evaluation of the case. (Exhibit M, Walker Decl., p. 3.)

In its June 22, 2011 letter, CAG told Sunridge that it was acting "on behalf of Interstate Fire and Casualty Company (hereafter IFCC), one of the Fireman's Fund Companies, the Claims Adjusting Group (CAG) is handling this claim in connection with the Commercial Industrial Building Owner's Alliance (CIBA) Insurance Program." (See Exhibit N, also marked as Joint Exhibit ("JX") 38-001.) The June 22, 2011 letter clearly establishes that CAG was the agent of Interstate since the inception of the claim. CAG's other letters to AMC/Sunridge also state that CAG is acting "on behalf of Interstate Fire and Casualty Company." (*See* Exhibit O, CAG's August 22, 2013 letter, JX 090-001.) This also includes the November 20, 2013 letter from CAG to AMC/Sunridge sent *eight days* before trial and which was the first mention of the punitive damage exclusion by CAG or anyone acting on Interstate's behalf. (Plaintiffs' Exhibit 39.) The November 20, 2013 letter from CAG states that CAG is acting "[o]n behalf of Interstate Fire and

- 6 -

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1    Casualty Company (hereinafter IFCC), one of the Fireman's Fund Companies." (*Id.*) Thus, CAG

2    was the agent of Interstate and FFIC *only*.

3        Section "E" and Supporting Fact Nos. 19-70: Interstate claims it reasonably relied upon

4    counsel and CAG regarding Ms. Lompe's "excessive" settlement demands, but ignore that

5    Interstate had multiple opportunities to settle within the Primary Policy limits. Although

6    AMC/Sunridge do not generally dispute the *factual* recitations in the insurers' timeline, the

7    conclusions they draw (in the headings and elsewhere in their factual section) do not comport

8    with the facts themselves. Instead, the *insurers* failed to attempt to effectuate a prompt, fair, and

9    equitable settlement during the pendency of the action.

10       The *Lompe* incident occurred on February 1, 2011. (UF 8.) Four months later, Sunridge

11   notified the insurers and CIBA of the claim by Ms. Lompe. (UF 9.) The *Lompe* lawsuit was filed

12   on May 2, 2012, and quickly tendered to the insurer. (UF 11.) On May 21, 2012, although he was

13   unsure if the damages would exceed the primary $1 million limit, Mr. Dusbabek advised that

14   "any excess carrier whose policy may come into play should be placed on notice of the claim

15   immediately"—implicitly recognizing that the claim may be one of excess exposure. (UF 19.)

16   On June 22, 2012, Mr. Dusbabek felt that liability was a "50/50 proposition" and that if Ms.

17   Lompe sustained permanent cognitive impairment "the exposure is multiple six figures *at a*

18   *minimum* and may be significantly greater depending on the extent of economic damages." (UF

19   20, emphasis added.) In addition, he recognized that Ms. Lompe's lawyers "typically accept[ ]

20   only those cases which their lawyers value as substantial — commonly seven figures or multiple

21   seven figures." (UF 20.)

22       On December 27, 2012, Mr. Dusbabek knew that Ms. Lompe's counsel placed "at least a

23   multiple six figure value and probably a seven figure value on the case" and that "the case

24   remains a *serious exposure*." (UF 22, emphasis added.) He even admitted that "[t]here is little

25   dispute that Ms. Lompe did suffer CO poisoning and that the source of the carbon monoxide was

26   the furnace in her apartment." (Plaintiffs' Ex. 16, p. 16, see also Exhibit M, Walker Decl., p. 5.)

27   Despite Ms. Lompe's counsel indicating that the case could be settled within the $1 million

28   Primary Policy limit (UF 23), the insurers never made an offer or attempt to settle the Lompe

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1     action before the March 26, 2013 mediation. And even pending that mediation, knowing that the

2     case could be settled within the Primary Policy limits (Exhibit M, Walker Decl., p. 4), knowing

3     the serious exposure of the *Lompe* Action, knowing the skill, verdicts, and valuation placed on

4     the case by Lompe's counsel, and having *already* conducted the depositions of many of the

5     liability fact witnesses and identified relevant medical reports/evaluations of Ms. Lompe (*Id.*, p.

6     7), Interstate/FFIC only provided Mr. Baker with $400,000 in authority at the mediation—less

7     than half of the Primary Policy limit. (UF 27.)

8        At the March 2013 mediation, Ms. Lompe made *three* offers within the Primary Policy

9     limit, going so far as to offer a bracket between $615,000 to $915,000. (UF 30.) In response,

10    Interstate's agent offered $325,000—i.e. not even the full amount of authority provided. (UF 30.)

11    There was ample evidence both before and after the mediation that Lompe was willing to settle

12    the case for within the policy limits of $1 million. But needless to say, with the insurer's paltry

13    offer, the matter did not settle.

14        Martha Knudson, on behalf of AMC and Sunridge, repeatedly requested that Interstate

15    attempt to settle the matter within the Primary Policy limit. (UF 39, 50.) In fact, in May 2013,

16    she wrote CAG stating that review of the *Lompe* case had "raised serious concerns that the

17    economic risk to both AMC and Sunridge Partners from this case is greater than our initial

18    evaluation . . . [I]t is our position that the only reasonable course of action is for this case to be

19    settled within policy limits." (Plaintiffs' Exhibit 25.) This was at a time when the matter still

20    could have been settled within the $1 million policy limit.  Yet the insurers did *nothing*.

21        Finally, even as late as November 19, 2013, after losing its summary judgment motion,

22    with trial imminent, and punitive exposure still at play and going to the jury, Interstate only

23    offered $425,000 to settle the matter. (Plaintiffs' Ex. 38.) Despite the fact that the first $500,000

24    of any settlement would come out of CIBA's coffers, the insurers and their agents were trying to

25    save money—and gambling with the fortunes of their insureds. (Exhibit P, Hull Depo., pp.

26    29:17-30:23.)

27

28



SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1    **AMC's AND SUNRIDGE'S ADDITIONAL MATERIAL FACTS**

2    **A.    The *Lompe* action and the insurers' failure to timely and properly issue a**
3    **reservation of rights**

4          On May 2, 2012, AMC and Sunridge were named as defendants in a lawsuit filed by

5    Amber Nicole Lompe. (UF 11.) Ms. Lompe alleged that she was poisoned by carbon monoxide

6    gas inside her apartment at Sunridge Apartments on February 1, 2011, causing her to suffer

7    injuries, damages, and losses. (Exhibit A, Insurer's Complaint, ¶ 22.)

8          As part of her complaint, Ms. Lompe sought "[e]xemplary and punitive damages in a

9    reasonable amount to be proved at trial, sufficient to adequately punish the defendants and to

10   serve as a deterrent and warning against future conduct of the type alleged in this complaint," as

11   well as "[j]udgment against the defendants for punitive damages in a fair and reasonable amount

12   to be proven at trial." (Exhibit D, *Lompe* Complaint, pp. 9-10; Exhibit A, Insurers' Complaint, ¶

13   23.) From the outset, punitive damages were an issue of damages alleged in the *Lompe* action.

14   (*Id.*, Exhibit B, Ctvrtlik Aff., ¶ 4; Exhibit C, Knudson Aff., ¶ 4.)

15         Shortly after being served with the *Lompe* Complaint, AMC and Sunridge tendered the

16   defense to the primary insurer, Interstate. (Exhibit B, Ctvrtlik Aff., ¶ 5; Exhibit C, Knudson Aff.,

17   ¶ 5.) In a letter dated April 12, 2012,[1] Claims Adjusting Group—handler of claims for the

18   Fireman's Fund Companies in connection with the CIBA program—sent a letter to Sunridge and

19   AMC. (Exhibit E, copy of the "April 12, 2012" letter; Exhibit B, Ctvrtlik Aff., ¶ 5; Exhibit C,

20   Knudson Aff., ¶ 5.) Interstate, through Claims Adjusting Group, acknowledged receipt of the

21   *Lompe* action and "agreed to participate in a defense of Sunridge Partners, LLC and Apartment

22   Management Consultants, LLC." In the initial correspondence from the carriers, where they

23   *agreed to unconditionally assume the defense*, rights were not reserved, exclusions were not

24   disclosed, and limitations of coverage were not discussed. The letter agreeing to assume the

25   defense of the *Lompe* action entirely failed to include a reservation of rights. (Exhibit E; Exhibit

26   B, Ctvrtlik Aff., ¶ 6; Exhibit C, Knudson Aff., ¶ 6.)

27   _____

28   [1] Possibly utilizing the incorrect date, as it is pre-dated from the filing of the *Lompe* complaint,
     yet uses the correct case number.

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1    On March 25, 2013, counsel for AMC and Sunridge in the *Lompe* action (attorney

2    Dusbabek, hired by the insurers) filed a Motion for Summary Judgment regarding Lompe's

3    claims. As part of that motion, Dusbabek also moved to summarily adjudicate Lompe's claims

4    for punitive damages with only the derivative statement that: "Plaintiff asserts that she is entitled

5    to an award of various forms of damages including punitive damages. A claim for punitive

6    damages is not a separate cause of action and cannot stand without an underlying claim."(Exhibit

7    F, March 25, 2013 MSJ, p. 10.) On October 25, 2013, the Court in the *Lompe* action denied

8    AMC's and Sunridge's motion for summary judgment, including a denial of the challenge to

9    Lompe's claim for punitive damages. (Exhibit G, a copy of the Court's October 25, 2013 order

10   denying the motion.)

11   On November 20, 2013, on the eve of trial in the *Lompe* action, the insurers for the first

12   time asserted a reservation of rights. Despite the inclusion of punitive damages in the *Lompe*

13   action from the outset, the insurers now stated that: "Please note that the Complaint against the

14   LLC prays for punitive and exemplary damages. An exclusionary provision to the [Primary

15   Policy] expressly negates coverage for those types of damages." (Exhibit H.) Additionally, the

16   November 20, 2013 letter provided that "While [the insurers] will continue to provide Sunridge

17   Partners, LLC and Apartment Management Consultants, LLC with a full and complete defense,

18   any award or judgment for punitive or exemplary damages will be the sole responsibility of

19   Sunridge Partners, LLC and Apartment Management Consultants, LLC. As such, those entities

20   may wish, at their own expense, to hire an attorney to represent them for that portion of the suit."

21   (*Id.*)

22   The November 20, 2013 letter constituted the *first time* the insurers had issued a

23   reservation of rights—but it only took place *eighteen months* after the initiation of litigation and

24   just on the eve of trial of the *Lompe* action. Prior to that time, neither Interstate nor FFIC had

25   ever reserved its rights on the issue of punitive damages. (Exhibit B, Ctvrtlik Aff., ¶¶ 9-10;

26   Exhibit C, Knudson Aff., ¶¶ 9-10.)

27   Trial in the *Lompe* action began before this Court on December 2, 2013. (Exhibit A,

28   Insurer's Complaint, ¶ 25; UF 62.) Lompe was ultimately successful in her action against AMC



SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS



1  and Sunridge. On December 26, 2013, the Court entered judgment against Sunridge in the

2  amount of $750,000 in compensatory damages and $3,000,000 in punitive damages, while also

3  entering judgment against AMC in the sum of $1,950,000 in compensatory damages and

4  $22,500,000 in punitive damages. (Exhibit I, copy of Court's December 26, 2013 judgment;

5  Exhibit A, Insurer's Complaint, ¶¶ 31, 32.)

6        Despite appointing counsel to appeal the judgment, Interstate and FFIC refused to

7  procure a bond or other security to stay enforcement of the punitive damage award during the

8  appeal of the *Lompe* Action. The insurers even stated that "If AMC and/or Sunridge wish to seek

9  a stay of execution on the punitive portion of the judgments against them, they will need to post

10 the bonds themselves to cover such amounts." (Exhibit J, p. 2.) This forced AMC and Sunridge

11 to obtain their own security in order to proceed, and avoid the risk of Ms. Lompe executing her

12 judgment and forcing bankruptcy or other measures from AMC and Sunridge. (Exhibit B,

13 Ctvrtlik Aff., ¶ 12; Exhibit C, Knudson Aff., ¶ 12.)

14       AMC and Sunridge advised the insurers that their position would force AMC/Sunridge to

15 procure their own security to stay execution of the *Lompe* judgment. The security would incur

16 interest, costs, and other penalties, and would cause additional damages to AMC/Sunridge.

17 (Exhibit K, letters to Interstate/FFIC advising of security/damages issue.) Interstate and FFIC

18 responded that "Interstate is not obligated to post a bond for the punitive damage awards."

19 (Exhibit L, insurers' response to requests for security.)

20       Despite a request to indemnify Sunridge and AMC for the full amount of the judgment

21 and to provide a bond or other security to release the loan funds from escrow, Interstate and

22 FFIC have refused to indemnify AMC or Sunridge for the punitive damage awards in the *Lompe*

23 action. Although Interstate and FFIC have now procured a supersedeas bond for the amount of

24 the punitive damage awards against Sunridge and AMC (procured on September 21, 2015), at

25 least as of October 16, 2015, they have still not authorized the filing of those bonds in order to

26 release AMC's/Sunridge's funds from escrow. (Exhibit B, Ctvrtlik Aff., ¶ 16; Exhibit C,

27 Knudson Aff., ¶ 16; see also Exhibits R & S.)

28

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

**B.** **The instant action, and the Court's summary judgment ruling estopping Interstate and FFIC from denying coverage for the punitive damage award against AMC and Sunridge**

A mere week after the judgment in the *Lompe* Action, Interstate and FFIC filed this action in January 2014 to negate coverage for their insureds for the large punitive damage award. (Dkt. No. 1.) AMC and Sunridge were left with no choice but to obtain counsel to defend this action and pursue coverage under the policies issued by Interstate and FFIC. (Exhibit B, Ctvrtlik Aff., ¶ 17; Exhibit C, Knudson Aff., ¶ 17.)

On December 22, 2014, AMC and Sunridge filed a motion for partial summary judgment to resolve the following question:

> Interstate Fire & Casualty Company's and Fireman's Fund Insurance Company's failure to properly and timely issue a reservation of rights under the respective policies regarding the defense of the matter entitled *Amber Nicole Lompe v. Sunridge Partners, LLC; and Apartment Management Consultants, LLC*, Civil Case No. 12-CV-088J, precludes them from relying on an exclusion for punitive damages to avoid indemnification for those damages. (Dkt. No. 51.)[*]

On September 1, 2015, the Court granted that motion, finding that: "[t]hus, the Court finds that plaintiffs [Interstate and FFIC] may not assert noncoverage as a defense to the claim and they are precluded from raising the punitive damages exclusion as a means of avoiding or denying indemnity. The Court finds AMC and Sunridge are entitled to summary judgment on their claim for coverage and indemnification." (Dkt. No. 131, p. 21.)

The Court also found that:

> There is, indisputably, little question that everyone involved in this matter on the defense side in the *Lompe* action, including the insurer, was aware that punitive damages were being sought and were aware of the potential for an award punitive damages in favor of Lompe in that underlying litigation. However, not until the eve of trial was a reservation of rights invoked by Interstate. Sunridge's and AMC's repeated pleas to settle the case within policy limits were rejected by the plaintiffs here, ***demonstrating a complete disregard of the insureds' exposure to punitive damages***, without a timely reservation of rights and with knowledge of facts that would bring the claim outside the policy. Interstate assumed full control of the defense in the *Lompe* case and did not inform AMC and Sunridge that it sought to reserve the right to deny coverage under the policy. (Dkt. No. 131, p. 18.)



SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

- 12 -

1    Interstate and FFIC also spent "nearly 19 months of lurking in the bushes after the May 2,

2    2012 *Lompe* complaint was filed" before even attempting to negate coverage for punitive

3    damages. (*Id.*) They "lulled [the insureds] into a false sense of security." (*Id.*)

4    Interstate and FFIC are thus obligated to provide coverage for the entire amount of the

5    judgment in the *Lompe* Action, including the award of punitive damages. (*Id.* at p. 21.)

6                                          **IV.**

7                                     **ARGUMENT**

8    **A.    Under Wyoming's choice of law analysis, Wyoming law controls**

9    In diversity cases, district courts apply the substantive law of the forum state, including

10   its choice of law rules. *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.* 431 F.3d 1241,

11   1255 (10th Cir. 2005); *New York Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 409 (10th Cir.

12   1996).

13   Wyoming uses traditional choice of law rules, which for actions involving a tort is the

14   place of the tort. *Tolman v. Stryker Corp* 926 F.Supp.2d 1255 (Wyo. Dist. Ct. 2013). "The law of

15   the place where the tort or wrong was committed is the law that governs and is to be applied with

16   respect to the substantive phases of torts or the actions therefor." *Archuleta v. Valencia* 871 P.2d

17   198, 200 (Wyo. 1994). In Wyoming, insurers owe a duty of good faith to their policy holders and

18   a breach of that duty gives rise to an independent tort action. *McCullough v. Golden Rule Ins.*

19   *Co.* 789 P.2d 855, 855 (Wyo. 1990).

20   Under this analysis, Wyoming law applies. The apartment complex at issue is located in

21   Wyoming, Ms. Lompe is a Wyoming resident who was injured in Wyoming, the underlying suit

22   against AMC and Sunridge was filed in Wyoming, the duty to defend and the implied covenant

23   of good faith and fair dealing were both triggered based on that Wyoming lawsuit, the alleged

24   breaches of those duties were based on the Wyoming action, the insurers have now brought this

25   suit in the District Court of Wyoming, and the Court previously decided the coverage issue under

26   *Wyoming* law. As the place of the wrong, the forum state, the place for performance of the

27   contract, *and* the subject matter of the insurance contract, Wyoming law must apply to this

28   action.

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1    **B.    Breach of the implied covenant of good faith and fair dealing in Wyoming**

2    "The duty of good faith and fair dealing imposes an obligation 'that neither party will do

3    anything which will injure the right of the other to receive the benefits of the agreement.'" *State*

4    *Farm Mut. Auto. Ins. Co. v. Shrader*, 882 P.2d 813, 825 (Wyo. 1994). Wyoming recognizes both

5    substantive and procedural bad faith in the insurance context. *See Sonnett v. First Am. Title Ins.*

6    *Co.,* 309 P.3d 799, 806–07 (Wyo. 2013) (stating that an insurer acts in bad faith where the

7    substantive validity of a denied claim is "not fairly debatable," and also "by the manner in which

8    it investigates, handles, or denies a claim"); *Hatch v. State Farm Fire & Cas. Co.,* 842 P.2d

9    1089, 1099 (Wyo. 1992) ("*Hatch I* ") (observing that a defense to substantive bad-faith liability,

10   which depends on an insurer having "[a] 'fairly debatable' reason to deny a claim," is "not a

11   defense" to procedural bad-faith liability, which "may flow from engaging in oppressive and

12   intimidating claim practices"); *see also Marathon Ashland Pipe Line LLC v. Md. Cas. Co.,* 243

13   F.3d 1232, 1246 (10th Cir. 2001) (acknowledging that Wyoming law recognizes both varieties of

14   bad faith). While an insured may state causes of action for breach of contract and breach of the

15   duty of good faith and fair dealing, the insured does not need to prevail on the contract claim to

16   prevail on the claim for breach of the duty of good faith and fair dealing. *Shrader*, at 828.

17   Even if the claim is fairly debatable, the insurer can breach the duty of good faith and fair

18   dealing by the manner in which it investigates, handles, or denies a claim. The rule is that an

19   insurer "cannot properly go beyond a reasonable denial of the claim and engage in unreasonable

20   or unfair behavior to gain an unfair advantage. A 'fairly debatable' reason to deny a claim is not

21   a defense against torts that may flow from engaging in oppressive and intimidating claim

22   practices." *Hatch*, at 1099.

23   Wyoming has also specifically delineated actions that constitute an unfair claims

24   settlement practice, including: (1) misrepresenting pertinent facts or insurance policy provisions

25   relating to the coverage at issue; (2) failing to acknowledge and act reasonably promptly upon

26   communications with respect to claims arising under insurance policies; (3) failing to affirm or

27   deny coverage of claims within a reasonable time period after proof of loss statements have been

28   completed; (4) not attempting in good faith to effectuate prompt, fair and equitable settlements of

- 14 -

SHERNOFF BIDART ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1   claims in which liability has become reasonably clear; and (5) failing to promptly settle claims,

2   where liability has become reasonable clear under one portion of the insurance policy coverage

3   in order to influence settlements under other portions of the insurance policy coverage. Wy. Stat.

4   § 26-13-124, parts (i), (ii), (v), (vi), and (xiii). Providing jury instructions as to an "insurer's

5   duties under the Unfair Claims Practices Act" has been specifically approved by the Wyoming

6   Supreme Court, and can inform the duty of good faith and fair dealing. *Cathcart v. State Farm*

7   *Mut. Auto. Ins. Co.* (2005) 123 P.3d 579, 599-600.

8   **C.     Interstate and FFIC breached the implied covenant of good faith and fair dealing in**
9   **their handling of the claim—failing to reserve rights, failing to warn its insureds**
    **about their exposure, and ignoring their insureds' pleas to settle the case**

10      It is true that one aspect of bad faith is whether the insurer had any reasonable basis for

11   denying the claim. *Cornhusker Cas. Co. v. Skaj*, 786 F.3d 842, 858 (10th Cir. 2015). But part and

12   parcel to that reasonable basis inquiry is "whether the facts necessary to evaluate the claim are

13   properly investigated and developed or recklessly ignored and disregarded." *Gainsco Ins. Co. v.*

14   *Amoco Prod. Co.,* 53 P.3d 1051, 1062 (Wyo. 2002), *quoting Anderson v. Continental Ins. Co.*,

15   271 N.W.2d 368, 276-77 (Wis. 1978).

16      Here, Interstate and FFIC recklessly ignored and disregarded the possibility of punitive

17   damages against their insureds, AMC and Sunridge. The insurers unconditionally accepted the

18   tender of defense, failing to reserve any rights at the time, and unreasonably failing to comply

19   with Wy. Stat. § 26-15-124, which requires a reservation of rights to be issued within 45 days of

20   the tender to be effective. *Marathon Ashland, supra*, 243 F.3d at 1243; Exhibit Q, Johnson

21   Depo., pp. 17, 32-33, 99-101. It was only *eighteen months later*, on the eve of trial, that Interstate

22   and FFIC first alerted the insureds to the exclusion they would rely upon to preclude coverage.

23   Despite their knowing failure to issue a reservation of rights until shortly before trial, FFIC and

24   Interstate then abandoned their insured to the multi-million dollar punitive damage award in the

25   *Lompe* Action—refusing to indemnify the award and refusing to bond the judgment to stay

26   execution during the appeal. But the insurers had no reasonable basis to do so, knowing they

27   violated Wyoming law, knowing they ignored their obligation to issue a reservation of rights,

28

SHERNOFF BIDART ECHEVERRIA BENTLEY

LAWYERS FOR INSURANCE POLICYHOLDERS

- 15 -

1   and knowing they failed to advise their insured throughout the *Lompe* Action as to noncoverage

2   for punitive damages. The insurers never evaluated internally whether or not their conduct might

3   make them responsible for what would otherwise be an uncovered claim of punitive damages.

4   (Exhibit M, Walker Decl., p. 5.) Instead, they simply took the position that punitive damages

5   weren't covered and never gave equal consideration to the interests of the insured—

6   consideration that would involve evaluation of the insureds' argument for coverage. (*Id.*)

7       Had Interstate and FFIC performed that evaluation, they would have found the lack of

8   reservation of rights until the eve of trial severely prejudiced the rights of AMC/Sunridge by: (1)

9   depriving them of independent, actively-involved counsel in the *Lompe* Action to protect their

10  interests with respect to punitive damages; (2) denying the insureds more than a token resistance

11  to Lompe's punitive damage claims, including the throw-away paragraph at the end of Mr.

12  Dusbabek's summary judgment motion that was denied in the underlying matter; (3) failing to

13  provide the insureds any reasonable time before the start of trial in the *Lompe* Action to

14  challenge punitive damages, such as by way of challenging the net worth evidence; (4) failing to

15  even consider the post-trial rights of the insureds—taking the knee-jerk reaction that punitive

16  damages weren't covered and abandoning the insureds to their own devices. (Exhibit M, Walker

17  Decl., pp. 5-6.)

18      In fact, the Court has already found that Interstate and FFIC demonstrated a "complete

19  disregard" for AMC's and Sunridge's exposure to punitive damages during the *Lompe* Action.

20  (Dkt. No. 131, p. 18.) Interstate and FFIC also spent "nearly 19 months of lurking in the bushes

21  after the May 2, 2012 *Lompe* complaint was filed" before even attempting to negate coverage for

22  punitive damages. (*Id.*) They "lulled [the insureds] into a false sense of security." (*Id.*) By

23  invoking estoppel, the Court has also already found that Interstate and FFIC were unfair to the

24  insureds and deceived them during the *Lompe* Action. *Birt v. Wells Fargo Home Mortg., Inc.,* 75

25  P.3d 640, 654 (Wyo. 2003) (fairness undergirds Wyoming's general approach to estoppel);

26  *Bauer v. State ex rel. Wyo. Worker's Comp. Div.,* 695 P.2d 1048, 1051 (Wyo. 1985) (insurer is

27  estoppel from denying coverage when the insured "is deceived"). This is exactly the kind of

28



SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

- 16 -

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1   callous disregard for properly investigating the underlying action and coverage that weighs into

2   the examination of bad faith—and presents a triable issue of material fact for the jury.

3         The insurers rely on *Cornhusker Cas. Co. v. Skaj*, 786 F.3d 842, 860 (10th Cir. 2015), in

4   their argument against bad faith, but that argument is misplaced. Although *Cornhusker* used

5   estoppel to find coverage for the insured, but then refused to find bad faith, there are some key

6   differences to recognize in weighing this motion—the actions of the insurers were considerably

7   different in *Cornhusker*. There, the evidence merely demonstrated "that Cornhusker could have

8   intensified its efforts to locate [the insured] during the pendency of the state-court proceedings"

9   and had failed to make a timely reservation of rights, though Cornhusker's defense of the insured

10  mostly related to opposing *default* proceedings (and attempting to overturn the default

11  judgment), areas where it would be difficult to steer the action to noncovered claims. *Id.* at 848,

12  860. The insured in *Cornhusker* was never out any of his own funds—there was no evidence he

13  had to personally bond an appellate bond or risk enforcement of the default judgment. Unlike

14  *Cornhusker*, Interstate and FFIC failed to advise the insureds about noncoverage for punitive

15  damages until just before trial in the *Lompe* Action. Their chosen counsel, Dusbabek, made only

16  a token challenge to punitive damages by way of a throw-away paragraph in a summary

17  judgment motion, and it was only when it was too late to otherwise attack those damages that the

18  insurers, for the first time, disclaimed coverage. They then refused to indemnify or bond any

19  amount of punitive damages, despite their knowing violations of Wyoming law and basic

20  fairness to their insureds. The actions of Interstate and FFIC at minimum present a triable issue

21  of fact regarding their breach of the implied covenant of good faith and fair dealing.

22

23  **D.    Interstate and FFIC breached the implied covenant of good faith and fair dealing by
        failing to settle the claims against their insureds within the Primary Policy limits**

24        Pursuant to an insurer's duty of good faith and fair dealing, it has an obligation to settle

25  claims against its insured when presented with a reasonable opportunity to do so:

26        The duty of good faith and fair dealing which is implied by law to inhere in every
        insurance policy runs from the insurer to the insured. [Citations]. Breach of this
27       duty may give rise to a cause of action for "third party" bad faith or for "first
        party" bad faith. A cause of action for "third party" bad faith will lie when a
28

- 17 -

liability insurer fails in bad faith to settle a third-party claim within policy limits against its insured. [Citations]. Bad faith in this context would occur if an excess judgment were obtained under circumstances when the insurer failed "to exercise intelligence, good faith, and honest and conscientious fidelity to the common interest of the [insured] as well as of the [insurer] and [to] give at least equal consideration to the interest of the insured."
*Herrig v. Herrig*, 844 P.2d 487, 490 (Wyo. 1992).

The governing standard is whether a prudent insurer would have accepted the settlement offer if it alone were to be liable for the entire judgment. *Gainsco Ins. Co. v. Amoco Production Co.*, 53 P.3d 1051, 1058 (Wyo. 2002). Failure to do so constitutes a breach of the insurers' duty of good faith and fair dealing. *Id.* And insurers act unfairly by "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Wy. Stat. § 26-13-124, parts (vi). Here, Interstate and FFIC cannot meet that standard.

Despite claiming that the mediation presented the first opportunity to settle the case within the Primary Policy limit (Motion, p. 21), the *insurers* failed to attempt to effectuate a prompt, fair, and equitable settlement before that date during the pendency of the action. The *Lompe* incident occurred on February 1, 2011. (UF 8.) Four months later, Sunridge notified the insurers and CIBA of the claim by Ms. Lompe. (UF 9.) The *Lompe* lawsuit was filed on May 2, 2012, and quickly tendered to the insurers. (UF 11.) On May 21, 2012, although he was unsure if the damages would exceed the primary $1 million limit, Mr. Dusbabek advised that "any excess carrier whose policy may come into play should be placed on notice of the claim immediately"—implicitly recognizing that the claim may be one of excess exposure. (UF 19.) On June 22, 2012, Mr. Dusbabek felt that liability was a "50/50 proposition" and that if Ms. Lompe sustained permanent cognitive impairment "the exposure is multiple six figures *at a minimum* and may be significantly greater depending on the extent of economic damages." (UF 20, emphasis added.) In addition, he recognized that Ms. Lompe's lawyers "typically accept[ ] only those cases which their lawyers value as substantial — commonly seven figures or multiple seven figures." (UF 20.)

1       On December 27, 2012, Mr. Dusbabek knew that Ms. Lompe's counsel placed "at least a

2   multiple six figure value and probably a seven figure value on the case" and that "the case

3   remains a *serious exposure*." (UF 22, emphasis added.) He even admitted that "[t]here is little

4   dispute that Ms. Lompe did suffer CO poisoning and that the source of the carbon monoxide was

5   the furnace in her apartment." (Plaintiffs' Ex. 16, p. 16, see also Exhibit M, Walker Decl., p. 5.)

6       Despite Ms. Lompe's counsel indicating that the case could be settled within the $1

7   million Primary Policy limit at mediation (UF 23), the insurers never made an offer or attempt to

8   settle the Lompe action before the March 26, 2013 mediation. And even pending that mediation,

9   knowing that the case could be settled within the Primary Policy limits, knowing the serious

10  exposure of the *Lompe* Action, and knowing the skill, verdicts, and valuation placed on the case

11  by Lompe's counsel, Interstate/FFIC only provided Mr. Baker with $400,000 in authority at the

12  mediation—less than half of the Primary Policy limit. (UF 27.)

13      At the March 2013 mediation, Ms. Lompe made *three* offers within the Primary Policy

14  limit, going so far as to offer a bracket between $615,000 to $915,000. (UF 30.) In response,

15  Interstate's agent offered $325,000—i.e. not even the full amount of authority provided. (UF 30.)

16  There was ample evidence both before and after the mediation that Lompe was willing to settle

17  the case for within the policy limits of $1 million. But needless to say, with the insurer's paltry

18  offer, the matter did not settle.

19      Martha Knudson, on behalf of AMC and Sunridge, repeatedly requested that Interstate

20  attempt to settle the matter within the Primary Policy limit. (UF 39, 50.) In fact, in May 2013,

21  she wrote CAG stating that review of the *Lompe* case had "raised serious concerns that the

22  economic risk to both AMC and Sunridge Partners from this case is greater than our initial

23  evaluation . . . [I]t is our position that the only reasonable course of action is for this case to be

24  settled within policy limits." (Plaintiffs' Exhibit 25.) This was at a time when the matter still

25  could have been settled within the $1 million policy limit.  Yet the insurers did *nothing*.

26      Even as late as November 19, 2013, after losing its summary judgment motion, with trial

27  imminent, and punitive exposure still at play and going to the jury, Interstate only offered

28  $425,000 to settle the matter—less than half of the Primary Policy limit. (Plaintiffs' Ex. 38.)

- 19 -

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1    Because of Interstate's refusal to attempt to effectuate a reasonable settlement in good

2    faith—due to the delays in resolution, providing authority far below the policy limits, and not

3    sufficiently considering the possibility of punitive damages—the chance to settle within the

4    Primary Policy limits was lost. Unsurprisingly, as the matter moved closer to trial, and Ms.

5    Lompe's case continued to improve, her demands increased. But that is no excuse for Interstate's

6    failure to attempt to effectuate a settlement in the *year* of litigation before the March 2013

7    mediation, or to ignore the *three* opportunities to settle within the Primary Policy limits

8    presented at that mediation. Interstate's failure to even arm its agent with sufficient authority to

9    settle the matter within the Primary Policy limits is further evidence of its bad faith—acting

10   unfairly toward its insureds and placing its own interest above theirs.

11   Nor does Interstate's and FFIC's extensive reliance upon the opinions of Mr. Dusbabek

12   and Mr. Baker shield them from a claim of bad faith. An insurer has a duty to conduct its own

13   independent evaluation of a case—it can't put its head in the sand and then simply claim it relied

14   on the evaluation of others. (Exhibit M, Walker Decl., p. 5.) "Of course, it is obvious that

15   counsel's conclusion was not shared in by the jury whose verdict was bottomed upon the same

16   evidence as that available to the insurer when the settlement offer was rejected." *W. Cas. & Sur.*

17   *Co. v. Fowler*, 390 P.2d 602, 606 (Wyo. 1964). Yet the entire matter could have been avoided

18   had the insurers abided by their settlement obligations within the Primary Policy limits. One

19   court has even found that "[t]he size of the judgment recovered in the personal injury action

20   when it exceeds the policy limits, although not conclusive, furnishes an inference that the value

21   of the claim is the equivalent of the amount of the judgment and that acceptance of an offer

22   within those limits was the most reasonable method of dealing with the claim." *Crisci v. Sec. Ins.*

23   *Co. of New Haven, Conn.*, 426 P.2d 173, 177 (Cal. 1967). Although not adopted specifically in

24   Wyoming, *Crisci* has been repeatedly relied upon by the Wyoming Supreme Court in evaluating

25   insurer bad faith. See, e.g., *Shrader, supra,* 882 P.2d at 833; *Farmers Ins. Exch. v. Shirley*, 958

26   P.2d 1040, 1046 (Wyo. 1998). Here, the size of the judgment was *well* in excess of the Primary

27   Policy limit—making settlement far and away the most reasonable method of dealing with the

28   claim. But the insurers repeatedly undervalued the *Lompe* Action, at their insureds' peril. Then,

1   after the excess judgment was rendered, Interstate and FFIC entirely abandoned AMC/Sunridge

2   with respect to the punitive portion of the claim—despite failing to timely reserve its rights on

3   that issue, failing to seriously challenge those damages by law and motion, failing to attempt to

4   settle those damages, and permitting that claim to go to the jury. The failure to settle the action

5   will subject the insurers to liability for bad faith.

6   And where an insurer fails to settle in bad faith, the *entire* amount of the underlying

7   judgment, and any consequential damage suffered, is a recoverable item of damages. (*Shrader,*

8   *supra*, 882 P.2d at 833 (proper measure of damages is amount which will compensate claimant

9   for *all detriment* proximately caused by the tortfeasors breach of duty). That breach of duty here

10  permitted the case to go to trial, verdict, and judgment, resulting in financially disastrous

11  consequences for the insureds.

12  An analogous situation is found in *Carpenter v. Automobile Club Interinsurance*

13  *Exchange,* 58 F.3d 1296 (8th Cir. 1995), which was decided under Arkansas law—a state similar

14  to Wyoming in that insurance for punitive damages is acceptable pursuant to public policy.

15  There, third party claimants made an offer to settle within the policy limits that was rejected by

16  the insurer. *Id.* 1298-1299. The case resulted in a large compensatory and punitive damage

17  judgment against the insured, who then sued the insurer for its failure to settle the personal injury

18  action within policy limits when presented with a reasonable opportunity. Despite an exclusion

19  for punitive damages, the Fifth Circuit affirmed a judgment against the insurer for the *entire*

20  *amount* of the personal injury judgment—including the portion for punitive damages—

21  recognizing that:

22  > We acknowledge that the policy excluded coverage for punitive damages, yet we
>  hold that [the insured] is entitled to be made whole, which necessarily requires her
23 > to recover the amount of punitive damages awarded to [the third party claimants]
>  in the underlying state court action. Those damages are part of the *consequential*
24 > damages flowing from [the insurer]'s alleged bad faith and negligence . . . ."
>  *Id.* at 1302.
25

26  Thus, *even with* an exclusion for punitive damages in the policy, the insurer was still

27  required to indemnify the insured for the entire amount of the underlying judgment. The punitive

28  damage award was a *consequential damage* for the insurer's refusal to settle the personal injury

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1  action within policy limits. The same is true here—because of Interstate's and FFIC's failure to

2  settle the matter within the Primary Policy limits, AMC/Sunridge were subjected to a large

3  punitive damage award. It is a consequential damage of the insurers' failure to settle—i.e. but-for

4  the rejected settlement opportunities, the punitive damage award against AMC/Sunridge would

5  have never taken place.

6      Interstate/FFIC attempt to rely on *Mangum Foods, Inc. v. Continental Cas. Co.*, 36 F.3d

7  1491 (10th Cir. 1994) for the premise that Wyoming would adopt a standard where an insurer's

8  duty of good faith "does not include settlement or a contribution to settlement by [the insurer] of

9  the uninsurable punitive claim." (Motion, p. 24.) But in reality, *Magnum Foods*' statements on

10  this point would hold little sway over the Wyoming Supreme Court. Instead, *Magnum*

11  overturned a compensatory damage award to the insured—including the punitive portion of the

12  underlying litigation—because it "in effect shifted [the insured's] punitive liability to the insurer

13  which, in the circumstances of this case, violated Oklahoma public policy." *Id.* at 1507. It was

14  Oklahoma's *public policy*, and Oklahoma's public policy alone, that precluded awarding the

15  punitive damage award as an item of consequential damages for the insurer's failure to settle. *Id.*

16  Despite the uninsurable punitive claim under Oklahoma law, the insurer *was still not* absolved

17  from its obligation of good faith in handling the entire case, even when the insurer issued a

18  reservation of rights. *Id.* at 1506. The insurer had to work "cooperatively with [the insured]

19  throughout in both defending and attempting to settle the entire case, with fair consideration

20  given to [the insured's] concerns because of its exposure to the uninsured punitive claim." *Id.*

21      Any rule in Wyoming would have to be that much broader, as punitive damages *are*

22  *insurable* per state law. *Sinclair Oil Corp. v. Columbia Cas. Co.*, 682 P.2d 975, 981 (Wyo.

23  1984). Instead of a duty to merely work with the insured regarding an uninsurable item of

24  damages, an insurer in Wyoming must treat *all* items of damages under its duty to defend,

25  indemnify, and settle. The Court here has already found that punitive damages are required to be

26  covered under the policies due to the insurers' conduct—requiring them to have considered,

27  evaluated, and attempted to settle those damages in the *Lompe* Action. But the insurers failed to

28



SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

- 22 -

1    make that effort, offering paltry numbers at every stage of the litigation. At minimum, the

2    insurers' conduct presents a triable issue of fact regarding the duty of good faith and fair dealing.

3

4    **E.    The "dual agency" argument contradicts the evidence and does not relieve the insurer of the obligation of good faith and fair dealing**

5

6               **i.    CAG was the agent of Interstate**

7         At the outset, it should be noted questions of agency are for the jury—reason enough to

8    deny this motion for summary judgment. "The fact of the agency and the nature and extent of the

9    agent's authority were questions for the jury." *Starrett v. Shepard*, 606 P.2d 1247, 1249 (Wyo.

10   1980), *quoting Henderson v. Coleman*, 115 P. 439, 445 (1911).

11        But even beyond this inherent question of fact, Interstate's contention that CAG, and

12   correspondingly, CAG's representative Mr. Baker, were AMC/Sunridge's agent is contrary to

13   the evidence. In its June 22, 2011 letter, CAG told Sunridge that it was acting "on behalf of

14   Interstate Fire and Casualty Company (hereafter IFCC), one of the Fireman's Fund Companies,

15   the Claims Adjusting Group (CAG) is handling this claim in connection with the Commercial

16   Industrial Building Owner's Alliance (CIBA) Insurance Program." (See Exhibit N, also marked

17   as Joint Exhibit ("JX") 38-001.) The June 22, 2011 letter clearly establishes that CAG was the

18   agent of Interstate since the inception of the claim. If CAG was not Interstate's agent, then CAG,

19   the company Interstate contracted with to "function as the claims adjuster" for claims under its

20   policy, committed fraud as Interstate's adjuster when it told AMC/Sunridge that it was acting on

21   "behalf of Interstate." (Plaintiffs' Exhibit 58 ("Whereas, the Insurer is willing to permit the

22   Servicing Company to function as the claims adjuster for such Claims . . ." and delegating claims

23   review, investigation, adjustment, and settlement authority to CAG on behalf of FFIC and

24   Interstate).

25        CAG's other letters to AMC/Sunridge also state that CAG is acting "on behalf of

26   Interstate Fire and Casualty Company." (*See* Exhibit O, CAG's August 22, 2013 letter, JX 090-

27   001.) This also includes the November 20, 2013 letter from CAG to AMC/Sunridge sent *twelve*

28   *days* before trial—a letter that was the first mention of the punitive damage exclusion by CAG or

- 23 -

SHERNOFF BIDART ECHEVERRIA BENTLEY

LAWYERS FOR INSURANCE POLICYHOLDERS

1  anyone acting on Interstate's behalf. (Plaintiffs' Exhibit 39.) The November 20, 2013 letter from

2  CAG states that CAG is acting "[o]n behalf of Interstate Fire and Casualty Company (hereinafter

3  IFCC), one of the Fireman's Fund Companies." *Id.*

4      Clearly, the contract between Interstate and CAG as well as CAG's letters to

5  AMC/Sunridge evidence that CAG was merely the adjuster of AMC/Sunridge's claims under the

6  Interstate policy, but acting *on behalf of* Interstate/FFIC. That makes CAG *the insurers'* agent.

7              **ii.    CAG was *not* AMC/Sunridge's agent**

8      Despite such clear documentation showing that CAG was indeed Interstate's agent,

9  Interstate argues that CAG was a dual agent of AMC/Sunridge. For this proposition, it offers the

10  testimony of Robert Baker, the CAG adjuster assigned to handle the Lompe claim. (Motion, pp.

11  18-19.) In response to the question, "CIBA was adjusting a claim on behalf of who?" Mr. Baker

12  answered, "AMC and Sunridge." (Plaintiffs' Ex. 5, p. 18:1-5.) This does not make him

13  AMC/Sunridge's agent. It just means that AMC and Sunridge were the *insureds* whose claims he

14  was adjusting. But he was adjusting those claims for Interstate pursuant to the agency contract

15  between Interstate and CIBA. In point of fact, the actual contract between Interstate/FFIC and

16  CIBA, that wholly owns CAG, states that Interstate retained CIBA to "function as the claims

17  adjuster" for Interstate. (Plaintiffs' Ex. 58, JX65-001.) Adjusters are the agents of the *insurers*

18  for whom they work for, not the agents of the insureds whose claims they adjust.

19      Moreover, the testimony of Mr. Baker ignores basic agency law. The principal gives the

20  agent the agent's authority. *Austin v. Kaness* 950 P.2d 561 (Wyo. 1997). Interstate knows that

21  AMC/Sunridge never appointed CAG as its agent to adjust its claim under the Interstate policy.

22  Their contention is absurd. How could AMC/Sunridge authorize CAG to adjust the claim under

23  Interstate's policy? The power comes from the *principal*—Interstate/FFIC.

24      If AMC/Sunridge had the power to adjust their own claims through the appointment of

25  CAG as its agent, then AMC/Sunridge would simply decline to enforce the punitive damages

26  exclusion and require Interstate to indemnify AMC/Sunridge against the entire amount of the

27  *Lompe* Judgment. But such an argument is absurd—under Interstate's/FFIC's theory, *every*

28

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1    adjuster of *every* insurance claim would be an agent of the insured. Such a result is untenable.

2    The dual agency argument is nothing more than a distraction.

3           iii.    **The agency arguments raised by Interstate are irrelevant to the**
4                   **insurers' failure to settle the *Lompe* Action within policy limits**

5           If anything of relevance can be gleaned from the insurers' arguments regarding dual

6    agency, it is that neither Interstate, nor anyone acting on its behalf, properly or timely reserved to

7    Interstate the right to deny coverage for punitive damages. Interstate argues now that it is not

8    responsible for CAG, but Interstate is responsible for itself, its policy, and its own actions. And it

9    did not reserve its rights to deny coverage for punitive damages. And no one else reserved those

10   rights for Interstate on its behalf. If Interstate wants to disclaim responsibility for CAG because

11   CAG was not its agent or because CAG was AMC/Sunridge's agent, despite the absurdity of

12   such an argument, it does not absolve it of responsibility to timely and properly reserve rights if

13   it intends to rely on an exclusion, and to uphold its duty of good faith and fair dealing under

14   Wyoming law. If anything, Interstate's attempts to avoid responsibility through its dual agency

15   argument merely present yet one more triable issue of fact—necessitating denial of this motion.

16   **F.    The mediation privilege does not shield Interstate/FFIC from bad faith**
17          **liability for their failure to settle within the Primary Policy limits**

18          Unlike the statutes in jurisdictions cited by Interstate/FFIC, the Wyoming mediation

19   statute does not specifically preclude admission of mediation communications in judicial

20   proceedings. Instead, Wyo. Stat. Ann. §1-43-103(a) merely states that "[a] party to the mediation

21   has a privilege to refuse to disclose and to prevent all mediation participants from disclosing

22   confidential communications." A *party* must be the one to assert the privilege—and even then,

23   the privilege relates to "disclosing" confidential communications, nothing is stated regarding

24   admissibility.

25          In fact, the parties to the dispute that was mediated on March 26, 2013 were

26   AMC/Sunridge and Amber Lompe. None of these parties is refusing to disclose the amount of

27   settlement demands and offers made at the mediation or thereafter. As they were not *parties* to

28   the mediation, Interstate/FFIC does not have a privilege to assert in this case. And no other

- 25 -

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1 provision in the Wyoming mediation statute states that such evidence is inadmissible. Therefore,

2 the Wyoming mediation statutes cannot be used to shield Interstate/FFIC from the consequences

3 of their bad faith conduct in failing to settle the underlying case. The legislature's intent to make

4 the privilege one that belongs only to the *parties* in the underlying litigation is made clear in

5 Wyo. Stat. Ann. §1-43-103(b), which states that the mediator may claim the privilege, but only

6 on behalf of the party.

7   The cases cited by Interstate/FFIC are easily distinguishable due to the language of the

8 particular mediation statutes at issue. In *Dietz & Watson, Inc. v. Liberty Mutual Insurance*

9 *Company,* 2015 WL 356949 (E.D. Pa. 2015), relied on by Interstate/FFIC (see Motion, p. 20),

10 the Pennsylvania mediation statute provided, in part, that "mediation communications and

11 mediation documents shall not be admissible as evidence in any action or proceeding." *Id.* at *3.

12 The Court in that case acknowledged that "[A]s a general rule, the party asserting the privilege,

13 Liberty in this case, has the burden of establishing that it applies." *Id.* at *3 (citation omitted).

14 Further, "because '[t]estimonial exclusionary rules and privileges contravene the fundamental

15 principle that the public . . . has a right to every man's evidence', they must be strictly

16 construed." *Id.* at *3 (citations omitted). In that case, due to the plain language of the statute—

17 specifically barring mediation documents in *any* action or proceeding—the Court ruled the

18 evidence inadmissible. *Id.* at *6.

19   The California mediation statute construed in *Wimsatt v. Superior Court,* 152 Cal. App.

20 4th 137 (Cal.Ct.App. 2007), cited by Plaintiffs, also states, in part, that no evidence of anything

21 said or any admission made in the mediation is admissible. *Id.* at 151. After discussion of the

22 number of cases in which the fair and equitable administration of justice has been thwarted by

23 application of the California statute, the Court suggested that perhaps it was time for the

24 legislature to craft mediation statutes that would allow countervailing public policies to be

25 considered. Further, the Court advised that "[i]n light of the harsh and inequitable results of the

26 mediation confidentiality statutes . . . the parties and their attorneys should be warned of the

27 unintended consequences of agreeing to mediate a dispute." *Id.* at 164.

28

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1    It certainly would be an inequitable result if an insurance company acting in bad faith by

2    refusing to reach a settlement within policy limits were able to preclude admission of the

3    settlement demands and offers made in the underlying case merely because they occurred during

4    a mediation. (Exhibit M, Walker Decl., p. 4.) If a Court adopted Interstate/FFIC's argument,

5    parties may be well-advised to opt out of mediation. That result would not promote the speedy,

6    inexpensive, and just resolution of disputes between Wyoming litigants. Wisely, Wyoming's

7    legislature did not include admissibility provisions in the mediation statutes. Instead, Wyoming

8    courts must determine whether the privilege is available to the person asserting it and whether

9    there are exceptions to the privilege under the circumstances before the Court.

10    Although the Wyoming Supreme Court has not addressed the issues before this Court, it

11    declined an opportunity to rule that all mediation communications are inadmissible, even when

12    the issue was raised by a party to the mediation. In *VJL v. RED*, 39 P.3d 1110, 1114 (Wyo.

13    2002), the appellant claimed error when the trial court denied her motion to reject a report filed

14    by the mediator in her case. The Supreme Court affirmed the trial court's ruling after it found

15    that appellant failed to cite authority or to present cogent argument that the mediator's report was

16    improper.

17    In this case, Interstate/FFIC cannot meet its burden to establish that the mediation

18    privilege applies to it since it was not a party to the underlying action and the privilege statute

19    must be narrowly construed. *See Dietz & Watson, Inc., supra* and *In re Quest Communications,*

20    *Inc.* 450 F.3d 1179, 1185 (10 Cir. 2006). Further, nothing in the statute precludes admission of

21    the settlement demands and offers. Therefore, there is no reason to believe that the Wyoming

22    Supreme Court would preclude such evidence. Other courts have not hesitated to allow

23    mediation communications that are relevant to claims of bad faith. In *Brown v. Nationwide*

24    *Mutual Insurance Company,* 2015 WL 71485 (M.D. N. Car. Jan. 6, 2015), the plaintiff

25    contended that the defendant committed unfair and deceptive insurance practices and bad faith

26    refusal to settle based on the defendant's conduct at and immediately after the mediation. The

27    statute in that case precluded admission of mediation statements and conduct in any proceeding

28    in the action or other civil actions on the same claim.

- 27 -

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1    In *Brown,* the court ruled that the evidence is offered for "other purposes" to establish

2    bad faith on separate claims against Nationwide and, therefore, is admissible. *Id.* at *3. The

3    Court noted that Federal Rules of Evidence 408 has also been construed to admit such evidence

4    to prove an insurer's bad faith. *Id.* at *3, Fn. 3 citing Fed. R. Civ. P. 408 and 2006 cmte. notes

5    (citing *Athey v. Farmers Ins. Exch.,* 234 F.3d 357 (8th Cir. 2000), and Wright & Miller, Fed.

6    Prac. & Proc. §5314 ("Hence, if an insurer is sued for having breached its obligations under an

7    indemnity policy by failing to make a reasonable settlement within policy limits, Rule 408 does

8    not prevent the plaintiff from proving his case; wrongful acts are not shielded because they took

9    place during compromise negotiations."). See also *Gelinas v. Metropolitan Property Liability*

10   *Insurance Co.,* 551 A.2d 962, 969 (N.H. 1988) holding that the New Hampshire Rules of

11   Evidence 408 allowed the insurer to present evidence of settlement negotiations on the issue of

12   whether it was negligent in its attempt to settle the case; *Avary v. Bank of America, N.A.,* 72

13   S.W.3d 779, 798-800 (Tex. App. 2002) holding that evidence of mediation communications was

14   admissible under the Texas mediation statutes and Texas Rules of Evidence 408 in a case

15   brought against the Bank for breach of fiduciary duty during a mediation.

16   In *Carles Construction Inc. v. Travelers Casualty & Surety Company of America,* 56 F.

17   Supp. 3d 1259 (S.D. Fla. 2014) the Court ruled mediation communications in an underlying

18   action were admissible in litigation for breach of a surety agreement. Florida law provides that

19   all mediation communications shall be confidential and participants shall not disclose a

20   mediation communication to a person other than another mediation participant or a participant's

21   counsel. The Court reasoned that the purpose of this ban is to preclude admission of settlement

22   offers between parties who are opposing parties in an underlying case. *Id.* at 1272. In the case

23   before the Court, the communications at issue pertain solely to settlement discussions between a

24   non-party to the action and the insurance company. The Court in *Carles* explained that the "at-

25   issue" doctrine is a basis for allowing disclosure. *Id.* at 1273 *(citation omitted).* In that case, the

26   plaintiffs alleged that the defendant's conflict of interest at the mediation caused it to breach its

27   agreements with the plaintiffs, and the defendant denied any wrongdoing. The Court found that

28   the defendant's objections to the mediation communications were inconsistent with the purposes

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1   of the prohibition on disclosure of mediation communications, and the defendant could not seek

2   to preclude the finder of fact from examining its conduct in settling the underlying disputes. *Id.*

3   at 1273-1274.

4       Even assuming that Interstate/FFIC is entitled to the mediation privilege, the Wyoming

5   Supreme Court has recognized the waiver of privilege when a party has placed its conduct or

6   condition "at issue." In *Wardell v. McMillan,* 844 P.2d 1052, 1066 (Wyo. 1992) the Court stated

7   that when a patient places his physical or mental condition into contest, the physician/patient

8   privilege is waived to the extent it is relevant to the controversy. In the case at bar,

9   Interstate/FFIC seeks a determination that it has no obligation to indemnify AMC/Sunridge for

10   the punitive damage judgments obtained by Amber Lompe. [Doc 6, Amended Complaint]. In

11   response, AMC/Sunridge has counterclaimed alleging that Interstate/FFIC failed to reserve its

12   rights and is responsible for payment of the punitive damages. Further, AMC/Sunridge asserts

13   that Interstate/FFIC breached the implied covenant of good faith and fair dealing when it failed

14   to settle the underlying action. Interstate/FFIC has denied AMC/Sunridge's allegations. [Doc

15   29]. The conduct of Interstate/FFIC is "at issue" due to its attempt to avoid responsibility for the

16   punitive damage judgments and AMC's/Sunridge's other damages. Further, Interstate/FFIC has

17   presented documents revealing the *Lompe* settlement demand made in mediation. In support of

18   its motion, Interstate/FFIC submitted to the Court letters authored by Martha Knudson on behalf

19   of AMC/Sunridge dated May 17, 2013 (Exhibit 25) and October 24, 2013 (Exhibit 32), which

20   revealed that there had been a settlement demand by Ms. Lompe within the policy limits.

21   Interstate/FFIC also revealed the exact nature of the settlement discussions and the offers made

22   and rejected at mediation. (UF 30.)

23       Even if the mediation privilege belonged to Interstate/FFIC, it is not enforceable under

24   the circumstances of this case. The settlement demands and offers made at the mediation in the

25   underlying case are admissible, and their admission is not inconsistent with the purposes or the

26   provisions of Wyoming's mediation statutes.

27

28



SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

**G.      The insurers' claims regarding breach of contract and punitive damages are merely derivate of their other arguments—and must be denied for the same reason**

In a throwaway paragraph, the insurers contest breach of contract and punitive damages. (See Motion, p. 30.) Those arguments are mere derivations of the arguments already addressed above. Interstate/FFIC fail to even address the issues with breach of contract and consequential contractual damages discussed extensively in AMC's/Sunridge's Motion for Partial Summary Judgment #1 Regarding Contractual Damages. (See Dkt. No. 139.) The motion regarding these points, like the others above, should be denied.

**V.**

**CONCLUSION**

The insurers violated their obligations under Wyoming law, failed to issue a timely reservation of rights, ignored the impact of that failure on their insured (steadfastly refusing to honor their obligations under the policy), failed to evaluate the claims of Ms. Lompe, and ignored multiple opportunities to settle the matter within Primary Policy limits. Then, after a staggering excess judgment was rendered against AMC and Sunridge, the insureds were set adrift, abandoned by their insurers. At minimum, the evidences presents a triable issue of material fact regarding Interstate's and FFIC's breach of the implied covenant of good faith and fair dealing. The motion should be denied in its entirety.

Dated: October 30, 2015

SHERNOFF BIDART
ECHEVERRIA BENTLEY LLP


By: ___/s/ Michael J. Bidart_____
Michael J. Bidart, *admitted pro hac vice*
Ricardo Echeverria, *admitted pro hac vice*
Steven Messner, *admitted pro hac vice*

WOLF TIEDEKEN & WOODARD, PC
Robert Tiedeken, #5-1948

Attorneys for Defendants AMC/SUNRIDGE

SHERNOFF BIDART ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

EXHIBIT A

Patrick Q. Hustead, #6-2864
The Hustead Law Firm,
A Professional Corporation
4643 South Ulster Street, Suite 1250
Denver, Colorado 80237
Telephone: 303-721-5000
Facsimile: 303-721-5001

Corinne E. Rutledge #5-2480
J. Kent Rutledge #5-1392
Erin A. Barkley #6-4216
LATHROP & RUTLEDGE, P.C.
1920 Thomes, Suite 500
P.O. Box 4068
Cheyenne, WY 82003-4068
Telephone: 307 632-0554
Facsimile: 307-635-4502

*Attorneys for Plaintiffs, Interstate Fire &
Casualty Company and Fireman's Fund Insurance Company*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF WYOMING

INTERSTATE FIRE & CASUALTY COMPANY, AND ）
FIREMAN'S FUND INSURANCE COMPANY ）
          ）

Plaintiffs, ）
          ）

v. ） Civil Action No. 13-CV-278 J
          ）

APARTMENT MANAGEMENT CONSULTANTS, ）
LLC, SUNRIDGE PARTNERS, LLC, AND AMBER ）
NICOLE LOMPE ）
Defendants. ）

---

## AMENDED COMPLAINT FOR DECLARATORY RELIEF

---

Plaintiffs, Interstate Fire and Casualty Company and Fireman's Fund Insurance Company, through their undersigned counsel, Patrick Q. Hustead of The Hustead Law Firm, A Professional Corporation, submit the following Amended Complaint for Declaratory Relief pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, *et seq.* against Defendants Sunridge Partners, LLC, Apartment Management Consultants, LLC, and Amber Nicole Lompe as follows:

## I. JURISDICTION AND VENUE

1.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, as diversity of citizenship exists between the Plaintiffs, on the one hand, and the above-named Defendants, on the other, and the amount in controversy exceeds $75,000.  Further, the Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201.

2.      Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in the State of Wyoming.

## II. PARTIES

3.      Interstate Fire and Casualty Company ("Interstate") is an Illinois company and maintains its executive offices at 33 W. Monroe St. Chicago, IL 60603.

4.      Fireman's Fund Insurance Company ("Fireman's Fund) is a California company, with its principal place of business at 777 San Marin Drive, Novato, CA 94998.

5.      On information and belief, Defendant Sunridge Partners, LLC ("Sunridge") is a Utah company, with its principal place of business at 353 E. 300 South, Salt Lake City, UT 84111.

2

6.      Sunridge owns Sunridge Apartments in Casper, Wyoming. Sunridge's registered agent in Wyoming is: CT Corporation System, 1712 Pioneer Ave, Suite 120, Cheyenne, WY 82001.

7.      On information and belief, Defendant Apartment Management Consultants, LLC ("AMC") is a Utah Company with its principal place of business at 1954 E. First Union Blvd, Suite 500, Cottonwood Heights, UT 84121.

8.      AMC operates and manages Sunridge Apartments in Casper, Wyoming. AMC's registered agent in Wyoming is: CT Corporation System, 1712 Pioneer Ave, Suite 120, Cheyenne, WY 82001.

9.      Upon information and belief, Amber Nicole Lompe (" Ms. Lompe") is a citizen of the United States, and of the State of Wyoming.

10.     Ms. Lompe was a tenant of Sunridge and/or AMC in February 2011, residing in Sunridge Apartment #436, located at 3900 E. 12th Street, Casper, Wyoming 82609 ("Apartment").

11.     Ms. Lompe is an interested person and proper party pursuant to Fed. R. Civ. P. 19 and Fed R. Civ. P. 57 with respect to the issues in this action.

### III.  GENERAL ALLEGATIONS

Insurance Policies & Named Insureds

12.     Interstate issued a Commercial General Liability insurance policy to Commercial Industrial Building Owner's Alliance, Inc. d/b/a CIBA ("CIBA"), bearing policy number SGL 1002220 (the "Primary Policy"), for a two-year term, from March 31, 2010 to March 31, 2012,

3

with a limit of $1,000,000 per occurrence, and a $2,000,000 General Aggregate Limit for the policy term.

13.     The Primary Policy contains a "Named Insured Endorsement" identifying CIBA as a named insured, as well as any associate of CIBA "to whom an Evidence or a Certificate of Insurance has been issued and which describes the specific location coverage is limited to."

14.     CIBA issued Certificates of Insurance to Sunridge and AMC, identifying them as named insureds under the Primary Policy.

15.     Interstate issued an Excess Liability Policy (which is in excess of the Primary Policy) to CIBA, bearing policy number PFX73097172 ("Interstate Excess Policy"), for a two-year term, from March 31, 2010 to March 31, 2012, with a limit of $10,000,000 per occurrence, with a $10,000,000 aggregate for the policy term.

16.     The Interstate Excess Policy contains a "Schedule of Named Insureds" identifying, among others, CIBA as a named insured, as well as any associate of CIBA "to whom an Evidence or a Certificate of Insurance has been issued and which describes the specific location coverage is limited to."

17.     Sunridge and AMC, are considered named insureds under the Interstate Excess Policy.

18.     Fireman's Fund issued an Excess Liability Policy (which is in excess of the Interstate Excess Policy) to "CIBA, et al as per First Underlying Insurance," bearing policy number SHX-000-7262-3879 ("Fireman's Fund Excess Policy") for a two-year term, from March 31, 2010 to March 31, 2012, with a limit of $15,000,000 per occurrence, with a

4

$15,000,000 aggregate for the policy term.[1]

    19.    As Sunridge and AMC are named insured under the Interstate Excess Policy, they are also considered named insureds under the Fireman's Fund Excess Policy.

    20.    The Primary Policy, the Interstate Excess Policy, and the Fireman's Fund Excess Policy are collectively referred to herein as the "Insurance Policies."

### The Lompe Action

    21.    On or about May 2, 2012, Ms. Lompe filed a Complaint & Demand for Jury Trial ("Complaint"), commencing an action in the United States District Court for the District of Wyoming, captioned, *Amber Nicole Lompe v. Sunridge Partners, LLC; and Apartment Management Consultants, LLC* with a civil action number of 12CV088J (the "Lompe Action").

    22.    As more fully set forth in the Complaint in the Lompe Action, Ms. Lompe alleged that on February 1, 2011, as a result of AMC's and Sunridge's negligent, grossly negligent, and willful and wanton acts, she was poisoned by carbon monoxide gas inside her Apartment at Sunridge Apartments, causing her to suffer injuries, damages, and losses.

    23.    In addition to compensatory damages, Ms. Lompe's Complaint requested "exemplary and punitive damages ... sufficient to adequately punish [Sunridge and AMC] and to serve as a deterrent and warning against future conduct of the type alleged in [the complaint."

    24.    Interstate has been and continues to defend AMC and Sunridge against the Lompe Action under a reservation of rights.

---

[1] The Fireman's Fund Excess Policy identifies "underlying insurance" as the Interstate Excess Policy.

25.    Commencing on December 2, 2013, the Lompe Action was tried to a jury, with the Honorable Alan B. Johnson presiding.

26.    On December 19, 2013, the jury in the Lompe Action delivered a verdict finding Sunridge, AMC, and Ms. Lompe negligent.

27.    The jury found Sunridge 25% at fault, AMC 65% at fault, and Ms. Lompe 10% at fault, and awarded a total of $3,000,000 in compensatory damages.

28.    The jury also found that the conduct of Sunridge constituted "willful and wanton misconduct" such that punitive damages should be awarded against Sunridge.

29.    The jury further found that the conduct of AMC constituted "willful and wanton misconduct" such that punitive damages should be awarded against AMC.

30.    On December 20, 2013, after the punitive damages portion of the Lompe case, the jury returned a verdict form assessing $3,000,000 in punitive damages against Sunridge, and $22,500,000 in punitive damages against AMC.

31.    On December 26, 2013, Judge Johnson entered judgment for Lompe to recover compensatory damages from Sunridge in the sum of $750,000, and punitive damages in the sum of $3,000,000, plus post-judgment interest thereon at the statutory rate of 0.14%, from the date of entry of judgment, pursuant to 28 U.S.C. § 1961.

32.    Judge Johnson also entered judgment for Lompe to recover compensatory damages from AMC in the sum of $1,950,000, and punitive damages in the sum of $22,500,000, plus post-judgment interest thereon at the statutory rate of 0.14%, from the date of entry of judgment, pursuant to 28 U.S.C. § 1961.

33.     Judge Johnson also entered judgment for Lompe to recover her costs, pursuant to Fed. R. Civ. P. 54(d)(1), upon filing of a timely bill of costs.

Insurance Coverage – Punitive Damages Exclusion

34.     The Insurance Policies provide coverage, subject to certain terms, conditions and exclusions, for certain sums that AMC and Sunrdige become legally obligated to pay as damages because of "bodily injury" or "property damage" to which the Insurance Policies apply.

35.     For reasons including, but not limited to, the following, no coverage exists under the Primary Policy for the punitive damages assessed in the Lompe Action against Defendants AMC and/or Sunridge, as such damages are expressly excluded by the Primary Policy.

36.     The Primary Policy language states, in relevant part:

**EXCLUSION – PUNITIVE OR EXEMPLARY DAMAGES**

This insurance does not apply to fines, penalties, punitive damages, exemplary damages, treble damages or the multiplication of compensatory damages.

37.     For reasons including, but not limited to, the following, no coverage exists under the Interstate Excess Policy for the punitive damages assessed in the Lompe Action against Defendants AMC and/or Sunridge, as such damages are not within the "Excess Insuring Agreement."

38.     The "Excess Insuring Agreement" in the Interstate Policy states, in relevant part:

**EXCESS INSURING AGREEMENT**

Subject to the other provisions of this policy, we will pay on behalf of any "insured", the "insured's" ultimate net loss" if such loss arises from:

a. Injury or damages that occurs; or

b. An offense committed
  during our Policy Period and is insured by "underlying insurance"

  designated in the Schedule of Underlying Insurance ...[2]

  The insurance afforded by this policy will apply only in excess of all "underlying insurance"; and only after all "underlying insurance" has been exhausted by payment of the limits of such insurance.

  \*\*\*

  The definitions, terms, conditions, limitations, exclusions and warranties contained in the "underlying insurance" polic(ies) that are in effect at the inception date of this policy apply to this policy unless they are inconsistent with the provisions of this policy, or relate to premium, subrogation, other insurance, an obligation to investigate or defend, the amount or limits of insurance, payment of expenses, cancellation or any renewal agreement.

  If any "underlying insurance" does not pay a loss, for reasons other than exhaustion of an aggregate limit of insurance, then we will not pay such loss.

A. **Occurrence**
  If the coverage provided by the "underlying insurance" applies on the basis of injury or damage that occurs, or an offense committed during the period of that policy, then this coverage only applies on the same basis and in a like manner to injury or damage that occurs, or an offense committed during our Policy Period.

39.   For reasons including, but not limited to, the following, no coverage exists under the Fireman's Fund Excess Policy for the punitive damages assessed in the Lompe Action against Defendants AMC and/or Sunridge, as such damages are not within the "Excess Insuring Agreement."

---

[2] The Interstate Excess Policy identifies "underlying insurance" as the Primary Policy.

8

40.   The "Excess Insuring Agreement" in the Fireman's Fund Excess Policy states, in relevant part:

> A.   We will pay on behalf of any Insured those sums in excess of all Underlying Insurance [the Interstate Excess Policy] that any Insured becomes legally obligated to pay as damages provided that:
>
> 1.   Such damages are insured by all of the policies shown as Underlying Insurance in our Schedule of Underlying Insurance; and
>
> 2.   Such damages arise from injury or damage that occurs, or from an offense committed, during our Policy Period; and
>
> 3.   All Underlying Insurance has been exhausted by payment of their limits of insurance; and
>
> 4.   If any Underlying Insurance does not pay damages for reasons other than exhaustion of an aggregate limit of insurance, then we shall not pay such damages.
>
> B.   The terms and condition of the First Underlying Insurance policy [the Interstate Excess Policy] in effect at the inception date of this policy apply to this policy unless they are inconsistent with any provision of this policy or relate to any renewal agreement.

41.   All conditions precedent to filing this action have been performed or have occurred.

42.   Pursuant to 28 U.S.C. § 2201, *et seq.* and Fed. R. Civ. P. 57, Plaintiffs request a declaration from the Court that they have no coverage obligation under the Insurance Policies concerning any award of punitive damage, and no duty to indemnify either AMC or Sunridge for any punitive damages awards in the Lompe Action.

9

## IV. CLAIM FOR RELIEF
(Declaratory Judgment)

43.     Plaintiffs reallege and incorporate herein by this reference the allegations contained in paragraphs 1 through 42 above as though fully set forth herein.

44.     A dispute has arisen between Plaintiffs and Defendants with respect to the nature and extent of insurance coverage available to Defendants.

45.     The rights, status, obligations and other legal relations of Plaintiffs and Defendants are affected by the terms, conditions and exclusions of the Insurance Policies and the determination of whether coverage exists for the punitive damages judgment in the Lompe Action against AMC and Sunridge.

46.     For reasons including, but not limited to, those set forth herein, and based on the clear and unambiguous language contained in the Insurance Policies, Plaintiffs have no duty to pay or indemnify the Defendants for any punitive damages judgment, including any post-judgment interest thereon, in the Lompe Action.

47.     As the above-referenced policies provide no coverage for any punitive damages judgment against Defendant AMC or Defendant Sunridge, Plaintiffs are entitled to a declaratory judgment in their favor decreeing that no coverage exists in regard to such damages, and that Plaintiffs have no duty to pay or indemnify Defendants for any such damages under the Insurance Policies as a matter of law.

WHEREFORE, for the foregoing reasons, Plaintiffs Interstate and Fireman's Fund respectfully request that this Court enter an Order decreeing that Plaintiffs have no coverage obligation concerning any judgment for punitive damage, and no duty to pay or indemnify Defendants for any punitive damages awards in the Lompe Action, and awarding Plaintiffs all other and further relief as this Court deems appropriate under the circumstances.

Dated this 3rd day of January, 2014.

| *Original Signature is on File at* | *Original Signature is on File at* |
|---|---|
| LATHROP & RUTLEDGE, P.C. | The Hustead Law Firm, |
| | A Professional Corporation |
| /s/ Corinne E. Rutledge | /s/ Patrick Q. Hustead |
| Corinne E. Rutledge #5-2480 | Patrick Q. Hustead, Esq. |
| J. Kent Rutledge #5-1392 | 4643 South Ulster Street, Suite 1250 |
| Erin A. Barkley #6-4216 | Denver, Colorado 80237 |
| 1920 Thomes, Suite 500 | Email: PQH@thlf.com |
| P.O. Box 4068 | Telephone No.: 303-721-5000 |
| Cheyenne, WY 82003-4068 | Facsimile: 303-721-5001 |
| Telephone: 307-632-0554 | Wyoming Bar No. 6-2864 |
| Facsimile: 307-635-4502 | |
| | |
| *Attorneys for Plaintiffs, Interstate Fire &* | *Attorneys for Plaintiffs, Interstate Fire &* |
| *Casualty Company and Fireman's Fund* | *Casualty Company and Fireman's Fund* |
| *Insurance Company* | *Insurance Company* |

Address of Plaintiffs:

For Interstate:
33 W. Monroe St.
Chicago, IL 60603

For Fireman's Fund:
777 San Marin Drive
Novato, CA 94998

EXHIBIT B

1  MICHAEL J. BIDART #60582
   RICARDO ECHEVERRIA #166049
2  STEVEN MESSNER #259606
   **SHERNOFF BIDART**
3  **ECHEVERRIA BENTLEY LLP**
   600 South Indian Hill Boulevard
4  Claremont, CA 91710
5  Phone: (909) 621-4935
   Fax: (909) 625-6915
6  MBidart@shernoff.com
7  SMessner@shernoff.com
   REcheverria@shernoff.com
8
9  ROBERT TIEDEKEN #5-1948
   **WOLF TIEDEKEN & WOODARD P.C.**
10 401 West 19th Street, Suite 300
   P.O. Box 491
11 Cheyenne, WY 82003-0491
   Phone: (307) 635-2876
12 Fax: (307) 632-4902
13 robert@wolftiedeken.com
14 Attorneys for Defendants Apartment Management
15 Consultants, LLC, and Sunridge Partners, LLC

16              UNITED STATES DISTRICT COURT

17                 DISTRICT OF WYOMING

18 INTERSTATE FIRE & CASUALTY          Case No. 2:13-CV-00278-ABJ
   COMPANY, AND FIREMAN'S FUND
19 INSURANCE COMPANY,
20              Plaintiffs,            **AFFIDAVIT OF ROBERT CTVRTLIK IN**
                                       **SUPPORT OF DEFENDANTS' AND**
21 v.                                  **COUNTERCLAIMANTS' MOTIONS FOR**
                                       **PARTIAL SUMMARY JUDGMENT**
22 APARTMENT MANAGEMENT
23 CONSULTANTS, LLC, SUNRIDGE
   PARTNERS, LLC, and AMBER NICOLE
24 LOMPE,
25              Defendants.
26
27
28

AFFIDAVIT OF ROBERT CTVRTLIK IN SUPPORT OF DEFENDANTS' AND COUNTERCLAIMANTS' MOTIONS FOR PARTIAL
SUMMARY JUDGMENT

1     I, Robert Ctvrtlik, being duly sworn, state as follows:

2     1.    I am over the age of 18 and have knowledge of the facts herein.

3     2.    During the times relevant to this and the underlying suit, I have been the

4     Managing Member for Sunridge Partners, LLC ("Sunridge").

5     3.    As part of its insurance coverage, Sunridge was insured under a Primary Policy

6     (No. SGL 1002220) from Interstate Fire & Casualty Company ("Interstate") with a $1,000,000

7     limit per occurrence. In excess of that, Sunridge was insured by an Excess Liability Policy (No.

8     PFX73097172) from Interstate, with a policy limit of $10,000,000 per occurrence. And, in

9     excess of that policy, Sunridge was insured with a Fireman's Fund Insurance Company ("FFIC")

10    policy (No. SHX-000-7262-3879) that provided a limit of $15,000,000 per occurrence.

11    4.    On May 2, 2012, Sunridge was named as a defendant in a lawsuit filed in the

12    United States District Court, for the District of Wyoming, Civil case no. 12-cv-088J, entitled

13    *Amber Nicole Lompe v. Sunridge Partners, LLC and Apartment Management Consultants, LLC*

14    (the *Lompe* action). As part of its complaint, Ms. Lompe sought "[e]xemplary and punitive

15    damages in a reasonable amount to be proved at trial, sufficient to adequately punish the

16    defendants and to serve as a deterrent and warning against future conduct of the type alleged in

17    this complaint," as well as "Judgment against the defendants for punitive damages in a fair and

18    reasonable amount to be proven at trial." (*Lompe* Complaint, pp. 9-10.) From the beginning,

19    punitive damages were an item of damages at stake in the *Lompe* action.

20    5.    Shortly after being served with the *Lompe* action, Sunridge tendered defense of

21    the matter to its insurer, Interstate, "one of the Fireman's Fund Companies." (See letter from

22    Claims Adjusting Group, Inc., dated "April 12, 2012," and acknowledging tender of suit).

23    6.    In agreeing to defend the *Lompe* action, the insurers specifically "agreed to

24    participate in the defense of Sunridge Partners, LLC and Apartment Management Consultants,

25    LLC." (*Id.*) The case was referred to Peter Dusbabek of Montgomery, Kolodny, Amatuzio &

26    Dusbabek for the defense of AMC and Sunridge. *But nowhere* in the correspondence from the

27    carrier was there a reservation of rights, disclosure of any exclusions, or the raising of any other

28    basis to deny or limit coverage.

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

- 2 -

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1          7.      On March 25, 2013, Peter Dusbabek, on behalf of AMC and Sunridge, filed a

2    motion for summary judgment as to the claims of Amber Lompe.  Included within that motion,

3    AMC and Sunridge also moved to summarily adjudicate Lompe's claims for punitive damages

4    "Plaintiff asserts that she is entitled to an award of various forms of damages including punitive

5    damages. A claim for punitive damages is not a separate cause of action and cannot stand

6    without an underlying claim."(March 25, 2013 Motion, p. 10.)

7          8.      On October 25, 2013, the Court denied AMC's and Sunridge's motion for

8    summary judgment in the *Lompe* action, which continued Lompe's claims for punitive damages.

9          9.      On November 20, 2013, only following the Court's denial of a motion for

10   summary judgment, did the insurers attempt to reserve their rights regarding punitive damages.

11   For the first time, the insurers stated "Please note that the Complaint against the LLC prays for

12   punitive and exemplary damages. An exclusionary provision to the [Interstate] policy expressly

13   negates coverage for those types of damages . . . ." Further, "While [the insurers] will continue

14   to provide Sunridge Partners, LLC and Apartment Management Consultants, LLC with a full and

15   complete defense, any award or judgment for punitive or exemplary damages will be the sole

16   responsibility of Sunridge Partners, LLC and Apartment Management Consultants, LLC. As

17   such, those entities may wish, at their own expense, to hire an attorney to represent them for that

18   portion of the suit." (November 20, 2013 letter.)

19         10.     It was only after *eighteen months* of litigation, where the insurers provided a

20   defense *without* a reservation of rights, that Interstate finally attempted to reserve its rights, right

21   on the eve of trial of the *Lompe* action.

22         11.     Lompe was ultimately successful in her action against AMC and Sunridge.  On

23   December 26, 2013, the Court entered judgment against Sunridge in the amount of $750,000

24   compensatory damages and $3,000,000 punitive damages, while also entering judgment against

25   AMC in the sum of $1,950,000 compensatory damages and $22,500,000 in punitive damages.

26         12.     Despite appointing counsel to appeal the judgment, Interstate and FFIC refused to

27   procure a bond or other security to stay enforcement of the punitive damage award during the

28   appeal of the *Lompe* Action. The insurers even stated that "If AMC and/or Sunridge wish to seek

- 3 -

1   a stay of execution on the punitive portion of the judgments against them, they will need to post

2   the bonds themselves to cover such amounts." (December 30, 2013 letter, p. 2.)  This forced

3   AMC and Sunridge to obtain their own security in order to proceed, and avoid the risk of Ms.

4   Lompe executing her judgment and forcing bankruptcy or other measures from AMC and

5   Sunridge.

6          13.     Unfortunately, and due to Sunridge's status as an LLC with a large judgment

7   against it, Sunridge was unable to obtain a supersedeas bond and was forced to provide security

8   in the form of an escrow account deposited with the Court.

9          14.     The funds for the escrow account came in the form of a loan in the amount of

10  $3,000,000 (the amount of the punitive damage award against Sunridge).

11         15.     To date, the loan for the security escrow account has caused Sunridge to incur

12  interest on the amount of the loan, which totals $284,810.19 as of September 30, 2015.

13         16.     Despite a request to indemnify Sunridge and AMC for the full amount of the

14  judgment and to provide a bond or other security to release the loan funds from escrow,

15  Interstate and FFIC have refused to indemnify AMC or Sunridge for the punitive damage awards

16  in the *Lompe* action.

17         17.     As a result of the refusal to abide by their coverage obligations, AMC and

18  Sunridge were forced to retain the law firms of Shernoff Bidart Echeverria Bentley LLP and

19  Wolf Tiedeken & Woodward, P.C., to both defend the claims of the insurers and to prosecute the

20  counterclaim in order to obtain coverage for the entire amount of the judgment in the *Lompe*

21  Action.

22         FURTHER AFFIANT SAYETH NAUGHT.



ROBERT CTVRTLIK

23

24

25

26

27

28  STATE OF _____        )
                                   ) ss.

- 4 -




SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1  County of _____     )

2

3  SUBSCRIBED AND SWORN to before me this _____ day of December 2014, in the

4  County of _____, State of _____, by Robert Ctvrtlik.

5

6

7  WITNESS my hand and official seal.   _____

8

9                                        Notary Public

10

11                                       _____

12

13                                       _____

14                                       Business address

15

16  My

17

18

19

20

21

See
CA
JuRAT
——>

22

23

24

25

26

27

28

AFFIDAVIT OF ROBERT CTVRTLIK IN SUPPORT OF DEFENDANTS' AND COUNTERCLAIMANTS' MOTIONS FOR PARTIAL
SUMMARY JUDGMENT

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS



## Jurat Certificate   California only

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _ORANGE_

Subscribed and sworn to (or affirmed) before me on this _12ᵗʰ_

day of _OCT_ , 20_15_, by _ROBERT C. TURTLIK_

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

*Place Seal Here*          Signature _____

MATT D. CRANDALL
COMM. #2060267
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
My Commission Expires 03/26/2018

DSG3010CA(Rev00_12-14)

EXHIBIT C

1    MICHAEL J. BIDART #60582
     RICARDO ECHEVERRIA #166049
2    STEVEN MESSNER #259606
     **SHERNOFF BIDART**
3    **ECHEVERRIA BENTLEY LLP**
     600 South Indian Hill Boulevard
4    Claremont, CA  91710
5    Phone: (909) 621-4935
     Fax: (909) 625-6915
6    MBidart@shernoff.com
7    SMessner@shernoff.com
     REcheverria@shernoff.com
8

9    ROBERT TIEDEKEN #5-1948
     **WOLF TIEDEKEN & WOODARD P.C.**
10   401 West 19th Street, Suite 300
     P.O. Box 491
11   Cheyenne, WY 82003-0491
12   Phone: (307) 635-2876
     Fax: (307) 632-4902
13   robert@wolftiedeken.com

14   Attorneys for Defendants Apartment Management
15   Consultants, LLC, and Sunridge Partners, LLC

16             UNITED STATES DISTRICT COURT

17               DISTRICT OF WYOMING

18   INTERSTATE FIRE & CASUALTY     Case No.  2:13-CV-00278-ABJ
19   COMPANY, AND FIREMAN'S FUND
     INSURANCE COMPANY,
20
          Plaintiffs,           **AFFIDAVIT OF MARTHA KNUDSON IN**
21                      **SUPPORT OF DEFENDANTS' AND**
     v.                     **COUNTERCLAIMANTS' MOTIONS FOR**
22                      **PARTIAL SUMMARY JUDGMENT**
     APARTMENT MANAGEMENT
23   CONSULTANTS, LLC, SUNRIDGE
     PARTNERS, LLC, and AMBER NICOLE
24   LOMPE,

25           Defendants.

26

27

28

AFFIDAVIT OF MARTHA KNUDSON IN SUPPORT OF DEFENDANTS' AND COUNTERCLAIMANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

1       I, Martha Knudson, being duly sworn, state as follows:

2       1.      I am over the age of 18 and have knowledge of the facts herein.

3       2.      During the times relevant to this and the underlying suit, I have been the General

4   Counsel for Apartment Management Consultants, LLC ("AMC"). I attended the University of

5   Utah, obtaining an undergraduate degree in Mass Communications in 1995. I then graduated

6   Magna Cum Laude from the J. Reuban Clark law school at Brigham Young University in 1999

7   and was in private practice from 1999 until 2008. From July 2010 to the present, I have been the

8   General Counsel for AMC.

9       3.      As part of its insurance coverage, AMC was insured under a Primary Policy (No.

10  SGL 1002220) from Interstate Fire & Casualty Company ("Interstate") with a $1,000,000 limit

11  per occurrence. In excess of that, AMC was insured by an Excess Liability Policy (No.

12  PFX73097172) from Interstate, with a policy limit of $10,000,000 per occurrence. And, in

13  excess of that policy, AMC was insured with a Fireman's Fund Insurance Company ("FFIC")

14  policy (No. SHX-000-7262-3879) that provided a limit of $15,000,000 per occurrence.

15      4.      On May 2, 2012, AMC was named as a defendant in a lawsuit filed in the United

16  States District Court, for the District of Wyoming, Civil case no. 12-cv-088J, entitled *Amber*

17  *Nicole Lompe v. Sunridge Partners, LLC and Apartment Management Consultants, LLC* (the

18  *Lompe* action). As part of its complaint, Ms. Lompe sought "[e]xemplary and punitive damages

19  in a reasonable amount to be proved at trial, sufficient to adequately punish the defendants and to

20  serve as a deterrent and warning against future conduct of the type alleged in this complaint," as

21  well as "Judgment against the defendants for punitive damages in a fair and reasonable amount

22  to be proven at trial." (*Lompe* Complaint, pp. 9-10.) From the beginning, punitive damages

23  were an item of damages at stake in the *Lompe* action.

24      5.      Shortly after being served with the *Lompe* action, AMC tendered defense of the

25  matter to its insurer, Interstate, "one of the Fireman's Fund Companies." (See letter from Claims

26  Adjusting Group, Inc., dated "April 12, 2012," and acknowledging tender of suit).

27      6.      In agreeing to defend the *Lompe* action, the insurers specifically "agreed to

28  participate in the defense of Sunridge Partners, LLC and Apartment Management Consultants,

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

- 2 -

1    LLC." (*Id.*) The case was referred to Peter Dusbabek of Montgomery, Kolodny, Amatuzio &

2    Dusbabek for the defense of AMC and Sunridge. *But nowhere* in the correspondence from the

3    carrier was there a reservation of rights, disclosure of any exclusions, or the raising of any other

4    basis to deny or limit coverage.

5          7.     On March 25, 2013, Peter Dusbabek, on behalf of AMC and Sunridge, filed a

6    motion for summary judgment as to the claims of Amber Lompe. Included within that motion,

7    AMC and Sunridge also moved to summarily adjudicate Lompe's claims for punitive damages

8    "Plaintiff asserts that she is entitled to an award of various forms of damages including punitive

9    damages. A claim for punitive damages is not a separate cause of action and cannot stand

10   without an underlying claim."(March 25, 2013 Motion, p. 10.)

11         8.     On October 25, 2013, the Court denied AMC's and Sunridge's motion for

12   summary judgment in the *Lompe* action, which continued Lompe's claims for punitive damages.

13         9.     On November 20, 2013, only following the Court's denial of a motion for

14   summary judgment, did the insurers attempt to reserve their rights regarding punitive damages.

15   For the first time, the insurers stated "Please note that the Complaint against the LLC prays for

16   punitive and exemplary damages. An exclusionary provision to the [Interstate] policy expressly

17   negates coverage for those types of damages . . . ." Further, "While [the insurers] will continue

18   to provide Sunridge Partners, LLC and Apartment Management Consultants, LLC with a full and

19   complete defense, any award or judgment for punitive or exemplary damages will be the sole

20   responsibility of Sunridge Partners, LLC and Apartment Management Consultants, LLC. As

21   such, those entities may wish, at their own expense, to hire an attorney to represent them for that

22   portion of the suit." (November 20, 2013 letter.)

23         10.    It was only after *eighteen months* of litigation, where the insurers provided a

24   defense *without* a reservation of rights, that Interstate finally attempted to reserve its rights, right

25   on the eve of trial of the *Lompe* action.

26         11.    Lompe was ultimately successful in her action against AMC and Sunridge. On

27   December 26, 2013, the Court entered judgment against Sunridge in the amount of $750,000

28   compensatory damages and $3,000,000 punitive damages, while also entering judgment against

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

- 3 -

1   AMC in the sum of $1,950,000 compensatory damages and $22,500,000 in punitive damages.

2       12.     Despite appointing counsel to appeal the judgment, Interstate and FFIC refused to

3   procure a bond or other security to stay enforcement of the punitive damage award during the

4   appeal of the *Lompe* Action. The insurers even stated that "If AMC and/or Sunridge wish to seek

5   a stay of execution on the punitive portion of the judgments against them, they will need to post

6   the bonds themselves to cover such amounts." (December 30, 2013 letter, p. 2.)  This forced

7   AMC and Sunridge to obtain their own security in order to proceed, and avoid the risk of Ms.

8   Lompe executing her judgment and forcing bankruptcy or other measures from AMC and

9   Sunridge.

10      13.     Unfortunately, and due to AMC's status as an LLC with a large judgment against

11  it, AMC was unable to obtain a supersedeas bond and was forced to provide security in the form

12  of an escrow account deposited with the Court.

13      14.     The funds for the escrow account came in the form of a series of loans in the

14  amount of $10,920,000 at interest rates of between 7.5% and 9.0%.  Over the course of the

15  repayment periods, the interest on these loans would amount to a total of $2,161,664.

16      15.     To date, the loan for the security escrow account has caused AMC to incur

17  interest on the amount of the loan, totaling $875,740.87 (See Ledger for AMC GL Account) as

18  of October 1, 2015.  In addition, even if Interstate and FFIC were to provide a bond *immediately*,

19  AMC would still incur a prepayment penalty for some of the various loans it was forced to

20  procure to provide the necessary security.  As of October 1, 2015, this prepayment penalty would

21  amount to $155,804.40.

22      16.     Despite a request to indemnify Sunridge and AMC for the full amount of the

23  judgment and to provide a bond or other security to release the loan funds from escrow,

24  Interstate and FFIC have refused to indemnify AMC or Sunridge for the punitive damage awards

25  in the *Lompe* action.  Although Interstate and FFIC have now procured a supersedeas bond for

26  the amount of the punitive damage awards against Sunridge and AMC (procured on September

27  21, 2015), they have still not authorized the filing of those bonds in order to release

28  AMC's/Sunridge's funds from escrow.  The funds remain in escrow and interest continues to

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

- 4 -

1    accrue.

2        17.    As a result of the refusal to abide by their coverage obligations, AMC and

3    Sunridge were forced to retain the law firms of Shernoff Bidart Echeverria Bentley LLP and

4    Wolf Tiedeken & Woodward, P.C., to both defend the claims of the insurers and to prosecute the

5    counterclaim in order to obtain coverage for the entire amount of the judgment in the *Lompe*

6    Action.

7        FURTHER AFFIANT SAYETH NAUGHT.

8

9

10                                         MARTHA KNUDSON

11

12

13

14   STATE OF Utah                    )

15   County of Salt lake              ) ss.
                                       )

16

17       SUBSCRIBED AND SWORN to before me this 13th day of October 2015, in the

18   County of Salt Lake, State of Utah, by Martha Knudson.

19

20

21   WITNESS my hand and official seal.

22                                         Nichole Flores

23                                         Notary Public

24

25                                         1964 E Fort union Blvd

26                                         Cottonwood Heights, UT 84121

27                                         Business address

28

Notary Public
NICHOLE FLORES
Commission #653343
My Commission Expires
April 17, 2016
State of Utah

-5-

SHERNOFF BIDART
ECHEVERRIA BENTLEY
LAWYERS FOR INSURANCE POLICYHOLDERS

1
2      My Commission Expires: 4\17\16
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AFFIDAVIT OF MARTHA KNUDSON IN SUPPORT OF DEFENDANTS' AND COUNTERCLAIMANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

EXHIBIT D

%JS 44 (Rev 12/07)

## CIVIL COVER SHEET

1 2 CV 088 J

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
Amber Nicole Lompe

### DEFENDANTS
Sunridge Partners, LLC and Apartment Management Consultants, LLC

(b) County of Residence of First Listed Plaintiff **Natrona Co., Wyoming**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Tyson E. Logan, The Spence Law Firm, LLC, PO Box 548, Jackson, WY 83001 307-733-7290

Attorneys (If Known) *12CV88 J*

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☒ 4 Diversity
(Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 3 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☒ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

### V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
20 U.S.C. § 1332

Brief description of cause:
Negligence - carbon monoxide poisoning

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

### VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE 5/4/12

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # *14419*    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

Tyson E. Logan, Wyoming Bar #6-3970
logan@spencelawyers.com
THE SPENCE LAW FIRM, LLC
15 S. Jackson Street, P.O. Box 548
Jackson, WY 83001
307-733-7290 / 307-733-5248 fax

Attorney for Plaintiff

FILED
U.S. ＿＿＿＿ COURT
DISTRICT OF WYOMING

2012 MAY 2 AM 9 53

STEPHEN HARRIS, CLERK
CHEYENNE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| AMBER NICOLE LOMPE, <br><br> Plaintiff, <br><br> v. <br><br> SUNRIDGE PARTNERS, LLC; and APARTMENT MANAGEMENT CONSULTANTS, L.L.C., <br><br> Defendants. | Civil No. **12CV088J** <br><br> **PLAINTIFF'S COMPLAINT & DEMAND FOR JURY TRIAL** |

### I. INTRODUCTION

On February 1, 2011, Amber Lompe was poisoned by carbon monoxide gas inside her apartment at the Sunridge Apartments in Casper, Wyoming. Lompe's carboxyhemoglobin level was near 30 percent before she was rescued from the toxic environment. She suffered serious permanent injuries – including a traumatic brain injury – as a result. Sunridge Partners, LLC (Sunridge) owns the Sunridge Apartments. Apartment Management Consultants, LLC (AMC), operates and manages the apartments. Sunridge and AMC's negligence caused the carbon monoxide leak that seriously injured Lompe.

This action for money damages is brought against Sunridge and AMC, the defendants responsible for Lompe's injuries and damages.

## II. PARTIES

### Plaintiff Amber Lompe

1. Plaintiff Amber Nicole Lompe was poisoned with carbon monoxide gas in her apartment because of the defendants' negligence and suffered serious and permanent injuries as a result.

2. Lompe was a "tenant" of Defendant Sunridge and/or Defendant AMC, within the definition by Wyoming law, at all times relevant to this complaint.

3. Lompe is a citizen of the State of Wyoming.

4. Lompe lived in Sunridge Apartment #436, located at 3900 E. 12th Street, Casper, Wyoming 82609 (the Apartment) at all times relevant to this complaint.

### Defendant Sunridge

5. Defendant Sunridge Partners, LLC is a Utah limited liability company. Its principal office is located at 353 E. 300 South, Salt Lake City, UT 84111. Its registered agent in Wyoming is: CT Corporation System, 1720 Carey Ave., Ste 200, Cheyenne, WY 82001.

6. Sunridge Partners, LLC also has an address listed with the Natrona County Assessor's office: 5633 E. Sorrento Dr., Long Beach, CA 90803.

7. As a limited liability company, Sunridge can only act through its members, managers, employees, and agents. As the employer of those who set policy and who are involved with its business operations, Sunridge is responsible for the acts and omissions of its managers, employees, and agents.

8.  Sunridge owned the apartment complex known as "Sunridge Apartments" – and specifically including Apartment #436 – at all times relevant to this complaint.

9.  On information and belief, Defendant Sunridge was Lompe's "landlord" as defined by Wyoming law, at all times relevant to this complaint.

## Defendant AMC

10.  Defendant Apartment Management Consultants, L.L.C. is a Utah limited liability company. On information and belief AMC's headquarters is located at: 6915 South 900 East, Midvale, UT 84047. AMC's registered agent in Wyoming is: CT Corporation System, 1720 Carey Ave., Ste 200, Cheyenne, WY 82001.

11.  As a limited liability company, AMC can only act through its members, managers, employees, and agents. As the employer of those who set policy and who are involved with its business operations, AMC is responsible for the acts and omissions of its managers, employees, and agents.

12.  On information and belief, AMC operated and managed the Apartments – and specifically AMC operated and managed Lompe's Apartment – at all times relevant to this complaint.

13.  On information and belief, AMC acted as Sunridge's agent at all times relevant to this complaint.

14.  On information and belief, Defendant AMC was Lompe's "landlord" as defined by Wyoming law, at all times relevant to this complaint.

### III. JURISDICTION & VENUE

15.  Plaintiff incorporates and adopts by reference all the facts and allegations above as though fully set forth herein.

16. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest and costs.

17. This Court is the proper venue pursuant to 28 U.S.C. § 1391 because the defendants' acts and omissions that harmed Lompe occurred in Wyoming.

### IV. Facts Common To All Causes Of Action

18. Plaintiff incorporates and adopt by reference all the facts and allegations above as though fully set forth herein.

19. On or before the morning of February 1, 2011, the furnace and ventilation system in Amber Lompe's Sunridge Apartment #436 leaked poison carbon monoxide gas while she slept. Lompe woke up that morning surrounded by carbon monoxide levels at a dangerously high 500 parts per million inside the Apartment. The exposure to high levels of carbon monoxide gas caused Lompe to suffer a permanent traumatic brain injury.

20. On information and belief, prior to February 1, 2011, Sunridge and AMC had actual knowledge that furnaces in the Sunridge Apartment complex were in dangerous need of repair or replacement, and in fact that one or more of the Apartment complex's furnaces had leaked carbon monoxide gas in dangerous levels within the past year. Despite such knowledge, the defendants, in reckless disregard for the safety of the tenants, did nothing to improve the furnaces or protect their tenants, including Lompe.

21. On information and belief, on February 1, 2011, the Apartment's furnace leaked carbon monoxide in Lompe's apartment while she slept.

22. On information and belief, on February 1, 2011, the Apartment's ventilation system leaked carbon monoxide in Lompe's apartment while she slept.

23. Lompe's carboxyhemoglobin level at the time she left the toxic environment was near 30 percent.

24. Carbon monoxide gas also spread into the Sunridge Apartments hallway and into at least one other apartment, in addition to Lompe's.

25. Carbon monoxide levels were measured in the hallway outside Lompe's Apartment at 60 parts per million.

26. No carbon monoxide detectors or alarms ever sounded that morning, anywhere at the Sunridge Apartments.

27. Defendants Sunridge and/or AMC failed to provide Lompe with a working carbon monoxide detector when she moved into the Apartment.

28. Sunridge did not provide Lompe with a working carbon monoxide detector until after the February 1, 2011 incident.

29. AMC did not provide Lompe with a working carbon monoxide detector until after the February 1, 2011 incident.

30. Defendants Sunridge and/or AMC replaced the Apartment's furnace sometime after February 1, 2011, knowingly destroying the defective and dangerous product that had injured Lompe.

31. Sunridge and/or AMC destroyed the furnace from Lompe's Apartment in bad faith, knowing she was seriously injured and that litigation was reasonably foreseeable stemming from the incident.   Such destruction and spoliation of evidence was done deliberately, and with reckless disregard to the relevance of the furnace in question.

32. On information and belief, a hidden or latently dangerous condition, known to the Sunridge and/or AMC, and unknown to Lompe, caused her injuries.

33. Defendants' negligent, grossly negligent, reckless, willful and wanton acts and omissions directly, legally, and proximately caused serious injuries and damages to Plaintiff, as more particularly set forth below in the section of this Complaint entitled "Damages."

## V. First Cause of Action
### Negligence – Defendant Sunridge

34. Plaintiff incorporates and adopt by reference all the facts and allegations above as though fully set forth herein.

35. Defendant Sunridge owed Lompe a duty to exercise reasonable care under the circumstances.

36. Defendant Sunridge owed Lompe – as a tenant – a duty to exercise reasonable care under the circumstances.

37. Defendant Sunridge, through the acts and omissions of its employees, members, managers, and agents, breached and violated its duty of care to Lompe.

38. The acts and omissions constituting such breaches and violations include, but are not limited to, the following:

   a. Failure to exercise reasonable care under all of the circumstances;

   b. Failure to provide and/or maintain the Apartment in a safe and sanitary condition fit for human habitation;

   c. Failure to provide and/or maintain the Apartment's heating system in a reasonably safe condition;

   d. Renting the Apartment to Lompe in an unsafe, unsanitary, and/or unfit condition for human occupancy;

    e.  Failure to perform a reasonable inspection of the Apartment – including a reasonable inspection of the Apartment's furnace and ventillation system – before renting it to Lompe;

    f.  Failure to warn of the unreasonably dangerous condition in Lompe's Apartment;

    g.  Failure to comply with applicable federal and state regulations and laws;

    h.  Failure to comply with industry safety standards;

    i.  Failure to keep the Sunridge Apartments rental property safe; and

    j.  Other negligence.

39. Defendant Sunridge's acts and omissions played a substantial part in bringing about Plaintiff's injuries and damages.

40. Defendant Sunridge's negligent, grossly negligent, and willful and wanton acts and omissions directly, legally, and proximately caused serious injuries and damages to Lompe, as more particularly set forth below in the section of this Complaint entitled "Damages."

## VI. SECOND CAUSE OF ACTION
### NEGLIGENCE – DEFENDANT AMC

41. Plaintiff incorporates and adopt by reference all the facts and allegations above as though fully set forth herein.

42. Defendant AMC owed Lompe – as a tenant – a duty to exercise reasonable care under the circumstances.

43. Defendant AMC, through the acts and omissions of its employees, members, managers, and agents, breached and violated its duty of care to Lompe.

44. The acts and omissions constituting such breaches and violations include, but are not limited to, the following:

    a.   Failure to exercise reasonable care under all of the circumstances;

    b.   Failure to provide and/or maintain the Apartment in a safe and sanitary condition fit for human habitation;

    c.   Failure to provide and/or maintain the Apartment's heating system in a reasonably safe condition;

    d.   Renting the Apartment to Lompe in an unsafe, unsanitary, and/or unfit condition for human occupancy;

    e.   Failure to perform a reasonable inspection of the Apartment – including a reasonable inspection of the Apartment's furnace and ventillation system – before renting it to Lompe;

    f.   Failure to warn of the unreasonably dangerous condition in Lompe's Apartment;

    g.   Failure to comply with applicable federal and state regulations and laws;

    h.   Failure to comply with industry safety standards;

    i.   Failure to keep the Sunridge Apartments rental property safe; and

    j.   Other negligence.

45. Defendant AMC's acts and omissions played a substantial part in bringing about Plaintiff's injuries and damages.

46. Defendant AMC's negligent, grossly negligent, and willful and wanton acts and omissions directly, legally, and proximately caused serious injuries and damages to Lompe, as more particularly set forth below in the section of this Complaint entitled "Damages."

## VII. DAMAGES

47. Plaintiff incorporates and adopts by reference all the facts and allegations above as though fully set forth herein.

48. As a direct and proximate result of the defendants' negligent, grossly negligent, reckless, willful and wanton, and otherwise wrongful acts and omissions, Plaintiff suffered serious injuries.

49. Lompe suffered injuries, including but not limited to: traumatic brain injury.

50. Lompe seeks damages including, but not limited to, the following:

   a. Medical expenses, in an amount to be proved at trial;

   b. Other pecuniary loss in an amount to be proved at trial;

   c. Physical, mental, and emotional pain and suffering damages, in an amount to be proved at trial;

   d. Loss of enjoyment of life, in an amount to be proved at trial;

   e. Caretaking expenses for necessary help in the home, in an amount to be proved at trial;

   f. Exemplary and punitive damages in a reasonable amount to be proved at trial, sufficient to adequately punish the defendants and to serve as a deterrent and warning against future conduct of the type alleged in this complaint; and

   g. Costs of this action and for other further relief as the court deems equitable and proper.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff requests that this Court grant judgment as follows:

1. Judgment against the defendants for special damages in an amount consistent with the allegations contained herein and to be proven at trial;

2. Judgment against the defendants for general damages in an amount consistent with the allegations contained herein and to be proven at trial;

3.    Judgment against the defendants for punitive damages in a fair and reasonable amount to be proven at trial; and

4.    Judgment for costs, interest and such other and further relief as the Court deems just and equitable.

DATED this 1st day of May, 2012.

Tyson E. Logan, Wyoming Bar #6-3970
logan@spencelawyers.com
THE SPENCE LAW FIRM, LLC
15 S. Jackson Street, P.O. Box 548
Jackson, WY 83001
307-733-7290 / 307-733-5248 fax

Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, by and through counsel, demands a jury trial to resolve this matter, and submits the requisite fee herewith.

DATED this _____ day of May, 2012.

Tyson E. Logan, Wyoming Bar No. 6-3970
logan@spencelawyers.com
THE SPENCE LAW FIRM, LLC
15 S. Jackson Street, P.O. Box 548
Jackson, WY 83001
307-733-7290 / 307-733-5248 fax

Attorney for Plaintiff

EXHIBIT E



CLAIMS ADJUSTING GROUP, INC.

April 12, 2012

Sunridge Partners, LLC
c/o AMC, LLC
6915 S. 900 East
Midvale, UT 84047

Attention: Martha Knudson

Re:  _Lompa v. Sunridge Partners, LLC, et al._
Claim No.:             RL10-427
Policy Period(s):      03/31/10 to 03/31/11
Date of Loss:          02/01/2011
Insured(s):            Sunridge Partners, LLC
Covered Location:      3900 E. 12th Street, Casper, WY 82609

Dear Ms. Knudson and LLC Members:

On behalf of Interstate Fire and Casualty Company (hereafter IFCC), one of the Fireman's Fund Companies, Claims Adjusting Group handles claims in connection with the Commercial Industrial Building Owner's Alliance Insurance Program. This correspondence shall serve to confirm receipt of the lawsuit entitled _Lompa v. Sunridge Partners, LLC, et al.Marie Schwarz v. BRC Real Estate, et al.,_ filed in Wyoming District Court, case number 12CV088J.

CIBA Insurance Services, via a policy written through IFCC, has agreed to participate in the defense of Sunridge Partners, LLC and Apartment Management Consultants, LLC. The case has been referred to Peter Dusbabek of Montgomery, Kolodny, Amatuzio & Dusbabek. Mr. Dusbabek's office is located at 2625 Redwing Road, Suite 200 in Fort Collins, CO 80526. You may reach Dusbabek telephonically at 970-221-2800.

We would also like to take this opportunity to advise you that your liability policy carries a $1,000 per loss deductible that applies to this loss.

AMC/SUN000082

Sunridge Partners, LLC
Page 2 of 2

Should you have any questions or concerns regarding any of the above, please feel free to contact me at 818-638-8534.

Sincerely,

*Kelly Lemoine*

Kelly Lemoine
Senior Coverage Analyst
On behalf of Interstate Fire and Casualty
Company, one of the Fireman's Fund Companies

CC: Pete Dusbabek, Esq.
CC: Phil Snow / Moreton & Co.

AMC/SUN000083

EXHIBIT F

Peter S. Dusbabek, Reg. No. 5-2788
Montgomery, Kolodny, Amatuzio & Dusbabek, L.L.P.
3534 John F. Kennedy Parkway, Suite B
Fort Collins, CO 80525
pdusbabek@mkadlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| AMBER NICOLE LOMPE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No: |
| | ) | |
| v. | ) | 12 CV 088 J |
| | ) | |
| SUNRIDGE PARTNERS, LLC; and | ) | |
| APARTMENT MANAGEMENT | ) | |
| CONSULTANTS, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION INCORPORATING AUTHORITY FOR SUMMARY
## JUDGMENT PURSUANT TO Fed. R. Civ. P. 56

Sunridge Partners, LLC and Apartment Management Consultants, LLC, Defendants, by and through their undersigned counsel, pursuant to Fed.R.Civ.P. Rule 56 move the Court to enter judgment in their favor and against Plaintiff as to all claims against them. In support of this Motion, Defendants state as follows:

**CERTIFICATE OF COMPLIANCE.** Counsel for Defendants conferred with counsel for Plaintiff. This motion will be opposed.

### I. INTRODUCTION AND SUMMARY OF ARGUMENT

The nature of this proceeding is a civil damage action. The parties have substantially completed non-expert discovery. The Complaint alleges that on February 1, 2011, Plaintiff was exposed to carbon monoxide gas inside her apartment at the Sunridge Apartments in Casper,

1

Wyoming due to the Defendants' alleged negligence and that she suffered injuries as a result. The Sunridge Apartments are owned by Sunridge Partners, LLC ("Sunridge") and managed by Apartment Management Consultants, LLC ("AMC"). Plaintiff asserts one claim of negligence against each Defendant alleging that they had "actual knowledge that furnaces in the Sunridge Apartment complex were in dangerous need of repair or replacement" and that despite such knowledge, did nothing to improve the furnaces or protect Plaintiff, "in reckless disregard" for her safety. However, the evidence revealed to date shows that the source of the carbon monoxide was a cracked heat exchanger in the furnace of Plaintiff's apartment. The Defendants had no notice that the heat exchanger was cracked thus rendering it an unknown, latent defect. In addition, Plaintiff disabled and, according to her testimony, disposed of a carbon monoxide detector provided for her unit prior to the event. Plaintiff has the burden to prove that the Defendants had actual or constructive notice of the defect which caused her alleged injury. Plaintiff cannot meet this burden. Accordingly, this Court should enter summary judgment for the Defendants on Plaintiff's claims.

## II. STANDARD OF REVIEW

F.R.C.P. Rule 56(a) provides that the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is a entitled to judgment as a matter of law. By its very terms, the standard in F.R.C.P. Rule 56 provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *International Surplus Lines, Ins. Co. v. University of Wyo. Research Corp.*, 850 F.Supp. 1509, 1517 (D. Wyo. 1994) *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 91 L.ED. 2d 202, 106 S.Ct. 2505 (U.S. 1986). The trial court decides

2

which facts are material as a matter of law and only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Id., citing Anderson,* 477 U.S. at 248; *Carey v. United States Postal Serv.,* 812 F.2d 621, 623 (10th Cir. 1987). Summary Judgment may be entered against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof. *Id., citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 91 L.Ed. 2d 265, 106 S. Ct. 2548 (U.S. 1986); *Carey,* 812 F. 2d at 623.

District Courts of the United States sitting in diversity apply state substantive law and federal procedural law. *Huff v. Shumate,* 360 F. Supp. 2d 1197, 1200 (D. Wyo. 2004) *citing Erie R.R. v. Tompkins,* 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817 (U.S. 1938); *Hanna v. Plumer,* 380 U.S. 460, 471-74, 14 L.Ed. 2d 8, 85 S. Ct. 1136 (U.S. 1965).

## III. STATEMENT OF UNDISPUTED FACTS

1. Amber Lompe moved in to the Sunridge Apartments in August of 2010. *Exhibit A, Deposition of Amber Lompe,* 28:15-19.

2. Prior to and at the time of the event, Sunridge hired AMC to perform all day to day management of the Sunridge Apartments. *Exhibit B, Affidavit of Michael Few,* ¶ 8.

3. Michael Few is the on-site property manager of Sunridge Apartments and is employed by AMC. *Exhibit B, Affidavit of Michael Few,* ¶¶ 2-3; *Exhibit C, Deposition of Michael Few,* 3:15-24.

4. When Ms. Lompe moved in to the Sunridge Apartments, she worked with Mr. Few and another woman from the leasing office to go over the basic amenities and functions of the apartment and apartment complex. *Exhibit A, Deposition of Amber Lompe,* 49:23 -- 51:10.

3

5.   At the time she moved in, Ms. Lompe read and signed a lease agreement. *Exhibit A,*
     *Deposition of Amber Lompe,* 47:2-10.

6.   Included in the lease agreement is a provision regarding smoke detectors, which Ms.
     Lompe read. *Exhibit A, Deposition of Amber Lompe,* 51:17-24.

7.   Paragraph 28 of the Lease Agreement provides: "Your Premises is supplied with a
     smoke detection devices(s). All detectors in your Premises are in proper working
     order.   Upon occupancy it shall be your responsibility to regularly test the
     detectors(s) to ensure that the device(s) are in operable condition.   You agree to
     inform Owner immediately in writing of any defect, malfunction or failure of such
     detectors.   You are responsible for changing the battery in the detectors when
     necessary.   You will also agree not to disconnect the smoke detector at any time and
     or for any reason." *Exhibit D, Lease Agreement,* ¶28.

8.   When a new tenant moves in to the Sunridge Apartments, AMC's practice is for the
     manager to go over the lease with the tenant, tell them that their unit is equipped with
     a carbon monoxide detector, tell them that if it beeps, let management know and they
     will provide a new battery and to not unplug it for any reason. *Exhibit C, Deposition*
     *of Michael Few,* 100:18-101:10.

9.   When Ms. Lompe moved in to her apartment, it was equipped with a carbon
     monoxide detector. *Exhibit A, Deposition of Amber Lompe,* 52:18-20.

10.  Ms. Lompe testified that the carbon monoxide detector that was in the apartment
     when she moved in did not have a battery in it. She took a battery from something
     else she had, put it in the detector and plugged it into the wall. It kept "going off"
     and saying "low" on the screen, so she assumed it meant it had a low battery. She

4

then got a new battery and plugged it in again. It kept beeping and saying "low." Ms. Lompe assumed it was broken and she threw it away. *Exhibit A, Deposition of Amber Lompe*, 63:11-64:4.

11.    On the morning of the incident, Mr. Few was walking down the hall outside Ms. Lompe's apartment and smelled something resembling car exhaust. *Exhibit C, Deposition of Michael Few*, 130:1-11.

12.    Mr. Few called Mr. Kemberling for a second opinion. Mr. Kemberling called SourceGas to respond. *Exhibit C, Deposition of Michael Few*, 130:14-18; *Exhibit E, Deposition of Scott Kemberling*, 49:1-6.

13.    Mike Coryell of SourceGas responded to the scene and knocked on Ms. Lompe's apartment door. She opened the door and Mr. Coryell and Mr. Kemberling got her out into the hallway. *Exhibit F, Deposition of Mike Coryell*, 18:4-19:11.

14.    Mr. Coryell went into the apartment, shut off her furnace and opened the sliding glass door to ventilate the apartment. *Exhibit F, Deposition of Mike Coryell*, 19:12-16.

15.    Mr. Kemberling then called Mr. Few and asked Mr. Few to call for emergency medical services. *Exhibit C, Deposition of Michael Few*, 134:22-135:4.

16.    After Ms. Lompe had been taken out of her apartment for medical attention, Scott Kemberling called John Haid with Haid Plumbing and Heating to come out and look at the furnace to tell them what was wrong with it. *Exhibit E, Deposition of Scott Kemberling*, 94:11-21.

17.    Mr. Haid recalls that Ms. Lompe's apartment was a mess and the cold air return for the furnace was plugged off by dirty clothes. *Exhibit G, Deposition of John Haid*,

67:22-24.

18. Mr. Haid recalls being pretty frustrated with the pile of clothing and seeing the carbon monoxide detector on the floor not plugged in. *Exhibit G, Deposition of John Haid*, 77:10-15.

19. When Mr. Haid was first called about a carbon monoxide leak, he immediately thought the furnace had a cracked heat exchanger. *Exhibit G, Deposition of John Haid*, 63:23-64:8.

20. Mr. Haid used a scope to inspect inside the furnace. In the process of checking the furnace, Mr. Haid pulled the burners, ran through all three chambers and found an area on the far right side of the heat exchanger that had a crack in it. *Exhibit G, Deposition of John Haid*, 79:11-25.

21. In 2010, management performed semi-annual inspections of each apartment at Sunridge, which included changing the air filters, checking that the smoke and carbon monoxide detectors are functioning, replacing the battery if needed, checking for leaks in plumbing, checking for unauthorized guests or pets, and doing a basic inspection of the unit. *Exhibit C, Deposition of Michael Few*, 53:13-54:4.

22. Neither the AMC property manager, Michael Few, nor the maintenance technician, Scott Kemberling is an expert in heating, ventilation and air conditioning (HVAC). Neither Mr. Few nor Mr. Kemberling is certified in HVAC work. *Exhibit C, Deposition of Michael Few*, 46:19-47:17, 48:21-25, 86:5; *Exhibit E, Deposition of Scott Kemberling*, 28:7-19.

23. Neither Mr. Few nor Mr. Kemberling were trained in maintenance or repair of heat exchangers. *Exhibit C, Deposition of Michael Few*, 50:23-51:16. *Exhibit E,*

6

*Deposition of Scott Kemberling*, 28:7-19, 35:9-14.

24.     Other than minor issues, if there was a problem with a furnace at Sunridge, management called an HVAC contractor to make the repair. *Exhibit C, Deposition of Michael Few*, 48:5-49:16; *Exhibit E, Deposition of Scott Kemberling*, 38:16-24. 88:24-89:11.

25.     Regularly scheduled cleaning and inspection of a furnace does not prevent the heat exchanger from subsequently cracking or failing. There is no way to predict when a heat exchanger might fail. *Exhibit G, Deposition of John Haid*, 104:5-15.

26.     There was no notice prior to the event that the heat exchanger in the furnace of Ms. Lompe's apartment had cracked. *Exhibit B, Affidavit of Michael Few*, ¶¶ 5-7.

27.     The most effective way to immediately detect carbon monoxide emissions is to have a functioning carbon monoxide detector. *Exhibit G, Deposition of John Haid*, 102:25-103:7.

## IV. ARGUMENT

Historically, landlord immunity was the rule in landlord-tenant law. *Merrill v. Jansma*, 86 P.3d 270, 274 (Wyo. 2004) (discussing historical development of landlord liability law). Wyoming adopted the Residential Rental Property Act ("Act" or "WRRPA"), Wyo. Stat. §1-21-1201 which provides, *inter alia*, that landowners and agents renting or leasing a residential unit shall maintain that unit in a safe and sanitary condition fit for human habitation. Wyo. Stat. at §1-21-1202(a). Citing the Act, other similar state acts and a growing body of case law from around the country the Wyoming Supreme Court abolished landlord immunity and adopted the liability standard of "whether the landlord acted reasonably under the circumstances." *Merrill*, 86 P.3d at 278. However, in so doing the Wyoming Supreme Court limited its decision:

> Our rejection of the general rule of landlord immunity does not make landlords liable as insurers. Their duty is to use reasonable care to discover and remedy conditions which present an unreasonable risk of harm under the circumstances. Nor does our ruling mean that questions as to whether a dangerous condition existed in an area occupied solely by the tenant or in a common area, or whether the condition was apparent or hidden, are irrelevant. These are circumstances which must be accounted for in customary negligence analysis. They may pertain to the reasonableness of the tenant's conduct and to the foreseeability and magnitude of the risk. In particular, a landlord ordinarily gives up the right to enter premises under the exclusive control of the tenant without the tenant's permission. The landlord's ability to inspect or repair tenant areas is therefore limited. In such cases, "a landlord should not be liable in negligence unless he knew or reasonably or should have known of the defect and had a reasonable opportunity to repair it."

*Merrill*, 86 P.3d at 279 quoting *Young v. Garwackl*, 402 N.E. 2d 1045 (Mass. 1980). Thus the legal issue becomes whether the Defendants knew or reasonably should have known of the defect and had a reasonable opportunity to repair it.

Lack of notice formed the basis for a ruling granting summary judgment for landlords in a carbon monoxide case in *Jennifer M. Moyer, et al. v. Kenneth Kreiling*, et al., Laramie County, Wyoming District Court Docket No. 172-392 (decision letter attached as Exhibit H.) In *Moyer*, the owners/landlords of duplexes assumed all aspects of management of the properties including the performance of minor maintenance work. The landlords leased one of the duplexes to the plaintiffs and their two children. After moving in the plaintiffs observed that the furnace fan began to run continuously. This problem was reported to the landlords who in turn called an HVAC contractor which repaired the problem. The plaintiffs were later exposed to carbon monoxide gas caused by ventilation issues alleged to include a solid door to the utility room where the furnace was located, ceiling air intakes covered by blown-in insulation and a dirty air filter all of which blocked fresh air intake. The plaintiffs brought claims against the HVAC contractor and the landlords.

8

Finding that there was no disputed issue of fact that the conditions leading to the failure were latent and unknown to the landlords, the district court granted summary judgment on the plaintiff's claim against the landlords. In so doing the court considered the holding in *Merrill* as well as similar foreign cases:

> However, the cases do not make a landowner responsible for a latent defect which could not be discovered by a landlord making a reasonable inspection. *Slavink* 108 So. 2d 462, 466-68 (FLA 1958); *Edward M. Chadbourne, Inc. v. Vaughn*, 491 So. 2d 551, 554 (FLA 1986); *Marco Supra, Id.* [711 So. 2d 583, 585 (FLA App. 1998)]; *Gourdi, Supra, Id.* [930 P.2d 812, 814-15 (N.M. 1996)]. Absent a condition which would create constructive notice, an owner is not required to consult an expert to seek out unknown latent defects. *See e.g., Fitzgerald v. Cestari*, 569 So. 2d 1258, 1260 (FLA 1990); *Marco, Id.* at 586. This rule strikes a reasonable accommodation of the interest of all parties, and is consistent with the language, interpretation and purpose of the WRRPA. It requires a landlord to make reasonable efforts to determine whether the premises are in a safe condition, but does not require a full expert inspection each time the property is rented, nor make the landlord an insurer of unknown latent conditions which occurred or developed without his knowledge or involvement
>
> ...
>
> In summary, the only means by which the Kreilings [the landlords] could be held responsible for the harm alleged to have been suffered by the Kores [the plaintiffs] would be to hold them to the standard of an HVAC contractor, or to impose strict liability of some kind. WRRPA does not impose such onerous duties.

*Moyer*, Exhibit H, pp. 12-14. *Merrill* and *Moyer* hold that landlords are not liable for a defect causing injury absent actual or constructive notice of the defect.

Here, the evidence shows that the defect causing injury was a crack in the heat exchanger of the furnace in Plaintiff's apartment. The crack was unknown to the Defendants. After the event John Haid, the HVAC contractor who replaced the furnace, had to use a specialized scope to look inside the furnace to observe the crack in the heat exchanger. Neither Defendant knew nor had any reason to know that the heat exchanger in the Plaintiff's unit was cracked. The crack occurred or developed without the Defendants' knowledge or involvement. Thus, as in *Moyer*, the facts do not meet the element of actual or constructive knowledge of the defect, a require

9

element for liability on the part of a landlord under Wyoming law.

Similarly, the Defendants did not know as of the time of the event that Ms. Lompe had disabled and discarded the CO detector supplied for her unit[1]. The Plaintiff's duties under the lease included maintaining all detectors supplied for her unit and notifying management of any malfunction. As Mr. Haid testified, the best and most immediate protection against a hidden defect such as a cracked heat exchanger is a carbon monoxide detector. By disabling and disposing of the CO detector Plaintiff breached the lease agreement and assumed the risk of the event of which she now complains.

Plaintiff asserts that she is entitled to an award of various forms of damages including punitive damages. A claim for punitive damages is not a separate cause of action and cannot stand without an underlying claim. *See, e.g. Barham v. Town of Greybull*, 2011 U.S. Dist. LEXIS 74484 (D. Wyo. July 11, 2011) para. 52, *aff'd* 483 Fed. Appx. 506, 2012 U.S. App. LEXIS 11306 (10th Cir. 2012). Accordingly, summary judgment for the Defendants on the Plaintiff's negligence claim disposes of her entire claim for relief.

## V. CONCLUSION

For the reasons stated herein, the Court should enter summary judgment for the Defendants. A proposed Order is filed herewith for the Court's convenience.

---

[1] Plaintiff testified that she threw away the CO detector provided in her apartment because she didn't believe it was working properly. This fact is disputed by two witnesses who observed a disabled carbon monoxide detector in Plaintiff's apartment both before and after the event. This is not relevant to the lack of notice on the part of the Defendants, and there is no dispute that Ms. Lompe disabled the CO detector regardless of whether she "threw it away."

10

MONTGOMERY, KOLODNY,
AMATUZIO & DUSBABEK, L.L.P.

s/Peter S. Dusbabek

By:   Peter S. Dusbabek
3534 John F. Kennedy Parkway, Suite B
Fort Collins, CO 80525
Telephone: 970-221-2800
Fax: 970-221-0271
pdusbabek@mkadlaw.com
Attorney for the Defendants

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 25  , 2013, a true and correct copy of the foregoing **MOTION INCORPORATING AUTHORITY FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of Court and served to the following parties using the CM/ECF system:

*Counsel for Plaintiff:*

Tyson E. Logan, Esq.
The Spence Law Firm, LLC
15 S. Jackson Street
P.O. Box 548
Jackson, WY 83001

s/Peter S. Dusbabek

11

EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2013 OCT 25   AM 8 29

STEPHAN HARRIS, CLERK
CHEYENNE

AMBER NICOLE LOMPE,

    Plaintiff,

    vs.                      Case No. 12-CV-88-J

SUNRIDGE PARTNERS, LLC, and
APARTMENT MANAGEMENT
CONSULTANTS, LLC,

    Defendants.

## ORDER DENYING MOTION FOR SUMMARY JUDGMENT

    Defendants' motion seeking summary judgment in its favor and plaintiff's opposition to the motion have come before the Court for consideration. The Court has reviewed the parties' written submissions and supporting materials, all pleadings of record, and the applicable law and finds and orders that the motion for summary judgment be denied.

    This is a personal injury action. Plaintiff alleges that she was exposed to carbon monoxide gas in her home at the Sunridge Apartments in Casper, Wyoming on February 1, 2011. She alleges that she suffered injuries as a result of the defendants' negligence and that she is entitled to recover damages. She alleges that the defendants had actual knowledge that the furnaces in the apartment complex were in dangerous need of repair or replacement and notwithstanding that knowledge, did nothing to improve the furnaces or protect the plaintiff. Defendants say that the evidence discloses that the source of the carbon monoxide was a cracked heat exchanger in the furnace of which they

had no notice or knowledge. They characterize this as an unknown latent defect. Defendants also claim that plaintiff disabled and disposed of a carbon monoxide detector provided in her apartment before the event occurred. It appears they also believe plaintiff's imperfect housekeeping may have contributed to the event in which Lompe was injured. Lompe's deposition indicates that she recalled no discussions about carbon monoxide detectors with apartment complex representatives. She testified she knew there were smoke detectors in the apartment; she learned after the event that there was a carbon monoxide detector in the apartment. The defendants argue plaintiff cannot prove they had actual or constructive notice of the problems with the furnace or the claimed heat exchanger defect that caused her injuries and thus, she is not entitled to any relief.

In response, the plaintiff asserts that the defendants had ignored repeated warnings and had actual knowledge that the furnaces in the apartment complex were too old to be safe and needed to be replaced. Plaintiff contends that the defendants rejected their own employees' requests that furnaces be inspected, cleaned and maintained by HVAC professionals. The argument is that this increased the likelihood that the furnaces would fail and cause injury. Maintenance for furnaces in the complex was not provided until furnaces actually failed. Only then were they replaced with new, safer furnaces. In October 2009, an AMC employee was poisoned by a 30 year old furnace that suffered a cracked heat exchanger, an event that would provide notice of problems with the furnaces in the apartment complex. The Lompe apartment's furnace also had a cracked heat exchanger, caused her to be poisoned only sixteen months later. The incident involving Lompe was foreseeable and without addressing the furnace problems in the apartment complex, the defendants failed to act reasonably as property owners and landlords.

2

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is genuine if a reasonable juror could resolve the disputed fact in favor of either side. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is material if under the substantive law it is essential to the proper disposition of the claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor." *Anderson*, 477 U.S. at 255.

The party moving for summary judgment has the burden of establishing the nonexistence of a genuine dispute of material fact. *Lynch v. Barrett*, 703 F.3d 1153, 1158 (10th Cir. 2013). The moving party can satisfy this burden by either (1) offering affirmative evidence that negates an essential element of the nonmoving party's claim, or (2) demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *See* Fed. R. Civ. P. 56(c)(1)(A)–(B).

Once the moving party satisfies this initial burden, the nonmoving party must support its contention that a genuine dispute of material fact exists either by (1) citing to particular materials in the record, or (2) showing that the materials cited by the moving party do not establish the absence of a genuine dispute. *See id.* The nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive a summary judgment motion, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case,

3

and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Further, when opposing summary judgment, the nonmoving party cannot rest on allegations or denials in the pleadings but must set forth specific facts showing that there is a genuine dispute of material fact for trial. *See Travis v. Park City Mun. Corp.*, 565 F.3d 1252, 1258 (10th Cir. 2009).

When considering a motion for summary judgment, the court's role is not to weigh the evidence and decide the truth of the matter, but rather to determine whether a genuine dispute of material fact exists for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact-finder, not the court. *Id.* at 255.

## Discussion

The Court has reviewed the parties' voluminous submissions. The deposition excerpts upon which defendants rely, particularly those of plaintiff Lompe, are not especially compelling or persuasive. The plaintiff asserts that defendants had notice of problems with the aged furnaces in the apartment complex. Simply by way of example, previous events involving carbon monoxide poisoning had occurred in that apartment complex and were known to its management. Other than defendants' say so, there is little to lead the Court to conclude that the genesis of the problems with the furnace causing plaintiff's injuries were due to latent defects in the system that would somehow excuse or absolve defendants from their responsibilities and duties as property owners and landlords owed to tenants and inhabitants of the apartment complex. Likewise, plaintiff's deposition testimony regarding her knowledge of carbon monoxide detectors in the apartment is susceptible of more than one interpretation. Contrary to the defendants' assertions, this testimony does not support a finding

4

that there are no genuine disputes of material fact.   There are differing versions of the story to be told at trial; different inferences, deductions or conclusions may be drawn from the evidence presented in conjunction with this motion. The Court is unwilling to find as a matter of law that one party or the other should prevail on the basis of the written submissions that have been presented so far.

The obvious issues at the forefront precluding summary judgment boil down to ask what a reasonable person in the defendants' circumstances knew or should have known. Was it foreseeable that tenants would suffer injury if old, dilapidated furnaces failed and permitted carbon monoxide to escape?  What are the duties owed by property owners and landlords to their tenants? Did the defendants have notice of furnace defects, if any?

In *Merrill v. Jansma*, 86 P.3d 270, 286 (Wyo. 2004), cited by the defendants, the Wyoming Supreme Court held that the Residential Rental Property Act, Wyo. Stat. § 1-21-1201 *et seq.*[1] clearly and unequivocally changed the common law by requiring landlords to provide rental premises that are reasonably safe , sanitary and fit for human habitation. "Electricity, heating, plumbing and hot

---

[1]Wyo. Stat. § 1-21-1202 provides:
Each owner and his agent renting or leasing a residential rental unit shall maintain that unit in a safe and sanitary condition fit for human habitation. Each residential rental unit shall have operational electrical, heating and plumbing, with hot and cold running water unless otherwise agreed upon in writing by both parties. Provided, however, this section shall not prevent the rental of seasonal rental units such as summer cabins which are not intended to have such amenities.
  (b) Each renter shall cooperate in maintaining his residential rental unit in accordance with this article.
  (c) This article does not apply to breakage, malfunctions or other conditions which do not materially affect the physical health or safety of the ordinary renter.
  (d) Any duty or obligation in this article may be assigned to a different party or modified by explicit written agreement signed by the parties.

and cold running water are certainly among the items the landlord must provide." *Id.* The act imposes a duty of reasonable care under the circumstances. *Id.* At page 279 of its opinion, the Wyoming Court favorably quoted *Newton v. Magill, 872* P.2d 1213, 1218 (Alaska 1994):

> Our rejection of the general rule of landlord immunity does not make landlords liable as insurers. Their duty is to use reasonable care to discover and remedy conditions which present an unreasonable risk of harm under the circumstances. Nor does our ruling mean that questions as to whether a dangerous condition existed in an area occupied solely by the tenant or in a common area, or whether the condition was apparent or hidden, are irrelevant. These are circumstances which must be accounted for in customary negligence analysis. They may pertain to the reasonableness of the landlord's or the tenant's conduct and to the foreseeability and magnitude of the risk. In particular, a landlord ordinarily gives up the right to enter premises under the exclusive control of the tenant without the tenant's permission. The landlord's ability to inspect or repair tenant areas is therefore limited. In such cases, "a landlord should not be liable in negligence unless he knew or reasonably should have know of the defect and had a reasonable opportunity to repair it." [*Garwacki*, supra.]

The facts in this case implicate issues that may be considered employing a normal negligence analysis. As noted above, this analysis would addresses issues such as whether the defendants had or should have had notice of problems with the furnace system and an opportunity to remedy the conditions complained of here. This is not exhaustive, but serves to demonstrate factual issues that are not easily or appropriately decided in the summary judgment context.

The Court will not belabor the facts and or the conclusions to be drawn from those facts any further in this order. Upon a review of the materials that have been submitted, including the depositions and other materials, the Court concludes that the defendants are not entitled to summary judgment as a matter of law for the reason that there are genuine issues of material fact to be determined by the jury. The defendants' motion for summary judgment will be denied. The plaintiffs will be permitted to present their case to the jury, the body charged with deciding issues of fact at trial using their common sense and reason and in accordance with the Court's instructions

6

on the law.  Accordingly, it is hereby

ORDERED that the defendants' motion for summary judgment (Docket Entry 27) shall be,

and hereby is, DENIED.

Dated this 24th day of October 2013.

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE

EXHIBIT H



CLAIMS ADJUSTING GROUP, INC.

November 20, 2013

Sunridge Partners, LLC
c/o AMC, LLC
6915 S. 900 East
Midvale, UT 84047

Attention: Martha Knudson

Re:  *Lompe v. Sunridge Partners, LLC, et al.*
      Claim No.:             RL10-427
      Policy Period(s):      03/31/10 to 03/31/11
      Date of Loss           02/01/2011
      Insured(s):            Sunridge Partners, LLC
      Covered Location:      3900 E. 12th Street, Casper, WY 82609

Dear Ms. Knudson and LLC Members:

On behalf of Interstate Fire and Casualty Company (hereafter IFCC), one of the Fireman's Fund Companies, Claims Adjusting Group handles claims in connection with the Commercial Industrial Building Owner's Alliance Insurance Program.

As you are aware, CIBA Insurance Services, via a policy written through IFCC, has been providing a defense to Sunridge Partners, LLC and Apartment Management Consultants, LLC utilizing Peter Dusbabek of Montgomery, Kolodny, Amatuzio & Dusbabek.

Please note that the Complaint against the LLC prays for punitive and exemplary damages.  An exclusionary provision to the IFCC policy expressly negates coverage for those types of damages. In this respect the policy provides:

> "This insurance does not apply to fines, penalties, punitive damages, exemplary damages, treble damages or the multiplication of compensatory damages."

655 North Central Avenue  |  Suite 2100  |  Glendale, CA 91203  / 818 638-8534 / 818 638-8530
License # 2D72600

AMC/SUN000086

Sunridge Partners, LLC
Page 2 of 2

While we will continue to provide Sunridge Partners, LLC and Apartment Management Consultants, LLC with a full and complete defense, any award or judgment for punitive or exemplary damages will be the sole responsibility of Sunridge Partners, LLC and Apartment Management Consultants, LLC. As such, those entities may wish, at their own expense, to hire an attorney to represent them for that portion of the suit.

Should you have any questions or concerns regarding any of the above, please feel free to contact me at 818-638-8534.

Sincerely,

Kelly Lemoine
Senior Coverage Analyst
On behalf of Interstate Fire and Casualty
Company, one of the Fireman's Fund Companies

CC: Pete Dusbabek, Esq.
CC: Phil Snow / Moraton & Co.

AMC/SUN000087

EXHIBIT I

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

U.S. ... ...URT
DIS...CY OF WYOMING

2013 DEC 26  PM 4 42

STEPHEN ......IS  CLERK
CHEYENNE

AMBER NICOLE LOMPE,

    Plaintiff,

    vs.

SUNRIDGE PARTNERS, LLC, and
APARTMENT MANAGEMENT
CONSULTANTS, LLC,

    Defendants.

Case No. 12-CV-88-J

## JUDGMENT

This action came on for trial before the Court and a jury, Honorable Alan B. Johnson, District Judge, presiding.  The issues having been tried and the jury having duly rendered its verdicts, finding that plaintiff Amber Nicole Lompe is entitled to recover compensatory and punitive damages, it is hereby

**ORDERED, ADJUDGED AND DECREED** that plaintiff, Amber Nicole Lompe, recover compensatory damages of the defendant, Sunridge Partners, LLC, in the sum of $750,000.00, plus punitive damages in sum of $3,000,000.00, plus post-judgment interest thereon at the statutory rate of 0.14%, from the date of entry of this judgment, pursuant to 28 U.S.C. § 1961. **It is further**

1

**ORDERED, ADJUDGED AND DECREED** that plaintiff, Amber Nicole Lompe, recover compensatory damages of the defendant, Apartment Management Consultants, LLC in the sum of $1,950,000.00, and punitive damages in the sum of $22,500,000.00, plus post-judgment interest thereon at the statutory rate of 0.14%, from the date of entry of this judgment, pursuant to 28 U.S.C. § 1961. **It is further**

**ORDERED, ADJUDGED AND DECREED** that plaintiff, Amber Nicole Lompe, recover her costs, pursuant to Fed. R. Civ. P. 54(d)(1), upon the filing of a bill of costs with the Clerk of the Court within ten (10) days of the date of entry of this Judgment, with the parties to bear their own attorneys' fees.

Dated this _26_ day of December 2013.

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE

2

EXHIBIT J



Protecting your future since 1863"

April 1, 2014

**VIA EMAIL & US MAIL**

Martha Knudson
Apartment Management Consultants, LLC
1954 Ft. Union Blvd., #500
Cottonwood Heights, UT 84121
m.knudson@amcllc.net

Robert Ctvrtlik
Sunridge Partners, LLC
353 E. 300 South
Salt Lake City, UT 84111
bob.ctvrtlik@verityllc.net

       Re:   *Lompe v. Sunridge Partners, LLC, et al.*
             Claim No.:  RL10-427
             Interstate Policy: SGL 1002220
             DOL: 02/01/2011

Dear Ms. Knudson and Mr. Ctvrtlik,

We are in receipt of your letters of March 19, 2014, as well as the March 18, 2014 letter from Amy F. Sorenson to Amber Lompe's counsel and the offer therein.  Both AMC and Sunridge make the same request for Interstate to reconsider its position on posting a bond to stay enforcement of the punitive damages portion of the judgment against AMC and Sunridge and/or to fund the offer they have made to Ms. Lompe.  This letter is in response.

Please be advised that Interstate respectfully maintains its position as expressed in the correspondence from Patrick Hustead, Esq. to Ms. Knudson on December 30, 2013.  A copy of that letter is attached hereto as *Exhibit A* for ease of reference.  For the reasons expressed therein, Interstate respectfully declines the request to post a bond or fund the offer to Ms. Lompe with regard to the punitive damages judgment.

As Interstate has already explained, the duty to post a supersedeas bond for the portions of the jury's verdict for punitive damages clearly falls on AMC and Sunridge -- not on Interstate.  Please again refer to Mr. Hustead's letter.  By extension, the same rationale applies to and supports Interstate's position with respect to AMC's and Sunridge's to fund their alternate proposal to Ms. Lompe.  If AMC and Sunridge wish to come to an agreement with Ms. Lompe to otherwise address the punitive damages judgment, funding it is also their sole responsibility.

Nonetheless, if you believe Interstate's position is incorrect and you have any law or additional documentation you wish to provide in support of your requests to reconsider, please provide such immediately for consideration.  We write this letter reserving any and all rights available either at law or in equity.

Sincerely,

Marc Orloff

Fireman's Fund Insurance Companies
777 San Marin Drive
Novato, California 94998
www.firemansfund.com



# THE HUSTEAD LAW FIRM

*A Professional Corporation*
REGENCY PLAZA ONE
4643 SOUTH ULSTER STREET
SUITE 1250
DENVER, COLORADO 80237

TELEPHONE (303) 721-5000
TELECOPIER (303) 721-5001
WWW.THLF.COM

Patrick Q. Hustead, Esq.

Martha Knudson
Apartment Management Consultants, LLC
1954 Ft. Union Blvd., #500
Cottonwood Heights, UT 84121
m.knudson@amcllc.net

       Re:   *Lompe v. Sunridge Partners, LLC, et al.*
             Claim No.: RL10-427
             Our File No.: HLF 2400-104
             Interstate Policy (Primary): SGL 1002220
             Interstate Excess Policy: PFX73097172
             Fireman's Fund Excess Policy: SHX-000-7262-3879

Dear Ms. Knudson,

    We write this letter on behalf of Interstate Fire and Casualty Company ("Interstate") and Fireman's Fund. We have reviewed the above-referenced policies, along with some additional information with regard to the above-referenced matter, and we have reviewed some of your recent correspondence and statement of expectations. We write this letter in response to your recent letters, excluding those sent today.

    Specifically, we write in response to your letters of December 24, 2013 and December 27, 2013, wherein: (1) you make incorrect allegations of wrongdoing on the part of Interstate; (2) you threaten a bad faith action if Interstate does not immediately comply with your demand to pay the uncovered punitive damages against Apartment Management Consultants, LLC ("AMC") and Sunridge Partners, LLC ("Sunridge"); and (3) you express your expectation that Interstate will post a bond to cover the full amount of the verdicts, including the uncovered punitive damages portions. Each is addressed in turn.[1]

---

[1] The activities of the insurers and the undersigned are undertaken with the full reservation of the insurers' rights and defenses under the terms of the policies, governing law and equity. This reservation of rights shall remain in full force and effect unless expressly revoked by the insurers in writing. Any failure by us to respond to any specific statement or contention in your letters is not to be interpreted as any sort of agreement with them.

AMC/SUN000002

# THE HUSTEAD LAW FIRM
### *A Professional Corporation*

Ms. Knudson
December 30, 2013
Page 3

though the duty to defend is present, it does not require payment of a judgment based on claims other than those covered by the policy.

Since you have and continue to assert that Interstate is liable for the punitive damage award, please be advised that, on behalf of Interstate, we have recently filed a Complaint for Declaratory Relief in the United States District Court for the District of Wyoming, 13-CV-278J. We are seeking an Order decreeing, among other things, that there is no coverage obligation concerning the punitive damages awards. To be clear, Interstate is not disputing coverage for or its obligation to pay the compensatory portion of the judgment. The Declaratory Judgment action pertains only to the punitive damages dispute. Please let us know if you will accept service or whether we need to effectuate personal service in a different manner.

Third, we understand, from your December 27, 2013 letter, it is your "expectation" that Interstate will "immediately" post a supersedeas bond in the *full* amount of the judgment to preserve your rights to file an appeal. Please, however, be advised that such is not Interstate's obligation, and it will not be posting such a bond. If AMC and/or Sunridge wish to seek a stay of execution on the punitive portion of the judgments against them, they will need to post the bonds themselves to cover such amounts.

We are currently analyzing whether Interstate will post a bond or simply pay the primary judgment. Assuming it is determined that Interstate will post a bond, please understand that such bond will sufficient to include the covered benefits. Punitive damages are not a covered benefit.

Please understand that it is well-settled throughout the country that an insurer such as Interstate has no obligation at all to post a supersedeas bond on behalf of an insured. Moreover, if an insurer elects to do so, the insurer must only post a supersedeas bond in an amount sufficient to include benefits that are covered under its policy. *See Weekley v. Transcraft, Inc.*, 121 F.R.D. 398 (N.D. Ind. 1988); *Bergeson v. Dilworth*, 749 F.Supp. 1555 (D. Kan. 1990); *Rudolph v. Cassidy*, 286 S.W.2d 489 (Ark. 1956); *Merritt v. J. A. Stafford Co.*, 440 P.2d 927 (Cal. 1968); *Fitzgerald v. Addison*, 287 So.2d 151 (Fla. App. 1973); *United Fire & Cas. Co. v. Shelly Funeral Home, Inc.* 642 N.W.2d 648 (Iowa 2002); *Todd v. Kelly*, 837 P.2d 381 (Kan. 1992); *Cansler v. Harrington*, 643 P.2d 110 (Kan. 1982); *Wilcox v. Bd. of Educ. of Warren County*, 779 S.W.2d 221 (Ky. App. 1989); *Bowen v. Gov't Employees Ins. Co.*, 451 So.2d 1196 (La. App. 5 1984); *O'Donnell v. McGann*, 529 A.2d 372 (Md. 1987); *State ex rel. Brickner v. Saltz*, 664 S.W.2d 209 (Mo. 1984); *Wiegert-Stathes v. Am. Family Mut. Ins. Co.*, 2009 WL

AMC/SUN000003

THE HUSTEAD LAW FIRM
*A Professional Corporation*

Ms. Knudson
December 30, 2013
Page 5

> 3. All Underlying Insurance has been exhausted by payment of their limits of insurance; and

> 4. If any Underlying Insurance does not pay damages for reasons other than exhaustion of an aggregate limit of insurance, then we shall not pay such damages.

> B.   The terms and condition of the First Underlying Insurance policy [the Interstate Excess Policy] in effect at the inception date of this policy apply to this policy unless they are inconsistent with any provision of this policy or relate to any renewal agreement.

There is similarly no other provision of the Fireman's Fund Excess Policy that provides coverage for punitive damages. As such, there is simply no coverage for punitive damages under any policy applicable to this matter.

Please see *Courvoisier, supra,* is it is almost exactly on point. There, the plaintiff was seriously injured in a motorcycle accident. The motorcycle was purchased from and serviced by Harley Davidson.   The plaintiff sued Harley Davidson for negligent maintenance of the motorcycle. At the time of the accident, Harley Davidson was insured by American Hardware Mutual Insurance Company in the amount of $500,000. American Hardware provided a defense to Harley Davidson.

The jury returned a verdict of $1.4 million in favor of the plaintiff, and the court entered judgment. Harley Davidson appealed, and American Hardware filed a motion for a "partial stay" of the judgment upon the posting of a supersedeas bond in the amount of its policy limit ($500,000). Harley Davidson filed a cross-motion to compel American Hardware to post a bond in the full amount of the judgment on the ground that American Hardware had failed to attempt, in good faith, to negotiate a settlement within the policy limits.

The trial court denied American Hardware's motion and ordered it to post a bond in the full amount of the judgment to secure a stay, reasoning that American Hardware could potentially be liable for the full amount of the judgment if it breached its duty of good faith to settle the claim within the policy limits.

Relying on the majority rule throughout the country, the New Jersey Supreme Court reversed the trial court's ruling and held that American Hardware was only required to post a

AMC/SUN000004

# THE HUSTEAD LAW FIRM
### A Professional Corporation

Ms. Knudson
December 30, 2013
Page 7

Regarding your allegations of bad faith, first, *Courvoisier* makes clear that such allegations are irrelevant in proceedings involving the proper amount of a supersedeas bond. Moreover, *Shelly Funeral Home, supra* (Iowa Supreme Court), is on point.

In *Shelly*, the underlying case was a tort action against a funeral home and its director for the director emotionally injuring elderly tenants by repeatedly exposing himself and subjecting them to displays of pornography. The jury held the funeral home and the director liable for $122,500 in compensatory damages and $40,000 in punitive damages.

United Fire (the funeral home's insurer) filed a declaratory judgment action regarding whether the plaintiff's claims were covered its policies. The funeral home counterclaimed, arguing that United Fire's refusal to post a supersedeas bond was bad faith. *Shelly* affirmed the trial court's dismissal of the bad faith claim, explaining that "given the insurer's good-faith doubts about coverage, and the underlying purpose of the bond to secure the judgment, we agree it was reasonable for United Fire not to place itself in a position of assuming liability on the bond no matter the outcome of the appeal."

Here, given the clear policy language cited above, Interstate maintains that is more than justified in having "good-faith doubts" about coverage of punitive damages. As such, as in *Shelly*, any allegation that Interstate is acting in bad faith by not posting a supersedeas bond in amount sufficient to encompass uncovered punitive damages run contrary to the established law.

Accordingly, please be clear that, should AMC and/or Sunridge wish to appeal the judgment with respect to punitive damages and simultaneously seek a stay of execution of those judgments, it is AMC and Sunridge that must post the supersedeas bond within the fourteen (14) day time period to cover such. If the primary (non-punitive) judgment is not paid by Interstate, Interstate (nor Fireman's Fund) will not post a bond for any amount beyond the compensatory portion of the judgments.

As we represent Interstate and Fireman's Fund, and as there is a Complaint for Declaratory Judgment on file, please direct all future correspondence with respect to your assertions of bad faith, the Declaratory Judgment action, bonding, and punitive damages coverage to me. Mr. Orloff will remain the contact person for appellate and defense issues, but you are not to contact him further for any other purpose.

Finally, if you have any law or additional documentation you wish to provide for us to consider, at any time, please provide such to us immediately for consideration.

**AMC/SUN000005**

# EXHIBIT K

Sunridge Partners LLC
c/o Robert J. Ctvrtlik
206 Marine Avenue, #5809
Newport Beach, California 92662
TEL: 949-723-1446 Email:bob.ctvrtlik@verityllc.net

July 22, 2014

**VIA EMAIL & US MAIL**

Marc Orloff
Fireman's Fund Insurance Company
777 San Marin Drive
Novato, CA 94998
marc.orloff@ffic.com

Re:    *Lompe v. Sunridge Partners, LLC et al.*

Dear Mr. Orloff:

Sunridge Partners, LLC ("Sunridge") must protect itself from the potential execution of the punitive damage portion of the judgment in *Lompe v. Sunridge Partners, LLC et al.* ("*Lompe* Action") if the Court upholds any part of that award. Therefore, Sunridge again asks Interstate Fire and Casualty Company's and Fireman's Fund Insurance Company's (collectively "Interstate") to post a bond for any punitive award upheld by the Court. Although Interstate previously refused this same request, Sunridge requests that it reconsider.

Sunridge would be devastated by execution of a punitive damage award, and will protect itself from that possibility even if Interstate will not. If Interstate refuses, Sunridge will be forced to secure a bond on its own. The cost of that bond will be sought against Interstate in addition to all other consequential damages caused by Interstate's failure to protect Sunridge.

Please advise immediately if Interstate will reconsider and post a bond for any punitive award upheld by the Court. The outcome of the post-trial rulings is unknown, but Sunridge needs Interstate's answer now, so it can move forward with obtaining a bond itself if Interstate will not provide that protection.

Sincerely,

Robert Ctvrtlik

cc    Elizabeth Zepeda, Esq.
      Martha Knudson, Esq.
      Shawn Hanson, Esq.
      Danielle Crockett, Esq.
      Eric G. Maxfield, Esq.
      Jeffery Ctvrtlik

Δ π EXHIBIT 28
Deponent Orloff
Date 3/11/15 Rptr
WWW.DEPOBOOK.COM

**AMC/SUN000294**



# AMC

## Apartment Management Consultants, LLC

October 1, 2014

**VIA EMAIL & US MAIL**

Marc Orloff
Fireman's Fund Insurance Company
777 San Marin Drive
Novato, CA 94998
marc.orloff@ffic.com

*Re:     Lompe v. Sunridge Partners, LLC et al.*

Dear Mr. Orloff:

Apartment Management Consultants, LLC ("AMC") must protect itself from execution on the punitive damage portion of the judgment in *Lompe v. Sunridge Partners, LLC et al.* ("*Lompe* Action.") Execution would be disastrous for AMC, and would force it into bankruptcy. To prevent execution, it must bond the entire amount. To fund the bond, it will pay, from its own sources, $11,580,000 of the award, and it will then need to take out seven separate high interest bearing loans totaling $10,920,000 to secure a bond for the entire punitive $22,500,000 (plus post-trial interest) award.

While AMC has previously asked Interstate Fire and Casualty Company's and Fireman's Fund Insurance Company's (collectively "Interstate") to post a bond for the entire punitive award, AMC is desperate for protection. AMC continues to maintain that Interstate is responsible for the entire punitive damage award, but at this juncture, it is only asking that Interstate post a bond for the $10,920,000 that AMC cannot cover without securing high interest loans. The interest on those loans will be $2,299,542 over the course of their terms.

If Interstate refuses this request to partially fund the bond, AMC will proceed with the loans described above to secure the bond. Thus, Interstate now has the opportunity to reduce further damages to AMC. While substantial damages have already been suffered, further harm can be minimized if Interstate changes course. If it refuses, AMC will seek these additional damages against Interstate in addition to all other consequential and recoverable damages for Interstate's failure to protect AMC.

Please advise immediately if Interstate will reconsider its prior denial and contribute to the bond. The outcome of the post-trial rulings is still unknown, but AMC needs Interstate's answer now, so it can move forward with obtaining a bond alone if Interstate will not provide assistance.



# AMC

### Apartment Management Consultants, LLC

October 30, 2014

**VIA EMAIL & US MAIL**

Marc Orloff
Fireman's Fund Insurance Company
777 San Marin Drive
Novato, CA 94998
marc.orloff@ffic.com

*Re:    Lompe v. Sunridge Partners, LLC et al.*

Dear Mr. Orloff:

The Court in *Lompe v. Sunridge Partners, LLC et al.* ("*Lompe* Action") has now issued its ruling on the post-trial motions, and the entire punitive damage award against Apartment Management Consultants, LLC ("AMC") was upheld. AMC, without any assistance from Interstate Fire and Casualty Company's and Fireman's Fund Insurance Company's (collectively "Interstate"), has had no choice but to already secure protection against execution of that award.  Now that the award has been upheld completely, AMC again asks for assistance from Interstate.

AMC asks that Interstate provide substitute bonding for the $22,500,000 punitive award that AMC bonded on its own. As advised in our October 1, 2014 letter, AMC was able to protect itself from execution by using $11,580,000 from its own sources and borrowing the balance of $10,920,000. Therefore, AMC asked Interstate to replace the entire security provided by AMC.

At a minimum, AMC asks Interstate to provide bonding for the $10,920,000 that AMC was required to borrow at high interest rates. The interest on the borrowed amount will cost AMC $2,299,542 over the course of the loan terms. Certainly, the interest cost for Interstate in securing this amount for its Insured AMC would be far less. By providing substitute bonding for the borrowed amount, Interstate could at the very least allow AMC to avoid these high interest costs.

Interstate can still provide this protection to AMC and mitigate its damages in the bad-faith case. If it refuses, AMC will seek these interest costs against Interstate as damages, in addition to all other recoverable damages, for Interstate's failure to protect AMC.

Please advise if Interstate will step in and provide the requested substitute security while the punitive damage award is on appeal.

Sincerely,

Martha Knudson
General Counsel

cc     Elizabeth Zepeda, Esq.

EXHIBIT L

 Fund

Protecting your future since 1863™

July 24, 2014

**VIA EMAIL & US MAIL**

Robert Ctvrtlik
Sunridge Partners, LLC
353 E. 300 South
Salt Lake City, UT 84111
bob.ctvrtlik@verityllc.net

Re:   *Lompe v. Sunridge Partners, LLC, et al.*
      Claim No.: RL10-427
      Interstate Policy: SGL 1002220
      DOL: 02/01/2011

Dear Mr. Ctvrtlik:

I write in response to your letter dated July 22, 2014. As I have previously explained, given the clear language in the insurance policies excluding punitive damage awards from coverage, Interstate Fire & Casualty Company and Fireman's Fund Insurance Company (collectively, "Interstate") do not believe the policies cover the jury's award of punitive damages in the Lompe matter, and Interstate is not obligated to post a bond for the punitive damage awards. If you require further clarification of Interstate's position, please let me know.

Interstate continues to reserve all rights in this matter.

Sincerely,

/s/ Marc Orloff

Marc Orloff

Fireman's Fund Insurance Companies
777 San Marin Drive
Novato, California 94998
www.firemansfund.com



**Fund**

Protecting your future since 1863

Marc Orloff
Claims Technical Director
Direct 415.899.3744

October 31, 2014

Martha Knudson
Apartment Management Consultants, LLC
1954 Ft. Union Blvd., #500
Cottonwood Heights, UT  84121

     Re:   *Lompe v. Sunridge Partners, LLC, et al.*
              Claim No.:  RL10-427
              Interstate Policy: SGL 1002220
              DOL: 02/01/2011

Dear Ms. Knudson:

I write in response to your letter dated October 30, 2014.  As you know, Interstate Fire and Casualty Company and Fireman's Fund Insurance Company (collectively, "Interstate") have posted a bond for the compensatory damages awarded against Apartment Management Consultants, LLC ("AMC") in the Lompe action.  Because the applicable insurance policies do not provide coverage for the punitive damage portion of the judgment against AMC, Interstate cannot post a bond to cover that portion of the award.

Interstate continues to reserve all rights in this matter.

Sincerely,

/s/ Marc Orloff

Marc Orloff



Fireman's Fund Insurance Companies
7 7 7   S a n   M a r i n   D r i v e
N o v a t o ,   C a l i f o r n i a   9 4 9 9 8
w w w . f i r e m a n s f u n d . c o m

**AMC/SUN000006**

EXHIBIT M

UNITED STATES DISTRICT COURT

DISTRICT OF WYOMING

| | |
|---|---|
| INTERSTATE FIRE & CASUALTY COMPANY, AND FIREMAN'S FUND INSURANCE COMPANY, | Case No. 2:13-CV-00278-ABJ |
| | Judge: Hon. Alan B. Johnson |
| Plaintiffs, | **DECLARATION OF TIMOTHY L. WALKER** |
| Vs. | |
| APARTMENT MANAGEMENT CONSULTANTS, LLC, SUNRIDGE PARTNERS, LLC, and AMBER NICOLE LOMPE, | |
| Defendants. | |

I, Timothy L. Walker, do declare under penalty of perjury the following:

1. I am an attorney at law duly licensed to practice in all of the courts in the State of California and have been so licensed since December 1972. I am a founding partner of the law firm of Ford, Walker, Haggerty & Behar and presently affiliated with the firm in an of counsel position. In my more than 42-year career, I have been primarily involved in the representation, counseling, and assisting of insurance companies in a wide variety of matters, including the preparation and content of policy provisions, preparation and content of claims and training manuals, training of insurance company personnel in the fundamentals of claims handling, compliance with claims regulations promulgated by the California Department of Insurance, duties and responsibilities involved with communication with insureds, duties and responsibilities relating to giving equal consideration to the interest of the insureds, issues involving coverage and bad faith together with defending insurance companies in hundreds of cases involving issues and allegations that the insurance company failed to properly exercise good faith and fair dealing in adequately representing and communicating with insureds.

2. I have tried in excess of 75 jury trials, including approximately 15 cases involving allegations of coverage and/or bad faith. In addition, I have handled hundreds of cases involving coverage, bad faith, and specifically issues revolving around duties and responsibilities of insurance companies to adequately and promptly investigate claims,

1

protect the assets of insureds and appropriately communicate with insureds with regards to issues surrounding the exposure of insureds to potential excess verdicts. I have specialized in advising insurance companies with regards to the duties and responsibilities that are involved in prompt and adequate investigation of claims, communications with insureds, and the receipt and handling of policy limit demands, and the appropriate duties and responsibilities dictated by law and practice in responding to those policy limit demands to adequately protect the interest of their insureds. I have lectured frequently, both to industry-wide groups and insurance company claims organizations, with regards to issues involving duties and responsibilities as claims personnel in adequately investigating claims and communicating with insureds. I have authored and reviewed guidelines and training manuals for insurance companies with regards to issues related to adequate investigations, response to policy limit demands, and duties and responsibilities of communication with insureds in giving equal consideration to the interest of the insureds versus those of the insurance companies. I have also authored and reviewed claims manuals utilized by insurance companies to help guide insurance claims representatives in the appropriate handling of claims in conformity with the standards of good faith and fair dealing and the regulations promulgated by the California Dept. of Insurance.

3. I am a Fellow of the American College of Trial Lawyers (1998) and the International Society of Barristers (1998). I am an Advocate of the American Board of Trial Advocates (1977). I am a Member and past President (1986) of the Association of Southern California Defense Counsel. I am a Member of the Defense Research Institute (1974) and was a Member of their Board of Directors (1995-1998). I have been included in the Best Lawyers of America for the past 25 years and Super Lawyers of California for the past 10 years. I have a Bachelor of Arts degree from the University of California at Santa Barbara (1969) and a Juris Doctorate from Loyola University of Los Angeles (1972). My Martin Dale Hubbell rating is AV.

4. I have been retained in this matter as an expert on behalf of defendants Apartment Management Consultants, LLC, and Sunridge Partners, LLC. In connection with my retention as an expert in this case, I have previously authored a Rule 26 Report dated January 13, 2015, and had my deposition taken in this matter on April 21, 2015. I have been asked to review materials consisting of the following:

A. The various pleadings filed in this matter on behalf of both plaintiffs and defendants/counter-claimants;

B. Plaintiffs' and defendants' cross motions for partial summary judgment pursuant to FRCP Rule 56 and the Court's ruling thereon on or about September 1, 2015;

C. Depositions taken of Amber Lompe, Michael Coryell, Scott Kemberling, Michael Few, John Haid, Allan Hull, Marc Orloff, Bob Ctvrtlik, Jeff Ctvrtlik, Kent Poulson, Robert Baker, Martha Knudson and Peter Dusbabek taken in connection with this case and the underlying case;

D.  Numerous reports and correspondence starting with the purchase of the property in question in 2008, the claim itself filed by Amber Lompe and various correspondence among the parties in the underlying case relating to settlement opportunities, demands for settlement, evaluations by retained defense counsel, court rulings, reports and documentation regarding the trial held in December of 2013, and post-trial issues in 2014 regarding posting a bond to secure the judgment while an appeal was taken.

5.  I have been asked to address the various arguments put forth by plaintiffs in connection with their motion for summary judgment filed on or about October 16, 2015.  I will address the arguments made by plaintiffs by first restating their contention and then offering my opinion regarding same:

A.  *"Interstate cannot be liable in tort for reasonably relying on the settlement recommendations of the dual agent"*:

(1)  Pursuant to insurance industry standards, it is rather clear from the evidence that Interstate/Fireman's Fund chose to delegate their adjusting duties to CIBA pursuant to contract.

The deposition of Allan Hull, Senior Director of Technical Services for Fireman's Fund who oversaw the CIBA program indicated that by contract dated 2007, Fireman's Fund gave up its normal claims adjusting duties and allowed CIBA members to make claims directly to CIBA or CAG (see Hull deposition, page 26) and further allowed CIBA to act as a claims handler.  Fireman's Fund received regular reports, held 30-day telephone calls with Fireman's Fund regarding pending claims, but clearly had delegated their normal duties and responsibility of claims handling to CIBA and thus under normal industry standards should be responsible for CIBA's conduct.

Further, Allan Hull testified in his deposition that Interstate/Fireman's Fund never did an independent evaluation of any case that was being handled by CIBA (see Allan Hull deposition, page 75).  Accordingly, pursuant to industry standards where a delegation of responsibility takes place, Interstate/Fireman's Fund remains responsible for the person to whom they delegated this responsibility.

It is important to note that the *Lompe* claim was handled under a program underwritten by Interstate/Fireman's Fund that had been in existence since 2007.  Pursuant to industry standards, it is clear that CIBA was acting on behalf of Fireman's Fund in carrying out the non-delegable duties of a prompt, thorough and fair investigation and evaluation of the case keeping in mind the interest of the insured must be considered equal with the interest of the carrier.

B.  *"The only opportunity to settle within the primary policy limit occurred during a March 2013 mediation, and those negotiations (and all pre-trial negotiations) are inadmissible"*:

3

(1) The application of the mediation privilege and application of this case may ultimately be a question of law for the Court to determine. However, it is noteworthy that if plaintiffs' argument that "all pre-trial negotiations are inadmissible," then it follows that an insured could never sue their insurance carrier for bad faith failure to settle.

Further, in this case, there is ample evidence outside of the actual mediation of March 26, 2013 that plaintiffs at that time were willing to settle the case within the policy limits of $1 million. On February 25, 2013, plaintiffs' counsel Tyson Logan in the underlying case sent an email to retained defense counsel Peter Dusbabek wherein he indicated:

> "I think we could settle the case within the underlying $1 million policy. I would not usually make such a commitment in a brain injury case with strong liability, but I think we all have something to gain by looking hard at an early resolution here . . . ."

Again, this information was reported by retained defense counsel to Baker & Associates. Post-mediation, on March 27, 2013, retained defense counsel Peter Dusbabek reported that at the mediation of the prior day that plaintiffs had made offers to settle of initially $985,000 and ultimately offered a bracket settlement of $650,000 to $915,000, well within the primary policy limits of $1 million.

Accordingly, even putting aside what occurred at the mediation, which consistent with industry standards is always admissible in connection with bad faith failure to settle cases, there was ample evidence both before the mediation and after the mediation that the plaintiffs were willing to settle the case for within the policy limits of $1 million. With the trial date then set for December of 2013, defense counsel Peter Dusbabek noted that plaintiffs' counsel indicated he was going to spend $150,000 with regards to a full work-up of his case. However, at the time of the opportunity to settle within the policy limits, it is noteworthy that extensive discovery had already taken place, including the depositions of Amber Lompe, Scott Kemberling, Michael Few and John Haid. Further, the defense had been provided with records and the identity of all of the plaintiffs' experts and knew that plaintiff had suffered a brain injury as a result of exposure to carbon monoxide.

C.   *"Even if the mediation privilege did not apply, Interstate reasonably and in good faith relied on the evaluations and settlement recommendations of defense counsel and CAG and authorized every settlement recommendation they made":*

(1) Plaintiff argues that at the time of the mediation, "Interstate had minimal information on Ms. Lompe's damages." First of all, all of the liability fact witnesses including plaintiff Amber Lompe, Mike Coryell, Scott Kemberling, Michael Few, and John Haid had already been deposed. Accordingly, virtually all of the information that led to a liability verdict in this case was known long before the mediation in March of 2013. The case had been litigated for nearly a year at the time of the March 26, 2013 litigation and the trial date of December 2013 was looming.

4

Further, plaintiff's claimed injuries and damages were well known even though her experts had yet to be formally declared and/or deposed. Defense counsel Peter Dusbabek in his March 13, 2013 status letter identified medical reports and evaluation of Dr. Helffenstein as well as Dr. Weaver, both of whom ultimately testified at the trial as experts on behalf of the plaintiff. As Mr. Dusbabek had noted in his letter of December 27, 2012, "There is little dispute that Ms. Lompe did suffer CO poisoning and that the source of the carbon monoxide was the furnace in her apartment."

It is noteworthy that Interstate/Fireman's Fund according to the person that oversaw the CIBA program and participated in monthly telephone calls testified at his deposition of March 19, 2015 regarding Interstate/Fireman's Fund's conduct as follows:

> "Q    Did Interstate and Fireman's Fund conduct its own
>        independent evaluation of the case, separate from Mr. Bakers?
>
> A      Not in the time that I was involved in the case."

(See deposition of Allan Hull, p. 26)

Pursuant to industry standards, an insurance carrier has the obligation to conduct its own independent evaluation of the case. They can't put their head in the sand and then claim that they simply relied upon the evaluation of others. Further, as testified to by both Allan Hull and Marc Orloff of Fireman's Fund, the payment of the first $500,000 under the CIBA program underwent by Interstate/Fireman's Fund would be paid by CIBA. Robert Baker, as an employee of CIBA or CAG has an inherent conflict of interest in evaluating the claim. It is noteworthy that at no time in this case even up through the jury selection did CIBA ever authorize settlement above $425,000. The obvious implication is that CIBA and CAG appear to be trying to save some money off of their retention of $500,000.

D.   *"None of AMC and Sunridge's remaining theories of bad faith liability has merit ... 1. Coverage for punitive damages was fairly debatable"*:

(1)   The essence of every insurance contract is that an insurer must give equal consideration to the insured's interests as it gives to its own. In this case, although Interstate waited 18 months from the filing of a complaint that sought punitive damages to reserve their rights to disclaim coverage for punitive damages some 14 days prior to the start of trial, Interstate/Fireman's Fund never evaluated internally whether or not that conduct might make Interstate/Fireman's Fund responsible for what otherwise would be an uncovered claim of punitive damages. Instead, Interstate/Fireman's Fund simply took the position that punitive damages weren't covered and never gave equal consideration to the interests of the insured which would be to evaluate what the insured's argument would be for coverage.

Had they done so, they would have found that the lack of reservation of rights until the eve of trial severely prejudiced the rights of AMC and Sunridge in the following manner:

1.  Had AMC/Sunridge been advised of the exposure to punitive damages, they likely would have retained their own independent counsel to actively participate in the litigation;

2.  For instance, the motion for summary judgment that retained defense counsel Peter Dusbabek filed on behalf of AMC/Sunridge on March 25, 2013 addressed punitive damages but only in a passing fashion at the end of the motion. The thrust of the motion was that the furnace defect constituted a latent defect and thus summary judgment should be granted. The only mention of punitive damages in that motion was thrown in at the end where retained defense counsel indicates,

> "Plaintiff asserts that she is entitled to an award of various forms of damages, including punitive damages. A claim for punitive damages is not a separate cause of action and cannot stand without an underlying claim. Accordingly, summary judgment for the defendants on the plaintiff's negligence claim disposes of her entire claim for relief."

This misguided attempt to tie the punitive damage dismissal to the primary thrust of the motion for summary judgment, as opposed to separately seeking a dismissal of the summary judgment and discussing the issues of conduct led to the obvious denial of the motion for summary judgment.

3.  The trial in this case commenced on December 2, 2013 and the letter reserving the rights is dated November 20, 2013. This left precious little time for the insured to take any appropriate action to adequately protect their interests or even to arrive at an informed decision whether or not their uninsured interests needed to be separately protected. Specifically, it is noteworthy that at the May 23, 2014 oral argument on Sunridge/AMC's motions pursuant to FRCP Rule 50 (for remittitur) and FRCP Rule 59 (seeking to set aside the punitive damage award) evidence was presented and arguments made on behalf of Sunridge/AMC arguing that the evidence presented at the trial resulted in a mischaracterization of the defendants' net worth. Unfortunately, these arguments and the accompanying evidence was not presented to the jury in the underlying case. Had Interstate/Fireman's Fund timely notified their insureds Sunridge/AMC of the exclusion for punitive damages, Sunridge/AMC could have been prepared to offer this very evidence to the jury in the event that the jury found the predicate for punitive damages.

The depositions of Fireman's Fund Senior Director of Technical Services Allan Hull and Technical Director Marc Orloff fully demonstrate that at no time did Interstate/Fireman's Fund consider the interests of the insured to weigh whether or not Interstate/Fireman's Fund might be responsible for the punitive damages verdict that was rendered by the jury. Instead, they took a knee jerk reaction that punitive damages aren't covered and therefore we won't pay anything to satisfy the judgment and/or post a bond while the matter is on appeal. There was no evidence of any internal discussion at Fireman's Fund with regards to Interstate/Fireman's Fund's liability based upon the late reservation of rights. By failing to consider post-trial the rights of the insured, it is clear that Interstate/Fireman's Fund was putting their own interests ahead of their insured.

It is well established pursuant to industry standards where an insurance carrier has what they consider to be a valid coverage defense, while being opposed by equal arguments for the insured, the insurance company should go forward and either pay or post a bond for the judgment and then file a declaratory relief action against their insureds seeking a declaration of the Court as to whether or not their argument that punitive damages are not covered is valid.  That was never done here, nor is there any indication that it was even considered by Interstate/Fireman's Fund following the jury's entry of the verdict for punitive damages as well as the subsequent upholding of same by the trial court following the above-referenced motion for remittitur and motion to strike punitive damages.  This failure by Interstate/Fireman's Fund is a breach of the implied covenant of good faith and fair dealing.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and would testify as same if called upon as a witness at time of trial.  Executed this **20** day of October, 2015, at Long Beach, California.

TIMOTHY L. WALKER, DECLARANT

# EXHIBIT N



# CLAIMS ADJUSTING GROUP, INC.

June 22, 2011

**VIA FIRST CLASS MAIL**

Sunridge Partners, LLC dba Sunridge
c/o AMC, LLC
6915 S. 900 East
Midvale, UT 84047

| | | |
|---|---|---|
| Re: | **Residential Liability Claim** | |
| | Claim No.: | RL10-427 |
| | Date of Loss: | February 1, 2011 |
| | Covered Location: | 3900 E. 12th Street, Casper, WY 82609-3153 |
| | Policy Eff. Date: | 03/31/2010 to 03/31/2011 |
| | Claimant(s): | Amber Lompe |

To Whom It May Concern:

On behalf of Interstate Fire and Casualty Company (hereafter IFCC), one of the Fireman's Fund Companies, the Claims Adjusting Group (CAG) is handling this claim in connection with the Commercial Industrial Building Owner's Alliance (CIBA) Insurance Program.

This letter shall serve to acknowledge receipt of your claim and advise you of the coverage available to you under the CIBA program for the property located at:

### 3900 E. 12th Street, Casper, WY 82609-3153

The CIBA program provides primary liability coverage for $1,000,000 per occurrence limit, subject to a $2,000,000 location annual aggregate limit. Your deductible is $5,000.00.

Should you have any questions or concerns regarding the above, please contact me at (818) 638-8534, Ext. 124.

Sincerely,

Kelly Lemoine
Senior Coverage Analyst
Claims Adjusting Group
**On behalf of Interstate Fire and Casualty Company,
one of the Fireman's Fund Companies**

KL:iw

655 North Central Avenue · Suite 2100   Glendale, CA 91203 / 818 638-8534 / 818 638-8530

www.claimsadjustgrp.com   License #2D72600

CONFIDENTIAL

EXHIBIT O



CLAIMS ADJUSTING GROUP, INC.



EXHIBIT
90
*Knudson*

JOINT
EXHIBIT
**90**
CASE NO. 13-CV-278-J

August 22, 2013

Su Casa Investments, LLC
c/o AMC, LLC
7001 South 900 East, Ste. 460
Midvale, UT 84047

Attention: Martha Knudson, Esq.

Re:     *Karrie Ramey v. Holladay on Ninth*
        Claim No.:              RL09-357
        Policy Period(s):       08/27/09 to 03/31/10
        Date of Loss            02/01/10
        Insured(s):             Su Casa Investments, LLC
        Covered Location:       4418 Lemans Drive, Holladay, UT 84117

Dear Ms. Knudson and LLC Members:

On behalf of Interstate Fire and Casualty Company (hereafter IFCC), one of the Fireman's Fund Companies, Claims Adjusting Group handles claims in connection with the Commercial Industrial Building Owner's Alliance Insurance Program.   This correspondence shall serve to confirm receipt of the lawsuit entitled *Karrie Ramey v. Holladay on Ninth,* filed in Salt Lake County District Court, case number 130905257.

CIBA Insurance Services, via a policy written through Interstate Fire and Casualty Company (IFCC), has agreed to participate in the defense of Su Casa Investments, LLC (erroneously sued and served as Holladay on Ninth).  The case has been referred to John R. Lund, Esq. of Snow, Christensen, & Martineau.  Mr. Lund's office is located at 10 Exchange Place, 11th Floor, Salt Lake City, UT 84105-5000.  You may reach Mr. Lund telephonically at 801-521-9000.

We would also like to take this opportunity to advise you that your liability policy carries a $1,000 per loss deductible that applies to this loss.

655 North Central Avenue  |  Suite 2100  |  Glendale, CA 91203  / 818 638-8534 / 818 638-8530
License # 2D72600

Su Casa Investments, LLC
Page 2 of 2

Should you have any questions or concerns regarding any of the above, please feel free to contact me at 818-638-8534.

Sincerely,

Kelly Lemoine
Senior Coverage Analyst
On behalf of Interstate Fire and Casualty
Company, one of the Fireman's Fund Companies

CC: John R. Lund, Esq.
CC: Mark Mackey / Mackey & Associates

EXHIBIT P

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF WYOMING

3

4    INTERSTATE FIRE & CASUALTY COMPANY,
     AND FIREMAN'S FUND INSURANCE COMPANY

5                    Plaintiffs,

6    vs.                        Civil No. 13-CV-278J

7    APARTMENT MANAGEMENT CONSULTANT, LLC,
     SUNRODGE PARTNERS, LLC, AND AMBER

8    NICOLE LOMPE,

9                    Defendants.

10   _____/

11

12

13

14        VIDEOTAPED DEPOSITION OF ALLAN HULL

15          San Francisco, California

16          Thursday, March 19, 2015

17

18

19

20

21

22

23   Reported By:

24   LINDA VACCAREZZA, RPR, CLR, CRP, CSR. NO. 10201

25   JOB NO. 12595

1

1

2

3

4                              March 19, 2015

5                               2:25 p.m.

6

7

8         Deposition of ALLAN HULL, held at Akin, Gump,

9   Strauss, Hauer & Feld, LLP, 580 California Street,

10  Suite 1500, San Francisco, California, pursuant to

11  Subpoena before Linda Vaccarezza, a Certified

12  Shorthand Reporter of the State of California.

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1          MR. MESSNER:  Overbroad, right?

2          MR. HANSON:  No, no, no, no.  I mean, he's

3    asking you for, I think, a general description of the

4    flow of a claim from inception.  Is that fair?  To the

5    extent --                                               02:47

6          MR. MESSNER:  Right.

7          MR. HANSON:  -- you know and there's a

8    generalized process.  I think it's a -- I think I'll

9    skip the narrative and overbroad.

10          And why don't you go ahead and tell him.        02:47

11          THE WITNESS:  Okay.  To the best of my

12    knowledge, the members would make a -- they make their

13    claims directly to or through their agents to CAG.  So

14    those claims are made either to the direct agent of

15    the member or directly to CAG.  I believe they have    02:47

16    the ability to take claims in.

17          And then the -- CAG has an adjusting staff

18    that will handle the claims.  And we don't have any

19    involvement with them when the claims are reported,

20    "we" being Fireman's Fund.                             02:47

21    BY MR. MESSNER:

22      Q.   And that was my -- how I -- kind of what I

23    was getting at.

24          When you said "members," what do you mean by

25    members?                                               02:48

                                                         26

1  that CAG wanted to be the claims handler, and we will

2  permit that.

3      Q.    And the contract specifies terms of that

4  arrangement?

5      A.    Correct.                                          02:50

6      Q.    Does the contract -- or I should not limit it

7  to that contract.  But is there an agreement between

8  Interstate and/or Fireman's Fund with CIBA and/or CAG

9  that authorizes the third-party administrator to

10 settle claims?                                             02:51

11     A.    It's the same contract.

12     Q.    And in that contract, does it specify at what

13 level of authority the third-party administrator has

14 to settle claims?

15     A.    Yes.                                             02:51

16     Q.    And what is that level of authority?

17     A.    First, for CAG, it was $25,000, but the way

18 that program worked was the first $500,000 of every

19 claim belonged to CIBA.  So while we recommended it at

20 $25,000, they come to us for consultation.  And most    02:51

21 times they did.  There are times that they did not.

22     Q.    So the actual agreement specifies that they

23 can take action up to 25,000, but in practice, since

24 they have the first $500,000 of exposure that they

25 would be paying for, they didn't necessarily always     02:52

                                                    29

1    come to you between 25,000 and 500,000; is that

2    accurate?

3         A.    That's accurate.

4         Q.    But anything under $25,000, that wouldn't

5    even be something that would ever show up on your         02:52

6    radar?

7         A.    That's correct.

8         Q.    And then going from $25,000 to $500,000, you

9    said that that is their exposure.   Is that based on

10   the self-insured retention in the CIBA program?   How    02:52

11   does that work?

12        A.    That you do need an underwriter.   It's a

13   reinsurance retrospectively rated program, and I'm not

14   versed well enough to give you the -- how it works.

15        Q.    It's just your understanding -- it's more     02:52

16   technical than your position allows, but your

17   understanding is that through some mechanism of self-

18   reinsurance, or however it's done that underwriting

19   handles, the first $500,000 comes out of CIBA?

20        A.    Correct.                                       02:53

21        Q.    So Interstate or Fireman's Fund doesn't start

22   paying until it's over $500,000?

23        A.    Correct.

24        Q.    Okay.   Do you know if that first $500,000 is

25   borne by the members, or is it borne by CIBA, the        02:53

30

Allan Hull, 3/19/2015
Interstate Fire & Casualty v. Apartment Management

1    that the claim was valued at above $500,000; is that

2    right?

3        A.    I'm trying to remember.   If it was, Marc

4    would have made that evaluation.   I don't know.

5        Q.    Well, regardless, do you have a memory -- can   04:09

6    you describe for me how involved Mr. Baker was in

7    providing input or evaluation of case value in the

8    Lompe case prior to trial in 2013?

9        A.    Completely.   He was the conduit between

10   defense counsel and Fireman's Fund providing us the --   04:09

11   what he thought the case was worth, what he thought

12   the liability looked like, what he thought the

13   comparative negligence looked like.   So we relied on

14   his representations.

15       Q.    Did Interstate and Fireman's Fund conduct its   04:10

16   own independent evaluation of the case, separate from

17   Mr. Baker's?

18       A.    Not in the time that I was involved in the

19   case.

20       Q.    My understanding, Mr. Hull, is that you   04:10

21   continued to be involved in the 30-day calls where the

22   Lompe case would have been discussed during 2013; is

23   that true?

24       A.    True.

25       Q.    And were you involved in the pretrial call   04:10

75

EXHIBIT Q

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| INTERSTATE FIRE & | ) | |
| CASUALTY COMPANY, AND | ) | Deposition of: |
| FIREMAN'S FUND | ) | |
| INSURANCE COMPANY, | ) | RAYMOND B. JOHNSON |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | Civil No. 2:13-CV-278-ABJ |
| vs. | ) | |
| | ) | |
| APARTMENT MANAGEMENT | ) | |
| CONSULTANTS, LLC, | ) | |
| SUNRIDGE PARTNERS, | ) | |
| LLC, AND AMBER NICOLE | ) | |
| LOMPE, | ) | |
| | ) | |
|     Defendants. | ) | |

June 10, 2015 * 10:03 a.m.


Location:  Regus

2150 South 1300 East, Suite 500

Salt Lake City, Utah 84106


Reporter:  Ann Fleming, RPR

Notary Public in and for the State of Utah

1          A P P E A R A N C E S

2   FOR THE PLAINTIFFS/COUNTER DEFENDANTS INTERSTATE FIRE
    & CASUALTY COMPANY and FIREMAN'S FUND INSURANCE
3   COMPANY:

4               Danielle Crockett
                AKIN GUMP STRAUSS HAUER & FELD
5               580 California Street, Suite 1500
                San Francisco, California 94104
6               Tel: (415) 765-9500
                Fax: (415) 765-9501
7               dcrockett@akingump.com

8

9   FOR THE DEFENDANTS APARTMENT MANAGEMENT CONSULTANTS,
    LLC, and SUNDRIDGE PARTNERS, LLC:

10              Robert Tiedeken
                WOLF TIEDEKEN & WOODARD, P.C.
11              401 West 19th Street, Suite 300
                PO Box 491
12              Cheyenne, Wyoming 82003-0491
                Tel: (307) 635-2876
13              Fax: (307) 632-4902
                robert@wolftiedeken.com

14

15  FOR THE DEFENDANT AMBER N. LOMPE:

16              G. Bryan Ulmer
                THE SPENCE LAW FIRM, LLC
17              15 S. Jackson Street, PO Box 548
                Jackson, Wyoming 83001
18              Tel: (307) 733-7290
                Fax: (307) 733-5248
19              ulmer@spencelawyers.com
                (Appearing via telephone)

20

21

22

23

24

25

                                                    2

1               I N D E X

2    RAYMOND B. JOHNSON                              PAGE

3      Examination by Mr. Tiedeken                     4

4      Examination by Mr. Ulmer                       118

5      Examination by Ms. Crockett                    119

6

7

8               E X H I B I T S

9    NUMBER              DESCRIPTION                  PAGE

10

11     160   November 19, 2013 Letter                107

       161   Handwritten Notes and Thumb Drive       121

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                       3

Interstate Fire & Casualty v. Apartment Management

| | | |
|---|---|---|
| 1 | A. Yes. | 10:23:24 |
| 2 | Q. What, if you recall, were the requirements | 10:23:24 |
| 3 | under Wyoming law for issuance of disclaimer or | 10:23:32 |
| 4 | reservation of rights letters? | 10:23:36 |
| 5 | A. Well, are you asking me about the practice | 10:23:41 |
| 6 | or are you asking me about the law? | 10:23:43 |
| 7 | Q. I'm asking you about the law and your | 10:23:47 |
| 8 | understanding of the law in Wyoming with respect to the | 10:23:49 |
| 9 | issuance of disclaimer or reservation of rights | 10:23:52 |
| 10 | letters. | 10:23:56 |
| 11 | A. Would that be timing or content? | 10:23:57 |
| 12 | Q. Let's deal with those separately. | 10:24:00 |
| 13 | A. Okay. | 10:24:02 |
| 14 | Q. What understanding do you have, if any, | 10:24:03 |
| 15 | regarding the timing of such a letter? | 10:24:07 |
| 16 | A. Filing the 45-day rule was very well | 10:24:09 |
| 17 | known. | 10:24:14 |
| 18 | Q. And then what about content? | 10:24:14 |
| 19 | A. Content, I don't recall the specifics, but | 10:24:16 |
| 20 | one I do recall was the regulation or case law, I've | 10:24:25 |
| 21 | forgotten now which, where you had to reference | 10:24:30 |
| 22 | specifically in a reservation of rights letter, the | 10:24:36 |
| 23 | exclusion or provision in the policy that you were | 10:24:41 |
| 24 | referencing in our wire, so you couldn't just say we're | 10:24:47 |
| 25 | reserving our rights. | 10:24:54 |

17

| | | |
|---|---|---|
| 1 | particular issues have the effect of law also? | 10:45:38 |
| 2 | A.    Well, that is the law. | 10:45:42 |
| 3 | Q.    And perhaps might also create insurance | 10:45:44 |
| 4 | industry practice or standards through a decision? | 10:45:48 |
| 5 | A.    Exactly. | 10:45:51 |
| 6 | Q.    As an attorney and having been involved in | 10:45:56 |
| 7 | the insurance industry for many, many years, | 10:45:59 |
| 8 | Mr. Johnson, any textbooks or treatises that you | 10:46:03 |
| 9 | yourself think are pretty good authoritative sources to | 10:46:09 |
| 10 | go? | 10:46:13 |
| 11 | A.    Yes, I do. | 10:46:13 |
| 12 | Q.    Tell me which ones? | 10:46:14 |
| 13 | A.    Couch on Insurance is good, Appleman is | 10:46:15 |
| 14 | good, Miller's Standard Policies Annotated is a great | 10:46:19 |
| 15 | work.  There are Shernoff and Levine, there's just all | 10:46:25 |
| 16 | kinds of -- | 10:46:32 |
| 17 | Q.    I think my co-counsel will like that. | 10:46:33 |
| 18 | A.    I thought I'd throw that in.  I think they | 10:46:36 |
| 19 | do a good job on that. | 10:46:39 |
| 20 | Q.    All right.  For purposes of this case, in | 10:46:40 |
| 21 | your opinion, does the Wyoming Fair Claims Settlement | 10:46:45 |
| 22 | Practices Act have any statutory provision that | 10:46:50 |
| 23 | references reservation of rights or disclaimers? | 10:46:54 |
| 24 | A.    I believe it does. | 10:47:00 |
| 25 | Q.    Can you point to me specifically which | 10:47:02 |

32

| | | |
|---|---|---|
| 1 | subsection of the Act? | 10:47:06 |
| 2 | A.   Give me the Act and I'll look. | 10:47:07 |
| 3 | Q.   All right.   You mentioned earlier the | 10:47:09 |
| 4 | 45-day rule, correct? | 10:47:15 |
| 5 | A.   Correct, that's a statute. | 10:47:16 |
| 6 | Q.   That's a separate statute? | 10:47:18 |
| 7 | A.   Correct. | 10:47:20 |
| 8 | Q.   From the Unfair Claims Practices, correct? | 10:47:20 |
| 9 | A.   Correct. | 10:47:24 |
| 10 | Q.   Thank you.   For purposes of your opinions | 10:47:24 |
| 11 | in this case, have you reviewed any claims manuals from | 10:47:28 |
| 12 | Interstate or Fireman's Fund? | 10:47:35 |
| 13 | A.   I don't recall doing that, no. | 10:47:41 |
| 14 | Q.   Have you reviewed any claims manuals from | 10:47:43 |
| 15 | Claims Adjusting Group? | 10:47:49 |
| 16 | A.   I don't recall that. | 10:47:54 |
| 17 | Q.   And I understand for foundation purposes | 10:47:55 |
| 18 | the questions presume there are such things. | 10:47:59 |
| 19 | A.   I would assume that there are such things, | 10:48:04 |
| 20 | yes. | 10:48:06 |
| 21 | Q.   Likewise any training manuals for | 10:48:08 |
| 22 | Fireman's Fund or Interstate? | 10:48:11 |
| 23 | A.   No. | 10:48:14 |
| 24 | Q.   Same question for Claims Adjusting Group? | 10:48:14 |
| 25 | A.   No. | 10:48:17 |

33

| | | |
|---|---|---|
| 1 | for a replacement fender or whatever it is shall be | 12:57:39 |
| 2 | rejected or accepted and paid for by the insurer | 12:57:43 |
| 3 | designated within 45 days after receipt of the claim | 12:57:47 |
| 4 | and supporting bill.  Well, how do you apply that to a | 12:57:50 |
| 5 | casualty policy? | 12:57:55 |
| 6 |      Q.   Okay. | 12:57:58 |
| 7 |      A.   So it's confusing. | 12:57:58 |
| 8 |      Q.   All right. | 12:57:59 |
| 9 |      A.   And so the first thing is that the | 12:58:00 |
| 10 | Insurance Commissioner said this is not a private right | 12:58:05 |
| 11 | of action, this is only a tool for the Insurance | 12:58:08 |
| 12 | Commissioner, which you've encountered before, so they | 12:58:11 |
| 13 | confirmed that.  The second thing they said was, when I | 12:58:14 |
| 14 | asked the question how does that apply to casualty | 12:58:18 |
| 15 | insurance policy, that's when they said they'd go | 12:58:21 |
| 16 | conference and call me back or have me call back, I've | 12:58:25 |
| 17 | forgotten, and they basically say -- I guess it | 12:58:28 |
| 18 | doesn't.  And unless, of course, as in this case, | 12:58:35 |
| 19 | there's a compensatory covered claim that was, you | 12:58:39 |
| 20 | know, payable day one, and if the company ignored that, | 12:58:44 |
| 21 | I think the 45-day rule would apply. | 12:58:50 |
| 22 |      Q.   Okay.  So your interpretation of 26-15-125 | 12:58:52 |
| 23 | is that in an instance like this where a Complaint is | 12:58:58 |
| 24 | filed and there is a clearly potentially compensable | 12:59:02 |
| 25 | claim -- strike that.  I think it even goes further | 12:59:07 |

99

| | | |
|---|---|---|
| 1 | back than that.  We saw that I think June letter of | 12:59:11 |
| 2 | 2011 where we have Claims Adjusting Group notifying the | 12:59:13 |
| 3 | insured.  You're telling me that in an instance where a | 12:59:19 |
| 4 | carrier is put on notice of a potentially compensable | 12:59:23 |
| 5 | claim under the policy, they got 45 days to accept or | 12:59:28 |
| 6 | reject? | 12:59:31 |
| 7 | A.    Well, no, because I'm saying that they | 12:59:35 |
| 8 | mixed up the statute and the Insurance Department, in | 12:59:43 |
| 9 | my conversations with them, agreed that the 45 -- | 12:59:46 |
| 10 | because of the conjunctive word there, notice of the | 12:59:50 |
| 11 | claim and supporting bills, so if there was a bill like | 12:59:54 |
| 12 | pay the verdict and it's not paid in 45 days, then | 12:59:59 |
| 13 | they're in violation. | 13:00:03 |
| 14 | Q.    Okay. | 13:00:04 |
| 15 | A.    But just being on notice of the claim, | 13:00:06 |
| 16 | there's no supporting bill. | 13:00:09 |
| 17 | Q.    So it doesn't really have any | 13:00:11 |
| 18 | applicability to this circumstance at all? | 13:00:12 |
| 19 | A.    Casualty. | 13:00:14 |
| 20 | Q.    From a casualty liability insurance -- | 13:00:16 |
| 21 | A.    Right, because they mixed up property and | 13:00:18 |
| 22 | casualty.  They were thinking property and added | 13:00:22 |
| 23 | casualty, so it's not applicable. | 13:00:26 |
| 24 | Q.    Not applicable to a third-party claim like | 13:00:27 |
| 25 | this? | 13:00:30 |

100

Interstate Fire & Casualty v. Apartment Management

| | | |
|---|---|---|
| 1 | A.   That's true.  Not until it's reduced to a | 13:00:30 |
| 2 | payable amount, then it is. | 13:00:33 |
| 3 | Q.   And not applicable in, for instance, | 13:00:34 |
| 4 | regarding the duty to notify an insured under a | 13:00:38 |
| 5 | reservation of rights regarding a policy exclusion? | 13:00:44 |
| 6 | A.   Yeah, has no applicability.  It's a | 13:00:47 |
| 7 | standard that's out there, and, frankly, it's a pretty | 13:00:52 |
| 8 | loose standard, I think, 45 days. | 13:00:55 |
| 9 | Q.   The next part of your opinion you're going | 13:01:04 |
| 10 | to express in this case starting with your opinions | 13:01:06 |
| 11 | that Interstate acted reasonably in its handling of the | 13:01:10 |
| 12 | settlement of the Lompe case, correct? | 13:01:15 |
| 13 | A.   Correct. | 13:01:21 |
| 14 | Q.   Let's start with this.  In your opinion, | 13:01:21 |
| 15 | can a liability carrier act in bad faith with respect | 13:01:29 |
| 16 | to its refusal to settle a claim? | 13:01:37 |
| 17 | A.   Correct. | 13:01:40 |
| 18 | Q.   It can? | 13:01:41 |
| 19 | A.   Yes. | 13:01:42 |
| 20 | Q.   And I'm talking in general. | 13:01:43 |
| 21 | A.   Yes. | 13:01:44 |
| 22 | Q.   Explain to me how or when that occurs in | 13:01:45 |
| 23 | your opinion, if you can generalize something like | 13:01:51 |
| 24 | that. | 13:01:56 |
| 25 | A.   Well, if they don't perform their | 13:01:57 |

101

# EXHIBIT R

Patrick J. Murphy, No. 5-1779
William, Porter, Day, & Neville, P.C.
159 North Wolcott, Suite 400
Casper, WY 82601
(307) 265-0700
pmurphy@WPDN.net

Amy F. Sorenson, *Pro Hac Vice*
Snell & Wilmer L.L.P.
15 W. South Temple, Suite 1200
Salt Lake City, UT 84121
(801) 257-1900
asorenson@swlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| INTERSTATE FIRE & CASUALTY COMPANY, and FIREMAN'S FUND INSURANCE COMPANY | ) ) ) | Bond No. 57BSBHD3257 |
| Plaintiffs, | ) ) | Civil Action No: 13-CV-278-J |
| vs. | ) ) ) | |
| APARTMENT MANAGEMENT CONSULTANTS LLC, AND SUNRIDGE PARTNERS LLC | ) ) ) | |
| Defendants | ) ) | |

## SUPERSEDEAS BOND FOR THE PUNITIVE DAMAGES AND POST-JUDGMENT INTEREST FOR THREE YEARS ON THE PUNITIVE DAMAGES

WHEREAS, this Court entered Judgment against Defendants Apartment Management Consultants, LLC ("AMC") for punitive damages of $22,500,000.00 on December 26, 2013 (the "Judgment"); and

WHEREAS, AMC seeks a stay of execution of that Judgment to permit it to challenge the Judgment before the Tenth Circuit Court of Appeals, and, if necessary, the United States Supreme Court; and

WHEREAS, AMC's liability insurer has paid for and procured this Supersedeas Bond in the amount of $22,594,632.36 from The Hartford Fire Insurance Company, which bond is intended to cover the $22,500,000.00 in punitive damages and post-judgment interest at .14% per year on the $22,500,000.00 punitive award for a period of three full years from the date of the Judgment; and

WHEREAS, a copy of this Court's Judgment is attached to this Supersedeas Bond; and

NOW, THEREFORE, for value received, Defendant AMC, as principal, and The Hartford Fire Insurance Company as its Surety, jointly and severally promise that Interstate Fire & Casualty Insurance Company and Fireman's Fund Insurance Company will pay the punitive damages Judgment in this Civil Case: ( 1) up to the amount of Twenty-Two Million Five Hundred Thousand Dollars and No Cents ($22,500,000.00), together with post-judgment interest on the $22,500,000.00 punitive damages Judgment, if the $22,500,000.00 Judgment is affirmed on appeal or the appeal is dismissed, or (2) if the $22,500,000.00 punitive damages Judgment is remitted or reduced on appeal, the remitted or reduced amount together with post-judgment interest awarded on appeal, all pursuant to Rule 8(b) of the Federal Rules of Appellate Procedure; PROVIDED, HOWEVER, that in no event shall the Surety's liability under this bond exceed the $22,594,632.36 sum of this Supersedeas Bond.

DATED this 21st day of September , 2015.

*Page 2 of 3*

**PRINCIPALS**

Apartment Management Consultants, LLC

By: _____

Title: CEO _____

**SURETY**

Hartford Fire Insurance Company

By: _____

Title: Laura L Plaisant - Attorney In Fact

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of California                                )

County of  San Francisco                    )

On  September 21, 2015    before me,  Leona Evangelista , Notary Public

        *Date*                                      *Here Insert Name and Title of the Officer*

                                 Laura L. Plaisant

personally appeared _____

                                 *Name(s) of Signer(s)*

---

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

> LEONA EVANGELISTA
> Commission # 2084269
> Notary Public - California
> Alameda County
> My Comm. Expires Oct 28, 2018

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

                     *Signature of Notary Public*

    *Place Notary Seal Above*

---
**OPTIONAL**
---

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____ Document Date: _____

Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____    Signer's Name: _____
□ Corporate Officer — Title(s): _____    □ Corporate Officer — Title(s): _____
□ Partner — □ Limited  □ General    □ Partner — □ Limited  □ General
□ Individual   □ Attorney in Fact    □ Individual   □ Attorney in Fact
□ Trustee   □ Guardian or Conservator    □ Trustee   □ Guardian or Conservator
□ Other: _____    □ Other: _____
Signer is Representing: _____    Signer is Representing: _____

---

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)

# POWER OF ATTORNEY

Direct inquiries/claims to:

**THE HARTFORD**
Bond T-4
One Hartford Plaza
Hartford, Connecticut 06155
call: 888-266-3488 or fax: 860-757-5835)

KNOW ALL PERSONS BY THESE PRESENTS THAT:

Agency Code: 57-556253

| | |
|---|---|
| X | Hartford Fire Insurance Company, a corporation duly organized under the laws of the State of Connecticut |
| X | Hartford Casualty Insurance Company, a corporation duly organized under the laws of the State of Indiana |
| X | Hartford Accident and Indemnity Company, a corporation duly organized under the laws of the State of Connecticut |
| | Hartford Underwriters Insurance Company, a corporation duly organized under the laws of the State of Connecticut |
| | Twin City Fire Insurance Company, a corporation duly organized under the laws of the State of Indiana |
| | Hartford Insurance Company of Illinois, a corporation duly organized under the laws of the State of Illinois |
| | Hartford Insurance Company of the Midwest, a corporation duly organized under the laws of the State of Indiana |
| | Hartford Insurance Company of the Southeast, a corporation duly organized under the laws of the State of Florida |

having their home office in Hartford, Connecticut (hereinafter collectively referred to as the "Companies") do hereby make, constitute and appoint,
*up to the amount of* Unlimited  :

Saundra L. Gingras, Jeff Prevost of San Francisco CA, Paul Boucher,
Leona Evangelista, Adia A. Griffith, Claudia Payne, Laura L. Plaisant,
Russell B. Sands, Rae Lynn Zachary of SAN FRANCISCO, California

their true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, to sign its name as surety(ies) only as delineated above by ⊠, and to execute, seal and acknowledge any and all bonds, undertakings, contracts and other written instruments in the nature thereof, on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

In Witness Whereof, and as authorized by a Resolution of the Board of Directors of the Companies on August 1, 2009, the Companies have caused these presents to be signed by its Vice President and its corporate seals to be hereto affixed, duly attested by its Assistant Secretary. Further, pursuant to Resolution of the Board of Directors of the Companies, the Companies hereby unambiguously affirm that they are and will be bound by any mechanically applied signatures applied to this Power of Attorney.





John Gray, Assistant Secretary

M. Ross Fisher, Vice President

STATE OF CONNECTICUT }
                      } ss.   Hartford
COUNTY OF HARTFORD    }

On this 12th day of July, 2012, before me personally came M. Ross Fisher, to me known, who being by me duly sworn, did depose and say: that he resides in the County of Hartford, State of Connecticut; that he is the Vice President of the Companies, the corporations described in and which executed the above instrument; that he knows the seals of the said corporations; that the seals affixed to the said instrument are such corporate seals; that they were so affixed by authority of the Boards of Directors of said corporations and that he signed his name thereto by like authority.

Kathleen T. Maynard
Notary Public
My Commission Expires July 31, 2016

CERTIFICATE

I, the undersigned, Vice President of the Companies, DO HEREBY CERTIFY that the above and foregoing is a true and correct copy of the Power of Attorney executed by said Companies, which is still in full force effective as of September 21, 2015
Signed and sealed at the City of Hartford.



Kevin Heckman, Assistant Vice President

POA 2012

# EXHIBIT S

Patrick J. Murphy, No. 5-1779
William, Porter, Day, & Neville, P.C.
159 North Wolcott, Suite 400
Casper, WY 82601
(307) 265-0700
pmurphy@WPDN.net

Amy F. Sorenson, *Pro Hac Vice*
Snell & Wilmer L.L.P.
15 W. South Temple, Suite 1200
Salt Lake City, UT 84121
(801) 257-1900
asorenson@swlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **INTERSTATE FIRE & CASUALTY COMPANY,** and **FIREMAN'S FUND INSURANCE COMPANY** | ) ) ) | **Bond No.** 57BSBHD3258 |
| Plaintiffs, | ) ) | **Civil Action No:** 13-CV-278-J |
| vs. | ) ) | |
| **APARTMENT MANAGEMENT CONSULTANTS LLC, AND SUNRIDGE PARTNERS LLC** | ) ) ) | |
| Defendants | ) ) | |

## SUPERSEDEAS BOND FOR THE PUNITIVE DAMAGES AND POST-JUDGMENT INTEREST FOR THREE YEARS ON THE PUNITIVE DAMAGES

WHEREAS, this Court entered Judgment against Defendants Sunridge Partners, LLC ("Sunridge") for punitive damages of $3,000,000 on December 26, 2013 (the "Judgment"); and

WHEREAS, Sunridge seeks a stay of execution of that Judgment to permit it to challenge the Judgment before the Tenth Circuit Court of Appeals, and, if necessary, the United States Supreme Court; and

WHEREAS, Sunridge's liability insurer has paid for and procured this Supersedeas Bond in the amount of $3,012,617.65 from Hartford Fire Insurance Company, which bond is intended to cover the $3,000,000.00 in punitive damages and post-judgment interest at .14% per year on the $3,000,000.00 punitive award for a period of three full years from the date of the Judgment; and

WHEREAS, a copy of this Court's Judgment is attached to this Supersedeas Bond; and

NOW, THEREFORE, for value received, Defendant Sunridge, as principal, and Hartford Fire Insurance Company as its Surety, jointly and severally promise that Interstate Fire & Casualty Insurance Company and Fireman's Fund Insurance Company will pay the punitive damages Judgment in this Civil Case: ( 1) up to the amount of Three Million Dollars and No Cents ($3,000,000.00), together with post-judgment interest on the $3,000,000.00 punitive damages Judgment, if the $3,000,000.00 Judgment is affirmed on appeal or the appeal is dismissed, or (2) if the $3,000,000.00 punitive damages Judgment is remitted or reduced on appeal, the remitted or reduced amount together with post-judgment interest awarded on appeal, all pursuant to Rule 8(b) of the Federal Rules of Appellate Procedure; PROVIDED, HOWEVER, that in no event shall the Surety's liability under this bond exceed the $3,012,617.65 sum of this Supersedeas Bond.

DATED this 21st day of September, 2015.

**PRINCIPALS**

Sunridge Partners, LLC

By: _____

Title: MEMBER

**SURETY**

Hartford Fire Insurance Company

By: _____

Title: Laura L. Plaisant – Attorney in Fact

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                                    CIVIL CODE § 1189

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                                              )
County of  San Francisco                                        )

On  September 21, 2015  before me,  Leona Evangelista , Notary Public
        *Date*                          *Here Insert Name and Title of the Officer*

personally appeared  Laura L. Plaisant
                              *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

LEONA EVANGELISTA
Commission # 2084259
Notary Public - California
Alameda County
My Comm. Expires Oct 28, 2018

Signature _____
               *Signature of Notary Public*

*Place Notary Seal Above*

---
**OPTIONAL**
---

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____  Document Date: _____
Number of Pages: _____  Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited  ☐ General
☐ Individual      ☐ Attorney in Fact
☐ Trustee         ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

Signer's Name: _____
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited  ☐ General
☐ Individual      ☐ Attorney in Fact
☐ Trustee         ☐ Guardian or Conservator
☐ Other: _____
Signer Is Representing: _____

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)

# POWER OF ATTORNEY

**THE HARTFORD**
Bond T-4
One Hartford Plaza
Hartford, Connecticut 06155
*call.* 888-266-3488 *or fax:* 860-757-5835)

**KNOW ALL PERSONS BY THESE PRESENTS THAT:**

Agency Code: 57-556253

| | |
|---|---|
| X | Hartford Fire Insurance Company, a corporation duly organized under the laws of the State of Connecticut |
| X | Hartford Casualty Insurance Company, a corporation duly organized under the laws of the State of Indiana |
| X | Hartford Accident and Indemnity Company, a corporation duly organized under the laws of the State of Connecticut |
| | Hartford Underwriters Insurance Company, a corporation duly organized under the laws of the State of Connecticut |
| | Twin City Fire Insurance Company, a corporation duly organized under the laws of the State of Indiana |
| | Hartford Insurance Company of Illinois, a corporation duly organized under the laws of the State of Illinois |
| | Hartford Insurance Company of the Midwest, a corporation duly organized under the laws of the State of Indiana |
| | Hartford Insurance Company of the Southeast, a corporation duly organized under the laws of the State of Florida |

having their home office in Hartford, Connecticut (hereinafter collectively referred to as the "Companies") do hereby make, constitute and appoint,
*up to the amount of* Unlimited

Saundra L. Gingras, Jeff Prevost of San Francisco CA, Paul Boucher,
Leona Evangelista, Adia A. Griffith, Claudia Payne, Laura L. Plaisant,
Russell B. Sands, Rae Lynn Zachary of SAN FRANCISCO, California

their true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, to sign its name as surety(ies) only as delineated above by ⊠, and to execute, seal and acknowledge any and all bonds, undertakings, contracts and other written instruments in the nature thereof, on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

In Witness Whereof, and as authorized by a Resolution of the Board of Directors of the Companies on August 1, 2009, the Companies have caused these presents to be signed by its Vice President and its corporate seals to be hereto affixed, duly attested by its Assistant Secretary. Further, pursuant to Resolution of the Board of Directors of the Companies, the Companies hereby unambiguously affirm that they are and will be bound by any mechanically applied signatures applied to this Power of Attorney.





John Gray, Assistant Secretary

M. Ross Fisher, Vice President

STATE OF CONNECTICUT }
                       } ss.    Hartford
COUNTY OF HARTFORD }

On this 12th day of July, 2012, before me personally came M. Ross Fisher, to me known, who being by me duly sworn, did depose and say: that he resides in the County of Hartford, State of Connecticut; that he is the Vice President of the Companies, the corporations described in and which executed the above instrument; that he knows the seals of the said corporations, that the seals affixed to the said instrument are such corporate seals; that they were so affixed by authority of the Boards of Directors of said corporations and that he signed his name thereto by like authority.

Kathleen T. Maynard
Kathleen T. Maynard
Notary Public
My Commission Expires July 31, 2016

CERTIFICATE

I, the undersigned, Vice President of the Companies, DO HEREBY CERTIFY that the above and foregoing is a true and correct copy of the Power of Attorney executed by said Companies, which is still in full force effective as of September 21, 2015
Signed and sealed at the City of Hartford.

       

Kevin Heckman, Assistant Vice President

POA 2012

**Appendix of Authorities and Complete Copies of Cases Pursuant to Judge Johnson's Court Procedures Rule 7(H)**

*Avary v. Bank of America, N.A.,*
　　　72 S.W.3d 779, 798-800 (Tex. App. 2002)

*Brown v. Nationwide Mutual Insurance Company,*
　　　2015 WL 71485 (M.D. N. Car. Jan. 6, 2015)

*Dietz & Watson, Inc. v. Liberty Mutual Insurance Company,*
　　　2015 WL 356949 (E.D. Pa. 2015)

*Gelinas v. Metropolitan Property Liability Insurance Co.,*
　　　551 A.2d 962, 969 (N.H. 1988)

*Wimsatt v. Superior Court,*
　　　152 Cal. App. 4th 137 (Cal.Ct.App. 2007)

§ 5314- Permissible Uses—Other, 23 Fed. Prac. & Proc. Evid. § 5314 (1st ed.)

KeyCite Yellow Flag - Negative Treatment

**Declined to Follow by**    Wimsatt v. Superior Court,    Cal.App. 2 Dist.,
June 18, 2007

72 S.W.3d 779
Court of Appeals of Texas,
Dallas.

Rhonda AVARY, Guardian of the Estates
of Brett Joseph Bourgeois and Timothy
James Bourgeois, Minor Children, Appellant,

v.

BANK OF AMERICA, N.A., Appellee.

No. 05–00–00918–CV.    |    March 22,
2002.    |    Rehearing Overruled May 6, 2002.

Guardian of the estates of decedent's minor children brought
action against executor of decedent's estate for breach
of fiduciary duty, negligence, fraud, and conspiracy, in
connection with executor's representation of decedent's estate
in court-ordered mediation of wrongful death and survival
action related to decedent's death. The 68th Judicial District
Court, Dallas County, Gary Hall, J., entered summary
judgment for executor. Guardian appealed. The Court of
Appeals, Whittington, J., held that: (1) guardian's testimony
that settlement was fair and reasonable did not establish
executor's affirmative defenses of accord and satisfaction,
ratification, waiver, and estoppel; (2) executor owed children
a fiduciary duty of full disclosure of all material facts known
to it that might affect their rights as beneficiaries; (3) genuine
issue of fact existed as to whether executor's acceptance
of settlement in wrongful death action breached that duty;
(4) in a matter of first impression, executor's fiduciary
duty of full disclosure warranted executor's disclosure of
confidential communications during mediation; and (5)
confidentiality provisions of alternative dispute resolution
(ADR) statute required in camera proceeding to determine
if testimony of attorney for defendants in wrongful death
action concerning confidential mediation communications
was subject to disclosure.

Reversed and remanded.

**West Headnotes (38)**

[1]    **Judgment**
       👉 Existence or non-existence of fact issue

       A no-evidence summary judgment motion may
       be urged on the ground that there is no evidence
       of one or more essential elements of a claim or
       defense on which the adverse party would have
       the burden of proof at trial. Vernon's Ann.Texas
       Rules Civ.Proc., Rule 166a(i).

       Cases that cite this headnote

[2]    **Judgment**
       👉 Presumptions and burden of proof

       A no-evidence motion for summary judgment
       places the burden on the nonmovant to present
       summary judgment evidence raising a genuine
       fact issue. Vernon's Ann.Texas Rules Civ.Proc.,
       Rule 166a(i).

       Cases that cite this headnote

[3]    **Appeal and Error**
       👉 Depositions, affidavits, or discovery

       A trial judge's discovery rulings are reviewed
       under an abuse of discretion standard.

       10 Cases that cite this headnote

[4]    **Pretrial Procedure**
       👉 Scope of Discovery
       **Trial**
       👉 Admission of evidence in general

       The scope of discovery and the admissibility of
       evidence is principally within the discretion of
       the trial judge.

       Cases that cite this headnote

[5]    **Pretrial Procedure**
       👉 Discretion of court

       The trial court is allowed great latitude in its
       discovery orders.

Cases that cite this headnote

[6]    **Appeal and Error**
        👈 Depositions, affidavits, or discovery
Unless there is a clear abuse of discretion, a trial
judge's discovery ruling should not be disturbed
on appeal.

5 Cases that cite this headnote

[7]    **Pretrial Procedure**
        👈 Nature and Purpose
        **Pretrial Procedure**
        👈 Discovering truth, narrowing issues, and
        eliminating surprise
The purpose of discovery is to allow the parties
to obtain the fullest knowledge of facts and issues
prior to trial; orders prohibiting discovery may
constitute an abuse of discretion.

Cases that cite this headnote

[8]    **Judgment**
        👈 Presumptions and burden of proof
Summary judgment movant was required to
establish as a matter of law each element of its
affirmative defenses of accord and satisfaction,
ratification, waiver, and estoppel.

Cases that cite this headnote

[9]    **Estoppel**
        👈 Nature and elements of waiver
"Waiver" is the intentional relinquishment of a
known right, or intentional conduct inconsistent
with claiming that right.

3 Cases that cite this headnote

[10]   **Estoppel**
        👈 Assent to or Ratification of Acts of Others
        in General
"Ratification" is the adoption or confirmation by
a person, with knowledge of all material facts,
of a prior act that did not then legally bind that

person and which that person had the right to
repudiate.

11 Cases that cite this headnote

[11]   **Estoppel**
        👈 Nature and elements of waiver
        **Estoppel**
        👈 Assent to or Ratification of Acts of Others
        in General
Ratification and waiver are largely a matter of
intent.

1 Cases that cite this headnote

[12]   **Estoppel**
        👈 Nature and elements of waiver
There can be no waiver unless it is so intended
by one party and so understood by the other.

Cases that cite this headnote

[13]   **Accord and Satisfaction**
        👈 Nature and requisites in general
        **Accord and Satisfaction**
        👈 Execution of Accord as Satisfaction
An "accord and satisfaction" occurs when parties
agree to the discharge of an existing obligation in
a manner other than in accordance with the terms
of their original contract; the "accord" is the new
agreement and the "satisfaction" is the discharge
of the obligation.

6 Cases that cite this headnote

[14]   **Accord and Satisfaction**
        👈 Remittances on condition
To establish defense of accord and satisfaction,
the evidence must show both parties agreed the
amount paid by the debtor to the creditor fully
satisfied the entire claim.

4 Cases that cite this headnote

[15]   **Accord and Satisfaction**
        👈 Remittances on condition

In determining whether an accord and satisfaction has occurred, the question is whether there was an unmistakable communication to the creditor that tender of the lesser sum is upon the condition that acceptance will constitute satisfaction of the underlying obligation; the condition must be so clear, full, and explicit as to not be susceptible to any other interpretation.

1 Cases that cite this headnote

[16]   **Estoppel**
    ⚬ When estoppel arises

"Estoppel" arises where, by the fault of one, another is induced to change his or her position for the worse.

Cases that cite this headnote

[17]   **Estoppel**
    ⚬ Essential elements

The elements of an estoppel defense are: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations.

Cases that cite this headnote

[18]   **Accord and Satisfaction**
    ⚬ Remittances on condition

Testimony by guardian of estates of decedent's minor children, stating that mediated settlement of wrongful death and survival lawsuit related to decedent's death was fair and reasonable, established only that guardian was accepting a lesser sum from wrongful death defendants on behalf of children, and not any intent to settle potential claims against executor of decedent's estate related to its handling of estate during settlement negotiations, and thus did not establish executor's affirmative defense of "accord and satisfaction" to guardian's action against executor for breach of fiduciary duty, negligence, fraud, and conspiracy.

2 Cases that cite this headnote

[19]   **Executors and Administrators**
    ⚬ Evidence

Executor could not establish affirmative defense of estoppel to claims, brought by guardian of the estates of decedent's minor children, related to executor's handling of decedent's estate during settlement negotiations of a wrongful death and survival action to which children were plaintiffs, even though guardian testified at approval hearing that settlement was fair and reasonable, absent any evidence that guardian falsely representation or concealed material facts or that executor had no means of obtaining knowledge of any such misrepresentation or concealment.

Cases that cite this headnote

[20]   **Executors and Administrators**
    ⚬ Evidence

Testimony by guardian of estates of decedent's minor children, stating that mediated settlement of wrongful death and survival lawsuit related to decedent's death was fair and reasonable, and her acceptance of settlement proceeds did not establish that guardian intentionally relinquished a right to pursue malpractice claims against executor of decedent's estate or that she ratified executor's actions, as required for executor's affirmative defenses of waiver and ratification to guardian's action alleging that executor accepted an allocation of overall settlement when it knew or should have known the estate's tax obligations far exceeded that allocation, where there was no evidence that guardian was aware of these facts at time she accepted the settlement.

3 Cases that cite this headnote

[21]   **Judgment**
    ⚬ Motion or Other Application

By failing to amend its summary judgment motion to address plaintiff's claim for declaratory judgment, which was added after original motion

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

was filed, defendant was not entitled to summary judgment on the declaratory judgment claim.

Cases that cite this headnote

**[22]   Judgment**
   👈 Motion or Other Application

If a plaintiff amends the petition to add new causes of action after being served with a motion for summary judgment, the defendant must file an amended or supplemental motion to address the newly pleaded causes of action; if a defendant fails to address newly pleaded causes of action, summary judgment may not be granted, as a matter of law, on the additional causes of action.

1 Cases that cite this headnote

**[23]   Executors and Administrators**
   👈 Representation of creditors and distributees

Independent executor of the estate had a fiduciary relationship with beneficiaries of estate and, therefore, owed them a fiduciary duty of full disclosure of all material facts known to it that might affect the beneficiaries' rights.

2 Cases that cite this headnote

**[24]   Fraud**
   👈 Fiduciary or confidential relations

A fiduciary owes its principal a high duty of good faith, fair dealing, honest performance, and strict accountability.

1 Cases that cite this headnote

**[25]   Negligence**
   👈 Elements in general

The elements of a negligence cause of action are a duty, a breach of that duty, and damages proximately caused by the breach.

1 Cases that cite this headnote

**[26]   Fraud**
   👈 Fraudulent Concealment

Breach of duty of full disclosure by a fiduciary is tantamount to fraudulent concealment.

2 Cases that cite this headnote

**[27]   Conspiracy**
   👈 Combination

Conspiracy claim requires proof of a combination of two or more persons with an unlawful purpose or a lawful purpose to be accomplished by unlawful means.

Cases that cite this headnote

**[28]   Conspiracy**
   👈 Nature and Elements in General

Because a defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold the defendant responsible, conspiracy is considered to be a derivative tort.

Cases that cite this headnote

**[29]   Judgment**
   👈 Tort cases in general

Genuine issue of material fact existed as to whether executor breached its fiduciary duty to beneficiaries of decedent's estate by accepting an apportionment of settlement proceeds in a wrongful death and survival action without considering estate's tax obligations and without any disclosure to beneficiaries as to apportionment's effect on estate's remaining assets and liabilities, precluding summary judgment for executor on beneficiaries' claims against executor for breach of fiduciary duty and related negligence and fraud.

5 Cases that cite this headnote

**[30]   Conspiracy**
   👈 Conspiracy to injure in property or business

Beneficiaries of decedent's estate could not recover on their claim that executor conspired with its attorneys to accept an unfavorable apportionment of settlement proceeds in a wrongful death and survival action in breach

of its fiduciary duty to beneficiaries, absent any evidence that executor and attorneys had a meeting of minds on the object to be accomplished or an unlawful purpose.

Cases that cite this headnote

**[31]    Conspiracy**
 Nature and Elements in General

The elements of a conspiracy claim are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result.

Cases that cite this headnote

**[32]    Privileged Communications and Confidentiality**
 Settlement negotiation privilege; mediation and arbitration

If a communication made by a participant in an alternative dispute resolution (ADR) procedure does not relate to the subject matter of the dispute or does not relate to or arise out of the matter in dispute, it may not be confidential under the confidentiality provisions of the ADR statute. V.T.C.A., Civil Practice & Remedies Code § 154.073.

4 Cases that cite this headnote

**[33]    Pretrial Procedure**
 Particular Subjects of Disclosure

Executor's fiduciary duty of full disclosure of all material facts that might affect rights of decedent's beneficiaries amounted to a "legal requirement for disclosure" that conflicted with confidentiality provisions of alternative dispute resolution (ADR) statute, requiring trial court to consider whether information concerning executor's rejection of settlement offer during court-ordered mediation of wrongful death action was subject to disclosure in beneficiaries' subsequent action for breach of fiduciary duty against executor arising out of that mediation.

V.T.C.A., Civil Practice & Remedies Code § 154.073(e).

1 Cases that cite this headnote

**[34]    Executors and Administrators**
 Representation of creditors and distributees

While an executor's fiduciary duty of disclosure is not unlimited, it is a high duty of full disclosure of all material facts that might affect the beneficiaries' rights.

Cases that cite this headnote

**[35]    Pretrial Procedure**
 Particular Subjects of Disclosure

Beneficiaries' claim against executor for breach of fiduciary duty was a new and independent tort that arose during court-ordered mediation of prior wrongful death action, and thus, executor's fiduciary duty of full disclosure of all material facts that might affect beneficiaries' rights warranted executor's disclosure of the facts, circumstances, and context of communications during mediation, in beneficiaries' action, alleging executor breached its duty by rejecting a settlement offer that exceeded estate's tax liabilities in favor of one that did not, notwithstanding confidentiality provisions of alternative dispute resolution (ADR) statute. V.T.C.A., Civil Practice & Remedies Code § 154.073(e).

8 Cases that cite this headnote

**[36]    Compromise and Settlement**
 Enforcement

In actions to enforce settlement agreements under the alternative dispute resolution (ADR) statute, parties have the right to be confronted by appropriate pleadings, assert defenses, conduct discovery, and submit contested fact issues to a judge or jury. V.T.C.A., Civil Practice & Remedies Code § 154.071.

2 Cases that cite this headnote

**[37]    Pretrial Procedure**

☞ Particular Subjects of Disclosure

Attorney for defendants in wrongful death action could potentially have knowledge of facts relevant to executor's duty to beneficiaries of decedent's estate during court-ordered mediation of that action, and thus, confidentiality provisions of alternative dispute resolution (ADR) statute required that trial court, in beneficiaries' action against executor for breach of fiduciary duty, conduct in camera proceeding to determine if attorney's potential testimony concerning confidential mediation communications was subject to disclosure. V.T.C.A., Civil Practice & Remedies Code § 154.073(e).

5 Cases that cite this headnote

**[38]** **Pretrial Procedure**

☞ Particular Subjects of Disclosure

Attorney who represented guardian of estates of decedent's minor children during wrongful death action on behalf decedent's estate could potentially have knowledge of facts relevant to executor's duty to children during court-ordered mediation of that action, and thus, confidentiality provisions of alternative dispute resolution (ADR) statute required that trial court, in guardian's action against executor for breach of fiduciary duty, conduct in camera proceeding to determine if attorney's potential testimony as to confidential mediation communications was subject to disclosure. V.T.C.A., Civil Practice & Remedies Code § 154.073(e).

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*784** Charles W. McGarry, Thurman & Andres, P.C., Dallas, for appellant.

Talmage Boston, Winstead, Secrest & Minick, P.C., Dallas, for appellee.

Before Justices MORRIS, WHITTINGTON, and O'NEILL.

**OPINION**

Opinion By Justice WHITTINGTON.

Rhonda Avary, guardian of the estates of Brett Joseph Bourgeois and Timothy James Bourgeois, minor children (Avary), sued Bank of America, N.A. (Bank) for breach of fiduciary duty, negligence, fraud, and conspiracy. The alleged wrongful conduct occurred during the court-ordered mediation of a now-concluded lawsuit. The Bank moved for summary judgment on the ground that Avary had no evidence to support her claims because all communications made at the mediation were confidential under section 154.073 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 154.073 (Vernon Supp.2002). The Bank's motion also raised the affirmative defenses of accord and satisfaction, ratification, waiver, and estoppel. After permitting limited discovery, the trial judge granted the Bank's motion. In three issues, Avary complains the trial judge erred in granting the Bank's motion for summary judgment and abused his discretion in prohibiting certain discovery relating to the mediation session. Because we find more than a scintilla of evidence to support Avary's claims, and because the trial judge abused his discretion in restricting discovery regarding the new and independent tort alleged to have occurred during the mediation, we reverse the trial court's judgment and remand this case for further proceedings.

**FACTUAL BACKGROUND**

Joseph Bourgeois was killed when a tractor rolled over on him. He was survived by his parents, his wife Nursen Bourgeois, and three sons, one by his marriage to Nursen and two by a previous marriage to Rhonda Avary. The Bank is the independent executor of Bourgeois's estate.

Bourgeois's wife, parents, sons, and estate filed wrongful death and survival claims against the manufacturer of the tractor and other parties in a lawsuit styled *Nursen Bourgeois, et al. v. Yanmar* **\*785** *Diesel Engine Co., Ltd., et al.,* Cause Number 219–232–98 in the 219th Judicial District Court of Collin County, Texas (the *Yanmar Diesel* lawsuit). The parties to the *Yanmar Diesel* lawsuit participated in a court-ordered mediation.

In the course of the mediation, the parties were divided into three groups. The defendants, including the tractor manufacturer, were in one room. Avary, as guardian of the estates of Brett and Timothy, was in a second room with her counsel. All other plaintiffs, including the Bank as executor, were in a third room with their counsel. Avary was represented at the mediation by Thomas M. McCrory, III and Shirley Sutherland. The remaining plaintiffs, including the Bank as executor of the estate, were represented by Marty L. Matthews and Steve Cowan. Eileen Kirchner, a trust officer, participated in the mediation as the Bank's representative. The defendants were represented by R. Douglas Noah, Jr.

The *Yanmar Diesel* lawsuit was settled at the mediation. There were two subsequent hearings to approve the settlement, one in the county court where Bourgeois's estate was pending, and one in the district court where the *Yanmar Diesel* lawsuit was filed. Both courts approved the settlement. Avary, with her counsel, appeared and testified at the district court hearing. Although provided notice, neither Avary nor her counsel appeared at the county court hearing. At neither hearing did Avary offer any objection to the settlement. Avary does not allege that she did not receive her designated portion of the settlement funds.

In this lawsuit, Avary contends that at the mediation, the defendants in the *Yanmar Diesel* lawsuit made a settlement offer of $450,000 to Bourgeois's estate. This offer was allegedly made to the estate alone, separate from the other plaintiffs. Kirchner, the Bank's representative, allegedly left the mediation before the $450,000 offer was made; the parties hotly dispute whether Kirchner delegated to the estate's attorneys the Bank's responsibility to represent the estate. Avary further contends the Bank (representing the estate) rejected this offer, "but offered instead to accept the money ... as part of a larger aggregate (lump-sum)" for all of the plaintiffs except Avary, to be allocated among those plaintiffs as they so decided. Avary alleges the Bourgeois estate actually received $75,000 in the settlement as a result of this allocation among the other plaintiffs. The estate's tax liability was over $185,000, which allegedly had to be paid from proceeds of life insurance policies of which Bourgeois's sons were the beneficiaries. Avary claims the rejection of the $450,000 offer and the acceptance of a smaller allocation was a breach of the Bank's fiduciary duty as executor of the estate.

After filing the lawsuit, Avary proceeded to serve discovery requests on the Bank. The Bank objected to many of these requests, and the parties filed various motions to compel and

for protective orders. The trial judge issued four orders on these motions.

The first order required the Bank to respond to two of Avary's requests for admission regarding whether or not the parties were in separate rooms at the mediation. The Bank was not required, however, to respond to requests for admission directed to the settlement offers made, the presence or absence of Kirchner at the mediation, and Kirchner's alleged delegation of authority at the mediation.

The second order denied Avary's request to depose and obtain documents from Noah, the defense attorney in the wrongful death lawsuit, regarding matters occurring during mediation.

**\*786** The third order, regarding Kirchner's deposition, was issued after the trial judge heard testimony from Kirchner *in camera*. The trial judge ordered that Kirchner's *in camera* testimony should be disclosed to Avary, "and that no objection based upon confidentiality or privilege under Civil Practice & Remedies Code § 154.073 is proper so as to prevent the admissibility of such testimony upon trial or hearing in this cause."

The fourth order denied Avary's request to depose Sutherland, one of the attorneys representing Avary at the mediation. The trial judge also ordered "that Plaintiff not attempt to obtain discovery from *any* persons (other than Defendant's representative Eileen Kirchner) regarding what occurred" at the mediation. (Emphasis added).

All the trial judge's orders appear to be founded upon the confidentiality provisions of section 154.073. The fourth order expressly cites the statute. The second and third orders explicitly deny discovery of "communications or conduct" which took place at the mediation. The first order does not specify a basis for the trial judge's ruling, but the Bank objected to the requested discovery of mediation communications on the grounds that Avary sought "privileged and confidential information."

The Bank moved for summary judgment on all of Avary's claims, claiming (i) there was no evidence of breach of fiduciary duty, negligence, or conspiracy to defraud, because each claim arose "out of confidential and inadmissible statements purportedly made at Mediation;" and (ii) the Bank established its affirmative defenses of accord and satisfaction, ratification, waiver, and estoppel. The trial judge granted the Bank's motion without specifying the grounds.

Avary now appeals the grant of summary judgment. In three issues, Avary argues the trial judge erred in (i) granting summary judgment; (ii) ordering witnesses not to testify about what occurred in the mediation; and (iii) denying Avary's request for discovery about what occurred during the mediation.

## STANDARD OF REVIEW

The standard of review in summary judgment is well-established. *See* TEX.R. CIV. P. 166a(c); *Black v. Victoria Lloyds Ins. Co.,* 797 S.W.2d 20, 23 (Tex.1990). In reviewing a summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). Every reasonable inference in favor of the nonmovant is allowed, and all doubts are resolved in his favor. *Nixon,* 690 S.W.2d at 548–49.

To prevail on summary judgment, a defendant as movant must either disprove at least one element of each of the plaintiff's theories of recovery or plead and conclusively establish each essential element of an affirmative defense, thereby rebutting the plaintiff's cause of action. *See City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979); *Hoover v. Gregory,* 835 S.W.2d 668, 671 (Tex.App.—Dallas 1992, writ denied). A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence. *See Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex.1982).

**[1] [2]** Although not so designated, the parties treat the Bank's request for summary judgment on Avary's affirmative claims as a "no-evidence" motion under rule 166a(i) of the Texas Rules of Civil Procedure. A no-evidence summary judgment motion may be urged on the ground **\*787** that there is no evidence of one or more essential elements of a claim or defense on which the adverse party would have the burden of proof at trial. *See Espalin v. Children's Med. Ctr. of Dallas,* 27 S.W.3d 675, 682–83 (Tex.App.—Dallas 2000, no pet.). A no-evidence motion for summary judgment places the burden on the nonmovant to present summary judgment evidence raising a genuine fact issue. *See Espalin,* 27 S.W.3d at 683.

We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.,* 12 S.W.3d 827, 832–33 (Tex.App.—Dallas 2000, no pet.). Thus, we must determine whether the nonmovant produced any evidence of probative force to raise a fact issue on the material questions presented. *Gen. Mills,* 12 S.W.3d at 833. A trial judge improperly grants a no-evidence summary judgment if the nonmovant presents more than a scintilla of probative evidence to raise a genuine issue of material fact. *Gen. Mills,* 12 S.W.3d at 833. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Espalin,* 27 S.W.3d at 683 (quoting *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997)); *Gen. Mills,* 12 S.W.3d at 833. When analyzing both traditional and no-evidence summary judgments, we consider the evidence in the light most favorable to the nonmovant. *See Nixon,* 690 S.W.2d at 549 (traditional summary judgment); *Gen. Mills,* 12 S.W.3d at 833 (no-evidence summary judgment).

**[3] [4] [5] [6] [7]** Finally, we review the trial judge's discovery rulings under an abuse of discretion standard. *Oyster Creek Fin. Corp. v. Richwood Inv. II, Inc.,* 957 S.W.2d 640, 646 (Tex.App.—Amarillo 1997, pet. denied). "The scope of discovery and the admissibility of evidence is principally within the discretion of the trial judge." *Oyster Creek Fin. Corp.,* 957 S.W.2d at 646; *see also Helfand v. Coane,* 12 S.W.3d 152, 155 (Tex.App.—Houston [1st Dist.] 2000, pet. denied) (orders prohibiting discovery are reviewed under abuse of discretion standard). The trial court is allowed "great latitude" in its discovery orders. *Martinez v. Rutledge,* 592 S.W.2d 398, 399 (Tex.Civ.App.—Dallas 1979, writ ref'd n.r.e.). Unless there is a clear abuse of discretion, the trial judge's ruling should not be disturbed on appeal. *Oyster Creek Fin. Corp.,* 957 S.W.2d at 646. The purpose of discovery, however, is to allow the parties to obtain the fullest knowledge of facts and issues prior to trial. *West v. Solito,* 563 S.W.2d 240, 243 (Tex.1978). Orders prohibiting discovery may constitute an abuse of discretion. *See Helfand,* 12 S.W.3d at 155; *see also* TEX.R. CIV. P. 192.3, cmt. 7 ("A court abuses its discretion in unreasonably restricting a party's access to information through discovery.").

In reviewing a summary judgment in which the court has not provided the specific basis for its decision, we must review each argument asserted in the motion and affirm the trial court's judgment if any of the arguments are meritorious. *See Star–Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex.1995).

## BANK'S AFFIRMATIVE DEFENSES

**[8]** The Bank sought summary judgment under rule 166a(c) on its affirmative defenses of accord and satisfaction, ratification, waiver, and estoppel. Because the Bank, as summary judgment movant, was required to establish each element of these defenses as a matter of law, *Maxson v. Travis County Rent Account,* 21 S.W.3d 311, 315 (Tex.App. —Austin 1999, pet. dism'd by agr.), we first address whether **\*788** the Bank established any of its affirmative defenses as a matter of law. In the district court hearing to approve the settlement of the wrongful death and survival lawsuit, Avary testified the settlement reached at the mediation was "fair and reasonable." In its motion for summary judgment, the Bank argued that this testimony, and Avary's failure to appear at the hearing in the county court, established the Bank's affirmative defenses of accord and satisfaction, ratification, waiver, and estoppel as a matter of law.

### Elements of Defenses

**[9]   [10]   [11]   [12]**   Waiver is the intentional relinquishment of a known right, or intentional conduct inconsistent with claiming that right. *Sun Exploration & Prod. Co. v. Benton,* 728 S.W.2d 35, 37 (Tex.1987). Ratification is the adoption or confirmation by a person, with knowledge of all material facts, of a prior act that did not then legally bind that person and which that person had the right to repudiate. *Lesikar v. Rappeport,* 33 S.W.3d 282, 300 (Tex.App.—Texarkana 2000, pet. denied). Ratification and waiver are largely a matter of intent. *Lesikar,* 33 S.W.3d at 300 (citing *Kennedy v. Bender,* 104 Tex. 149, 135 S.W. 524, 525 (1911)). There can be no waiver unless it is so intended by one party and so understood by the other. *Lesikar,* 33 S.W.3d at 300.

**[13]   [14]   [15]**   An accord and satisfaction occurs when parties agree to the discharge of an existing obligation in a manner other than in accordance with the terms of their original contract. *Metromarketing Serv., Inc. v. HTT Headwear, Ltd.,* 15 S.W.3d 190, 197 (Tex.App.—Houston [14th Dist.] 2000, no pet.). The "accord" is the new agreement and the "satisfaction" is the discharge of the obligation. *Metromarketing,* 15 S.W.3d at 197. To establish this defense, the evidence must show both parties agreed the amount paid by the debtor to the creditor fully satisfied the entire claim. *Metromarketing,* 15 S.W.3d at 197. In determining whether an accord and satisfaction has occurred, the question is whether there was an "unmistakable communication to the creditor that tender of the lesser sum is upon the condition that acceptance will constitute satisfaction of the underlying obligation." *Metromarketing,* 15 S.W.3d at 198 (quoting *Jenkins v. Henry C. Beck Co.,* 449 S.W.2d 454, 455 (Tex.1969)). The condition must be so clear, full, and explicit as to not be susceptible to any other interpretation. *Metromarketing,* 15 S.W.3d at 198.

**[16]   [17]**   Estoppel arises where, by the fault of one, another is induced to change his or her position for the worse. *Herschbach v. City of Corpus Christi,* 883 S.W.2d 720, 736 (Tex.App.—Corpus Christi 1994, writ denied). The elements of an estoppel defense are (i) a false representation or concealment of material facts, (ii) made with knowledge, actual or constructive, of those facts, (iii) with the intention that it should be acted on, (iv) to a party without knowledge or means of obtaining knowledge of the facts, (v) who detrimentally relies on the representations. *Schroeder v. Tex. Iron Works, Inc.,* 813 S.W.2d 483, 489 (Tex.1991).

### Application of Law to Facts

Although the Bank contends it met its burden of conclusively proving each of the essential elements of its accord and satisfaction, ratification, waiver, and estoppel defenses, we cannot agree.

At the district court hearing to approve the settlement, Avary testified she was the guardian of the estate of her two minor sons, who were plaintiffs in the wrongful death and survival lawsuit. She testified she was "in total accord" with the settlement "insofar as it affects Brett and Timothy." **\*789** She was asked whether she believed "that the settlement amount that was reached in mediation is a fair and reasonable amount for your minors." She answered "Yes." She further confirmed she understood "that this is all the money that you're ever going to receive on behalf of your boys *from these defendants.*" (Emphasis added). She testified she understood by making the settlement agreement, neither she nor her sons would "ever again be permitted to bring any kind of lawsuit to compensate them for the damages that they have suffered as a result of their father's death." Finally, she testified she understood she was "releasing all of the defendants that are named in that lawsuit."

Avary's testimony that the settlement was fair and reasonable does not conclusively establish the Bank's affirmative defenses of accord and satisfaction, ratification, waiver, and estoppel. Rather, Avary's testimony reveals she understood she was settling her sons' wrongful death and survival claims against the tractor manufacturer and others (*not* including the Bank) relating to the death of Bourgeois, the boys' father. It does not demonstrate intent on her part to settle claims she might have against the Bank. Avary was not asked to testify regarding the reasonableness of the amount awarded to Bourgeois's estate, the Bank's handling of the settlement negotiations on behalf of the estate, any agreements she had with the Bank, or any potential claims she might have against the Bank.

**[18]**   The Bank has not established intent on Avary's part to accept payment from the defendants in the *Yanmar Diesel* suit to satisfy an obligation owed to her sons by the Bank, as would be required to establish the defense of accord and satisfaction. The Bank must have made an "unmistakable communication ... that tender of the lesser sum is upon the condition that acceptance will constitute satisfaction of the underlying obligation." *Metromarketing,* 15 S.W.3d at 198. The condition must be "so clear, full, and explicit as to not be susceptible to any other interpretation." *Metromarketing,* 15 S.W.3d at 198. Avary testified she was accepting a lesser sum from the wrongful death defendants to satisfy their obligation to her sons; she said nothing of any obligation of the Bank.

**[19]**   Regarding its estoppel defense, the Bank has not established as a matter of law it was without means of acquiring knowledge of facts misrepresented or concealed by Avary on which it relied to its detriment. The Bank has neither identified any false representation or concealment of material facts by Avary, nor alleged it had no knowledge or means of obtaining knowledge of any such misrepresentation or concealment.

**[20]**   With respect to the waiver defense, the Bank has not established that Avary intentionally relinquished a right to pursue a claim against the Bank for its conduct in handling the estate. The Bank argues that Avary was aware of the rejected $450,000 offer at the time she testified in favor of the settlement. This evidence does not establish, however, that Avary knew "of the facts on which she bases ... her claims" for purposes of establishing the Bank's waiver and ratification defenses. *See Byrd v. Woodruff,* 891 S.W.2d 689, 699 (Tex.App.—Dallas 1994, writ dism'd by agr.). Avary's complaint is that the Bank accepted an allocation of $75,000

of the overall settlement when it knew or should have known the estate's tax obligations far exceeded that amount. There is no evidence in the summary judgment record that Avary was aware of these facts and therefore intentionally relinquished her   **\*790**  right to challenge the Bank's handling of the estate's affairs.

In reaching our conclusion regarding the Bank's affirmative defenses, we find our decision in *Byrd* instructive. In that case, we held a client's testimony that a settlement was "fair and equitable" did not bar a subsequent claim for legal malpractice. Woodruff had represented Byrd, a minor, in two lawsuits arising out of Byrd's accident on a riding lawn mower. The judge in the underlying personal injury lawsuit held hearings on the various settlements reached in the case. At the hearings, Byrd testified the settlements were fair and equitable. *Byrd,* 891 S.W.2d at 696. In the subsequent legal malpractice case, Byrd alleged Woodruff was derelict in her duties regarding settlement and a related trust agreement. *Byrd,* 891 S.W.2d at 697. The trial judge granted Woodruff's motion for summary judgment without specifying the grounds. *Byrd,* 891 S.W.2d at 698. Woodruff's summary judgment motion included a request for judgment on the affirmative defenses of estoppel, ratification, and waiver. *Byrd,* 891 S.W.2d at 699.

As in this case, Woodruff argued Byrd's testimony at the settlement approval hearings precluded Byrd's later claims. We concluded summary judgment on the ground of estoppel was not proper, noting Byrd did not "challenge the fairness and reasonableness of the underlying settlements themselves." *Byrd,* 891 S.W.2d at 699. Rather, Byrd's suit complained of Woodruff's conduct in representing her and managing the settlement funds. No issue of Woodruff's legal representation was litigated in the prior suit, and Byrd was not estopped from asserting her claims against Woodruff:

> [T]he doctrine of estoppel requires that the party claiming the estoppel must be without knowledge, or the means of acquiring knowledge, of the facts which the party to be estopped is alleged to have represented by her acts, conduct, or silence. *Simpson v. MBank Dallas, N.A.,* 724 S.W.2d 102, 107 (Tex.App.—Dallas 1987, writ ref'd n.r.e.). As [Byrd]'s attorney, Woodruff knew, or should have known, of the facts and circumstances surrounding the judgment and creation of the

trust. Woodruff was as competent as [Byrd], if not more so, to evaluate the fairness of the settlements and the creation of the trust. There is no evidence that Woodruff was without such knowledge. Under these circumstances, estoppel does not apply. *See Simpson,* 724 S.W.2d at 108.

*Byrd,* 891 S.W.2d at 699. We also concluded there was no waiver or ratification through Byrd's acceptance of the settlement proceeds, because she was not challenging the reasonableness of the settlements themselves, but rather Woodruff's alleged mishandling of the settlement proceeds. *Byrd,* 891 S.W.2d at 699. Further, there was no evidence that Byrd knew, at the time she accepted the check and executed the trust agreement, of the facts on which she based her malpractice claims. *Byrd,* 891 S.W.2d at 699.

With respect to the Bank's affirmative defenses, there is no summary judgment evidence Avary was aware the Bank accepted an allocation of $75,000 of the overall settlement when it knew or should have known the estate's tax obligations far exceeded that amount and, therefore, intentionally relinquished her right to challenge the Bank's handling of the estate's affairs. There is no summary judgment evidence of misrepresentation or concealment by Avary of facts the Bank had no means of knowing. There is no summary judgment evidence Avary agreed to discharge an obligation of the Bank or to ratify its **\*791** actions. Accordingly, the trial judge erred in granting summary judgment for the Bank on its affirmative defenses of accord and satisfaction, ratification, waiver, and estoppel.

## AVARY'S CLAIMS

Next, we address whether summary judgment was properly granted on the remaining ground of the Bank's motion, that there is no evidence to support Avary's claims. If there is more than a scintilla of evidence supporting the elements of these claims, then summary judgment was not proper. *See Gen. Mills,* 12 S.W.3d at 833. After reviewing the summary judgment record, we conclude there is more than a scintilla of evidence to support Avary's claims, even without further discovery of communications made at the mediation.

At the outset, we note the Bank's summary judgment motion did not address all of Avary's claims. In her original petition, Avary alleged claims for "breach of fiduciary duty/mismanagement of estate assets," "negligence/wilful neglect," and "fraud, conspiracy, conversion of assets." Avary pleaded similar facts to support each cause of action, all arising out of the Bank's settlement of the estate's claims in the *Yanmar Diesel* lawsuit. The Bank filed its summary judgment motion on these claims shortly after Avary filed her original petition. By the time of the summary judgment hearing, almost a year later, Avary's sixth amended original petition had been filed. In it, Avary alleged the same three causes of action, and added a new cause of action for a declaratory judgment that sections 154.073 and 154.053 of the Texas Civil Practice and Remedies Code violated the open courts provision of the Texas Constitution.

**[21]** **[22]** The Bank's summary judgment motion, however, was not amended to address the declaratory judgment claim. If the plaintiff amends the petition to add new causes of action after being served with a motion for summary judgment, the defendant must file an amended or supplemental motion to address the newly-pleaded causes of action. *See Harris v. Varo, Inc.,* 814 S.W.2d 520, 526 (Tex.App.—Dallas 1991, no writ); *Johnson v. Rollen,* 818 S.W.2d 180, 183 (Tex. App.—Houston [1st Dist.] 1991, no writ). If the defendant fails to address the newly-pleaded causes of action, summary judgment may not be granted, as a matter of law, on the additional causes of action. *See Harris,* 814 S.W.2d at 526. Thus, summary judgment on Avary's claim for declaratory judgment was improper. *See Espalin,* 27 S.W.3d at 688 ("A summary judgment that purports to dispose of causes of action not addressed in the summary judgment motion is erroneous.").

**[23]** **[24]** For her remaining claims, Avary was required to produce more than a scintilla of evidence of the Bank's breach of fiduciary duty, negligence, fraud, and conspiracy in order to avoid summary judgment. *See Gen. Mills,* 12 S.W.3d at 832–33. As independent executor of the estate, the Bank had a fiduciary relationship with Brett and Timothy and, therefore, owed them "a fiduciary duty of full disclosure of all material facts known to [it] that might affect [the beneficiaries'] rights." *Montgomery v. Kennedy,* 669 S.W.2d 309, 313 (Tex.1984) (trustees of trust and executors of estate had fiduciary duty of full disclosure to beneficiary); *see Huie v. DeShazo,* 922 S.W.2d 920, 923 (Tex.1996). A fiduciary "owes its principal a high duty of good faith, fair dealing, honest performance, and strict accountability."

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

*Ludlow v. DeBerry,* 959 S.W.2d 265, 279 (Tex.App.—
Houston [14th Dist.] 1997, no writ). Avary's claims arise out
of the Bank's rejection of the alleged $450,000 settlement
offer and **\*792** the allocation to the estate of a much smaller
portion of the settlement, which was insufficient to satisfy the
estate's known tax obligations. The amount of the settlement
apportionment to the estate and the amount of the estate's tax
obligations are matters that may be proved without disturbing
the confidentiality of the mediation. As will be discussed in
more detail below, evidence that is discoverable independent
of the alternative dispute resolution procedure is discoverable
regardless of its use in the procedure. *See* TEX. CIV. PRAC.
& REM.CODE ANN. § 154.073(c) (Vernon Supp.2002).

**[25]   [26]   [27]   [28]**   Avary's negligence, fraud, and
conspiracy claims arise out of the alleged breaches of
fiduciary duty and failures to disclose. The elements of a
negligence cause of action are a duty, a breach of that
duty, and damages proximately caused by the breach. *See
El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987).
As noted above, the Bank as executor of the estate had a
duty to the beneficiaries which Avary claims it breached.
Similarly, breach of the duty of full disclosure by a
fiduciary is tantamount to fraudulent concealment. *See Willis
v. Maverick,* 760 S.W.2d 642, 645 (Tex.1988). Avary's
conspiracy claim requires proof of a combination of two or
more persons with an unlawful purpose or a lawful purpose
to be accomplished by unlawful means. *See Ins. Co. of N.
Am. v. Morris,* 981 S.W.2d 667, 675 (Tex.1998). Because a
defendant's liability for conspiracy depends on participation
in some underlying tort for which the plaintiff seeks to hold
the defendant responsible, conspiracy is considered to be
a derivative tort. *Tilton v. Marshall,* 925 S.W.2d 672, 681
(Tex.1996). The conspiracy Avary alleges arises out of her
breach of fiduciary duty claim. Thus, Avary's negligence,
fraud, and conspiracy claims overlap her claim of breach of
fiduciary duty, and much of the same evidence relevant to the
breach of fiduciary duty claim is also relevant to the other
causes of action.

**[29]**   The summary judgment record reflects Kirchner's
testimony was elicited on three different occasions: first, at
her original deposition; second, in the *in camera* hearing
held by the trial judge; and third, at the continuation of
her deposition following the trial judge's ruling that the *in
camera* testimony could be released to Avary. At the *in
camera* hearing, Kirchner testified regarding the $75,000
figure for allocation of the settlement proceeds to the estate:
"It was something the bank said we needed, and the way

we arrived at the 75,000 was we needed to cover fees. We
needed to pay burial expenses. We needed to reimburse
parents for the death of the decedent. That's how the $75,000
arose." Kirchner reiterated this testimony: "We arrived at
our $75,000 by determining what the burial expenses were,
what we needed to reimburse the parents for, and what fees
it would be." In this testimony, she made no mention of the
estate's tax liability as a factor that was considered in the
decision to accept the $75,000 allocation. In the continuation
of Kirchner's deposition, she testified that on the day prior to
the mediation, she received an e-mail [1] from the Bank's tax
department giving an estimate of the **\*793** amount of the
estate's state and federal taxes that were due as of that date.
Kirchner responded, "Hopefully, we will get some money
tomorrow at the mediation to pay these debts off." She further
testified:

> Q: So you were aware of the necessity and need by the
> Estate for tax money?
>
> A: Certainly, we all were aware of that.
>
> Q: At the time you went to the mediation?
>
> A: Yes.
>
> Q: And you were aware of that at the time that the
> bank accepted the $75,000?
>
> A: Yes.

This testimony was submitted with Avary's amended
summary judgment response, and the Bank made no further
objection to its admission after the conclusion of the *in
camera* hearing and order. The summary judgment evidence
also revealed Avary was not consulted about the allocation of
settlement proceeds to the estate or informed of the estate's
outstanding obligations prior to the mediation.

Viewed in the light most favorable to the nonmovant, the
Bank's acceptance of an apportionment of the settlement
proceeds without consideration of the estate's tax obligations
and without any disclosure to the heirs of the effect of the
apportionment on the estate's remaining assets and liabilities
is some evidence of a breach of fiduciary duty. Thus,
summary judgment was not proper on Avary's claim for
breach of fiduciary duty and the related negligence and fraud
claims.

**[30]   [31]**   To avoid summary judgment on the conspiracy
claim, Avary was required to produce evidence on the

following elements: (i) two or more persons; (ii) an object to be accomplished; (iii) a meeting of minds on the object or course of action; (iv) one or more unlawful, overt acts; and (v) damages as a proximate result. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983). As noted above, the unlawful, overt act alleged is the Bank's breach of fiduciary duty. As to the first three elements, however, Avary alleges that the Bank conspired with attorneys Matthews and Cowan, but does not proffer or cite to any summary judgment evidence of meeting of the minds or unlawful purpose. Therefore, summary judgment on this cause of action was proper unless Avary should have been permitted to conduct further discovery. We address this point below.

## DISCOVERY ON AVARY'S CLAIMS

The trial judge's rulings on Avary's affirmative claims and on the discovery motions seeking evidence relating to those claims were based upon the confidentiality provisions of the alternative dispute resolution statute. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 154.073 (Vernon Supp.2002). As noted above, the trial judge permitted a deposition of the Bank's representative, but did not allow any further discovery of mediation communications or events relating to Avary's affirmative claims. These rulings resulted in the trial judge's concluding there was no genuine issue of material fact supporting Avary's claims. Kirchner was not present at the mediation when the offer of $450,000 was allegedly made. Thus, she could not testify about the alleged offer and rejection of it, and no other witness was permitted to testify as to anything occurring at the mediation. With only Kirchner's testimony, Avary had no evidence of one of the primary factual allegations underlying her claims against the Bank. Further, she was prohibited from obtaining any other discovery of mediation communications or events that might provide evidence to support her *794 claims. This result, however harsh, should be the correct one if every communication made in mediation is always confidential.

### Confidentiality Provisions and Exceptions

Section 154.073 of the Texas Civil Practice and Remedies Code is part of the statutory scheme for alternative dispute resolution ("ADR"). *See* TEX. CIV. PRAC. & REM.CODE ANN. Chapter 154, "Alternative Dispute Resolution Procedures" (Vernon 1997 and Supp.2002) (the "ADR statute"). Section 154.073 provides:

### Confidentiality of Certain Records and Communications

(a) Except as provided by Subsections (c), (d), (e), and (f), a communication relating to the subject matter of any civil or criminal dispute made by a participant in an alternative dispute resolution procedure, whether before or after the institution of formal judicial proceedings, is confidential, is not subject to disclosure, and may not be used as evidence against the participant in any judicial or administrative proceeding.

(b) Any record made at an alternative dispute resolution procedure is confidential, and the participants or the third party facilitating the procedure may not be required to testify in any proceedings relating to or arising out of the matter in dispute or be subject to process requiring disclosure of confidential information or data relating to or arising out of the matter in dispute.

(c) An oral communication or written material used in or made a part of an alternative dispute resolution procedure is admissible or discoverable if it is admissible or discoverable independent of the procedure.

(d) A final written agreement to which a governmental body, as defined by Section 552.003, Government Code, is a signatory that is reached as a result of a dispute resolution procedure conducted under this chapter is subject to or excepted from required disclosure in accordance with Chapter 552, Government Code.

(e) If this section conflicts with other legal requirements for disclosure of communications, records, or materials, the issue of confidentiality may be presented to the court having jurisdiction of the proceedings to determine, in camera, whether the facts, circumstances, and context of the communications or materials sought to be disclosed warrant a protective order of the court or whether the communications or materials are subject to disclosure.

(f) This section does not affect the duty to report abuse or neglect under Subchapter B, Chapter 261, Family Code, and abuse, exploitation, or neglect under Subchapter C, Chapter 48, Human Resources Code.

(g) This section applies to a victim-offender mediation by the Texas Department of Criminal Justice as described in Article 56.13, Code of Criminal Procedure.

[32]   Under section 154.073, there are several exceptions to the general rule of confidentiality.[2] First, if the communication does not relate to the subject matter of the dispute, or does not relate to or arise out of the matter in dispute, it may not be confidential under subsections (a) and (b). *See In re Daley,* 29 S.W.3d 915, 918 (Tex.App.—Beaumont 2000, orig. proceeding) (deposition questions regarding whether participant attended mediation **\*795** and whether he had mediator's permission to leave did not concern subject matter of underlying suit and thus were not confidential under section 154.073). Second, subsection (c) provides that if the communication is admissible or discoverable independent of the alternative dispute resolution procedure, then it is admissible or discoverable regardless of its use in an alternative dispute resolution procedure. *See Smith v. Smith,* 154 F.R.D. 661, 669 (N.D.Tex.1994) (subsection 154.073(c) should have same effect as Texas Rule of Civil Evidence 408, which does not require exclusion of "otherwise discoverable" evidence). While, as noted above, some of the evidence at issue here may be "otherwise discoverable," and some may not relate to the subject matter of the underlying lawsuit, we do not find either exception to be dispositive here.

Third, if there are "other legal requirements for disclosure" of the communication, the trial court may order disclosure after *in camera* review. This appeal involves the third exception.

### The Trial Judge's Rulings

The trial judge made four determinations in the course of his discovery rulings. First, he concluded the Bank's fiduciary duty was a "legal requirement for disclosure" that conflicted with the confidentiality provisions of section 154.073. Second, he decided to hold an *in camera* hearing under subsection (e). Third, he determined that the facts and circumstances of the case warranted disclosure of mediation communications. Fourth, he prohibited any discovery of mediation communications or events other than Kirchner's deposition.

The trial judge conducted one *in camera* proceeding under subsection (e) regarding questions posed to Kirchner at her deposition. At the *in camera* hearing, out of the hearing of Avary's counsel, the trial judge read questions to Kirchner from the transcript of her deposition that she had not answered based upon the Bank's confidentiality objection. The trial judge then ruled Kirchner's answers should be disclosed to

Avary's counsel after being sealed for a period of ten days. The Bank did not challenge this ruling.

While the trial judge permitted some discovery regarding Avary's claim for breach of fiduciary duty by allowing the deposition of the Bank's representative, he did not allow any other discovery of the claim. The requests for admission directed to the Bank inquired into the alleged $450,000 settlement offer, Kirchner's presence at the mediation, and Kirchner's delegation of authority to others upon leaving the mediation. The Bank objected to these requests as calling for privileged and confidential information. While Kirchner did answer some of these questions during the *in camera* hearing, she could not answer others because she admittedly was not present when the alleged $450,000 settlement offer was made. Thus, the trial judge found that Avary could question Kirchner about the events of the mediation, but could not question the Bank itself on the same topics through written requests for admission. The basis for this distinction is not apparent from the record. Given the Bank's strenuous argument that it did not delegate authority to any other party regarding the settlement of the case, and the Bank's fiduciary obligations, whether or not the Bank had knowledge of the mediation proceedings after Kirchner left is a question highly relevant to Avary's claims.

The trial judge concluded the Bank's fiduciary obligations to make disclosures to the beneficiaries constituted a "legal requirement for disclosure" under section 154.073(e). Once the trial judge concluded **\*796** such a "legal requirement" existed, he made the determination contained in subsection (e), that is, whether the "facts, circumstances, and context of the communications or materials sought to be disclosed warrant a protective order of the court or whether the communications or materials are subject to disclosure." He concluded Kirchner, the Bank's representative, could be questioned, but no further discovery could be taken.

### Analysis Under Subsection 154.073(e)

[33]   In issues two and three, Avary complains the trial judge abused his discretion in entering orders preventing her from deposing witnesses and obtaining written discovery regarding what occurred at the mediation session. Initially, we must determine whether the trial judge correctly concluded that the confidentiality provisions of section 154.073 conflicted with "other legal requirements for disclosure," and the "facts,

circumstances, and context of the communications ... sought to be disclosed ... [were] subject to disclosure."

First, as noted above, the trial judge concluded the Bank's fiduciary obligations constituted a "legal requirement for disclosure" for purposes of subsection 154.073(e). We agree. A legal duty of disclosure has been established between the Bank and Avary; that is, in its capacity as executor of the Bourgeois estate, the Bank had a legal duty to disclose material information to the beneficiaries. *See Montgomery,* 669 S.W.2d at 313. Because of this fiduciary relationship, Avary was entitled to question the Bank fully regarding its handling of the estate and other matters regarding the estate. *See Huie,* 922 S.W.2d at 923. The information at issue here —a rejection of a settlement offer exceeding the estate's tax liabilities in favor of an allocation that did not—is a material fact affecting the beneficiaries' rights. The Bank as executor has a duty to disclose this material information to the beneficiaries and their representative. Once such a legal duty to disclose is established, the trial judge must determine under section 154.073(e) whether a conflict exists between the legal duty and the confidentiality requirements of the ADR statute. If a conflict exists, the trial judge must next determine whether, under the facts and circumstances presented, disclosure of the confidential communications is warranted.

The *Yanmar Diesel* defendants' alleged offer of $450,000 to the estate alone, and the Bank's rejection of that offer on the estate's behalf is a confidential mediation communication, and is the very information Avary seeks to establish her claims against the Bank. Thus, the Bank's fiduciary duty to disclose a material fact potentially affecting the beneficiaries' rights is squarely in conflict with the statutory provisions of section 154.073(a) that "a communication relating to the subject matter of any civil ... dispute made by a participant in an alternative dispute resolution procedure ... is confidential, is not subject to disclosure, and may not be used as evidence against the participant in any judicial or administrative proceeding." The Bank's fiduciary duty of disclosure was a "legal requirement for disclosure" conflicting with the confidentiality provisions of section 154.073.

[34]    Second, because of the conflict between the Bank's duty to disclose and the confidentiality provisions of section 154.073, the trial judge undertook the analysis under section 154.073(e), whether disclosure of the confidential communications was warranted under the facts and circumstances presented. The trial judge correctly

concluded the Bank's fiduciary obligations warranted disclosure of mediation **\*797** communications under these circumstances. While the fiduciary duty of disclosure is not unlimited, *see Huie,* 922 S.W.2d at 925 (attorney-client privilege protects communications between fiduciary and attorney), it is a "high duty" of "full disclosure of all material facts" that might affect the beneficiaries' rights. *Huie,* 922 S.W.2d at 923; *Montgomery,* 669 S.W.2d at 313; *Ludlow,* 959 S.W.2d at 279.

There is no question that confidentiality of communications is an important part of the statutory scheme of alternative dispute resolution. The overarching policy goal of alternative dispute resolution is clearly set forth by the legislature in section 154.002 of the ADR statute: "It is the policy of this state to encourage the peaceable resolution of disputes ... and the early settlement of pending litigation through voluntary settlement procedures." TEX. CIV. PRAC. & REM.CODE ANN. § 154.002 (Vernon 1997). Mediation is described in the ADR statute as "a forum in which an impartial person, the mediator, facilitates communication between parties to promote reconciliation, settlement, or understanding among them." TEX. CIV. PRAC. & REM.CODE ANN. § 154.023(a) (Vernon Supp.2002). It is the responsibility of courts to carry out the statutory policy. TEX. CIV. PRAC. & REM.CODE ANN. § 154.003 (Vernon 1997); *In re Acceptance Ins. Co.,* 33 S.W.3d 443, 451 (Tex.App.—Fort Worth 2000, orig. proceeding). Proponents of mediation stress that confidentiality is critical to the success of the process. ALAN SCOTT RAU, EDWARD F. SHERMAN & BRIAN D. SHANNON, RAU, SHERMAN & SHANNON'S TEXAS ADR & ARBITRATION: STATUTES AND COMMENTARY 45 (2000) ("RAU, SHERMAN & SHANNON"). Without a guarantee of confidentiality, parties may be reluctant to speak freely and address the heart of their dispute. RAU, SHERMAN & SHANNON at 45. The breadth of the language used in section 154.073 indicates the legislature recognized these concerns.

Courts have recognized the importance of confidentiality as well. Several courts have held that while a trial judge may order parties to attend a mediation, he cannot impose sanctions for failure to negotiate in "good faith." *See, e.g., Hansen v. Sullivan,* 886 S.W.2d 467, 469 (Tex.App.—Houston [1st Dist.] 1994, orig. proceeding) (judge "cannot force the disputants to peaceably resolve or negotiate their differences;" sanctions for failure to negotiate in good faith improper where party appeared and participated in

mediation for three hours until mediator declared impasse); *Decker v. Lindsay*, 824 S.W.2d 247, 250–51 (Tex.App.—Houston [1st Dist.] 1992, no writ) (parties may be ordered to attend mediation over objection, but cannot be compelled to negotiate in good faith). These opinions reveal the courts' concern that proving a party's "good faith" would necessarily involve disclosure of confidential communications. *See In Re Acceptance Ins. Co.*, 33 S.W.3d at 453 (ADR statute requires that manner in which participants negotiate should not be disclosed to trial judge; therefore, judge abused his discretion in overruling objections to testimony about participant's consultations with supervisor during mediation and sanctioning party for failure to comply with mediation order).

[35]  As previously noted, when a legal requirement for disclosure conflicts with the statute's confidentiality provisions, section 154.073 permits parties to submit to the trial judge the question whether, under the circumstances of a particular case, communications made by a participant in mediation may be disclosed. Here, the parties to the original litigation have peaceably resolved their dispute, as the ADR statute contemplates. Avary now seeks to prove a new and independent tort *798 that she alleges occurred between her and her own fiduciary, the Bank, during the course of the mediation proceeding. She does not propose to discover evidence to allow her to obtain additional funds from the *Yanmar Diesel* defendants or to use mediation communications to establish any liability on their part after they have peaceably resolved their dispute. Instead, Avary proposes to offer the evidence in a separate case against a separate party to prove a claim that is factually and legally unrelated to the wrongful death and survival claims.

Although no courts have addressed this issue under section 154.073 of the ADR statute, similar considerations have arisen under rule 408 of the Texas Rules of Evidence, [3] which excludes evidence of offers to compromise a disputed claim. The confidentiality protections of section 154.073 are broader than the exclusionary rule set forth in rule 408, but similar policy concerns underlie both provisions. Under rule 408, offers of compromise or settlement are excluded as evidence "to allow a party to buy his peace and encourage settlement of claims outside of the courthouse." *State Farm Mut. Auto. Ins. Co. v. Wilborn*, 835 S.W.2d 260, 261 (Tex.App.—Houston [14th Dist.] 1992, orig. proceeding). Evidence of an offer of compromise is considered unreliable on the issue of liability because it does not necessarily represent a party's actual position on the merits of a claim, but rather the amount a

party may be willing to give or take to avoid the expense and annoyance of litigation. *See Wilborn*, 835 S.W.2d at 261. Like section 154.073's exceptions, rule 408 does not exclude evidence that is "otherwise discoverable," and evidence of compromise may be "offered for another purpose."

Under rule 408, courts addressing insurance bad faith claims have struggled with the admission of an offer to compromise where the offer would be irrelevant and prejudicial regarding the insurance company's liability under the policy itself, but could be an essential element of the insured's cause of action for bad faith or of the insurance company's defense to the bad faith claim. *See, e.g., Wilborn*, 835 S.W.2d at 261; *Allstate Ins. Co. v. Evins*, 894 S.W.2d 847, 849 (Tex.App.—Corpus Christi 1995, orig. proceeding). While evidence of an offer of settlement "would be prejudicial to the insurer because of its implication that the insurer has admitted liability" on the contract claim, "the very same evidence of settlement offers may be of great benefit to the insurance company in its defense against the bad faith claims, to show that it made a reasonable attempt to pay the amount it believed it owed on its insured's claim." *Evins*, 894 S.W.2d at 849. In *Wilborn*, the settlement offer was a key to the *plaintiff's* case; she testified that the insurer's offer of $20,000 on a policy with limits of $50,000 provided the *799 grounds for her bad faith claim. *Wilborn*, 835 S.W.2d at 261. In these cases, evidence of an offer to compromise is admissible to prove or disprove the extracontractual liability of an insurance company on a bad faith claim, even against the party making the offer, although sometimes not until a second, severed proceeding. *Compare Wilborn*, 835 S.W.2d at 262 (severance of two claims required), *with Evins*, 894 S.W.2d at 849–50 (limiting instruction suffices).

In these cases, courts have recognized a party's right to present evidence of the offer to compromise when it is proof of the bad faith claim itself or relevant to the defense of it. The right to develop evidence for a bad faith claim or defense is considered to be a "substantial right." *See, e.g., Wilborn*, 835 S.W.2d at 262; *In re Foremost Ins. Co.*, 966 S.W.2d 770, 772 (Tex.App.—Corpus Christi 1998, orig. proceeding). Rule 408 does not prevent a party from proving a separate cause of action simply because some of the acts complained of took place during compromise negotiations. [4]

[36]  Similarly, we have held that despite the public policy supporting ADR and the peaceable resolution of disputes, there is an equally important public policy to preserve "significant and well established procedural and substantive

rights." *Cadle Co. v. Castle,* 913 S.W.2d 627, 632 (Tex.App. —Dallas 1995, writ denied). Thus, in actions to enforce settlement agreements under section 154.071 of the ADR statute, parties have "the right to be confronted by appropriate pleadings, assert defenses, conduct discovery, and submit contested fact issues to a judge or jury." *Cadle,* 913 S.W.2d at 632; *see also Mantas v. Fifth Court of Appeals,* 925 S.W.2d 656, 658–59 and n. 2 (Tex.1996) (party seeking enforcement of settlement agreement where other party has withdrawn consent must pursue breach of contract claim, "which is subject to the normal rules of pleading and proof," citing *Cadle*); *Stevens v. Snyder,* 874 S.W.2d 241, 243–44 (Tex.App.—Dallas 1994, writ denied) (under ADR statute, party may enforce settlement agreement without other party's consent under contract law).

**\*800** These actions to enforce settlement agreements implicate confidentiality concerns. Although not raised in *Cadle,* evidence relating to (i) the parties' intent in entering into a settlement agreement, (ii) any ambiguity in the agreement, and (iii) affirmative defenses to a claim for breach of the agreement could, in some circumstances, involve evidence of otherwise confidential mediation communications. One court rejected a confidentiality objection in holding that an oral agreement reached in mediation was enforceable, although the parties apparently did not raise, and the court did not address, confidentiality under section 154.073 of the ADR statute. *See Hur v. City of Mesquite,* 893 S.W.2d 227, 234 (Tex.App.—Amarillo 1995, writ denied) (confidentiality provisions of section 154.053(c) speak only to mediator's duties). Because the alleged oral agreement in *Hur* was reached in mediation, proof of the agreement and any defenses would necessarily involve disclosure of mediation communications.[5]

Here, Avary alleges that a new and independent tort arose during the course of the mediation. That tort involves breach of a duty to disclose by Avary's fiduciary. Significant substantive and procedural rights of Avary's are implicated, including the opportunity to develop evidence of her claim and to submit contested fact issues to a judge or jury. In pursuing this claim, Avary will not disturb the settlement with the *Yanmar Diesel* defendants. All of these considerations support the trial court's decision under subsection 154.073(e). We conclude the trial judge correctly determined that the Bank's fiduciary obligations warranted disclosure under "the facts, circumstances, and context" presented to him.

However, our analysis does not end here. After conducting an *in camera* hearing under section 154.073(e), the trial judge concluded that the Bank's fiduciary obligations warranted disclosure but limited discovery to the testimony of Kirchner, the Bank trust officer who left the mediation before it concluded. The trial judge did not conduct similar *in camera* proceedings before denying discovery of other mediation communications. For the requests for admission to the Bank, an additional hearing may not have been needed. The requests for admission were directed to the Bank, so the same "facts, circumstances, and context" relevant to Kirchner's deposition would control disclosure under subsection (e). For the purpose of the analysis under subsection (e), there is no distinction between the Bank and Kirchner, its agent, with respect to the Bank's duty to disclose. Once he concluded that the facts, circumstances, and context of the case required disclosure of Kirchner's testimony, the trial judge abused his discretion by entering an order that the Bank was not required to respond to requests for admission involving the same information.

**[37]** The considerations for the deposition of the *Yanmar Diesel* defendants' attorney, Noah, however, were different from those surrounding discovery from the **\*801** Bank and its agents. The trial judge should have conducted an *in camera* hearing to determine the "facts, circumstances, and context" surrounding Noah's potential testimony. While it is true that neither Noah nor his clients, the *Yanmar Diesel* defendants, shared any fiduciary obligation with the Bank, it does not follow that Noah would have no knowledge of any fact relevant to the *Bank's* duty. Nonparty witnesses may well have knowledge of facts relevant to a party's potential liability in any lawsuit, as the Texas Rules of Civil Procedure recognize. *See* TEX.R. CIV. P. 205, "Discovery from Nonparties." Nevertheless, the mere possession of relevant knowledge does not end the inquiry here. Because Noah would be testifying as to confidential mediation communications, the trial judge must first determine whether disclosure is warranted under the facts, circumstances, and context as they relate to Noah. Noah may have relevant knowledge of facts critical to Avary's claims. On the other hand, Noah may have no knowledge or only knowledge that was gained through an attorney-client communication with one of his clients or through his own work product. Noah and his clients may have relied on the protections of the attorney-client and the work product privileges in analyzing their case and making decisions about settlement. Revealing why an offer was made or how the specific amount of the offer was calculated could invade those privileges. Purely

factual information, however, would not be protected by these privileges. *See Huie,* 922 S.W.2d at 923 ("a person cannot cloak a material fact with the [attorney-client] privilege merely by communicating it to an attorney"). The trial judge could also weigh any potential harm to the mediation process by disclosure of communications the parties made under the expectation that they would remain confidential. It is one thing to order discovery from a party alleged to have committed a tort during the mediation process; it is another to reach across the mediation table to parties who have settled the claims against them. The trial judge may consider these and other factors in an *in camera* hearing, and could then decide that all, some, or none of Noah's testimony should be disclosed. The trial judge abused his discretion in not conducting an *in camera* hearing to determine the "facts, circumstances and context" surrounding Noah's potential testimony.

[38]   The trial judge did not conduct an *in camera* hearing before prohibiting Avary from deposing Sutherland, Avary's own attorney. As with Noah, Sutherland would be testifying at least in part as to confidential mediation communications. Further, like Noah, Sutherland may have knowledge of facts relevant to the Bank's alleged breach of fiduciary duty. Unlike Noah, Sutherland's client would be conducting the deposition. Any attorney-client privilege as to communications between Sutherland and Avary belongs to Avary and could be waived by her. *See* TEX.R. EVID. 503(c) ("The privilege may be claimed by the client ..."); TEX.R. EVID. 511 (holder of privilege may waive privilege by voluntarily disclosing or consenting to disclosure of privileged matter); *Turner v. Montgomery,* 836 S.W.2d 848, 850 (Tex.App.—Houston [1st Dist.] 1992, orig. proceeding) (attorney can claim privilege only on behalf of client). The analysis under section 154.073(e) of the facts, circumstances, and context surrounding Sutherland's disclosure of mediation communications would be different from the analysis for Noah or the Bank. Thus, the trial judge abused his discretion in not conducting an *in camera* hearing to determine the "facts, circumstances and context" surrounding Sutherland's potential testimony.

In addition, where the Bank's fiduciary obligations warranted disclosure of mediation **\*802** communications, the trial judge should not have ordered a blanket prohibition on any further discovery of evidence relating to alleged breaches of those obligations, even if the persons from whom discovery was sought did not share the Bank's fiduciary obligation to Avary. As noted with respect to attorney Noah, facts

relevant to a cause of action may be known by persons other than parties to the litigation. *See* TEX.R. CIV. P. 205. The general rule regarding the scope of discovery is very broad: "In general, a party may obtain discovery regarding any matter that is not privileged and is relevant to the subject matter of the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party." TEX.R. CIV. P. 192.3(a) & cmt. 7 ("A court abuses its discretion in unreasonably restricting a party's access to information through discovery."). Under section 154.073(e), the facts, circumstances, and context of the communications sought may warrant protective orders rather than disclosures. This possibility, however, does not justify restricting discovery to a single witness who admittedly lacked knowledge of facts material to Avary's claims. Without further analysis, the trial judge assumed discovery of any information relevant to Avary's claims from any person other than an agent or employee of the Bank was precluded under the confidentiality provisions of section 154.073. This assumption was too broad in light of the trial judge's finding of a conflict between section 154.073's confidentiality provisions and the Bank's fiduciary obligations. The trial judge should have considered the facts, circumstances, and context surrounding the particular information sought, rather than issuing a blanket prohibition on any further discovery.

Our analysis does not require the Bank or any other proposed witness to forego all objection to Avary's requested discovery. The Texas Supreme Court held that while a fiduciary "must fully disclose material facts regarding the administration of the [estate], the attorney-client privilege protects confidential communications between the [fiduciary] and his or her attorney under Rule 503" of the Texas Rules of Evidence. *Huie,* 922 S.W.2d at 925. The court explained:

> Our holding, therefore, in no way affects Huie's [the fiduciary's] duty to disclose all material facts and to provide a full trust accounting to Chenault [the beneficiary], even as to information conveyed to Ringer [the attorney]. In the underlying litigation, Chenault may depose Huie and question him fully regarding his handling of trust property and other factual matters involving the trust. Moreover, the attorney-client privilege does not bar Ringer from testifying about factual matters

involving the trust, as long as he is not called on to reveal confidential attorney-client communications.

*Huie,* 922 S.W.2d at 923. Thus, the Bank may assert objections to revealing attorney-client communications or make other applicable objections. Similarly, any other person or entity from whom discovery is sought may object as permitted by the rules of civil procedure. Moreover, the trial judge may decide that further *in camera* proceedings are necessary under subsection 154.073(e) to determine the "facts, circumstances, and context" of particular mediation communications or events before ordering disclosure. We recognize this process is potentially cumbersome. In light of the important considerations involved, however, convenience is secondary.

### CONCLUSION

Our conclusion that the trial judge unreasonably restricted discovery regarding **\*803** Avary's affirmative claims is limited to the facts before us. We are not presented with the question whether discovery of mediation communications would be appropriate if sought in the same case in which mediation had failed, and in which the parties were proceeding to trial on their original claims and defenses. Nor are we presented with the question whether a mediator can be compelled to testify or respond to discovery. We conclude only that where a claim is based upon a new and independent tort committed in the course of the mediation proceedings, and that tort encompasses a duty to disclose, section 154.073 does not bar discovery of the claim where the trial judge finds in light of the "facts, circumstances, and context," disclosure is warranted.

Avary presented more than a scintilla of evidence on her claims for breach of fiduciary duty, negligence, and fraud relating to the Bank's failures to disclose material facts affecting the rights of the beneficiaries of the estate. The Bank did not establish each element of its affirmative defenses as a matter of law. The Bank's motion did not address Avary's claim for declaratory judgment. For these reasons, summary judgment for the Bank was not proper. Further, the trial judge abused his discretion in unreasonably restricting discovery on Avary's claims. We reverse the trial court's judgment and remand this case for further proceedings consistent with this opinion.

### All Citations

72 S.W.3d 779

### Footnotes

1   It appears that this e-mail may have been part of Exhibit 4 to Kirchner's deposition, but the exhibits were not included in the record. For this reason, the record does not include the amount of tax liability calculated by the Bank as of the date of the mediation. Kirchner's testimony, however, does establish the Bank was aware of a tax liability and the possibility of obtaining settlement proceeds to satisfy the estate's tax obligations. Kirchner also testified in the first part of her deposition that the estate's funds were insufficient to pay outstanding taxes.

2   Two statutory exceptions, for written agreements to which governmental bodies are signatories, and for reporting of abuse and neglect, set forth in subsections (d) and subsection (f), have no relevance here and are not discussed further.

3   Rule 408 provides:
   **Compromise and Offers to Compromise**
   Evidence of (1) furnishing or offering or promising to furnish or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice or interest of a witness or a party, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.
   TEX.R. EVID. 408.

4   Rule 408 of the Federal Rules of Evidence is substantially similar to its Texas counterpart. Interestingly, in commenting on Federal Rule of Evidence 408, Wright and Graham state: "Rule 408 is also inapplicable when the claim is based upon some wrong that was committed in the course of the settlement discussions; e.g. libel, assault, breach of contract, unfair labor practice, and the like." 23 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND

PROCEDURE § 5314 (1980) ("WRIGHT & GRAHAM") (footnotes omitted). Wright and Graham note that rule 408 "does not prevent the plaintiff from proving his case; wrongful acts are not shielded because they took place during compromise negotiations." 23 WRIGHT & GRAHAM § 5314, main volume and 2000 supplement. Wright and Graham include in their citations *Portland Savings & Loan Association v. Bernstein,* 716 S.W.2d 532, 537 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.), *overruled on other grounds, Dawson–Austin v. Austin,* 968 S.W.2d 319, 323 (Tex.1998), as well as Texas insurance cases. *See* 23 WRIGHT & GRAHAM § 5314, main volume and 2000 supplement. At least one later court has limited *Bernstein* to cases in which evidence of compromise negotiations was admitted only in order to establish personal jurisdiction, not to establish liability for a wrong occurring in the course of a settlement discussion. *See Barrett v. U.S. Brass Corp.,* 864 S.W.2d 606, 633–34 (Tex.App.—Houston [1st Dist.] 1993), *aff'd in part, rev'd in part on other grounds, Amstadt v. U.S. Brass Corp.,* 919 S.W.2d 644 (Tex.1996). In any event, under Wright and Graham's analysis, rule 408's exclusionary rule would not prevent the discovery Avary seeks here, regarding a wrong committed in the course of a settlement discussion. Because the confidentiality provisions of section 154.073 of the ADR statute are broader than rule 408's exclusionary rule, however, we cannot conclude our analysis here.

5   The *Hur* case is cited here because it is one of very few opinions by Texas courts addressing the issue of mediation confidentiality, and because the *Hur* court recognized that confidentiality concerns may arise in a suit to enforce a settlement agreement reached in a mediation. The ADR statute itself allows a party to enforce a written settlement agreement reached at mediation "in the same manner as any other written contract." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 154.071(a) (Vernon 1997) (implicitly creating exception to confidentiality where necessary to prove terms of written agreement). The *Hur* court's assumption that the same exception exists for an oral agreement has broader implications for mediation confidentiality that we do not address here.

---

   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 71485
Only the Westlaw citation is currently available.
United States District Court,
M.D. North Carolina.

Shirley C. BROWN, Plaintiff,
v.
NATIONWIDE MUTUAL
INSURANCE COMPANY, Defendant.

No. 1:11CV49.    |    Signed Jan. 6, 2015.

**Attorneys and Law Firms**

Jennifer E. Bowden, Lutrell T. Williams, R. Steve Bowden,
R. Steve Bowden & Associates, Greensboro, NC, for
Plaintiff.

Brian Orlando Beverly, Young Moore and Henderson, P.A.,
Raleigh, NC, for Defendant.

*MEMORANDUM OPINION AND ORDER*

JOI ELIZABETH PEAKE, United States Magistrate Judge.

**\*1** This insurance dispute comes before the Court on a
Motion for Partial Summary Judgment filed by Plaintiff
Shirley Brown [Doc. # 17] and a Cross–Motion for
Summary Judgment filed by Defendant Nationwide Mutual
Fire Insurance Company ("Nationwide" or "Defendant
Nationwide") [Doc. # 18]. This action has been referred to
the undersigned to conduct all proceedings pursuant to 28
U.S.C. § 636(c) [Doc. # 24]. For the reasons set out below, the
Court will set this matter for a hearing and for a final pretrial
conference on February 19, 2015 at 9:30 a.m.

**I. FACTS, CLAIMS, AND PROCEDURAL HISTORY**
In this case, Plaintiff asserts claims for unfair and deceptive
trade practices and bad faith refusal to settle an insurance
claim. These claims arise out of an automobile accident
that occurred on May 28, 2007, in Guilford County, North
Carolina, involving a vehicle driven by Plaintiff and a
vehicle driven by Mr. Jonathan Drinkard. Plaintiff suffered
bodily injury in the accident. At the time of the accident,
Plaintiff had underinsured motorist coverage with Defendant
Nationwide of $100,000, and the vehicle driven by Mr.

Drinkard was covered by an insurance policy issued by
Defendant Nationwide with liability limits of $30,000.

On April 14, 2010, Plaintiff Brown filed a tort action against
Mr. Drinkard in Guilford County Superior Court seeking
damages for personal injury. In his Answer, Mr. Drinkard
admitted negligence in failing to keep a proper lookout,
but denied proximately causing Plaintiff Brown's injuries.
The parties engaged in discovery during 2010 leading up
to a mediation proceeding held on December 2, 2010. In
the present suit, Plaintiff contends that Defendant committed
unfair and deceptive insurance practices and bad faith refusal
to settle, based on Defendant's conduct at and immediately
after that December 2, 2010 mediation. Although that
mediation was set with respect to Plaintiff's liability claim,
it is undisputed that Defendant's agent was also there to
at least "monitor" the underinsured claim, and Defendant
expressed a willingness at the mediation to settle both the
liability claim and the underinsured claim for $45,000. In
addition, Defendant's agent testified at his deposition that if
Defendant had no underinsured coverage at issue, Defendant
would have settled for the $30,000 policy limits. (Swann Dep.
at 12 [Doc. # 17–4].) After the December 2, 2010 mediation,
Defendant requested additional documents and records from
Plaintiff. Plaintiff then filed the present suit, alleging unfair
and deceptive trade practices and bad faith refusal to settle.
Defendant subsequently tendered the $30,000 liability limits
on Mr. Drinkard's policy on December 21, 2010, nineteen
days after the mediation. Defendant contends that it tendered
the limits after receiving the additional requested medical
records; Plaintiff contends that the document requests were
harassment designed to force Plaintiff to settle the liability
and underinsured claims together for a lesser amount, and that
the liability policy limits were only tendered as a result of her
filing the present suit.

**\*2** After Defendant tendered the policy limits on the
liability policy, the parties proceeded to arbitration as to the
underinsured claim, and Plaintiff was ultimately awarded
$82,500, representing the $30,000 in liability limits already
paid by Defendant Nationwide and $52,500 in underinsured
motorist coverage under Plaintiff's automobile insurance
policy with Defendant Nationwide. Defendant Nationwide
has paid the arbitration award.

Plaintiff filed her Complaint in the present action in Guilford
County state court and Defendant Nationwide removed the
action to this Court on the basis of diversity-of-citizenship
jurisdiction. Plaintiff's First Claim for Relief is for Unfair

and Deceptive Trade Practices pursuant to North Carolina General Statutes § 75–1.1(a), based on alleged violations of North Carolina General Statutes § 58–63–15(11)(f), (h), & (m), and based on alleged refusal to promptly settle the liability claim after liability was reasonably clear, in order to influence settlement negotiations on the underinsured claim. (Compl. at 3.)[1] She charges a violation of Section 58–63–15(11)(f) by failing to attempt good faith efforts to effectuate prompt, fair, and equitable settlement, a violation of Section 58–63–15(11)(h) by attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled, and a violation of Section 58–63–15(11)(m) by failing to promptly settle claims where liability has become reasonably clear under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage. Plaintiff's Second Claim for Relief is that "Defendant committed tort[i]ous and bad-faith breach of contract during its dealings with the Plaintiff" by refusing to settle the primary liability claim in an effort to coerce Plaintiff to settle the primary liability claim and the underinsured claim together without the use of arbitration on the underinsured claim.[2] Plaintiff seeks damages, attorney's fees, and costs as relief.

Plaintiff seeks summary judgment only on her bad faith claim, contending that the evidence establishes a bad faith refusal to settle as a matter of law. Defendant seeks summary judgment on both claims against it. Defendant argues (1) that Plaintiff cannot rely upon the statements or conduct that occurred at mediation as evidence of liability due to the confidential nature of mediation pursuant to N.C. Gen.Stat. § 7A–38.1(l); (2) that there is no cause of action for third-party bad faith or unfair and deceptive trade practices under North Carolina law; (3) that Plaintiff has failed to create a genuine issue of material fact on her claims; and (4) that Plaintiff has not presented evidence of any damages. The Court will consider each of these contentions in turn.

## II. DISCUSSION

### A. Summary Judgment Standard
Summary judgment is appropriate only when no genuine issue of material fact exists. *Shealy v. Winston,* 929 F.2d 1009, 1011 (4th Cir.1991). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all

facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. *Id.* The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." *Temkin v. Frederick Cnty. Comm'rs,* 945 F.2d 716, 718 (4th Cir.1991) (citing *Celotex Corp. v. Catrett,* 477 U .S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." *Id.* at 718–19 (citing *Anderson,* 477 U.S. at 247–48).

### B. Admissibility of Conduct Occurring at Mediation
**\*3** Defendant first contends that under North Carolina General Statute § 7A–38.1(l), statements and conduct that occurred during the court-ordered mediation are inadmissible to support the Plaintiff's claims. Section 7A–38.1(l) provides that:

> Evidence of statements made and conduct occurring in a mediated settlement conference or other settlement proceeding conducted under this section, whether attributable to a party, the mediator, other neutral, or a neutral observer present at the settlement proceeding, shall not be subject to discovery and shall be inadmissible in any proceeding in the action or other civil actions on the same claim[.]

N.C. Gen.Stat. § 7A–38.1(l)(2010).

Defendant argues that under a plain reading of the statute, statements and conduct during the mediation are inadmissible to support the Plaintiff's claims. Defendant cites *Few v. Hammack Enters., Inc.,* 132 N.C.App. 291, 296 (1999), to support this contention. However, in *Few,* the court held that Section 7A–38.1(l) "does not prohibit the admission of the outcome of a mediated settlement conference before a judge making the determination of whether settlement was reached and of the terms of that settlement." *Id.* The court reasoned that Section 7A–38.1(l) was "enacted to prevent a chilling effect on settlement negotiations by allowing parties to freely make settlement offers without fear that those offers would be revealed to a subsequent finder of fact as some evidence of liability on either the present or a future substantive claim." *Few v. Hammack Enters., Inc.,* 132 N.C.App. at 296. Consistent with this purpose, the statute includes a general

prohibition against the admission of statements made during a court-ordered mediation. However, under a plain reading of Section 7A–38.1(l), the statute only bars the admission of such evidence "in any proceeding in the action or other civil actions on the *same* claim."N.C. Gen.Stat. § 7A–38.1(l)(2010) (emphasis added); *see also Breedlove ex rel. Howard v. Aerotrim, U.S.A., Inc.,* 142 N.C.App. 447, 454–55 (2001) (noting that Section 7A–38.1(l) does "not prohibit the presentation of evidence of statements made in compromise negotiations, if offered for some other purpose"); *Renner v. Hawk,* 125 N.C.App. 483, 493 (1997) ("Assuming, arguendo, that all of the statements in question were made in the course of compromise negotiations, the evidence was not offered to prove liability for or invalidity of the claim or its amount.... Since the rule excludes only when the purpose is proving the validity or invalidity of the claim or its amount, an offer for another purpose is not within the rule."(internal quotations omitted)).

In this case, the underlying action that was the subject of the mediation involved a negligence claim against Mr. Drinkard. In contrast, the present action is a separate civil action proceeding on two substantively different claims against Defendant Nationwide. The evidence is offered for "other purposes" in order to establish bad faith and unfair and deceptive trade practices on those separate claims. In the circumstances, a plain reading of Section 7A–38.1(l) demonstrates that it does not affect the admission in this case of statements made and conduct occurring during the mediation in the prior state case against Mr. Drinkard. [3]

## C. Third Party Claims

**\*4** Defendant contends that Plaintiff cannot bring a claim for unfair and deceptive trade practices or bad faith failure to settle regarding Defendant's failure to settle the $30,000 liability claim because as to that claim, Plaintiff is considered an adverse party to Defendant Nationwide, since Defendant Nationwide owes its duty of good faith to its insured on that claim, Mr. Drinkard, and not to Plaintiff. In *Wilson v. Wilson,* 121 N.C.App. 662, 665 (1996), the court held that "North Carolina does not recognize a cause of action for third-party claimants against the insurance company of an adverse party based on unfair and deceptive trade practices under N.C. Gen.Stat. § 75–1.1."A plaintiff must therefore be an insured or in privity with the insurer to assert a private right of action under N.C. Gen.Stat. § 58–63–15 and N.C. Gen.Stat. § 75–1.1. *Id.* at 665. The court's reasoning was two-fold. First, "allowing such third-party suits against

insurers would encourage unwarranted settlement demands, since plaintiffs would be able to threaten a claim for an alleged violation of N.C.G.S. § 58–63–15 in an attempt to extract a settlement offer."*Id.* at 666. Further, "allowing a third-party claim against the insurer of an adverse party for violating N.C.G.S. § 58–63–15 may result in a conflict of interest for the insurance company."*Id.* at 667. This is because "upon defending its insured, the insurer has a duty to act diligently and in good faith to its insured" and "to safeguard the interests of its insured," but allowing a third-party action "would require the insurer to also act in the best interests of the party adverse to its insured."*Id.*

However, an insurer nevertheless owes a duty to its insured with respect to an underinsured policy. *See Murray v. Nationwide Mutual Ins. Co.,* 123 N.C.App. 1 (1996) (concluding that the plaintiff had stated a claim against the UIM carrier for unfair and deceptive practices); *Miller v. Nationwide Mut. Ins. Co.,* 112 N.C.App. 295, 301 (1993) (holding that a plaintiff may state a claim for unfair trade practices based on alleged refusal of the insurer to pay UIM coverage and the insurer's withholding of a UIM payment after the insurer had sufficient information to determine that UIM would be due and payable). This is because "North Carolina courts hold uninsured motorist policies to the same standards set forth in Section 58–63–15(11) as other policies."*Chew v. Progressive Universal Ins. Co.,* No. 5:09–cv–351–FL, 2010 WL 4338352, at \*9 (E.D.N.C. Oct. 25, 2010); *see also Weese v. Nationwide Ins. Co.,* 879 F.2d 115, 118 (4th Cir.1989) (applying West Virginia law) (holding that the Court will hold an uninsured motorist insurer to its contractual obligations of fair dealing in settlement negotiations, despite the parties' adversarial posture).

In reconciling these doctrines, the District of Colorado has held as follows:

> The duty of good faith and fair dealing is implied in every insurance policy and is based upon the special relationship between the insurer and the insured. Thus, the duty does not extend to injured third-party claimants. When both the tortfeasor and the injured party are insured by the same insurer, however, the question whether the insurer owes a duty of good faith and fair dealing to the injured party becomes more difficult. Nevertheless, courts almost universally hold that the insurer does not owe such a duty to the injured party when she asserts a third-party claim against the tortfeasor. To hold otherwise places the insurer in the untenable position of owing a duty of good faith to both the insured tortfeasor and his adversary.

**\*5** [In this case, the plaintiff] has asserted a third-party claim against [the tortfeasor]; thus, I conclude that Farmers did not owe her a duty of good faith and fair dealing with respect to that claim. However, [the plaintiff] also has asserted a first-party UIM claim. Farmers did owe [the plaintiff] a duty of good faith and fair dealing in its handling of that claim. [The plaintiff's] allegations of bad faith relate at least in part to Farmers' handling of her UIM claim. Accordingly, Farmers' motion for summary judgment on the ground that it did not owe [the plaintiff] a duty of good faith and fair dealing will be denied as to this aspect of the case.

*Galusha v. Farmers Ins. Exch.,* 844 F.Supp. 1401, 1403–04 (D.Colo.1994) (internal citations omitted); *see also Myers v. State Farm Mut. Auto. Ins. Co.,* 950 F.Supp. 148, 151 (D.S.C.1997) (denying motion to dismiss bad faith claims based on insurer's conduct relating to underinsured coverage, and noting that "the insured's carrier has the duty to act in good faith toward, and deal fairly with, its insured by investigating and processing the underinsurance claim"); *Herrig v. Herrig,* 844 P.2d 487, 491 (Wyo.1992).

Therefore, in this case, Plaintiff may not bring a third-party claim based on Defendant's conduct in its role as insurer of the vehicle driven by Mr. Drinkard. However, Defendant still owed Plaintiff a duty of good faith and fair dealing in handling her UIM claim and, as a result, Plaintiff may bring a cause of action against Defendant in its capacity as her UIM insurer. To the extent the claims in this case are based on Defendant's actions between December 2 and December 21, 2010, there is evidence that Defendant was at that time acting in its capacity as Plaintiff's UIM insurer, based on Defendant's concession that its agent at the mediation was also there to "monitor" the UIM claim, that Defendant's agent agreed to a settlement figure that included settlement of the UIM claim, and that Defendant's agent later conceded that he would have settled the liability claim for the policy limits if Defendant did not have the UIM interest at stake. Therefore, the Court cannot conclude as a matter of law that Plaintiff cannot state a claim against Defendant, to the extent that Defendant was acting in its capacity as her UIM insurer.

**D. Issues of Material Fact**
Defendant next contends that Plaintiff has failed to present evidence of bad faith or unfair or deceptive practices because Defendant paid the liability limits and proceeded to arbitration on the UIM claim as soon as Plaintiff provided all of the requested medical records. Plaintiff in turn contends that she is entitled to judgment in her favor because the evidence establishes that Defendant refused to pay the liability claim in an effort to obstruct her ability to proceed on the UIM claim, and then only agreed to pay the liability claim and allow the UIM claim to proceed when the present suit was filed.

**\*6** Having considered the parties' contentions and the evidence presented, the Court finds that there are genuine issues of material fact in this case, as the evidence presented would support a finding for either party on this issue. Specifically, the evidence would support a conclusion that in valuing Plaintiff's claims, Defendant had legitimate questions regarding a preexisting injury, and those questions were not resolved until the relevant medical records were provided. Correspondence between the parties shows that Defendant Nationwide received additional medical records between December 8, 2010, and December 21, 2010. Defendant Nationwide tendered to Plaintiff the limits of Mr. Drinkard's liability policy on December 21, 2010, shortly after receiving the medical records. Under this version of the facts, Plaintiff has not shown bad faith or unfair and deceptive trade practices. However, the evidence would also support the conclusion that Defendant had received the requisite medical information before or during the mediation on December 2, 2010, that Defendant valued the claim at over $30,000 by that time, that Defendant would have paid the liability policy limits if it were not also the UIM carrier, that Defendant's efforts to force Plaintiff to provide additional records, including records that had already been provided, reflected an effort to delay payment of the liability policy and force Plaintiff to settle the UIM policy without arbitration, and that Defendant only paid the liability policy limits and proceeded to arbitration on the UIM claim after the present suit was filed. Thus, the evidence would support a finding in favor of either party on this issue. In the circumstances, the Court cannot conclude that either party has established a lack of genuine issue of material facts.

**E. Damages**
Finally, Defendant contends that Plaintiff has not shown that she was injured or that the injury was proximately caused by any of the alleged unfair or deceptive trade practices. In her Response [Doc. # 22, at 5], Plaintiff argues only that her "contractual rights were deprived because of Defendant's conduct."However, to the extent that Plaintiff is referring to her right to proceed to arbitration on her UIM claim, Defendant contends that Plaintiff did not suffer any injury

because she proceeded to arbitration, was awarded a sum, and Defendant paid that sum of money. To the extent Plaintiff relies on a delay in her ability to proceed on the UIM claim, it is not clear what injury Plaintiff suffered as a result of the 3–week delay from December 2 to December 21, 2010, or whether she can rely on the cost of the present suit as part of the damages claimed in this case: *See, e.g., Dailey v. Integon Gen. Ins. Corp.,* 75 N.C.App. 387 (1985) (concluding that "the allegations made concerning the expenses plaintiff incurred in presenting his claim to the defendant and in preparing and pursuing this lawsuit do not state a claim that will support legal relief"). However, the parties have not addressed that issue in the present briefing. Similarly, to the extent that Plaintiff may be asserting a claim for punitive damages, even in the absence of any actual damages, the parties have not specifically addressed these issues in the present briefing. The Court will therefore set this matter for a hearing and a final pretrial conference on February 19, 2015. Prior to the hearing, Plaintiff must file a supplemental Response, setting out the specific basis for any alleged injury or damages claimed, as well as any supporting case law. Defendant may file a reply. The Court will consider this issue further at the hearing. In addition, to the extent that there are genuine issues requiring a trial, the Court will consider scheduling issues during the February 19 hearing, including

setting final pretrial deadlines and scheduling the case for trial. Therefore, the parties should be prepared to address any pretrial and trial scheduling matters, including the schedule for a pretrial settlement conference, as this matter appears suited for additional mediation prior to trial.

**III. CONCLUSION**

**\*7** IT IS THEREFORE ORDERED that Plaintiff's Motion for Partial Summary Judgment [Doc. # 17] is DENIED, and that Defendant Nationwide's Cross Motion for Summary Judgment [Doc. # 18] is DENIED, subject to further consideration of the question of damages, which is set for a hearing on February 19, 2015 at 9:30 a.m. in Courtroom 3 of the Hiram H. Ward Federal Building and United States Courthouse, Winston–Salem, North Carolina. Plaintiff must file a Supplemental Response by January 26, 2015, further addressing the issue of damages as noted above. Defendant may file a Reply on that issue by February 9, 2015. At the hearing, the Court will also address pretrial scheduling as noted above.

**All Citations**

Slip Copy, 2015 WL 71485

---

Footnotes

1    To establish an unfair or deceptive trade practice in violation of Section 75–1.1, a plaintiff must show: (1) an unfair or deceptive act or practice; (2) in or affecting commerce; (3) which proximately caused injury to the plaintiff. *Gray v. North Carolina Ins. Underwriting Ass'n,* 352 N.C. 61, 68 (2000). A practice is considered unfair and deceptive if it offends established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *Id.* Moreover, "where a party engages in conduct manifesting an inequitable assertion of power or position, such conduct constitutes an unfair act or practice."*Id.* In addition, N.C. Gen.Stat. § 58–63–15 defines unfair methods of competition and unfair or deceptive acts or practices in the insurance industry and enumerates a list of unfair claim settlement practices. North Carolina courts have held that a violation of N.G. Gen.Stat. § 58–63–15(11) also constitutes an unfair and deceptive trade practice in violation of § 75–1.1 as a matter of law. *Murray v. Nationwide Mut. Ins. Co.,* 123 N.C.App. 1, 10 (1996).

2    In order to recover punitive damages for an insurance company's bad faith refusal to settle, Plaintiff must establish: (1) a refusal to pay after recognition of a valid claim, (2) bad faith, and (3) aggravating or outrageous conduct. *Lovell v. Nationwide Mut. Ins. Co.,* 108 N.C.App. 416, 420 (1993) (citing *Michael v. Metropolitan Life Ins. Co.,* 631 F.Supp. 451, 455 (W.D.N.C.1986); *Robinson v. North Carolina Farm Bureau Ins. Co.,* 86 N.C.App. 44, 49–50 (1987) (noting that an action for punitive damages for tortious conduct is not necessarily precluded when the company eventually pays, if bad faith delay and aggravating conduct is present); *Lovell,* 108 N.C.App. at 421 (finding that evidence tending to establish that an insurer intended to "wear down" its insured in order to influence settlement of the liability claim was sufficient to withstand a motion for a directed verdict on a bad faith claim).

3    Moreover, the Court notes that Federal Rule of Evidence 408, not addressed by the parties, provides that conduct or statements made during compromise negotiations are not admissible to "prove or disprove the validity or amount of a disputed claim or to impeach," but such evidence is admissible for other purposes. *See*Fed.R.Civ.P. 408 and 2006 cmte. notes (citing *Athey v. Farmers Ins. Exch.,* 234 F.3d 357 (8th Cir.2000), for the proposition that "evidence of settlement offer by insurer was properly admitted to prove insurer's bad faith"); *see also*Wright & Miller, Fed. Prac. & Proc. § 5314 ("Hence, if an insurer is sued for having breached its obligations under an indemnity policy by failing to make a reasonable

**Brown v. Nationwide Mut. Ins. Co., Slip Copy (2015)**

2015 WL 71485

settlement within policy limits, Rule 408 does not prevent the plaintiff from proving his case; wrongful acts are not shielded because they took place during compromise negotiations."). Because the result is the same under both federal and state rules, the Court need not resolve *sua sponte* the extent to which the state rule applies in this federal action.

---

**End of Document**                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 356949
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

DIETZ & WATSON, INC.
v.

LIBERTY MUTUAL INSURANCE COMPANY
and Liberty Mutual Fire Insurance Company.

Civil Action No. 14–4082.
|
Signed Jan. 28, 2015.

**Attorneys and Law Firms**

Thomas A. Lynam, III, Leonard G. Villari, Villari Lentz &
Lynam, LLC, Philadelhia, PA, for Dietz & Watson, Inc.

Timothy J. O'Driscoll, Alan M. Kidd, Stephen C. Baker,
Drinker Biddle & Reath LLP, Philadelphia, PA, for
Liberty Mutual Insurance Company and Liberty Mutual Fire
Insurance Company.

*MEMORANDUM OF DECISION*

THOMAS J. RUETER, United States Magistrate Judge.

**\*1** Presently before the court are seven discovery motions
filed by the parties in the above captioned case which were
referred to the undersigned for disposition by the Honorable
Jan E. DuBois (Doc. No. 22). The court granted one motion,
Document No. 17, as unopposed. On January 14, 2015, the
court heard oral argument on the remaining six motions,
Document Nos. 14, 15, 16, 18, 19 and 21. This Memorandum
of Decision sets forth the court's rulings on these motions.

**I. BACKGROUND**
This is an action for bad faith under Pennsylvania law, 42 Pa.
Cons.Stat. Ann. § 8371 (West 2014), filed by plaintiff Dietz
& Watson, Inc. ("D & W") against defendants Liberty Mutual
Insurance Company and Liberty Mutual Fire Insurance
Company (collectively referred to hereinafter as "Liberty").
The case stems from an underlying state court action (the
"Underlying Action") wherein an individual named Javier
Fernandez sued D & W and another defendant for damages
relating to a work place injury. Liberty provided insurance
coverage to D & W for the claim and provided a defense in the

Underlying Action under a reservation of rights letter. Liberty
reserved rights to disclaim coverage on a claim for punitive
damages. At the start of the trial in state court in September
2013, Mr. Fernandez settled his claims against D & W for
$2.5 million, which consisted of a payment of $1,750,000
from Liberty and $750,000 from D & W. At the time of the
settlement, Mr. Fernandez was represented by the law firm
of Villari Lentz & Lynam, LLC, counsel to D & W in the
present litigation. At first, Liberty retained John Baginski,
Esquire and, later, David White, Esquire to represent D &
W in the Underlying Action. D & W's "corporate counsel,"
Alan Milstein, Esquire, also later entered an appearance on
behalf of D & W. (N.T., 1/14/15, at 16–17.) At the time of
the settlement, counsel for D & W, Mr. Milstein, reached
an agreement with Mr. Fernandez's counsel, Messrs. Lynam
and Villari, whereby they would represent D & W in a
bad faith action against Liberty and Mr. Fernandez would
recover the first $250,000 from any monies recovered from
Liberty in the bad faith action. Furthermore, at the time of
the settlement, Mr. Fernandez withdrew his claim for punitive
damages against D & W.

In this bad faith action, plaintiff's "primary claim is that
Liberty failed to engage in good faith settlement negotiations
in the Fernandez action."(Pl.'s Mot. to Compel (Doc. No. 14)
at 2.) In particular, D & W alleges that Liberty unreasonably
refused to pay more than $1,750,000 to settle the Underlying
Action and thereby forced D & W to use its own monies
to complete the settlement. In addition, D & W claims
that Liberty "acted in bad faith following settlement of the
Fernandez action by obstructing D & W from investigating
and pursuing its bad faith claims."*Id.*

**II. DISCOVERY MOTIONS**

**1. D & W's Motion to Compel Production of Documents
and/or Request for an in Camera Review of Liberty's
Claims of Privilege (Doc. No. 14) and Liberty's Response
(Doc. No. 23)**
**\*2** D & W requests the court to compel production of the
following documents from Liberty: (1) certain documents
withheld as mediation documents or communications
pursuant to 42 Pa. Cons.Stat. Ann. § 5949; (2) certain
documents withheld because they are protected by the
attorney-client privilege or constitute work product; and (3)
the litigation files of Liberty and its attorneys relating to
the defense of the Underlying Action. For the reasons stated
below, this Motion is **GRANTED IN PART** and **DENIED
IN PART.**

Dietz & Watson, Inc. v. Liberty Mut. Ins. Co., Slip Copy (2015)

2015 WL 356949

**a. Mediation Privilege**

"[W]ith the great increase in recent years in the use of alternative dispute resolution in general and mediation in particular, all states have enacted statutes or rules designed to protect mediation communications from disclosure in legal proceedings."Jay M. Zitter, *Construction and Application of State Mediation Privilege,* 32 A.L.R.6th 285, at § 2 (2008). One commentator has explained why there is such universal acceptance of the mediation privilege:

Having no coercive power, a mediator is dependent upon increasing communication, if not trust, between disputants. The willingness of mediation parties to "open up" is essential to the success of the process.

The mediation process is purposefully informal to encourage a broad ranging discussion of facts, feelings, issues, underlying interests and possible solutions to the parties' conflict. Mediation's private setting invites parties to speak openly, with complete candor. In addition, mediators often hold private meetings—"caucuses"—with each of the parties. More overt assurances of confidentiality are common. Mediators regularly require all present to promise to keep mediation discussions confidential, and routinely assure participants that the proceedings are confidential (whether or not legal protection is certain).

Under such circumstances, mediation parties often reveal personal and business secrets, share deep-seated feelings about others, and make admissions of fact and law. Without adequate legal protection, a party's candor in mediation might well be "rewarded" by a discovery request or the revelation of mediation information at trial. A principal purpose of the mediation privilege is to provide mediation parties protection against these downside risks of a failed mediation. Participation will diminish if perceptions of confidentiality are not matched by reality. Another critical purpose of the privilege is to maintain the public's perception that individual mediators and the mediation process are neutral and unbiased.

Alan Kirtley,*The Mediation Privilege's Transition from Theory to Implementation: Designing a Mediation Privilege Standard to Protect Mediation Participants, The Process and The Public Interest,* 1995 J. Disp. Resol. *1, *8–10 (1995) (footnotes omitted) ("Kirtley").

The parties agree that Pennsylvania's mediation privilege, 42 Pa. Cons.Stat. Ann. § 5949, which covers confidential mediation communications and documents, governs this proceeding. *See*Fed.R.Evid. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.").[1] *See also In re Ford Motor Co.,* 110 F.3d 954, 965 (3d Cir.1997) (quoting Fed.R.Evid. 501) (abrogated on other grounds by *Mohawk Indus., Inc. v. Carpenter,* 558 U.S. 100, 130 S.Ct. 599, 175 L.Ed.2d 458 (2009)); *Samuelson v. Susen,* 576 F.2d 546, 549–50 (3d Cir.1978) (same). In pertinent part, Pennsylvania's mediation privilege states as follows:

**\*3** 42 Pa.C.S.A. § 5949. Confidential mediation communications and documents

(a) General rule.-Except as provided in subsection (b), all mediation communications and mediation documents are privileged. Disclosure of mediation communications and mediation documents may not be required or compelled through discovery or any other process. Mediation communications and mediation documents shall not be admissible as evidence in any action or proceeding, including, but not limited to, a judicial, administrative or arbitration action or proceeding.

(b) Exceptions.—

(1) A settlement document may be introduced in an action or proceeding to enforce the settlement agreement expressed in the document, unless the settlement document by its terms states that it is unenforceable or not intended to be legally binding.

...

(4) Any document which otherwise exists, or existed independent of the mediation and is not otherwise covered by this section, is not subject to this privilege.

(c) Definitions....

"Mediation." The deliberate and knowing use of a third person by disputing parties to help them reach a resolution of their dispute. For purposes of this section, mediation commences at the time of initial contact with a mediator or mediation program.

"Mediation communication." A communication, verbal or nonverbal, oral or written, made by, between or among a party, mediator, mediation program or any other person present to further the mediation process

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

when the communication occurs during a mediation session or outside a session when made to or by the mediator or mediation program.

"Mediation document." Written material, including copies, prepared for the purpose of, in the course of or pursuant to mediation. The term includes, but is not limited to, memoranda, notes, files, records and work product of a mediator, mediation program or party.

"Mediation program." A plan or organization through which mediators or mediation may be provided.

"Mediator."-A person who performs mediation.

42 Pa. Cons.Stat. Ann. § 5949. As a general rule, the party asserting the privilege, Liberty in this case, has the burden of establishing that it applies. *United States Fid. & Guar. Co. v. Dick Corp.,* 215 F.R.D. 503, 506 (W.D.Pa.2003). Moreover, because "[t]estimonial exclusionary rules and privileges contravene the fundamental principle that the public ... has a right to every man's evidence," they must be strictly construed. *Commonwealth v. Spetzer,* 572 Pa. 17, 813 A.2d 707, 717 (Pa.2002) (quoting *Trammel v. United States,* 445 U.S. 40, 50–51, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)) (quotation omitted).*See also United States v. Bowman,* 358 F.2d 421, 423 (3d Cir.1966) (same).

During the Underlying Action, there were several mediation sessions with privately paid mediators, trial judges, and an attorney appointed by the court:

**First Mediation:** March 19, 2013 before Philadelphia Judge Pro Tempore Edward F. Chacker, Esquire attended by representatives of all parties.

**\*4 Second Mediation:** May 9, 2013 private mediation before the Honorable Diane M. Welsh (Ret.) attended by representatives of all parties.

**Third Mediation:** July 12, 2013 before the Honorable Sandra Mazer Moss attended by representatives of all parties.

**Fourth Mediation:** August 8, 2013 private mediation before Peter A. Dunn, Esquire. D & W did not participate in this mediation.

**Fifth Mediation:** September 10, 2013 before the Honorable John M. Younge attended by representatives of all parties.

(Compl.¶¶ 33, 37–39, 45, 48–49, 54.) The court finds that all but the fourth mediation session are covered by Pennsylvania's mediation privilege statute since they involved "[t]he deliberate and knowing use of a third person by disputing parties to help them reach a resolution of their dispute."42 Pa. Cons.Stat. Ann. § 5949(c). The statute does not apply to the fourth mediation session because Liberty did not participate in that session as it solely involved Mr. Fernandez's claims against D & W's co-defendant in the Underlying Action.[2] (N.T., 1/14/15, at 34–35.)

D & W seeks all documents relating to communications during those mediation sessions. The parties do not dispute that Liberty's correspondence and claim notes reflecting communications made during those medication sessions are relevant to D & W's claim that Liberty failed to engage in good faith settlement negotiations in the Underlying Action. However, the plain language of 42 Pa. Cons.Stat. Ann. § 5949, bars the use of this evidence "in any action or proceeding, including, but not limited to, a judicial, administrative or arbitration action or proceeding."42 Pa. Cons.Stat. Ann. § 5949(a). While the statute enumerates limited exceptions, *see*§ 5949(b), none of these exceptions apply here. Specifically, the court rejects D & W's assertion that the mediation privilege does not apply in a bad faith action alleging an insurer's failure to engage in good faith settlement negotiations.

There is a strong policy in Pennsylvania for keeping mediation communications and documents confidential. One court articulated these reasons as follows:

> If participants cannot rely on the confidential treatment of everything that transpires during [mediation] sessions then counsel of necessity will feel constrained to conduct themselves in a cautious, tightlipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute. This atmosphere if allowed to exist would surely destroy the effectiveness of the program which has led to settlements ..., thereby expediting cases at a time when ... judicial resources ... are sorely taxed.

Dietz & Watson, Inc. v. Liberty Mut. Ins. Co., Slip Copy (2015)

2015 WL 356949

*United States Fid. & Guar. Co. v. Bilt–Rite Contractors, Inc.*, 2005 WL 1168374, at *5 n. 10 (E.D.Pa. May 16, 2005) (quoting *Lake Utopia Paper Ltd. v. Connelly Containers, Inc.*, 608 F.2d 928, 930 (2d Cir.1979)).

**\*5** The mediation privilege extends not only to mediation communications of parties, but also to communications "by, between or among" representatives of insurance companies present at the mediation. *See* 42 Pa. Cons.Stat. Ann. § 5949(c) (defining "Mediation communication" as "A communication, verbal or nonverbal, oral or written, made by, between or among a party, mediator, mediation program *or any other person present to further the mediation process* when the communication occurs during a mediation session or outside a session when made to or by the mediator or mediation program.") (emphasis added). *See also Exec. Risk Indem., Inc. v. Cigna Corp.*, 2006 WL 2439733, at *9 (Pa.Com.Pl. Aug.18, 2006) (same). Finding that the mediation privilege applies to participating insurance companies' representatives is essential to the success of the mediation sessions. Frequently, adjustors or representatives of insurance companies attend mediation sessions. Indeed, many mediators require their presence, either in person or by telephone. *See, e.g., Lockhart v. Patel*, 115 F.R.D. 44, 46–47 (E.D.Ky.1987) (imposing sanctions for failure of insurance representative to attend settlement conference). For mediation sessions to be fruitful, insurance adjustors and representatives must be free to discuss candidly any offers and proposals without fear that such communications may be used against them in future litigation.

D & W argues that Pennsylvania's mediation privilege should apply only "in connection with the prosecution and trial of the underlying claim" that was mediated. (D & W Letter Br. ("D & W Letter Br.") dated Jan. 12, 2015 at 4 (quoting *Aetna, Inc. v. Lexington Ins. Co.*, 2005 WL 2840327, at *5 (Pa.Com.Pl. Oct.27, 2005))). At oral argument, counsel for D & W clarified this argument and stated that because the underlying claim is a personal injury claim, the mediation communications relating to that claim should be admissible in a proceeding on a different claim, *i.e.*, a bad faith claim against an insurer. D & W argues that allowing it to use confidential mediation communications from the Underlying Action would promote the goal of inhibiting insurance companies from engaging in bad faith settlement negotiations. Liberty responds by citing contravening policy concerns; namely, if confidential mediation communications are admissible in a subsequent bad faith action, insurers would be reluctant to engage in

candid discussions during mediation sessions which would substantially impair the effectiveness of these sessions, and threaten Pennsylvania's strong policy that favors settlement of lawsuits. *See Step Plan Servs., Inc. v. Koresko*, 12 A.3d 401, 408–09 (Pa.Super.Ct.2010) ("The law of this Commonwealth establishes that an agreement to settle legal disputes between parties is favored. There is a strong judicial policy in favor of voluntarily settling lawsuits because it reduces the burden on the courts and expedites the transfer of money into the hands of a complainant.").

**\*6** This court rejects D & W's interpretation of Pennsylvania's mediation privilege because it is contrary to the plain language of the statute. It is not the role of this court to ignore the language of the statute and weigh and choose between the parties' competing policy arguments. These policy decisions are for the legislature who presumably considered such competing policy arguments in deciding on the current language of 42 Pa. Cons.Stat. Ann. § 5949.[3] The duty of this court is to apply the plain language of the statute. As quoted above, 42 Pa. Cons.Stat. Ann. § 5949(a) states that "[m]ediation communications and mediation documents shall not be admissible as evidence in *any* action or proceeding." 42 Pa. Cons.Stat. Ann. § 5949(a) (emphasis added). The plain language of this section bars use of mediation communications in any and all actions or proceedings subject only to the exceptions outlined in the statute. A bad faith lawsuit is not one of the enumerated exceptions.[4]

The mediation privilege codified in 42 Pa. Cons.Stat. Ann. § 5949, however, is limited to communications "by, between or among" the mediator, parties and participants made during the mediation session, or communications made to the mediator or from the mediator outside a session. Thus, "discussions among parties outside the presence of the mediator and not occurring at a mediation proceeding are not privileged. Where the mediator has no direct involvement in the discussions and where the discussions were not designated by the parties to be a part of an ongoing mediation process, the rationale underlying the mediation privilege (*i.e.*, that confidentiality will make the mediation more effective) is not implicated." *United States Fid. & Guar. Co. v. Dick Corp.*, 215 F.R.D. at 506. *See also Stewart Title Guar. Co. v. Owlett & Lewis, P.C.*, 297 F.R.D. 232, 239 (M.D.Pa.2013) (report prepared for and used in mediation was privileged; expert report attached to mediation report that was prepared sixteen months before mediation and existed independent of the mediation was not privileged).

Therefore, to the extent Liberty has responsive documents that reflect communications involving additional negotiations as to which the mediators had no involvement, they must be produced to D & W. Otherwise, Liberty's claim of mediation privilege is upheld.

**b. Attorney–Client Privilege/Work Product**

Where, as here, the claims and defenses in issue arise under state law, " 'Federal Rules of Evidence 501 and 1101(c) provide that [the Court] should apply state law in determining the extent and scope of the attorney-client privilege.' " *CAMICO Mut. Ins. Co. v. Heffler, Radetich & Saitta, LLP*, 2013 WL 315716, at *1 (E.D.Pa. Jan.28, 2013) (DuBois, J.) (quoting *Rhone–Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 861–62 (3d Cir.1994)). The parties do not dispute that the privilege rules of Pennsylvania apply to this case. In Pennsylvania, the attorney-client privilege generally provides: "In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa. Cons.Stat. Ann. § 5928. "[I]n Pennsylvania, the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice." *Gillard v. AIG Ins. Co.*, 609 Pa. 65, 15 A.3d 44, 59 (Pa.2011).

*\*7* Under Pennsylvania law, when an insurer retains an attorney to represent an insured pursuant to the insurer's duty to defend, that attorney's client is the insured and "the insurer may be, but is not always, a co-client of the insured."*CAMICO*, 2013 WL 315716, at *5. Here, Liberty retained two attorneys to represent D & W in the Underlying Action, Mr. Baginski and Mr. White. Clearly, when these attorneys communicated with Liberty regarding the defense of the Underlying Action, they acted as the attorneys for D & W, as well as Liberty. In these communications, Liberty cannot claim the attorney-client privilege to prevent disclosure to D & W of these communications. When an attorney represents both parties to a transaction, "no communications in relation to the common business are privileged in favor or against either, but only against a common adversary."*Id.* at *2 (quoting *Tracy v. Tracy*, 377 Pa. 420, 105 A.2d 122, 125 (Pa.1954)) (internal quotation marks omitted).

Liberty claims, however, that there exists other distinct communications that in-house Liberty counsel (other than Mr. Baginski and Mr White) had with the insurer's employees that relate solely to insurance coverage issues and to a reservation of rights letter issued in March of 2013 (N.T., 1/14/15, at 44), and to D & W's threat of a bad faith claim against Liberty. *Id.* at 53–54, 105 A.2d 122. In these communications, counsel would have been acting solely as counsel for Liberty since D & W and Liberty's positions on these issues were adverse to one another.

Conversely, the work product doctrine is governed by federal law at Fed.R.Civ.P. 26(b)(3).*See Borgia v. State Farm Mut. Auto. Ins. Co.*, 2014 WL 4375643, at *2 (E.D.Pa. Sept.3, 2014) (citing *United Coal Cos. v. Powell Constr. Co.*, 839 F.2d 958, 966 (3d Cir.1988)). Under that standard, a party "[o]rdinarily ... may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."*Id.*(quoting Fed.R.Civ.P. 26(b)(3)(A)). A document is prepared in anticipation of litigation when "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."*Id.* at *3 (quoting *In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir.1979)). It has generally been held that the work product doctrine applies to insurance companies confronted with a bad faith claim brought by an insured. A "mere claim of bad faith is not enough to shatter the work-product privilege."*Id.* (quoting *Robertson v. Allstate Ins. Co.*, 1999 WL 179754, at *3 (E.D.Pa. Mar.10, 1999)). Courts recognize that "[a]t some point in its investigation, ... an insurance company's activity shifts from mere claims evaluation to an anticipation of litigation."*Id.* (quotation omitted).

*\*8* Considering all of these principles, the court reaches the following conclusions. It is clear that any mediation communications and mediation documents not covered by 42 Pa. Cons.Stat. Ann. § 5949, as interpreted herein, are discoverable and Liberty must produce those documents. Liberty shall review its privilege log and ascertain whether it is in compliance with the court's conclusions stated in this Memorandum of Decision and accompanying order. If necessary, Liberty shall make a further production and/ or amend its privilege log. To the extent, Liberty asserts the attorney-client privilege, or the work product doctrine to exclude production of documents created *prior* to the settlement of the Underlying Action in September 2013, Liberty shall produce those documents to this court for in

2015 WL 356949

camera review within the time deadlines set forth in this court's accompanying order.[5]

**c. Post Lawsuit Correspondence**

This issue focuses on Liberty's refusal to turn over the Fernandez litigation file following settlement of the Underlying Action. (D & W's Letter Br. at 8–9.) At the oral argument, counsel for Liberty represented that, as of approximately February 2014, D & W had obtained the litigation files from Attorneys Baginski and White and, as of approximately July 2014, D & W had obtained the Liberty claims file with certain redactions for privileged materials. (N.T., 1/14/15, at 53–54, 62, 67, 72–73.)[6] Therefore, this request to compel production of these files is **DENIED AS MOOT.**

**2. D & W's Motion for Protective Order Pursuant to Federal Rule of Civil Procedure 26(c) (Doc. No. 15) and Liberty's Response (Doc. No. 24)**

For the reasons set forth below, this Motion (Doc. No. 15) is **GRANTED IN PART** and **DENIED IN PART.** D & W filed this motion seeking to preclude the depositions of Mr. Fernandez, and of Thomas A. Lynam, Esquire and Leonard G. Villari, Esquire, Mr. Fernandez's counsel in the Underlying Action and D & W's counsel in the instant litigation. Liberty states that these depositions are necessary to prove several of Liberty's affirmative defenses to this action. In their answer, Liberty, citing a provision of its policy which outlines the duties of the insured, states that D & W's actions should be barred because D & W "voluntarily made a payment, assumed an obligation, or incurred an expense without Liberty Mutual's consent."(Third Affirmative Defense.)[7] Considering policy language almost identical to that in the Liberty policy at issue in this matter, the court in *Nationwide Mut. Fire Ins. Co. v. Nova Real Estate LLC,* 2011 WL 721905 (E.D.Pa. Mar.1, 2011), held that the insurance company had no obligation to pay a settlement obligation incurred voluntarily by the insured without the insurer's consent. *Id.* at *8. Furthermore, the court granted summary judgment on the insured's bad faith claim because the insurer had no obligation to pay the settlement amount. *Id.*

**\*9** Liberty also alleged that the complaint is barred by D & W's "unclean hands, and by its collusion with the plaintiff in the Underlying Lawsuit and with that plaintiff's attorney."(Tenth Affirmative Defense.) Pennsylvania law applies "the duty to act in good faith to each party

to an insurance contract, including the insured."*Jung v. Nationwide Mut. Fire Ins. Co.,* 949 F.Supp. 353, 360–61 (E.D.Pa.1997) (quotation omitted). Pennsylvania law requires that a settlement entered without the insurers' knowledge or consent must be reasonable and in good faith and non-collusive, even if the insurer breached its duty to defend. *Babcock & Wilcox Co. v. Am. Nuclear Insurers,* 76 A.3d 1, 22 (Pa.Super.Ct.2013)."Among the indicators of [an insured's] bad faith and collusion are unreasonableness, misrepresentation, concealment, secretiveness, lack of serious negotiations on damages, attempts to affect the insurance coverage, profit to the insured, and attempts to harm the interest of the insurer."*Cont'l Cas. Co. v. Westerfield,* 961 F.Supp. 1502, 1505 (D.N.M.1997) (quoting Stephen R. Schmidt, *The Bad Faith Setup,* 29 Tort & Ins. L.J. 705, 728 (1994)), *affirmed,*74 F.App'x 703 (10th Cir.2001). As evidence of collusion, Liberty points to the fact that at the time of the settlement, Mr. Fernandez withdrew his claim for punitive damages, so that it would not appear that D & W was paying money to Mr. Fernandez to settle a claim not covered by the terms of the Liberty insurance policy.[8] Furthermore, Liberty notes that D & W now is represented by Mr. Fernandez's counsel and that D & W had secretly agreed to pay Mr. Fernandez a large portion, *i.e.,* $250,000.00, of any monies received by D & W from its bad faith action against Liberty.

The court finds that if proven, these two affirmative defenses, without limitation, are valid defenses to D & W's action. The facts alleged by Liberty are sufficient for it to take discovery into the areas of D & W's alleged voluntary payment made without the consent of Liberty and D & W's bad faith. Because Liberty has shown that the depositions of Mr. Fernandez and his attorneys who negotiated the challenged settlement are relevant to Liberty's affirmative defenses, the court will permit the deposition of Mr. Fernandez to proceed. In addition, Liberty may take the deposition of D & W's attorneys from the Underlying Action, Alan Milstein, Esquire and Edward Hovatter, Esquire, to explore this area of inquiry. After those depositions are concluded, should Liberty believe that it needs to obtain further information from Messrs. Lynam and Villari, it shall make a renewed application to the court. The court defers ruling on this issue now since the information sought by Liberty may be available from other sources.

Dietz & Watson, Inc. v. Liberty Mut. Ins. Co., Slip Copy (2015)
2015 WL 356949

**3. D & W's Motion to Compel Defendants to Produce Nancy Brown, Esquire for a Deposition (Doc. No. 16) and Liberty's Response (Doc. No. 26)**

For the reasons set forth below, D & W's Motion (Doc. No. 16) is DENIED. D & W seeks the deposition of Nancy Brown, Esquire who is an attorney for Liberty. Ms. Brown responded to D & W's request for the litigation and claim files of the Fernandez matter after the Underlying Action settled in September 2013. At oral argument on the discovery motions, counsel for D & W admitted that D & W sent its first letter to Liberty threatening a bad faith lawsuit in May, 2013. (N.T., 1/14/15, at 16.) It appears that Ms. Brown first had contact with this matter in approximately December 2013. (Liberty's Resp. (Doc. No. 26) at 4.) Upon receipt of D & W's request for the litigation and claim files, Ms. Brown sent those files to counsel at another office to consider the propriety of their production in light of the threats of a bad faith claim. At that time, this action by Ms. Brown was reasonable because D & W already had sent a letter threatening a bad faith claim months earlier, in May 2013. Also, at that time, D & W had retained Mr. Fernandez's prior counsel, Messrs. Lynam and Villari, to prosecute a bad faith claim against Liberty.

*10 D & W alleges that Liberty acted in bad faith by obstructing D & W's ability to pursue its bad faith action against Liberty. However, as detailed above, as of approximately February, 2014, D & W had obtained the litigation files of John Baginski, Esquire and David White, Esquire (which included much of Mr. Baginski's litigation file after the case was transferred from Mr. Baginski to Mr. White). As of approximately July 2014, D & W had obtained the claims file with certain redactions for privileged materials. The court will deny this Motion to Compel Ms. Brown's deposition. It is clear that by November 2013, and even as early as May 2013, D & W and Liberty were legal adversaries in a contemplated bad faith action by D & W. It is true that bad faith is actionable regardless of whether it occurs "before, during or after litigation." *O'Donnell v. Allstate Ins. Co.,* 734 A.2d 901, 906 (Pa.Super.Ct.1999). However, Pennsylvania courts have made it clear that an insured may not recover under Pennsylvania's bad faith statute "for discovery abuses by an insurer or its lawyer in defending a claim predicated on its alleged prior bad faith handling of an insurance claim."*Id.* at 908 (quoting *Slater v. Liberty Mut. Ins. Co.,* 1999 WL 178367, at *2 (E.D.Pa. Mar.30, 1999)).*See also W.V. Realty, Inc. v. Northern Ins. Co. of New York,* 334 F.3d 306, 313 (3d Cir.2003) (same); *Slater,* 1999 WL 178367, at *1–2 ("The court is confident that the legislature did not contemplate a potentially endless cycle of § 8371 suits, each based on alleged discovery abuses by the insurer in defending itself in the prior suit.").

D & W's only claim alleged of post settlement bad faith conduct is Liberty's refusal to turn over its claim file after it was notified it may be sued for bad faith. This is the nature of a discovery violation, which does not constitute bad faith under Pennsylvania law.

**4. D & W's Motion for Protective Order Pursuant to Federal Rule of Civil Procedure 26(c) (Doc. No. 18) and Liberty's Response (Doc. No. 27)**

Liberty seeks to depose Alan Milstein, Esquire and Edward Hovatter, Esquire. In this Motion, D & W does not contest the propriety of taking the depositions of these two attorneys, who represented D & W in the Underlying Action, but requests that these depositions be deferred until the court rules on D & W's Motion to Compel (Doc. No. 14). Since the court herein rules on D & W's Motion to Compel (Doc. No. 14), this Motion (Doc. No. 18) is **DENIED AS MOOT.**

**5. Liberty's Motion to Strike D & W's Discovery Motions (Doc. No. 19) and D & W's Response (Doc. No. 20)**

In this Motion, Liberty requests that D & W's discovery motions (Doc. Nos. 14, 15, 16 and 18) be stricken because of improper service and for failure of D & W to comply with applicable rules of both federal and local rule civil procedure. The court denies this motion in the interests of judicial economy. Because the discovery deadline expires the end of this month, the court has addressed the merits of the motions in order to expedite this matter. Liberty's Motion (Doc. No. 19) is **DENIED.**

**6. D & W's Motion for Protective Order Pursuant to Federal Rule of Civil Procedure 26(c) (Doc. No. 21) and Liberty's Response (Doc. No. 30)**

*11 In this Motion, D & W requests that Liberty's deposition of its corporate designee be deferred until the court rules on D & W's Motion to Compel (Doc. No. 14). D & W does not contest the propriety of taking the deposition of its corporate designee. Because the court herein rules on D & W's Motion to Compel (Doc. No. 14), this Motion (Doc. No. 21) is **DENIED AS MOOT.**

An appropriate Order follows.

## ORDER

AND NOW, this 28th day of January, 2015, in accordance with the court's Memorandum of Decision dated this same date, it is hereby

## ORDERED

1. Plaintiff Dietz & Watson, Inc.'s ("D & W") Motion to Compel Production of Documents and/or Request for an in Camera Review of Liberty's Claims of Privilege (Doc. No. 14) is **GRANTED IN PART** and **DENIED IN PART.**Any supplemental production by Liberty shall be made on or before February 11, 2015. No later than February 11, 2015, defendants Liberty Mutual Insurance Company and Liberty Mutual Fire Insurance Company (collectively "Liberty") shall submit to the undersigned for in *camera* inspection any documents withheld from production on the basis of the attorney-client privilege or work product doctrine created prior to the settlement of the Underlying Action in September 2013;

2. D & W's Motion for Protective Order Pursuant to Federal Rule of Civil Procedure 26(c) (Doc. No. 15) is **GRANTED IN PART** and **DENIED IN PART;**

3. D & W's Motion to Compel Defendants to Produce Nancy Brown, Esquire for a Deposition (Doc. No. 16) is **DENIED;**

4. D & W's Motion for Protective Order Pursuant to Federal Rule of Civil Procedure 26(c) (Doc. No. 18) is **DENIED AS MOOT;**

5. Liberty's Motion to Strike D & W's Discovery Motions (Doc. No. 19) is **DENIED;** and

6. D & W's Motion for Protective Order Pursuant to Federal Rule of Civil Procedure 26(c) (Doc. No. 21) is **DENIED AS MOOT.**

**All Citations**

Slip Copy, 2015 WL 356949

---

Footnotes

1   This is true even if the privilege provided by state law would bar evidence otherwise admissible under the Federal Rule of Evidence 408. *See Athey v. Farmers Ins. Exch.*, 234 F.3d 357, 362 (8th Cir.2000) (finding evidence of settlement offer by insurer was properly admitted to prove insurer's bad faith).

2   At the January 14, 2015 oral argument on the discovery motions, D & W argued that only the second mediation session, on May 9, 2013 before Judge Welsh, was a "mediation" covered by the statute. D & W urged, *inter alia,* that the first, third and fifth mediation sessions either were not voluntary, and/or that the parties were not in a mediation "mindset," and/or that the session was attended by associates and not trial counsel. This is inconsistent with the position asserted by D & W and its counsel in the Complaint initiating this matter. In the Complaint, D & W identified the first mediation session as a "settlement conference" at which the mediator placed a verdict range on the case. (Compl.¶ 33.) In the Complaint, D & W also identified the third mediation session as a "settlement conference" at which the mediator valued the case "for settlement purposes." *Id.* ¶ 45. Finally, D & W identified the fifth mediation conference in the Complaint as a "settlement conference." *Id.* ¶ 54.

3   For example, the legislature in North Carolina enacted a less broad mediation privilege, which provides a limitation more in line with D & W's argument and states as follows:

> Evidence of statements made and conduct occurring in a mediated settlement conference or other settlement proceeding conducted under this section, whether attributable to a party, the mediator, other neutral, or a neutral observer present at the settlement proceeding, shall not be subject to discovery and shall be inadmissible in any proceeding *in the action or other civil actions on the same claim[ .]*

N.C. Gen.Stat. § 7A–38.1(l) (2010) (emphasis added).*See Brown v. Nationwide Mut. Ins. Co.,* 2015 WL 71485, at *3 (M.D.N.C. Jan.6, 2015) (quoting statute). The Pennsylvania legislature could have enacted a similarly less broad version of the mediation privilege, but chose not to do so. Instead, Pennsylvania adopted a very broad prohibition against the use of mediation communications, similar to one urged by some legal scholars. *See* Kirtley, *supra,* at *13–14 ("A mediation privilege should be of broad unambiguous scope, bar discovery, and exclude evidence in all types of proceedings."). Pennsylvania's legislative decision represents its judgment that, on balance, the benefits of broadly protecting mediation communications are worth the price of the privilege. It is not this court's role to question this legislative decision.

4    Some general rules of construction enacted by the Pennsylvania legislature guide this court in the interpretation and application of Pennsylvania's mediation privilege. Words and phrases in Pennsylvania statutes are to "be construed according to rules of grammar and according to their common and approved usage."1 Pa. Cons.Stat. Ann. § 1903. "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."1 Pa. Cons.Stat. Ann. § 1921. Additionally, "[e]xceptions expressed in a statute shall be construed to exclude all others."1 Pa. Cons.Stat. Ann. § 1924. *See also In re Barshak,* 106 F.3d 501, 506 (3d Cir.1997) (stating that the court "is not free to ignore the clear language of a Pennsylvania statute," and holding that "[i]n the end, the case comes down to this: we rule on the basis of what the law is rather than what a party wishes it could be") (citing 1 Pa. Cons.Stat. Ann. § 1921(b) (1995)); *Commonwealth v. Patchett,* 284 Pa.Super. 252, 425 A.2d 798, 800 (Pa.Super.Ct.1981) (The court is "constrained ... to give effect to the obvious meaning of clear and unambiguous statutory language ...; when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded.") (citing 1 Pa. Cons.Stat. Ann. §§ 1903, 1921; case citations omitted).

5    Based on the court's interpretation of Pennsylvania's mediation privilege, the court finds no need to review documents in *camera* that were withheld on the basis of the mediation privilege. If D & W disagrees, it may make a written request to have the court review these documents, but it must support its request with specific reasons.

6    At oral argument, counsel for D & W emphasized that a file identified as the "Share Point file" was not produced by Liberty and that this file "is the biggest deal." (N.T., 1/14/15, at 73–74.) Counsel for Liberty represented that the Share Point file does not "actually have data on it." *Id.* at 74–75, 425 A.2d 798. After oral argument, Liberty submitted an email from Stephen C. Baker, Esquire, dated November 5, 2014, in which Mr. Baker stated that the Share Point file does not contain any documents but is a "cloud-based document sharing system into which documents from other locations (e.g. a claim file) are loaded for use."(Liberty Ltr. dated Jan. 16, 2015.) Mr. Baker's explanation is consistent with Liberty's response to D & W's second Request for Production in which Liberty represented that it had not located any Share Point entries regarding the Underlying Action. *Id.* The court accepts Liberty's representation that the Share Point file at issue contains no documents regarding the Underlying Action.

7    The Liberty policy provides: "No Insured will, except at that Insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."

8    Under Pennsylvania law, an insurer has no duty to indemnify its insured to the extent that any amounts paid by the insured are in satisfaction of claims for punitive damages. *TIG Ins. Co. v. Nobel Learning Communities, Inc.,* 2002 WL 1340332, at *15 (E.D.Pa. June 18, 2002).

---

**End of Document**        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

551 A.2d 962

131 N.H. 154
Supreme Court of New Hampshire.

Joseph O. GELINAS
v.
METROPOLITAN PROPERTY
& LIABILITY INSURANCE CO.

No. 87-053.    |    Dec. 9, 1988.

Insured's assignee brought action against insurer, alleging that insurer was negligent in failing to settle underlying tort action for less than policy limits. The Superior Court, Hillsborough County, Dalianis, J., entered judgment in favor of insurer, and assignee appealed. The Supreme Court, Thayer, J., held that: (1) insurer did not violate Consumer Protection Act; (2) trial court properly applied negligence standard to assignee's claim; (3) evidence established that insurer acted reasonably in refusing to settle claim; (4) evidence concerning settlement negotiations in underlying action was admissible; and (5) "limits of liability" clause in assignee's policy precluded intrapolicy stacking.

Affirmed.

West Headnotes (11)

[1]      **Antitrust and Trade Regulation**
         ⟜ Insurance
         Liability insurer did not violate Consumer Protection Act when it failed to settle claim of insured's assignee within policy limits, even assuming that Act applied to insurance industry, where insurer acted in good faith in refusing to settle claim. RSA 358-A:2, 358-A:3, subd. 1, 417:1 et seq.

         Cases that cite this headnote

[2]      **Insurance**
         ⟜ Duty to Settle Within or Pay Policy Limits
         Negligence standard was properly applied in determining whether liability insurer breached its duty to insured by failing to settle claim of insured's assignee within policy limits.

         Cases that cite this headnote

[3]      **Insurance**
         ⟜ Weight and Sufficiency
         Trial court properly considered evidence concerning settlement negotiations between liability insurer and insured's assignee before and during early stages of trial, rather than merely situation at close of evidence, in determining whether insurer negligently failed to settle assignee's claim within policy limits.

         Cases that cite this headnote

[4]      **Insurance**
         ⟜ Duty to Settle Within or Pay Policy Limits
         To determine whether insurer met duty of care to its insured in refusing to settle claim within policy limits, reviewing judge must review behavior between parties during settlement negotiations and throughout trial; focus of analysis must be at time when settlement was possible and not in hindsight of jury's verdict.

         Cases that cite this headnote

[5]      **Insurance**
         ⟜ Duty to Settle Within or Pay Policy Limits
         Evidence was sufficient to establish that liability insurer was not negligent in failing to settle claim of insured's assignee for less than policy limits in action arising when assignee allegedly suffered back injury as result of automobile accident; evidence indicated that assignee's condition was not serious, that assignee was able to engage in physical activities and had increased earnings after accident, and that insurer continued to reanalyze and adjust its offer as new evidence relevant to merits of case became available.

         Cases that cite this headnote

[6]      **Insurance**
         ⟜ Admissibility
         Evidence concerning settlement negotiations between liability insurer and insured's assignee was relevant in determining whether insured

negligently failed to settle assignee's claim for less than policy limits. Rules of Evid., Rule 408.

Cases that cite this headnote

[7]     **Evidence**
   &#9758; Offers of Compromise or Settlement

Rule making evidence of settlement inadmissible to prove liability did not preclude consideration of statements made during settlement negotiations between liability insurer and insured's assignee, in determining whether insurer negligently failed to settle claim for less than policy limits. Rules of Evid., Rule 408.

1 Cases that cite this headnote

[8]     **Evidence**
   &#9758; Knowledge of Witness

Attorney, judge and claims adjuster involved in settlement negotiations in underlying tort action were not expert witnesses in subsequent action based on allegation that liability insurer negligently failed to settle claim in underlying action for less than policy limits; witnesses testified as to their firsthand knowledge of negotiations at trial, but did not give their opinions as to whether insurer was negligent in failing to settle case. Superior Court Rule 35, subd. f; Rules of Evid., Rules 602, 701.

2 Cases that cite this headnote

[9]     **Evidence**
   &#9758; Tendency to Mislead or Confuse

Probative value of testimony of judge who presided over underlying tort case was not substantially outweighed by danger of unfair prejudice in action based on allegation that liability insurer was negligent in failing to settle underlying tort claim for less than policy limits; judge's testimony was uncontroverted and strictly factual in nature, and was given only to demonstrate one factor insurer considered in its evaluation of case. Rules of Evid., Rule 403.

Cases that cite this headnote

[10]    **Insurance**
   &#9758; "Stacking"

"Limits of liability" clause in automobile policy precluded intrapolicy stacking of uninsured motorist benefits covering two vehicles; policy contained specific limiting language which limited insurer's liability for damages to any one person as result of one accident, regardless of number of automobiles to which policy applied.

5 Cases that cite this headnote

[11]    **Appeal and Error**
   &#9758; Review Where Evidence Consists of Documents

Although final interpretation of language in insurance policy is question of law for Supreme Court to decide, that does not mean that trial court cannot make findings of fact relative to ambiguity or interpret insurance policies, subject to Supreme Court's review.

10 Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*963  \*156** Thomas E. Craig, orally, and Elizabeth Cazden, on the brief, Manchester, for plaintiff.

McLane, Graf, Raulerson & Middleton P.A., Manchester (James R. Muirhead, orally, and Maria Holland Law on the brief), for defendant.

Stephen E. Merrill, Atty. Gen. (Amy L. Ignatius, Asst. Atty. Gen., on the brief), by brief for the State, as amicus curiae.

**Opinion**

THAYER, Justice.

In this appeal from a ruling by the Superior Court (*Dalianis,* J.), we are asked to determine whether an insurance company should be held liable to the assignee of a policyholder for a jury verdict in excess of the coverage. We affirm the decision in favor of the defendant. The case before us arises from the underlying tort action which was the subject of our decision in *Gelinas v. Mackey,* 123 N.H. 690, 465 A.2d 498 (1983), in which we upheld a jury award of $200,000 for injuries

Gelinas v. Metropolitan Property & Liability Ins. Co., 131 N.H. 154 (1988)

551 A.2d 962

received by Mr. Gelinas. In the case now before us, the plaintiff attempts to require the insurance company to pay the entire judgment, which is in excess of the policy limit. The plaintiff alleges violation of the New Hampshire Consumer Protection Act, RSA chapter 358-A, negligence in failing to settle the case within the policy limits, and ambiguity in the limiting language of the insurance policy.

*157 This appeal arises out of the following fact situation. On March 22, 1978, Joseph Gelinas, the present plaintiff, was involved in a car accident with John Mackey, who later assigned his rights to Gelinas. Mackey, the defendant in the underlying case, was insured for $100,000 in liability by Metropolitan Property and Liability Insurance Company (MPL). MPL hired counsel and undertook Mackey's defense in accordance with terms of the insurance policy. Attorney William S. Orcutt represented Mr. Mackey, on behalf of MPL, during the tort trial. Attorney Thomas Craig represented the plaintiff. Before and during the tort trial, MPL made settlement offers ranging from $15,000 to $40,000. The parties could not reach a settlement, however, and the case went to the jury. The jury returned a verdict in favor of Gelinas in the amount of $200,000.

Mackey, who was liable for the damages in excess of his $100,000 policy coverage, assigned to Gelinas his rights to sue his insurance carrier, MPL, under the doctrine of *Dumas v. Hartford Accident & Indemnity Co.,* 94 N.H. 484, 56 A.2d 57 (1947) (hereinafter *Dumas II*) (policyholder against whom verdict is returned in excess of coverage may sue insurer for negligently failing to settle the case within the policy limits). In the *Dumas* action, Harry **964 Leidke (presently an MPL casualty unit manager), who attended the tort trial, and Attorney Orcutt testified regarding the negotiation process in the tort case. Their testimony elicited the following facts. In 1979, prior to trial, MPL had evaluated the tort claim at $6800. MPL then sought to open negotiations with Craig, the plaintiff's attorney, but to no avail. MPL then made an offer of $5000 to settle and received no response. In 1981, at the time the case was originally scheduled for trial, MPL reassessed the case at $25,000 based on information received on special damages.

According to Leidke's testimony, at the time of the pretrial conference on April 2, 1982, the only demand MPL had received from the plaintiff was a combined $220,000 demand for the case-in-chief and a related claim for loss of consortium brought by Gelinas' wife. However, the plaintiff introduced into evidence a letter dated April 2, 1982, showing the

plaintiff's willingness to settle for $99,400, within the policy limit. Although Orcutt did not remember receiving the letter, the trial court found as a fact that an authorized offer was made available to the insurer to settle within the policy limits.

At the pretrial conference, MPL extended an offer of $15,000 based partly on the depositions taken for trial. Craig then met with Orcutt over the weekend, and viewed the videotapes MPL had *158 taken of the plaintiff, building an addition to his house. Leidke testified that after viewing the tapes, Craig made a demand of $60,000 reduced from $220,000.

On April 19, 1982, prior to jury selection, MPL learned that Justice Flynn had ruled that he would allow evidence of the insured's inebriated state and allow a claim for enhanced damages. Attorney Orcutt then evaluated the case at between $30,000 and $40,000. Leidke reevaluated the case at $50,000 but was granted the authority to settle for up to $35,000. Upon reevaluation, Leidke delivered a letter to the insured stating, in effect, that MPL would not provide any coverage or indemnification for an award based on the enhanced damages that Justice Flynn was going to allow. MPL then increased its offer to $25,000.

Gelinas was the first witness. According to Leidke, Gelinas was having a difficult time with the substance of the cross-examination and requested a recess to talk to his lawyer. After their discussion, Craig approached Leidke and Orcutt to discuss the possible settlement of the case. The plaintiff's attorney demanded $50,000. Leidke and Orcutt raised MPL's offer to $30,000. According to Leidke's trial notes, he had increased the offer to $30,000 "with the attendent [sic] assertion that Mr. Craig's client was coming across very poorly to the jury ... that his client had no out-of-pocket specials and that the loss of consortium claim was worthless." The plaintiff's attorney then reduced his demand to $40,000 although, according to Orcutt's testimony, Craig's demand was not firm. Leidke then increased MPL's final offer to $35,000. According to Orcutt, Craig then indicated that $35,000 "sounds pretty good" and that he would discuss it with his client. Both Leidke and Orcutt "felt the case would settle" at this point.

Mrs. Gelinas, who had a loss of consortium claim, declined the $35,000 offer, and Orcutt then asked if the plaintiff still wanted to settle for $40,000 and Craig said "no we can't settle it." Attorney Orcutt later received a letter from Attorney Craig dated April 23, 1982, with an offer to settle-a full release to

Gelinas v. Metropolitan Property & Liability Ins. Co., 131 N.H. 154 (1988)

551 A.2d 962

the defendant if the case was settled within the applicable coverage before 12:00 noon on April 23, 1982.

At the close of the evidence, however, Orcutt and MPL reevaluated the case at a maximum of $40,000 and offered that sum to the plaintiff during the jury deliberations. The offer was not accepted. When asked about this end-of-evidence offer, Orcutt testified, they were still trying to settle and he thought that Leidke's offer was reasonable and that MPL was not unduly venturesome. **\*159** Leidke also testified about the factors that went into the $40,000 offer. This assessment was based on: medical bills, lost wages, periods of total temporary disability and partial temporary disability, and the testimony of the four doctors. **\*\*965** The offer was also based on the plaintiff's testimony concerning his running, weightlifting, house building, his ability to continue to play softball, increased earnings following the accident, as well as the advice of counsel, and Leidke's assessment that "the plaintiff had not made an impressive or credible witness." Leidke also noted that he considered the fact that Justice Flynn had indicated that he felt $40,000 was a reasonable figure for the case. Orcutt specifically testified that during trial he made an ongoing evaluation of the case, and that after cross-examination of the plaintiff and discussion with Craig he thought the case was going to be settled. The jury returned a verdict for the plaintiff in the amount of $200,000, but denied Mrs. Gelinas' claim for loss of consortium. MPL paid the policy limit of $100,000 plus interest from the date of the judgment to the date of payment.

As assignee of Mackey's claims against MPL, Gelinas filed suit on September 29, 1982, against MPL for negligently failing to settle the claim within the policy limits. Gelinas contends that MPL knew or should have known that a jury verdict would be in excess of the policy limit, that its failure to settle at or within the policy limit was negligent, and that MPL is therefore, under *Dumas II supra,* responsible for paying the verdict in excess of the policy limit. MPL contends that its evaluation of Gelinas' case was supported by the evidence and was thus reasonable. MPL, therefore, asserts that it is not responsible for the overage.

The superior court found that MPL's evaluation of the case had been reasonable and, ruled that it was not liable for the jury verdict in excess of the policy limit. Gelinas now challenges that ruling on appeal and raises the following issues: (1) whether the trial court erred in dismissing the plaintiff's claim under the Consumer Protection Act, RSA chapter 358-A; (2) whether the trial court applied the correct legal standard under the *Dumas* line of cases; (3) whether the trial court's ruling that the defendant had acted reasonably in attempting to settle is supported by the evidence; (4) whether the trial court erred in admitting evidence of settlement discussions and opinions of certain witnesses; and (5) whether the trial court erred in ruling that certain language in Gelinas' insurance policy effectively prohibited intra-policy stacking. We **\*160** find no error in the trial court's rulings and affirm for the reasons stated below.

**[1]** First, the plaintiff contends that the trial court erred in dismissing his claim under the New Hampshire Consumer Protection Act, RSA chapter 358-A. Specifically, the plaintiff contends that MPL had engaged in unfair trade practice by failing, in bad faith, to settle his claim within the policy limits and, in so doing violated the statute.

The trial court, relying on *Rousseau v. Eshleman,* 128 N.H. 564, 519 A.2d 243 (1986) (attorneys included within consumer protection statute exemption), dismissed the claim prior to trial, finding that "the insurance industry which is heavily regulated by a plethora of statutes, RSA 400-420b, falls within the exemption provision of the Consumer Protection Act, RSA 358-A:3, I."

The plaintiff, in his brief, makes the argument that the language of the statute, the support of its broad interpretation by the attorney general in his *amicus* brief, and this court's restrictive interpretation of RSA chapter 417, *see Arouchon v. Whaland,* 119 N.H. 923, 925, 409 A.2d 1331, 1332-33 (1979) (court recognized the primary purpose of RSA ch. 417 is to regulate trade practice in the business of insurance, and not to redress individual wrongs), the principal regulatory statute of insurance companies, *a fortiori,* imply that insurance companies should be governed by the Consumer Protection Act. We need not decide whether the insurance industry is exempt from the Consumer Protection Act, because assuming, *arguendo,* that the statute does apply, the trial judge's findings indicate that MPL did not violate the statute. The plaintiff's position is that the "unfair or deceptive act or practice," RSA 358-A:2, was failing in bad faith to settle this claim. The trial court specifically found, however, **\*\*966** that MPL had acted in good faith when dealing with the plaintiff. The court said that it had reviewed "the evidence that informed the settlement process, and [found] that the MPL exercised reasonable care and acted in good faith in its attempts to reach an agreement with Mr. Gelinas." The court also granted the defendant's request for findings of fact confirming that MPL had acted in good faith.

551 A.2d 962

Whether an insurance company has acted in good faith is a question of fact. *See Lawton v. Great Southwest Fire Ins. Co.,* 118 N.H. 607, 612-13, 392 A.2d 576, 580 (1978). The trial court expressly made factual determinations that MPL acted in good faith. Such a finding by the trier of fact, in this case the trial judge, will not be overturned on appeal unless it is "lacking in evidential **\*161** support or tainted by error of law." *Liberty Mut. Ins. Co. v. Custombilt, Inc.,* 128 N.H. 167, 169, 512 A.2d 1098, 1099 (1986) (quoting *Burnham v. Downing,* 125 N.H. 293, 296, 480 A.2d 128, 130 (1984)). Upon review of the record, we hold that the trial court's determination is not lacking in evidential support, and thus we affirm. *See State v. Winders,* 127 N.H. 471, 475, 503 A.2d 798, 802 (1985).

[2] We now turn to the plaintiff's second issue. The plaintiff argues that the trial court either applied the incorrect legal standard for determining whether MPL breached its duty of care to its insured, or applied the standard incorrectly. The plaintiff contends that the trial court, although it claimed to have used the *Dumas II* standard of negligence, rejected that standard and applied the more stringent standard of "bad faith." This misapplication of the standard, claims the plaintiff, tainted the entire trial court proceeding.

Various standards, such as bad faith and negligence, have been used to determine the liability of an insurer in failing to settle a third-party claim within policy limits. *See generally Dumas v. State Mut. Auto. Ins. Co.,* 111 N.H. 43, 46-47, 274 A.2d 781, 783 (1971) (hereinafter *Dumas III* ). New Hampshire, however, has specifically adopted a negligence standard. The negligence standard is defined as how "a reasonable man might act under the same circumstances." *Dumas II,* 94 N.H. at 487, 56 A.2d at 59 (quoting *Douglas v. Company,* 81 N.H. 371, 374-75, 127 A. 708, 710 (1924)). In applying this standard, it is well recognized that "when one knows or has reason to anticipate that the person, property, or rights of another are so situated ... that they may be injured through his conduct, it becomes his duty so to govern his action as to not negligently to injure the person, property, or rights of that other." *Dumas II, supra* 94 N.H. at 488, 56 A.2d at 60. It follows from this standard that the insurer must recognize the conflict of interest inherent in the insurance contract and "perform the duty arising from the particular facts presented." *Dumas III,* 111 N.H. at 48, 274 A.2d at 784. The determination of negligence is made by "a slow motion rerun of [the insurer's] actions *leading up to* the verdict." *Id.* (Emphasis added.)

In this case, the judge specifically adopted and applied the *Dumas* negligence standard. Quoting *Dumas II,* 94 N.H. at 488, 56 A.2d at 60, she wrote, "The standard of care is at least what a reasonable man would exercise in the management of his own affairs." In Justice Dalianis' pre-trial order, she reiterated the **\*162** requirements of *Dumas,* noting that an insurance company must exercise due care in ascertaining all the facts and must not be unduly venturesome. After reviewing the evidence of the settlement process, the judge found that "MPL exercised reasonable care and acted in good faith in its attempts to reach an agreement with Mr. Gelinas." The judge granted findings of fact which stated that the probability of harm was not sufficiently serious that an ordinary man would avoid it, that MPL was not unduly venturesome at the risk of the insured, and that MPL's actions comported with the standard of care that a reasonable man would exercise in the management of his own affairs. Accordingly, the court's orders and findings make it clear that Justice Dalianis applied the appropriate negligence standard.

**\*\*967** [3] [4] The plaintiff further alleges that the court erred in focusing on evidence concerning settlement before and during the early stages of the trial. The plaintiff further complains that the trial court improperly focused on Gelinas' and his attorney's actions, rather than the company's actions and knowledge. The plaintiff argues that a negligence determination should be made based on the situation at the close of evidence, as the case is submitted to the jury. For this proposition the plaintiff cites dictum from *Dumas II* which stated, "It is unnecessary to consider the extent of the company's knowledge at the time of the different offers of [the plaintiff at the tort trial]." 94 N.H. at 490, 56 A.2d at 61. From this passage the plaintiff makes the inferential leap that the determination of the negligence of an insurer is made only at the close of evidence. The plaintiff is grasping at straws. What the plaintiff misunderstands is the context of this passage, to wit, that during the *Dumas II* trial, all the pertinent facts relative to defendant's knowledge were disclosed. As we stated in *Dumas III,* the duty of the insurer arises "out of the particular facts of the situation presented." *Dumas III,* 111 N.H. at 48, 274 A.2d at 784. To determine whether this duty was met, the reviewing judge must review the behavior between the parties during the settlement negotiations and throughout the trial. The focus of the analysis must be at the time when settlement was possible and not in the hindsight of the jury's verdict. *See generally* 7C *Appleman* § 4711, at 386. In this case, the court properly focused on the information available when settlement was possible.

Gelinas v. Metropolitan Property & Liability Ins. Co., 131 N.H. 154 (1988)

551 A.2d 962

**\*163** The plaintiff also claims that the court's use of the term "good faith" implies that the court inappropriately used the bad faith standard as opposed to the negligence standard. This assertion is misguided. The plaintiff's allegation that damages were suffered as a result of MPL's failure to perform its contractual duty to act in good faith is what put MPL's good faith dealings with the plaintiff in issue. Accordingly, the court's use of the term "good faith" appears to refer to this and not to a standard higher than negligence. We agree with the defendant's observation that the plaintiff is attempting to blur issues.

After reviewing the transcripts, the exhibits, and the trial judge's analysis, it is obvious to us that the judge examined the entire sequence of events from pre-trial settlement discussion through the conclusion of the evidence, subjecting the defendant to a "slow motion rerun of its actions leading up to the verdict," as required by *Dumas III,* 111 N.H. at 48, 274 A.2d at 784. The record before us reveals no error of law, and in light of the evidence presented, we hold that the trial court correctly applied the *Dumas* negligence standard.

**[5]** The third issue we address is whether the evidence supported the trial court's ruling that MPL had acted reasonably. The plaintiff contends that the trial court's ruling was based on a cursory review of the evidence from the tort trial, claiming that the court was particularly impressed by the evidence adverse to Gelinas. The trial court's reading of the evidence, claims the plaintiff, was not supported by a careful reading of the evidence presented in the trial of the underlying tort case. Furthermore, the plaintiff claims that the trial court "completely ignored expert testimony by an experienced independent claims adjuster and evidence that MPL believed the case was worth more than it was willing to settle for." The plaintiff points out that Justice Dalianis' summary of Gelinas' injuries differs substantially from this court's summary in *Gelinas v. Mackey,* 123 N.H. 690, 465 A.2d 498 (1983).

The issue decided in *Gelinas v. Mackey* and that to be decided in this case are two different issues. In *Gelinas v. Mackey* we were faced with the issue of whether the jury award was one no reasonable person could have made. The standard used in determining the appropriateness of a jury's award for damages is whether "no reasonable person could have made such an award." *Id.* at 694, 465 A.2d at 500. The issue in this case, however, is whether the defendant was negligent. The standard, as discussed **\*164** earlier in this opinion, is

whether **\*\*968** the insurer acted as a reasonable person might have acted under the circumstances.

The determinations whether a jury award is reasonable, and whether an insurer acted negligently, involve not only a different standard, but a review of different evidence. In cases involving the reasonableness of jury awards, only the evidence presented to the jury is examined. In contrast, to determine whether an insurer's actions were negligent, a close scrutiny of *all* the evidence-that during pre-trial as well as at trial-is required to assess the reasonableness of a defendant's action.

The standard of review we apply to a trial court's factual findings is that "[a]bsent an abuse of discretion, we will not overturn the trial court's findings 'unless it clearly appears they were made without evidence....' " *Chagnon Lumber Co., Inc. v. DeMulder,* 121 N.H. 173, 175, 427 A.2d 48, 50 (1981) (quoting *Kierstead v. Betley Chevrolet-Buick, Inc.,* 118 N.H. 493, 497, 389 A.2d 429, 432 (1978), itself quoting *Eichel v. Payeur,* 107 N.H. 194, 196, 219 A.2d 287, 288 (1966)). "Our function is to ascertain whether a reasonable person could have reached the same decision as the trial judge on the basis of the evidence," *Chagnon Lumber,* 121 N.H. at 175, 427 A.2d at 50, and "not whether we would have found differently...." *Restaurant Operators, Inc. v. Jenney,* 128 N.H. 708, 710, 519 A.2d 256, 258 (1986).

Justice Dalianis' statements during trial and the analysis set forth in her orders show that she reviewed the record and considered all of the testimony presented to her. The plaintiff argues, however, that the trial court was particularly persuaded by evidence of Gelinas' increased earnings, prior back problems, physical activity, and by medical testimony. Upon a review of the evidence, we hold that the trial court could reasonably have found as it did. With regard to the plaintiff's claim of lost earnings, it is clear that his income actually increased in the years after the accident. With respect to Gelinas' physical abilities, although they were reduced, he was still able to play softball, run, lift weights and do construction work. The testimony further indicates that Gelinas did in fact have back problems prior to the accident, and the medical testimony of three out of four doctors indicated that his condition, as a result of the accident, was not serious. In a *Dumas* action, evidence of the negotiations between the parties is as relevant to an assessment of whether the insurer was negligent as is evidence from the underlying tort action. A review of the **\*165** evidence indicates that MPL continued to re-analyze and adjust its offer as new

evidence relative to the merits of the case became available. Accordingly, there was a reasonable basis for the trial court to rule that MPL was not negligent in its assessment of the case.

The fourth issue before us is whether the trial court erred in admitting evidence of settlement discussions and the testimony of certain witnesses. Specifically, the plaintiff contends: (1) New Hampshire Rule of Evidence 408 prohibits the introduction of settlement negotiations into evidence to show liability; (2) the testimony of attorneys Chiesa and Orcutt, Justice Flynn and adjuster Leidke constituted expert testimony and because they were not identified as such, should have been disallowed; and (3) introduction of the testimony of Justice Flynn, as presiding judge of the underlying tort case, was particularly erroneous and prejudicial.

**[6]** The plaintiff's argument that New Hampshire Rule of Evidence 408 prohibits the admission of certain evidence has two components. The first component is that the trial court considered irrelevant evidence. The plaintiff alleges that the only relevant evidence the court should have examined was the evidence placed before the jury, MPL's assessment of the case, and whether MPL had reason to believe the jury's verdict might be over $100,000. The plaintiff stresses that the court inappropriately focused in minute detail on the negotiation statements of plaintiff's attorney and on the plaintiff's willingness to settle. This improper focus allegedly prejudiced the plaintiff.

We note that the plaintiff has artfully attempted to make his point by mischaracterizing **\*\*969** the facts and the behavior of the trial court. In essence, the plaintiff's argument here is the same argument he has made with respect to the immediately preceding issues, to wit, that the evidence the trial court should examine to determine whether an insurer has acted reasonably is limited. As we have previously stated, negligence is determined by an objective reasonable person standard. *Dumas II,* 94 N.H. at 487, 56 A.2d at 59. The determination whether the insurer acted reasonably under the circumstances can not be done in hindsight, but must be done by "a slow motion rerun of [the insurer's] actions leading up to the verdict." *Dumas III,* 111 N.H. at 48, 274 A.2d at 784. Certainly the amount demanded by the plaintiff for settlement is relevant evidence that can be considered in determining whether the insurance company acted reasonably.

**\*166** A review of the transcript and notice of appeal indicates that the trial court properly and reasonably focused

in minute detail on the pretrial and trial negotiations, the factors MPL used in determining its settlement offer, to determine whether MPL had acted as "a man of ordinary caution" would have acted in the situation and whether the defendant had considered not only its interests but those of the insured. *See id.*

**[7]** Having established that an examination of the settlement negotiations is relevant to a *Dumas* action, we now address the plaintiff's contention that an examination of Craig's statements during settlement negotiations was prejudicial, contrary to Rule 408 and not harmless error. Rule 408 provides, in part, that evidence of settlement "is not admissible to prove liability for or invalidity of the claim or its amount." *N.H.R.Ev.* 408. The plaintiff contends that the trial court improperly used his attorney's proposed settlement figures during negotiations as a way of valuing the plaintiff's case, in contravention of Rule 408. The plaintiff, however, misunderstands the application of Rule 408 to the situation at hand and the discretion the trial court has in admitting evidence. Rule 408 further provides that "[t]his rule does not require exclusion when the evidence is offered for a purpose other than the proof of liability or for an invalidity of the claim or its amount...." As commentators have noted, "The exclusionary rule is designed to exclude the offer of compromise only when it is tendered as an admission of the weakness of the offering party's claim or defense." *McCormick on Evidence* 812 (3d ed.).

The ultimate question of fact before Justice Dalianis was whether MPL was negligent in failing to settle the case. To determine this central issue, the trial judge must consider the evidence, some of which was conflicting, such as whether the plaintiff had made an authorized demand of the insurer. Here, the judge was not reviewing the value of the claim, but was reviewing the evidence to determine whether the defendant had acted reasonably in attempting to settle. The trial court specifically noted the purpose for which the evidence was admitted, when it stated that "[i]n the instant case, evidence of the parties' negotiations is clearly being offered for the purpose of shedding light on the events which led to the dispute currently before the Court.... [T]he evidence surrounding the reasons for the parties' inability to reach a compromise is highly probative and is admissible." The negotiations are reviewed only with an eye to determining whether they were reasonable, not to ascertain the actual value of the case.

**Gelinas v. Metropolitan Property & Liability Ins. Co., 131 N.H. 154 (1988)**

551 A.2d 962

**\*167** We agree with the defendant that the evidence of the demands and offers to settle between the parties was fundamentally pertinent to the disposition of the central issue, and we hold that the admission of the settlement discussions was a proper exercise of the trial court's discretion and did not conflict with the letter or intent of Rule 408. The plaintiff's argument that allowing such testimony into evidence will chill settlement discussions in the future is without merit. The purpose of allowing such testimony into evidence is narrowly limited to the issue of whether the insurer was negligent in its attempt to settle the case. Such a limited purpose falls outside the scope of the Rule 408 exclusions.

**\*\*970** The plaintiff further contends that the testimony of attorneys Chiesa and Orcutt, Justice Flynn, and adjuster Leidke constituted expert testimony and, because they were not identified as such, should have been disallowed. *See Hydraform Prods. Corp. v. American Steel & Alum. Corp.,* 127 N.H. 187, 202, 498 A.2d 339, 348 (1985). In April 1985, plaintiff's counsel sent defendant's counsel a set of expert interrogatories asking for the names of its expert witnesses. *Super.Ct.R.* 35(f). The defendant answered, indicating that no expert witnesses were to be called. The plaintiff contends, however, that the above-named witnesses were in fact experts because they "were qualified as expert witnesses, and gave opinions that only expert witnesses would be permitted to give." Furthermore, the plaintiff contends that the trial court's decision to permit their testimony was not harmless error, and that it prejudiced the plaintiff's ability to cross-examine the witnesses regarding their qualifications or the basis of their opinions.

**[8]** The plaintiff's entire argument hinges on the characterization of the witnesses. We will not discuss the issue raised as to Attorney Chiesa, since the plaintiff succeeded in excluding Attorney Chiesa's testimony in its entirety. A review of the trial transcript indicates that witnesses Leidke, Attorney Orcutt, and Justice Flynn were all involved with the underlying tort case and negotiations. At the hearing, however, they testified as to their first-hand knowledge of the negotiations and trial. Such testimony regarding the negotiations was relevant to the issue before Justice Dalianis. The witnesses were not, however, being asked to give their opinions on the issue before Justice Dalianis and presently before this court; namely, whether the defendant was negligent in failing to settle the case. Where a person who might otherwise be qualified as an expert testifies as to personal or first-hand knowledge, such a witness should be treated as an ordinary witness and not as an **\*168** expert.

*See N.H.Rs.Ev.* 602, 701. The evidence offered by these witnesses was rationally based on their perception and helpful to a clear understanding of the interaction between the parties and the determination of a fact in issue as required by our case law and New Hampshire Rule of Evidence 701. Accordingly, these witnesses did not testify as experts.

The plaintiff asserts that Justice Flynn's testimony "went far beyond the facts to embrace his own opinions of the settlement value of the case." The transcript, however, reveals the factual nature of Justice Flynn's direct testimony. After establishing background information, the defendant's counsel asked one factual question, which was, "Your Honor, what was it you indicated to counsel?" Justice Flynn replied by stating, "I think Brother Craig was offered \$40,000, and I think I told him that wasn't a bad figure, under the circumstances, to accept." A reading of the transcript indicates that this testimony was factual in nature, not an opinion meant to sway Justice Dalianis. Justice Flynn was not asked his present opinion on what the case should be worth. Justice Flynn's testimony merely showed one of the many factors MPL had considered in the settlement negotiations. In addition, we note that some of the testimony with which the plaintiff takes issue was given in response to the plaintiff's questioning on cross-examination. We are hard-pressed to see how the plaintiff can object to such testimony, given the fact that he extracted it. Accordingly, such testimony was admissible. Because we do not find these witnesses to have been expert witnesses, we hold that the defendant did not violate Superior Court Rule 35(f), and that the trial court thus properly admitted the testimony.

**[9]** The plaintiff next argues that the admission of Justice Flynn's testimony was otherwise erroneous and prejudicial. Although the plaintiff admits that a judge can be a competent witness, he stresses that a judge's testimony, because of his official stature, may be given undue weight. The plaintiff argues that the trial judge is also susceptible of being influenced by a judge's testimony, as would a lay jury, and that the risk of prejudice far outweighed the probative value of his testimony.

**\*\*971** In *Hale v. Wyatt,* 78 N.H. 214, 98 A. 379 (1916), this court recognized that a judge may be a competent witness to prove all that occurred before him, but may not be compelled to do so. *See N.H.R.Ev.* 501 (noting in commentary that existing common law no longer source of evidentiary privilege, but that rule is not intended to abrogate any immunity from interrogation as to the **\*169**

Gelinas v. Metropolitan Property & Liability Ins. Co., 131 N.H. 154 (1988)

551 A.2d 962

mental processes involved in a judicial decision). Here Justice Dalianis acknowledged that Justice Flynn would testify if he did not assert his privilege, which he did not. She further ruled during trial that Justice Flynn would not be asked expert opinion, but could testify as to what was said in his chambers during settlement negotiations.

Plaintiff argues that Justice Flynn's "testimony was highly improper and inherently prejudicial, and only marginally relevant and should have been excluded." The plaintiff relies on *State v. Fecteau*, 121 N.H. 1003, 1006, 437 A.2d 294, 296 (1981) to imply that a judge's testimony may be given undue weight. In *Fecteau*, we held that a municipal court judge could testify as a witness, and emphasized "that the judge-witness never presided in this case, and that the trial judge 'could ... find, in its sound exercise of discretion, that the probative value of the [testimony] outweighed the possible prejudice.' " *Id.* (Citations omitted.) This language does not indicate that a judge's testimony is *per se* prejudicial, and once again we note this court's recognition that a judge can be a competent witness. *See Hale*, 78 N.H. at 215, 98 A. at 381.

The plaintiff asserts that judges are as susceptible to prejudice as are lay jurors and claims that Justice Dalianis was reluctant to second-guess Justice Flynn. However, Justice Flynn's testimony was uncontroverted and strictly factual in nature. His testimony was given only to demonstrate one factor MPL considered in its evaluation of the case. Such limited testimony can hardly be said to have had a prejudicial impact on Justice Dalianis. Accordingly, we hold that the probative value of the testimony was not substantially outweighed by the danger of unfair prejudice. *See N.H.R.Ev.* 403.

**[10]**   The last issue raised by the plaintiff is whether the trial court erred in ruling that the "limits of liability" clause in Gelinas' insurance policy precludes the intra-policy stacking of uninsured motorist benefits covering two vehicles. Gelinas was also insured by MPL. According to the facts before us, Gelinas' policy was a family policy covering two vehicles with a policy limit of $100,000. Gelinas paid one premium for the policy. While this case was pending, Gelinas amended his pleadings to request coverage under his uninsured motorist policy to cover the excess verdict. The plaintiff, relying on *Cacavas v. Maine Bonding & Casualty Co.*, 128 N.H. 204, 512 A.2d 423 (1986), claims the right to stack intra-policy **\*170** limits, for a total of $200,000 minus the amount recovered on the verdict against Mackey.

The thrust of the plaintiff's argument is two-pronged. First he claims, because the interpretation of language in an insurance policy is a question of law for the supreme court, Justice Dalianis' finding that the limitation clause is clear and unambiguous is not entitled to deference by this court. Furthermore, in oral argument, the plaintiff contended that the exclusionary language in the uninsured motorist policy is indeed ambiguous. Second, the plaintiff argues that our line of cases dealing with the stacking of insurance policies necessitates a decision in his favor because they lead to the premise that "the exact language of the ... policy is of less concern than the public policy reasons for permitting stacking." The defendant concedes that the standard for interpreting insurance policy language is that governed by *Trombly v. Blue Cross/Blue Shield*, 120 N.H. 764, 771-72, 423 A.2d 980, 985 (1980), followed in *Cacavas*, 128 N.H. at 207, 512 A.2d at 425, which requires that an ambiguous policy be construed in favor of the insured; however, MPL argues that the exclusionary language in Gelinas' uninsured motorist policy is clear and unambiguous.

**\*\*972**  **[11]**   Although final interpretation of the language in an insurance policy is a question of law for this court to decide, *Laconia Rod & Gun Club v. Hartford Acc. & Indemn. Co.*, 123 N.H. 179, 182, 459 A.2d 249, 250 (1983), that does not mean that the trial court cannot make findings of fact relative to ambiguity or interpret insurance policies, subject to our review. In *Cacavas*, we allowed intra-policy stacking where we found the language of the "limits of liability" clause in an insurance policy to be ambiguous. 128 N.H. at 207, 512 A.2d at 425. We affirmed the " 'general rule ... that the court will honor the reasonable expectations of the policy holder' in determining the amount of coverage," *id.* (quoting *Andrews v. Nationwide Mut. Ins. Co.*, 124 N.H. 148, 153, 467 A.2d 254, 258 (1983)), and that " 'an ambiguous insurance policy will be construed in favor of the insured and against the insurer.' " *Cacavas, supra,* 128 N.H. at 207, 512 A.2d at 425 (quoting *Trombly v. Blue Cross/Blue Shield*, 120 N.H. at 771, 423 A.2d at 985); *accord, State Farm Mut. Auto. Ins. Co. v. DesFosses*, 130 N.H. 260, 536 A.2d 205 (1987) (allowed stacking because language of clause was ambiguous). We also stated, however, that an "insurance company remains free to limit its liability through clear and unambiguous policy language." *Cacavas*, 128 N.H. at 208, 512 A.2d at 425. "[S]uch **\*171** language must be so clear as to create no ambiguity which might affect the insured's reasonable expectations." *DesFosses, supra* 130 N.H. at 264, 536 A.2d at 208 (citing *Cacavas, supra* 128 N.H. at 208, 512 A.2d at 425). Accordingly, unless the exclusionary language

of a policy is clear and unambiguous, our case law would allow stacking uninsured motorist coverage. *See DesFosses, supra* 130 N.H. at 264, 536 A.2d at 208; *Cacavas, supra* 128 N.H. at 208, 512 A.2d at 425; *Descoteaux v. Liberty Mut. Ins. Co.,* 125 N.H. 38, 42, 480 A.2d 14, 17 (1984).

To determine whether an ambiguity exists, we look at the language in question and "consider it in its appropriate context, and construe the words used according to their plain, ordinary, and popular definitions." *Robbins Auto Parts, Inc. v. Granite State Ins. Co.,* 121 N.H. 760, 764, 435 A.2d 507, 509 (1981).

The MPL policy, under "Limits of Liability," reads in pertinent part:

> "*Regardless of the number of* (1) persons or organizations who are insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, (3) claims made or suits brought on account of bodily injury or property damage, or (4) *automobiles or trailers to which this policy applies, METROPOLITAN's liability is limited as follows:*
>
> ....
>
> *The limit for Protection Against Uninsured Motorist Coverage stated in the Declarations as applicable to each person is the limit of METROPOLITAN's liability for all damages, arising out of bodily injury sustained by one person in any one accident,* and subject to this provision, the limit of liability stated in the Declarations as applicable to each accident is the total limit of METROPOLITAN's liability for all such damages for bodily injury sustained by two or more persons in any one accident."

(Emphasis added.)

This court has recognized that, in general, exclusionary language in a policy has been upheld when there is specific reference to the policy, such as: "under this policy," "declarations of this policy" or "insured automobile under this policy." *DesFosses,* 130 N.H. at 263, 536 A.2d at 207. Furthermore, we have noted that a company may limit liability by using plain prefatory language to the effect that "regardless of the number of vehicles to which this policy applies...." **\*172** *Grimes v. Concord Gen'l Mut. Ins. Co.,* 120 N.H. 718, 724, 422 A.2d 1312, 1317 (1980) (Douglas, J., dissenting). We have also noted that an insurance company

may limit liability by clearly stating that the "'per occurrence' limit is subject to the 'per person' limit." *Andrews v. Nationwide Mut. Ins. Co.,* 124 N.H. 148, 154, 467 A.2d 254, 258 (1983).

The trial court found that MPL's language "clearly and unambiguously limits **\*\*973** Mr. Gelinas' coverage under uninsured motorist coverage to the applicable 'each person' amount" and that this limiting clause was "distinctly *absent from the policy in Cacavas....*" (Emphasis in original.) Here, the policy contains specific limiting language which limits MPL's liability for damages to any one person as a result of one accident, *regardless of the number of automobiles to which this policy applies.* Furthermore, this exclusionary clause, which falls under "limits of liability," reasonably appears to limit rather than double liability. We can not see how a reasonable policyholder could construe it otherwise. In view of the language in the MPL policy, the plaintiff could have no reasonable expectation that the policy did not mean exactly what it stated. We agree with the trial court and hold that the language in the Gelinas policy is clear and unambiguous and meets the *Cacavas* test.

Finally, the plaintiff argues in his brief that public policy concerns are the crux of his stacking argument, stating that, in light of the cases from *Descoteaux supra* to *Cacavas supra,* the "language of the MPL policy is of less concern than the public policy reasons for permitting stacking." The plaintiff has mischaracterized our prior cases, however. In *Cacavas* we clearly stated that "[t]he insurance company remains free to limit its liability through 'clear and unambiguous policy language.'" 128 N.H. at 208, 512 A.2d at 425. Public policy concerns may enter in when the policy is ambiguous as to its liability. In any event, however, the plaintiff has not asserted any particular public policy concerns that were not considered in *Cacavas.* Because the MPL policy clearly and unambiguously limits MPL's liability, it falls within the ambit of our prior holdings.

AFFIRMED.

All concurred.

**All Citations**

131 N.H. 154, 551 A.2d 962

**Gelinas v. Metropolitan Property & Liability Ins. Co., 131 N.H. 154 (1988)**

551 A.2d 962

---

**End of Document**                                © 2015 Thomson Reuters. No claim to original U.S. Government Works.

61 Cal.Rptr.3d 200, 07 Cal. Daily Op. Serv. 6994, 2007 Daily Journal D.A.R. 8961...

KeyCite Yellow Flag - Negative Treatment

**Not Followed as Dicta**   Cassel v. Superior Court,   Cal.App. 2 Dist.,
November 12, 2009

152 Cal.App.4th 137
Court of Appeal, Second
District, Division 3, California.

William WIMSATT et al., Petitioners,
v.
SUPERIOR COURT of California for
the County of Los Angeles, Respondent;
Corey Kausch, Real Party in Interest.

No. B196903.   |   June 18, 2007.

**Synopsis**

**Background:** Law firm and attorney in legal malpractice
case petitioned for a writ of mandate compelling the Superior
Court, Los Angeles County, No. BC354508, Rolf M. Treu, J.,
to vacate order denying law firm's application for a protective
order pertaining to certain mediation related communications
in client's personal injury action, which formed basis of
malpractice claim.

**Holdings:** The Court of Appeal, Aldrich, J., held that:

[1] law firm was entitled to a protective order with regard to
the mediation briefs produced in underlying personal injury
action;

[2] e-mails from law firm regarding mediation of personal
injury action were protected from discovery pursuant to the
mediation confidentiality statutes; and

[3] statements between client's attorney and defendants
in personal injury action purportedly lowering client's
settlement demand were not protected from discovery.

Writ granted in part and denied in part.

West Headnotes (14)

**[1]     Alternative Dispute Resolution**

👈 Nature, purpose, and right to mediation in
general

Mediation, which can take many forms, is one
type of alternative dispute resolution.

Cases that cite this headnote

**[2]     Privileged Communications and
Confidentiality**

👈 Settlement negotiation privilege; mediation
and arbitration

Court of Appeal strictly construes the mediation
confidentiality statutes, even when the equities
in the case suggest contrary results. West's
Ann.Cal.Evid.Code § 1115 et seq.

1 Cases that cite this headnote

**[3]     Privileged Communications and
Confidentiality**

👈 Settlement negotiation privilege; mediation
and arbitration

Although the statutory scheme regarding
confidentiality of mediation materials and
statements is broadly applied, it does not protect
items admissible or subject to discovery merely
because they were introduced in mediation.
West's Ann.Cal.Evid.Code § 1115 et seq.

5 Cases that cite this headnote

**[4]     Privileged Communications and
Confidentiality**

👈 Settlement negotiation privilege; mediation
and arbitration

If a witness observed a car accident and the
witness's statement prepared for a mediation was
used by one party to support his or her position
in mediation, the witness would not be precluded
from testifying in a subsequent trial, even if the
witness' statement was protected from disclosure
under statutes regarding confidentiality of
mediation materials. West's Ann.Cal.Evid.Code
§§ 1119, 1120.

Cases that cite this headnote

Wimsatt v. Superior Court, 152 Cal.App.4th 137 (2007)

61 Cal.Rptr.3d 200, 07 Cal. Daily Op. Serv. 6994, 2007 Daily Journal D.A.R. 8961...

[5]    **Privileged Communications and Confidentiality**

☞ Settlement negotiation privilege; mediation and arbitration

If parties use facts in mediation, mediation confidentiality does not necessarily preclude disclosure of those facts. West's Ann.Cal.Evid.Code §§ 1119, 1120.

3 Cases that cite this headnote

[6]    **Privileged Communications and Confidentiality**

☞ Settlement negotiation privilege; mediation and arbitration

Mediation briefs epitomize the types of writings which the mediation confidentiality statutes have been designed to protect from disclosure; mediation briefs are part and parcel of the mediation negotiation process. West's Ann.Cal.Evid.Code § 1119.

14 Cases that cite this headnote

[7]    **Pretrial Procedure**

☞ Privileged matters

Under the mediation confidentiality statutes, law firm in legal malpractice action was entitled to a protective order with regard to the mediation briefs produced on behalf of client and the personal injury defendants in the mediation of client's underlying personal injury action, which formed the basis of client's legal malpractice claim; the client was prohibited from questioning or soliciting information in deposition or by written discovery as to the contents of the mediation briefs. West's Ann.Cal.Evid.Code § 1119.

*See 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 473; Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2006) ¶ 3:94 et seq (CAADR Ch. 3-C).*

1 Cases that cite this headnote

[8]    **Privileged Communications and Confidentiality**

☞ Settlement negotiation privilege; mediation and arbitration

E-mails between law firm representing client in personal injury action and firm representing defendant were made pursuant to the mediation of the personal injury action, and thus, the e-mails were protected from discovery pursuant to the mediation confidentiality statutes in client's subsequent legal malpractice action against firm. West's Ann.Cal.Evid.Code § 1115 et seq.

3 Cases that cite this headnote

[9]    **Privileged Communications and Confidentiality**

☞ Settlement negotiation privilege; mediation and arbitration

An e-mail is considered a writing for purposes of mediation confidentiality. West's Ann.Cal.Evid.Code § 1115 et seq.

1 Cases that cite this headnote

[10]    **Privileged Communications and Confidentiality**

☞ Settlement negotiation privilege; mediation and arbitration

Mediation confidentiality protects communications and writings if they are materially related to, and foster, the mediation; mediation confidentiality is to be applied where the writing, or statement would not have existed but for a mediation communication, negotiation, or settlement discussion. West's Ann.Cal.Evid.Code § 1119.

16 Cases that cite this headnote

[11]    **Privileged Communications and Confidentiality**

☞ Settlement negotiation privilege; mediation and arbitration

All conversations between the parties are not protected by mediation confidentiality simply because the conversations might have occurred

**Wimsatt v. Superior Court, 152 Cal.App.4th 137 (2007)**

61 Cal.Rptr.3d 200, 07 Cal. Daily Op. Serv. 6994, 2007 Daily Journal D.A.R. 8961...

temporally before a scheduled mediation. West's Ann.Cal.Evid.Code § 1119.

2 Cases that cite this headnote

[12]     **Privileged Communications and Confidentiality**

☞ Settlement negotiation privilege; mediation and arbitration

Statements between client's attorney and defendants in personal injury action purportedly lowering client's settlement demand were not protected from discovery in client's subsequent legal malpractice action by the mediation confidentiality statutes, where there was no evidence that the statements were made for the purpose of, or pursuant to, mediation. West's Ann.Cal.Evid.Code §§ 1119, 1120.

9 Cases that cite this headnote

[13]     **Privileged Communications and Confidentiality**

☞ Settlement negotiation privilege; mediation and arbitration

Under the mediation confidentiality statutes, when clients participate in mediation they are, in effect, relinquishing all claims for new and independent torts arising from mediation, including legal malpractice causes of action against their own counsel. West's Ann.Cal.Evid.Code § 1115 et seq.

9 Cases that cite this headnote

[14]     **Alternative Dispute Resolution**
☞ Mediation

**Privileged Communications and Confidentiality**

☞ Settlement negotiation privilege; mediation and arbitration

In light of the harsh and inequitable results of the mediation confidentiality statutes, the parties and their attorneys should be warned of the unintended consequences of agreeing to mediate a dispute; if they do not intend to be bound by the mediation confidentiality statutes, then they should make it clear at the outset that

something other than a mediation is intended. West's Ann.Cal.Evid.Code § 1115 et seq.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*202** Luce, Forward, Hamilton & Scripps and George J. Stephan, Los Angeles, for Petitioners.

Robie & Matthai, James R. Robie and Natalie A. Kouyoumdjian, Los Angeles, for Association of Southern California Defense Counsel as Amicus Curiae on behalf of Petitioners.

Law Office of Ivan K. Stevenson and Ivan K. Stevenson, Rolling Hills Estates, for Southern California Mediation Association and Confidential Mediation & Dispute Resolution as Amici Curiae on behalf of Petitioners.

Baker, Keener & Nahra, Robert C. Baker and R. Jeffrey Neer, Los Angeles, as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Rackohn & Rackohn, Craig D. Rackohn, Westlake Village, for Real Party in Interest.

ALDRICH, J.

**\*141 I.**

**INTRODUCTION**

Plaintiff and real party in interest Corey Kausch (Kausch) filed this legal malpractice case against defendants and petitioners Magaña, Cathcart & McCarthy and attorney William H. Wimsatt concerning legal representation rendered in a personal injury lawsuit.[1] Among other allegations, Kausch alleged Magaña breached its fiduciary duty by submitting an unauthorized settlement demand to the opposing party. Kausch learned of this potentially unauthorized act from a "confidential mediation brief" submitted to a mediator in the personal injury lawsuit.

Magaña seeks a writ of mandate compelling the trial court to vacate its order **\*\*203** denying Magaña's application for a protective order and, instead, to enter an order that will

protect "mediation-related" communications. Magaña **\*142** contends that the following items may not be disclosed: (1) all mediation briefs; (2) e-mails sent the day before the mediation that quoted from a mediation brief; and (3) a communication made by Wimsatt to the personal injury defendants purportedly lowering Kausch's settlement demand. (Evid.Code, § 1115 et seq.)

In addressing these evidentiary issues, we examine the mediation confidentiality statutes, Evidence Code section 1115 et. seq., and in particular Evidence Code section 1119. The Supreme Court has held that the mediation statutes are to be broadly construed to effectuate the legislative intent, even if there are conflicting public policies and even if the equities in a particular case suggest a contrary result. In light of the Supreme Court's analysis, stare decisis obligates us to construe the statutes broadly, although in doing so Kausch may be deprived of his ability to prove the purported legal malpractice.

Accordingly, we hold that the first two listed items (the briefs and the e-mails) are protected by mediation confidentiality. However, Magaña has not met its burden of proof with regard to the oral communication by Wimsatt. We issue a writ of mandate and direct the trial court to issue a protective order only with respect to the mediation briefs and the e-mails.

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

**A. General background.**

Kausch was injured in a November 18, 2003, airplane crash. Wimsatt was an attorney in the Magaña firm. Kausch hired Magaña and also hired attorney Marc Goldstein to represent him in his personal injury lawsuit. The defendants in the personal injury lawsuit were represented by attorney Peter P. Brotzen of Dwyer, Daly, Brotzen & Bruno, LLP, and attorney Robert Baker of Baker Keener & Nahra LLP.

In January 2006, a mediation session was held in an attempt to resolve the case. The mediator was the Honorable R. William Schoettler, retired. The case did not settle.

Around April of 2006, a second mediation session was scheduled for the purpose of trying to settle the personal injury lawsuit.

**\*143** Brotzen prepared a "confidential mediation brief" for the second mediation scheduled for April 28, 2006. Under a section entitled "prior settlement discussions," the brief stated: " 'The attorneys for [Kausch] have purportedly recently communicated a settlement demand in the sum of $1.5 million.' "

Early in the morning on April 27, 2006, Goldstein sent an e-mail to Brotzen. Goldstein identified the subject of the e-mail as "mediation." Goldstein stated in part, "I received your mediation brief and read through it last night.... Although it contained a number of statements with which we don't agree, I am particularly concerned about the last statement. Your brief suggests that plaintiffs' lawyers have communicated a $1.5 Million settlement demand. That has not occurred to my knowledge. Where did you get that one? I am unaware of any settlement discussions that have taken place since the last mediation in January."

An hour later, Brotzen responded by e-mail to Goldstein. Brotzen stated: "Two places—second hand from Baker relating what Bill [Wimsatt] said to him [directly] and also Bill [Wimsatt] made that remark during one of our telephone conference **\*\*204** calls scheduling the expert depos and touching on whether a second mediation conf[erence] would be worthwhile."

On April 27, 2006, Goldstein also sent an e-mail to Wimsatt. In the e-mail, Goldstein said: "I read in Brotzen's mediation brief that the plaintiffs' lawyers have reduced our settlement demand to $1.5 Million. Did you have any discussion with them regarding numbers? If so, please fill me in."

About five hours later, Wimsatt responded to Goldstein's e-mail. Wimsatt stated by e-mail, "I did have a discussion with him about a month ago. I did not make a demand. I did, however, tell him that I had reevaluated the damages; and, that I thought a demand for half of plaintiff's original demand was more in order. I, also, told him that I had no authority to reduce the original demand."

The second mediation was held on April 28, 2006. Wimsatt, Kausch, Kausch's mother, Goldstein, Brotzen, and Baker attended, along with mediator, the Honorable William Sheffield, retired. The underlying personal injury case was resolved. The appellate record does not disclose the amount of the confidential settlement. At the conclusion of the mediation, Kausch signed a stipulation for settlement. Thereafter, Kausch signed a settlement agreement and mutual

Case 2:13-cv-00278-ABJ   Document 143   Filed 10/30/15   Page 211 of 242

Wimsatt v. Superior Court, 152 Cal.App.4th 137 (2007)
61 Cal.Rptr.3d 200, 07 Cal. Daily Op. Serv. 6994, 2007 Daily Journal D.A.R. 8961...

release, as well as a statement of accounting, and he endorsed a settlement check.

## *144 B. Proceedings in this legal malpractice action before the trial court.

### 1. The complaint.

In June 2006, Kausch filed a complaint for damages against Magaña. In addition to other allegations, Kausch alleged Magaña breached its fiduciary duty by "lowering [Kausch's] settlement demand by more than one-half, from $3.5 Million to $1.5 Million, which was done without the knowledge, permission or consent of [Kausch]. This was done on the eve of the second mediation and constituted a complete departure and breach of [Magaña's] fiduciary duties ... owed to [Kausch]. Such conduct greatly impaired [Kausch's] ability to achieve his desired results and undermined his position and efforts in the mediation." Kausch further alleged that "[a]s a result of that unauthorized communication, the second mediation concluded at a settlement number much less than [Kausch] could have otherwise received had [Magaña] not reduced [Kausch's] settlement demand by 50% prior to the second mediation." Goldstein was not named as a defendant in the legal malpractice case.

### 2. Wimsatt's deposition.

Kausch took the deposition of Wimsatt on November 2, 2006. Kausch waived the attorney-client privilege. Wimsatt testified that before the personal injury lawsuit was filed, Kausch made a settlement demand between $3.5 and $5 million. Wimsatt repeatedly denied that he had ever lowered the settlement demand. He objected to all questions relating to the mediations based upon mediation confidentiality. (Evid.Code, § 1115 et seq.)

The following are excerpts from the deposition of Wimsatt taken on November 2, 2006:

(First excerpt )

"Q. Did you make any demands after the lawsuit was filed to the defendants in the case as to what the settlement should be for Corey Kausch?

"[Objection.]

"A. Not alone, no. In other words, the only settlement demand —the only other settlement demand I'm aware of one for

**205 the 3.5 million that Corey Kausch authorized in writing at the first mediation."

*145 (Second excerpt )

"Q. Getting back to this meeting that you had, did you, once again, request Mr. Kausch to give you the authority to reduce his demand prior to the second mediation?

"A. I certainly did.

"Q. And did he give it to you?

"A. No.

"Q. And at any time before the second mediation, were you authorized by Corey Kausch to contact the defendants' attorneys and inform them that he was lowering his demand in the case?

"A. No, and I didn't."

"Q. [Wimsatt was shown the confidential mediation brief and in particular the following statement: " 'The attorneys for [Kausch] have purportedly recently communicated a settlement demand in the sum of $1.5 million.' "] Did you have any discussions prior to the mediation as to where that information came from?

"A. With?

"Q. Mark Goldstein?

"[Objection.]

"A. There was no demand on behalf of Corey Kausch communicated to the other side by me at any time other than through either Judge Schoetler or through Judge Sheffield who handled the second mediation.

"Q. Does that mediation brief refresh your recollection that you're the one who conveyed a demand to the defendants' attorneys that Corey Kausch was lowering his demand for settlement?

"A. I didn't make such a demand, and I wouldn't without authority from Mr. Kausch."

*146 (Third excerpt )

61 Cal.Rptr.3d 200, 07 Cal. Daily Op. Serv. 6994, 2007 Daily Journal D.A.R. 8961...

"Q. [Wimsatt was shown the April 27, 2006, e-mail exchange between Goldstein and Brotzen.] Does that E-mail refresh your recollection that you had a conversation with Bob Baker reducing [Kausch's] demand for settlement in half prior to the second mediation?

"A. No.

"Q. Does that E-mail refresh your recollection that you had a communication with Peter Brotzen reducing [Kausch's] demand prior to the mediation?

"A. I did have a conversation with Peter Brotzen. I specifically said I have no authority to make a demand on behalf of Corey Kausch or to reduce this demand. I simply told him what the evidence I had collected had showed.

"Q. Do you recall Marc Goldstein contacting you prior to the second mediation and that he was quite upset as to where the information came from that plaintiff's demand had been reduced to half?

"A. Well, I would think—sure. He would be upset if, in fact, a demand had been made to reduce the...."

(Fourth excerpt )

"Q.... It's your position that you did not reduce [Kausch's] settlement demand prior to the second mediation? Is that a correct statement?

"A. That didn't happen.

"Q. Now, when you testified earlier regarding your E-mail to Marc Goldstein in response to his question if you knew anything about the settlement demand being reduced, you referred to a conversation you had a month earlier where you had told the defense attorney that you had re-evaluated the case and you thought the demand should be in half, but you didn't have authority to make that demand. [¶] Do you recall that testimony?

**206 "A. I don't recall when that conversation took place so—whether it was a month before or a few days before. But I did have a conversation with Mr. Brotzen that I had new evidence on what the damages were...."

**3. Other discovery by Kausch in the malpractice lawsuit.**

In November 2006, Kausch sent a letter to Brotzen and Baker (counsel for defendants in the underlying personal injury case) requesting information *147 about the statement made in the confidential mediation brief filed prior to the second mediation. The letter stated in part: "If both of you could be kind enough to state in a letter the name of the attorney representing Corey Kausch who made this demand and when it was made in relationship to the second mediation it will probably allow [us] to forego your depositions regarding this issue."

Kausch's attorney informed counsel for Wimsatt that he intended to depose Brotzen "on the conversation prior to the second mediation [wherein Kausch] had reduced his settlement demand to $1.5 million." Thereafter, it appears Kausch noticed the depositions of Brotzen and Baker.

**4. Magaña's request for a protective order.**

On December 21, 2006, Magaña sought a protective order to prevent Kausch from obtaining certain discovery. Magaña contended that the mediation confidentiality statutes (Evid.Code, § 1115 et seq.) made confidential the following:

(1) discovery concerning the statements made in any mediation brief prepared on Kausch's behalf for both mediation sessions and discovery concerning the content of any mediation brief prepared by the defendants in the personal injury case, including the "Confidential Mediation Brief;"

(2) discovery concerning the contents of the e-mails; and

(3) discovery seeking to establish that there was a conversation between Wimsatt and Brotzen or Baker "in which Bill Wimsatt allegedly lowered [Kausch's] settlement demand 'on the eve of the second mediation' session held on April 28, 2006...."

Further, Magaña sought a protective order to seal the mediation statements of the parties, documents which refer to mediation statements, and statements made at or in connection with the mediation sessions. [2]

Kausch opposed the motion for protective order, stating "During litigation Defendant Wimsatt intentionally breached his fiduciary duty of trust and loyalty by cutting [Kausch's] settlement demand in half from $3,000,000 to $1.5 million without his client's authority. [¶] [Kausch] has noticed the deposition of Peter Brotzen who is a percipient witness to a

61 Cal.Rptr.3d 200, 07 Cal. Daily Op. Serv. 6994, 2007 Daily Journal D.A.R. 8961...

statement made by Defendant Wimsatt lowering [Kausch's] demand in half.... [¶] The mediation privilege does not shield Defendant Wimsatt's statements made *148 prior to the second mediation." Kausch "has no intent to conduct discovery regarding the mediation, only unrelated prior statements to the mediation [.]" (Capitalization omitted.) "The conversations at issue occurred prior to the second mediation regarding [Kausch's] settlement demand being cut in half. Defendant Wimsatt[ ] testified under **207 penalty of perjury he did not make statements attributed to him. Questioning Peter Brotzen on who made the statement, what was said, when was it said, where was it said, does not 'disclose anything said or done or any admission made in the course of the mediation.' "

In reply, Magaña stressed that mediation confidentiality protects not only communications made in the presence of the mediator, "but also communications made 'before' the mediation ends, those 'materially related' to the mediation, and those 'made for the purpose' of mediation or 'pursuant to' mediation...."

### (a) The first hearing.

At the first hearing held on January 17, 2007, Kausch argued, in part: "It's not the mediation brief that we wish to conduct discovery on. It's a statement that was made unrelated to the mediation that ended up in the mediation brief. [¶] And our position has always been that ... defendant Wimsatt is denying that he ever made this statement prior to mediation. He also testified in his deposition that while having a conversation with Peter Brotzen on another case, this case came up and he expressed an opinion that he had revalued the case and that he thought the value should be cut in half. [¶] Now, that is a statement that was not made towards mediation.... [S]ince this statement was made prior to the mediation, and it wasn't made for the purposes of facilitating mediation, then the privilege doesn't apply." Kausch asserted he wished to prove that Wimsatt had lied in his deposition when he said that he had not lowered Kausch's settlement demand.

The court expressed some concern as to whether the privilege protected perjury. The trial court stayed the proceedings to enable the parties to meet and confer and resolve the issues. The parties were not able to resolve all of their discovery disputes.

### (b) The second hearing and the trial court's ruling.

At the second hearing on February 2, 2007, the trial court denied Magaña's motion for a protective order. In issuing its ruling, the trial court stated the following: "the [L]egislature did not intend confidentiality of mediation proceedings to be so complete as to shield perjury or inconsistent statements." Rather, the court observed that in *Foxgate Homeowners' Assn. v. *149 Bramalea California, Inc.* (2001) 26 Cal.4th 1, 108 Cal.Rptr.2d 642, 25 P.3d 1117 (*Foxgate* ) the Supreme Court acknowledged there were some situations in which the privilege did not make inadmissible all mediation-related information, such as in *Rinaker v. Superior Court* (1998) 62 Cal.App.4th 155, 74 Cal.Rptr.2d 464 (*Rinaker* ). The trial court noted that Evidence Code section 703.5 precluded mediators from testifying in civil proceedings, except that the statute permitted such testimony relating to conduct that would constitute a crime, and perjury is a crime.

On February 13, 2007, Magaña filed an ex parte application to seal documents. Magaña sought to place under seal all documents submitted by Kausch as they had included unredacted copies of relevant documents. Magaña argued that sealing was necessary because the items were all subject to mediation confidentiality.

On February 22, 2007, the trial court denied the application to seal documents.

### C. These writ proceedings.

Magaña filed a petition for writ of mandate requesting an order directing the trial court to vacate its order denying the application for a protective order and, instead, **208 to enter an order that would protect "mediation-related" discovery. We issued an order to show cause and the matter was heard by us at oral argument.[3]

### III.

### DISCUSSION

*The mediation briefs and the April 27, 2006, e-mails are protected by mediation confidentiality. However, Magaña has not shown that the contents of the conversation in which Wimsatt purportedly lowered Kausch's settlement demand are protected by mediation confidentiality.*

*150 A. *Mediation confidentiality.*[4]

Wimsatt v. Superior Court, 152 Cal.App.4th 137 (2007)

61 Cal.Rptr.3d 200, 07 Cal. Daily Op. Serv. 6994, 2007 Daily Journal D.A.R. 8961...

[1]    Mediation, which can take many forms, is one type of alternative dispute resolution. (*Rojas v. Superior Court* (2004) 33 Cal.4th 407, 415, 15 Cal.Rptr.3d 643, 93 P.3d 260 (*Rojas* ); *Saeta v. Superior Court* (2004) 117 Cal.App.4th 261, 269–270, 11 Cal.Rptr.3d 610; see generally, Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2006) ¶ 3:5, p. 3–2 et seq.) The Legislature has determined that litigants should be encouraged to participate in these proceedings as one alternative to "formal court proceedings which it found to be 'unnecessarily costly, time-consuming, and complex' ...." (*Foxgate, supra,* 26 Cal.4th at p. 14, 108 Cal.Rptr.2d 642, 25 P.3d 1117.) "The Legislature has expressly declared: 'In appropriate cases, mediation provides parties with a simplified and economical procedure for obtaining prompt and equitable resolution of their disputes and a greater opportunity to participate directly in resolving these disputes. Mediation may also assist to reduce the backlog of cases burdening the judicial system. It is in the public interest for mediation to be encouraged and used where appropriate by the courts.' (Code Civ. Proc., § 1775, subd. (c).)" (*Rojas, supra,* at p. 415, 15 Cal.Rptr.3d 643, 93 P.3d 260.)

"[C]onfidentiality is essential to effective mediation ... and, in some cases required by, the Legislature." (*Foxgate, supra,* 26 Cal.4th at p. 14, 108 Cal.Rptr.2d 642, 25 P.3d 1117.) "[T]he mediation confidentiality provisions of the Evidence Code were enacted to encourage mediation by permitting the parties to frankly exchange views, without fear that disclosures might be used against them in later proceedings. [Citations.]" (*Fair v. Bakhtiari* (2006) 40 Cal.4th 189, 194, 51 Cal.Rptr.3d 871, 147 P.3d 653.)

Mediation confidentiality is codified in Evidence Code section 1115 et seq. This evidentiary restriction is not limited to those communications made "in the course of mediation. [Citation.]" (*Rojas, supra,* 33 Cal.4th at p. 417, 15 Cal.Rptr.3d 643, 93 P.3d 260.) Rather, as delineated in Evidence Code section 1119, the restriction  **209** applies to any written or oral communication made "for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation," as well as all "communications, negotiations, or settlement discussions by and  *151*  between participants in the course of a mediation or a mediation consultation...." (Evid. Code, § 1119.) Section 1119 also makes such evidence not subject to discovery.

Evidence Code section 1119 provides: "Except as otherwise provided in this chapter:

"(a) No evidence of anything said or any admission made for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation is admissible or subject to discovery, and disclosure of the evidence shall not be compelled, in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which, pursuant to law, testimony can be compelled to be given.

"(b) No writing ... that is prepared for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation, is admissible or subject to discovery, and disclosure of the writing shall not be compelled, in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which, pursuant to law, testimony can be compelled to be given.

"(c) All communications, negotiations, or settlement discussions by and between participants in the course of a mediation or a mediation consultation shall remain confidential."

Some mediation communications and writings are admissible, if the statutory requirements are met. For example, the statutory scheme specifies when written settlements and oral settlements resulting from the mediation process are admissible. (Evid.Code, §§ 1118, 1122, 1123, 1124.) Additionally, communications or writings otherwise protected may be disclosed if there is consent for disclosure, according to the parameters of section 1122.

Subject to a limitation not relevant here, mediators are expressly prohibited from testifying in civil proceedings about mediations over which they presided, except as to conduct that would give rise to civil or criminal contempt, constitute a crime, be the subject of investigation by the State Bar or Commission on Judicial performance, or give rise to disqualification proceedings. (Evid.Code, § 703.5.) [5]

*152*  Evidence Code section 1121 also places restrictions on the use of a mediator's reports, assessments, evaluations, recommendations, or findings by the mediator. These items may not be submitted to a court or other adjudicative body absent consent of the parties to the mediation, or unless disclosure is mandated by court rules or other laws. [6]

**210**  Even after mediation ends, communications and writings protected by the statutes are to remain confidential.

(Evid.Code, § 1126; cf. Evid.Code, § 1128 [reference to mediation in subsequent trial is grounds for new trial].) [7]

The Supreme Court has repeatedly resisted attempts to narrow the scope of mediation confidentiality. The court has refused to judicially create exceptions to the statutory scheme, even in situations where justice seems to call for a different result. Rather, the Supreme Court has broadly applied the mediation confidentiality statutes and has severely curtailed courts' ability to formulate exceptions. The court has stated that "[t]o carry out the purpose of encouraging mediation by ensuring confidentiality, the statutory scheme ... unqualifiedly bars disclosure of communications [and writings] made during mediation absent an express statutory exception." (*Foxgate, supra,* 26 Cal.4th at p. 15, 108 Cal.Rptr.2d 642, 25 P.3d 1117, fn. omitted; accord, *Rojas, supra,* 33 Cal.4th at p. 416, 15 Cal.Rptr.3d 643, 93 P.3d 260; *Fair v. Bakhtiari, supra,* 40 Cal.4th at p. 194, 51 Cal.Rptr.3d 871, 147 P.3d 653.)

In *Foxgate, supra,* 26 Cal.4th 1, 108 Cal.Rptr.2d 642, 25 P.3d 1117, a mediator's report indicated the attorney for one party had engaged in a pattern of tactics that were in bad faith and intended solely to delay. The report and the declarations of the opposing counsel were submitted in support of a motion for sanctions. (*Id.* at pp. 5–7, 108 Cal.Rptr.2d 642, 25 P.3d 1117.) By crafting a nonstatutory exception to mediation confidentiality, the court of appeal held that the report was admissible. The court of appeal reasoned that disclosure was necessary because the Legislature did not intend to statutorily mandate confidentiality to shield parties who obstructed the mediation process. (*Id.* at p. 9, 108 Cal.Rptr.2d 642, 25 P.3d 1117.) The Supreme Court disagreed. It held that the **\*153** motion and the trial court's consideration of the motion and attached documents violated the Evidence Code. (*Id.* at p. 17, 108 Cal.Rptr.2d 642, 25 P.3d 1117.) *Foxgate* reasoned that the mediation confidentiality statutes "are clear. [Evidence Code] section 1119 prohibits any person, mediator and participants alike, from revealing any written or oral communication made during mediation." (*Foxgate,* at p. 13, 108 Cal.Rptr.2d 642, 25 P.3d 1117.)

*Foxgate* recognized its conclusion left unpunished sanctionable conduct—conduct that obstructed the mediation process—and in effect, undermined the entire purpose of mediation. However, *Foxgate* deferred to the Legislature to balance competing public policies and to create exceptions to the statutory scheme. *Foxgate* stated: "The mediator and the Court of Appeal here were troubled by what they perceived to be a failure of [the defendant] to participate in good faith in the mediation process. Nonetheless, the Legislature has weighed and balanced the policy that promotes effective mediation by requiring confidentiality against a policy that might better **\*\*211** encourage good faith participation in the process. Whether a mediator in addition to participants should be allowed to report conduct during mediation that the mediator believes is taken in bad faith and therefore might be sanctionable under Code of Civil Procedure section 128.5, subdivision (a), is a policy question to be resolved by the Legislature. Although a party may report obstructive conduct to the court, none of the confidentiality statutes currently make an exception for reporting bad faith conduct or for imposition of sanctions under that section when doing so would require disclosure of communications or a mediator's assessment of a party's conduct although the Legislature presumably is aware that Code of Civil Procedure section 128.5 permits imposition of sanctions when similar conduct occurs during trial proceedings." (*Foxgate, supra,* 26 Cal.4th at p. 17, 108 Cal.Rptr.2d 642, 25 P.3d 1117, fn. omitted.) "The Legislature has decided that the policy of encouraging mediation by ensuring confidentiality is promoted by avoiding the threat that frank expression of viewpoints by the parties during mediation may subject a participant to a motion for imposition of sanctions by another party or the mediator who might assert that those views constitute a bad faith failure to participate in mediation. Therefore, even were the court free to ignore the plain language of the confidentiality statutes, there is no justification for doing so here." (*Ibid.*)

*Foxgate* also recognized that there were additional public policies that the Legislature had balanced: "The conflict between the policy of preserving confidentiality of mediation in order to encourage resolution of disputes and the interest of the state in enforcing professional responsibility to protect the integrity of the judiciary and to protect the public against incompetent and/or unscrupulous attorneys has not gone unrecognized. (See Kentra, *Hear No Evil, See No Evil, Speak No Evil: The Intolerable Conflict for Attorney–Mediators Between the Duty to Maintain Mediation Confidentiality and the Duty to Report Fellow Attorney Misconduct* (1997) BYU L.Rev. 715; Irvine, **\*154** *Serving Two Masters: The Obligation under the Rules of Professional Conduct to Report Attorney Misconduct in a Confidential Mediation* (1994) 26 Rutgers L.J. 155.) As noted, however, any resolution of the competing policies is a matter for legislative, not judicial, action." (*Foxgate, supra,* 26 Cal.4th at p. 17, fn. 13, 108 Cal.Rptr.2d 642, 25 P.3d 1117.)

61 Cal.Rptr.3d 200, 07 Cal. Daily Op. Serv. 6994, 2007 Daily Journal D.A.R. 8961...

The Supreme Court again broadly interpreted mediation confidentiality in *Rojas, supra,* 33 Cal.4th 407, 15 Cal.Rptr.3d 643, 93 P.3d 260 to preclude exceptions other than those expressly contained in the statutes. In *Rojas,* contractors and subcontractors settled a construction defect case brought by the owner of an apartment complex in which it was alleged "that water leakage due to construction defects had produced toxic molds and other microbes on the property...." (*Id.* at p. 411, 15 Cal.Rptr.3d 643, 93 P.3d 260.) A settlement was reached during mediation. (*Id.* at p. 412, 15 Cal.Rptr.3d 643, 93 P.3d 260.) Thereafter, several hundred tenants of the apartment complex sued many of the entities who had been involved in the development and construction of the complex, as well as the complex's owner. Among other allegations, the tenants alleged numerous health problems associated with construction defects. (*Ibid.*) The tenants served deposition subpoenas and demanded production of a number of items prepared during the prior litigation including, the "entire files" relating to the construction defect case, witness statements, test samples, physical evidence removed from **212 the building, analyses of raw data, videotapes, and photographs. (*Id.* at pp. 412–413, 15 Cal.Rptr.3d 643, 93 P.3d 260.)

*Rojas* acknowledged that the trial court expressed concern that, without the requested discovery, the tenants might not have been able to obtain much of the necessary evidence. (*Rojas, supra,* 33 Cal.4th at p. 414, 15 Cal.Rptr.3d 643, 93 P.3d 260.) However, *Rojas* held that the mediation confidentiality statutes are not subject to a " 'good cause' exception." (*Id.* at p. 423, 15 Cal.Rptr.3d 643, 93 P.3d 260.) *Rojas* concluded that the requested items were *not* discoverable because they were " 'prepared for the purpose of, in the course of, or pursuant to, [the] mediation' " in the underlying construction action. (*Id.* at pp. 416–417, 423, 15 Cal.Rptr.3d 643, 93 P.3d 260.) In reaching this conclusion, *Rojas* focused on the strong public policy favoring mediation and the need for confidentiality in the mediation process. (*Id.* at pp. 415–416, 15 Cal.Rptr.3d 643, 93 P.3d 260.)

As *Rojas* explained, the Legislature intended a broad and expansive confidentiality rule: "Before [Evidence Code] section 1119's passage, former section 1152.5 governed mediation confidentiality. [When 1119 was enacted, the Legislature substantially followed the recommendation of the Law Revision Commission to provide broad protection in section 1119, subdivision (b) ] to all types of writings, including photographs. [¶] At the same time, the Legislature also sought to expand protection for oral communications. Whereas subdivision (a)(2) of former section 1152.5 protected documents 'prepared for the purpose of, or in the course of, or pursuant to, the mediation,' subdivision (a)(1) protected only those oral communications and *155 admissions 'made ... in the course of the mediation.' (Stats.1996, ch. 174, § 1.) The Commission's recommendation explained that, under these provisions, the protection for documents was 'broader' than the protection for oral communications and admissions, and '[t]o encourage frankness in discussions relating to mediation, the Commission propose[d] ... eliminat[ing] this distinction [by] protect[ing] "evidence of anything said or of any admission made for the purpose of, or in the course of, or pursuant to," the mediation.' (Recommendation on Mediation Confidentiality [ (Jan.1997) ] 26 Cal. Law Revision Com. Rep. [ (1996) ] p. 428.) Again, the Legislature followed suit by protecting, in subdivision (a) of section 1119, 'evidence of anything said or any admission made for the purpose of, in the course of, or pursuant to, a mediation.' The Commission's official comment explains that this section 'extends [protection] to oral communications made for the purpose of or pursuant to a mediation, not just oral communications made in the course of the mediation.' (Cal. Law Revision Com. com., 29B pt. 3 West's Ann. Evid.Code [ (2004 supp.) ] foll. § 1119 at p. 149.)" (*Rojas, supra,* 33 Cal.4th at pp. 421–422, 15 Cal.Rptr.3d 643, 93 P.3d 260.) [8]

**[2]** The Courts of Appeal also strictly construe the mediation confidentiality statutes, even when the equities in the case suggest contrary results.

In *Eisendrath, supra,* 109 Cal.App.4th 351, 134 Cal.Rptr.2d 716, a former husband moved to correct a spousal support agreement negotiated in mediation. (*Id.* at p. 355, 134 Cal.Rptr.2d 716.) Noting that at the time he negotiated and executed the agreement, he had not been represented **213 by counsel, the former husband argued many of the conversations that occurred before the agreement was signed would demonstrate it did not accurately reflect the parties' understanding. *Eisendrath* held the discussions, which purportedly were inconsistent with the finalized mediated agreement, were inadmissible. (*Id.* at pp. 363–365, 134 Cal.Rptr.2d 716.) *Eisendrath* concluded that, in contrast to the privileges found in Evidence Code section 910 et. seq. (e.g., the attorney-client privilege (§ 950)), mediation confidentiality cannot be impliedly waived. (*Eisendrath, supra,* at p. 362, 134 Cal.Rptr.2d 716.) The Legislature mandated this result, even if it gave great power to the spouse who refused to expressly waive mediation confidentiality.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

61 Cal.Rptr.3d 200, 07 Cal. Daily Op. Serv. 6994, 2007 Daily Journal D.A.R. 8961...

(*Id.* at p. 365, 134 Cal.Rptr.2d 716.) *Eisendrath* stated: "In explaining that the Legislature had balanced conflicting policies in enacting this scheme, the *Foxgate* court recognized that the scheme effectively gives control over evidence of some sanctionable misconduct to the *party engaged in the misconduct.* On this matter, the court in *Foxgate* remarked that 'none of the confidentiality statutes currently make an exception for reporting bad faith conduct....' \*156 (*Foxgate, supra,* 26 Cal.4th at p. 17, 108 Cal.Rptr.2d 642, 25 P.3d 1117.) Following the *Foxgate* court, we assume that the Legislature considered these limitations on the presentation of evidence when it enacted the statutory scheme." (*Eisendrath, supra,* at p. 365, 134 Cal.Rptr.2d 716.)

In *Doe 1 v. Superior Court* (2005) 132 Cal.App.4th 1160, 34 Cal.Rptr.3d 248 (*Doe 1*), 26 Catholic priests were successful in stopping the Los Angeles Archdiocese from disclosing written summaries of personnel records of priests who were accused of sexually molesting minors. (*Id.* at p. 1163, 34 Cal.Rptr.3d 248.) The summaries were confidential because they had been prepared for the mediation of 500 cases alleging child sexual molestation. (*Ibid.*)

There have been only two cases that have deviated from a broad application of the mediation confidentiality statutes. Both of these cases were referred to in *Foxgate, supra,* 26 Cal.4th at pages 15 to 17, 108 Cal.Rptr.2d 642, 25 P.3d 1117, and both have been narrowly construed to apply to their unique facts. One is relevant to the case before us because the trial court relied upon it. [9]

In *Rinaker, supra,* 62 Cal.App.4th 155, 74 Cal.Rptr.2d 464, two minors were accused of vandalizing a car. (*Id.* at pp. 161–162, 74 Cal.Rptr.2d 464.) The victim's civil harassment action was resolved in mediation. (*Ibid.*) Thereafter, the two minors were charged in a delinquency proceeding (Welf. & Inst.Code, § 602) with vandalism in violation of Penal Code section 594. (*Rinaker, supra,* at pp. 161–162, 74 Cal.Rptr.2d 464.) In the delinquency case, the minors sought to compel the civil mediator to testify that in the mediation the victim admitted he had not seen who had committed the vandalism. (*Id.* at p. 162, 74 Cal.Rptr.2d 464.) The mediator objected, arguing that statements made during mediation were to remain confidential pursuant to Evidence Code section 1119. (*Rinaker, supra,* at p. 163, 74 Cal.Rptr.2d 464.) *Rinaker* \*\*214 noted that section 1119 is applicable in civil and noncriminal proceedings, and that a juvenile delinquency proceeding was considered to be "civil." (*Rinaker, supra,* at p. 164, 74 Cal.Rptr.2d 464.) However, mediation confidentiality

had to give way to the constitutional rights of the minors. (*Id.* at p. 165, 74 Cal.Rptr.2d 464.) *Rinaker* concluded, "section 1119 does not bar the minors from calling [the mediator] to appear at their juvenile delinquency proceeding and testify concerning statements made by [the victim] during confidential mediation if those statements are inconsistent with [the victim's] testimony in the juvenile delinquency proceeding." (*Rinaker, supra,* at p. 167, 74 Cal.Rptr.2d 464.)

\*157 When *Foxgate, supra,* 26 Cal.4th 1, 108 Cal.Rptr.2d 642, 25 P.3d 1117, held there could be no judicially created exceptions, it acknowledged *Rinaker, supra,* 62 Cal.App.4th 155, 74 Cal.Rptr.2d 464. But *Foxgate* restricted *Rinaker* to its facts. *Foxgate* stated, "*Rinaker* is consistent with our past recognition and that of the United States Supreme Court that due process entitles juveniles to some of the basic constitutional rights accorded adults, including the right to confrontation and cross-examination. [Citations.]" (*Foxgate, supra,* at p. 16, 108 Cal.Rptr.2d 642, 25 P.3d 1117.)

[3] [4] Although the statutory scheme is broadly applied, it does *not* protect items admissible or subject to discovery merely because they were introduced in mediation. (*Rojas, supra,* 33 Cal.4th at p. 417, 15 Cal.Rptr.3d 643, 93 P.3d 260.) Evidence Code section 1120, subdivision (a) states: "Evidence otherwise admissible or subject to discovery outside of a mediation or a mediation consultation shall not be or become inadmissible or protected from disclosure solely by reason of its introduction or use in a mediation or a mediation consultation." Thus, for example, if a witness observed a car accident and the witness's statement prepared for a mediation was used by one party to support his or her position in mediation, the witness would not be precluded from testifying in a subsequent trial, even if the witness' statement was protected from disclosure. (*Rojas, supra,* at pp. 417 & 423, fn. 8, 15 Cal.Rptr.3d 643, 93 P.3d 260.)

The Supreme Court has addressed the interplay between Evidence Code section 1119 and section 1120 as follows: "Read together, sections 1119 and 1120 establish that a writing—which qualifies as ' "[e]vidence" ' (§ 140)—is not protected 'solely by reason of its introduction or use in a mediation' (§ 1120, subd. (a)), but is protected only if it was 'prepared for the purpose of, in the course of, or pursuant to, a mediation.' (§ 1119, subd. (b).) In other words, under section 1120, a party cannot secure protection for a writing—including a photograph, a witness statement, or an analysis of a test sample—that was not 'prepared for the purpose of, in the course of, or pursuant to, a mediation' (§

1119, subd. (b)) simply by using or introducing it in a mediation or even including it as part of a writing—such as a brief or a declaration or a consultant's report—that was 'prepared for the purpose of, in the course of, or pursuant to, a mediation.' [Citation.] [T]his construction does not render section 1120 'surplusage' or permit parties 'to use mediation as a shield to hide evidence.' Rather, consistent with the Legislature's intent, it applies section 1120 as a 'limit[ ]' on 'the scope of [s]ection 1119' that 'prevent[s] parties from using a mediation as a pretext to shield materials from disclosure.' " (*Rojas, supra,* 33 Cal.4th at p. 417, 15 Cal.Rptr.3d 643, 93 P.3d 260, fn. omitted.) [10]

**\*\*215** **[5]** **\*158** Thus, if parties use facts in mediation, mediation confidentiality does not necessarily preclude disclosure of those facts. As *Rojas* stated: "Of course, that witness statements 'prepared for the purpose of, in the course of, or pursuant to, a mediation' are protected from discovery under [Evidence Code] section 1119 does not mean that *the facts* set forth in those statements are so protected. Under section 1120, subdivision (a), because facts known to percipient witnesses constitute '[e]vidence otherwise admissible or subject to discovery outside of a mediation,' those facts do not 'become inadmissible or protected from disclosure solely by reason of [their] introduction or use in a mediation' through witness statements prepared for the purpose of, in the course of, or pursuant to, the mediation." (*Rojas, supra,* 33 Cal.4th at p. 423, fn. 8, 15 Cal.Rptr.3d 643, 93 P.3d 260.)

We now turn to the facts before us.

**B. Discussion.**

Here, Magaña sought to preclude discovery of three categories of items: (1) statements made in all mediation briefs, including statements in the "confidential mediation brief;" (2) the contents of the April 27, 2006, e-mails; and (3) a conversation between Wimsatt and Brotzen or Baker "in which Bill Wimsatt allegedly lowered plaintiff's settlement demand 'on the eve of the second mediation' held on April 28, 2006...." We analyze each category separately.

**1. The mediation briefs are protected from disclosure.**

**[6]** **[7]** Mediation briefs epitomize the types of writings which the mediation confidentiality statutes have been designed to protect from disclosure. Mediation briefs are part and parcel of the mediation negotiation process. Typically, they provide a global view of the dispute and focus the positions of the parties. (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution, *supra,* ¶ 3:163, p. 3–35.) Mediation briefs outline "the procedural posture of the case, disputed and undisputed facts, applicable law, itemized damages, and the settlement picture." (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution, *supra,* ¶ 4:227, p. 4–65, see also ¶ 3:163, p. 3–35; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2006) ¶¶ 13:11.34 to 13:11.34a, pp. 13–7 to 13–8.) Documents may be attached to the briefs. (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution, *supra,* ¶ 4:227.1, p. 4–65.) Mediation briefs are designed to facilitate an open and frank dialogue with the hope that the case can be resolved in the mediation. When written, the authors expect the briefs will always be kept confidential and used only in mediation by the mediator and the parties. Thus, mediation briefs are an integral part of the mediation **\*159** process and are "prepared for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation," and are to remain confidential. (Evid.Code, § 1119, subd. (b).)

The trial court should have issued a protective order with regard to the mediation briefs produced on behalf of Kausch and the personal injury defendants, including the confidential mediation brief written for the second mediation. This would include an order prohibiting questioning or soliciting information in a deposition or by written discovery as to the contents of the mediation briefs.

**\*\*216** **2. *The April 27, 2006, e-mails are protected from disclosure.***

**[8]** The April 27, 2006, e-mails were written the day before the second mediation. They quoted from, and referenced, the confidential mediation brief. The purpose of the e-mails was to clarify statements made in all the mediation briefs as such statements would significantly affect the mediation negotiation to be held the next day. The e-mails would not have existed had the mediation briefs not been written. The e-mails were materially related to the mediation that was to be held the next day and are to remain confidential. (Cf. *Eisendrath, supra,* 109 Cal.App.4th at p. 364, 134 Cal.Rptr.2d 716.) To conclude otherwise would permit mediation participants to extract excerpts from a mediation brief and avoid confidentiality by publishing the contents of the brief in another medium. Thus, the e-mails are protected and not subject to discovery.

Case 2:13-cv-00278-ABJ   Document 143   Filed 10/30/15   Page 219 of 242

Wimsatt v. Superior Court, 152 Cal.App.4th 137 (2007)

61 Cal.Rptr.3d 200, 07 Cal. Daily Op. Serv. 6994, 2007 Daily Journal D.A.R. 8961...

[9]    The fact that the e-mail communications were transmitted by electronic means does not alter our conclusion. An e-mail is considered a writing for purposes of mediation confidentiality. (*Rojas, supra,* 33 Cal.4th at p. 421, 15 Cal.Rptr.3d 643, 93 P.3d 260; Evid.Code, § 1119 [incorporating the definition of writing in Evidence Code section 250]; Evid.Code, § 250 [writing includes recording transmitted by electronic mail]; Cal. Law Revision Com. com., 29B pt. 3 West's Ann. Evid.Code, *supra,* foll. § 1119 at p. 221 [subd. (b) of Evid.Code, § 1119 "expressly encompasses any type of 'writing' as defined in Section 250, regardless of whether the representations are on paper or on some other medium"].)

Accordingly, the e-mails were "made for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation" and are not subject to disclosure. The trial court should have issued a protective order with regard to the April 27, 2006, e-mails. This would include an order prohibiting questioning or soliciting information in a deposition or by written discovery as to the content of the e-mails.

*\*160 3. Magaña failed to meet its burden to prove that the statements made by Wimsatt purportedly lowering Kausch's settlement demand were protected.*

Lastly, Kausch sought to gather information through discovery about statements Wimsatt made in which he purportedly lowered Kausch's settlement demand. While the protective order only referred to a conversation that might have occurred on the "eve" of the mediation, as had been alleged in the complaint, the parties have not limited the discussion to that time frame. Other information suggests the statements may have been made a month or a few days before the mediation, during a telephone call to schedule depositions, or, as stated in argument by Kausch's attorney, when Wimsatt was talking about another case. It is also unclear if there was a single conversation between Wimsatt and Brotzen or if there was a second conversation between Wimsatt and Baker. [11] The contents of the conversation is also disputed, as Wimsatt insists that he never breached his fiduciary duties and never lowered Kausch's demand. [12] Further, the \*\*217 parties agree that there is additional information about the purported conversation contained in the deposition of Wimsatt that was not presented to the trial court and thus has not been considered by us. [13]

[10]    What is clear is that Magaña, as the moving party, has the burden to show that the conversation is protected

by mediation confidentiality. To do so, the timing, context, and content of the communication all must be considered. Mediation confidentiality protects communications and writings if they are materially related to, and foster, the mediation. (Cf. *Eisendrath, supra,* 109 Cal.App.4th at p. 364, 134 Cal.Rptr.2d 716; *Doe 1, supra,* 132 Cal.App.4th at p. 1167, fn. 6, 34 Cal.Rptr.3d 248.) Mediation confidentiality is to be applied where the writing, or statement would not have existed but for a mediation communication, negotiation, or settlement discussion. (Cf. *Rojas, supra,* 33 Cal.4th at p. 417, fn. 5, 15 Cal.Rptr.3d 643, 93 P.3d 260.)

[11]    Magaña has not brought forth any evidence to demonstrate that the conversation is linked to the second mediation or that it is anything other than expected negotiation posturing that occurs in most civil litigation. Throughout litigation, parties discuss discovery, settlement ranges, and developing evidence, including witnesses and documents. It is not unusual for parties to change positions as new information is developed. Parties re-value liability \*161 and damages. They alter their negotiation strategy. All conversations between the parties are not protected by mediation confidentiality simply because the conversations might have occurred temporally before a scheduled mediation.

[12]    Here, there was an unsuccessful mediation in January 2006. The case did not settle. Eventually, a second mediation was scheduled for April 28, 2006, before a different mediator. The fact that the conversation in which Wimsatt allegedly lowered Kausch's settlement demand occurred outside the presence of the mediator does not automatically foreclose a conclusion that it was protected by mediation confidentiality. (*Eisendrath, supra,* 109 Cal.App.4th at p. 364, 134 Cal.Rptr.2d 716; *Doe 1, supra,* 132 Cal.App.4th at p. 1167, fn. 6, 34 Cal.Rptr.3d 248.) However, it is Magaña's burden to link the conversation to a mediation session. It has not done so. Magaña has not shown that the purported conversation was made for the purpose of, or pursuant to, the mediation. Rather, there is evidence that it was made during a telephone call "scheduling the expert depos and touching on whether a second mediation conf[erence] would be worthwhile." This evidence suggests the conversation occurred during a "discovery" conversation. Thus, the conversation may have occurred, and the statement could have been made, even if there was to be no mediation. If so, the statements were communications, negotiations, and settlements made in the regular course of the litigation, not for the purpose of, in the course of, or pursuant to a

*Wimsatt v. Superior Court, 152 Cal.App.4th 137 (2007)*
61 Cal.Rptr.3d 200, 07 Cal. Daily Op. Serv. 6994, 2007 Daily Journal D.A.R. 8961...

mediation. Magaña failed to bring forth facts to show that this conversation was anything other than a routine discussion, unassociated with mediation that routinely occurs in civil litigation. As such, Magaña failed to meet its burden of proof.

We note, however, that the contents of any purported conversation are not automatically confidential simply because they are referred to in the protected confidential mediation brief and the protected e-mails. Pursuant to **218 Evidence Code section 1120, subdivision (a), because facts exist that constitute otherwise admissible evidence or are subject to discovery outside of a mediation, those facts do not "become inadmissible or protected from disclosure solely by reason of [their] introduction or use in a mediation" through such protected documents as mediation briefs or protected e-mails. Facts otherwise admissible cannot be shielded from disclosure simply because they have been placed in confidential documents. (*Rojas, supra,* 33 Cal.4th at p. 423, fn. 8, 15 Cal.Rptr.3d 643, 93 P.3d 260.)

Thus, Magaña has not shown that the conversation in which Wimsatt purportedly lowered Kausch's settlement demand is protected by mediation confidentiality.

*162 **4. The trial court could not craft exceptions.**
The trial court created an exception to mediation confidentiality by ruling that "the [L]egislature did not intend confidentiality of mediation proceedings to be so complete as to shield perjury or inconsistent statements." This ruling was based upon Kausch's argument that Wimsatt's deposition testimony was perjurious because it was inconsistent with, and contrary to, other statements made by him.

We appreciate the trial court's desire to avoid the strict limitations of mediation confidentiality in this case. Preventing Kausch from accessing mediation-related communications may mean he must forgo his legal malpractice lawsuit against his own attorneys. However, the Supreme Court has declared that exceptions to mediation confidentiality must be expressly stated in the statutes. (*Foxgate, supra,* 26 Cal.4th at p. 15, 108 Cal.Rptr.2d 642, 25 P.3d 1117; *Rojas, supra,* 33 Cal.4th at p. 416, 15 Cal.Rptr.3d 643, 93 P.3d 260; *Fair v. Bakhtiari, supra,* 40 Cal.4th at p. 194, 51 Cal.Rptr.3d 871, 147 P.3d 653.) Further, cases have shielded evidence of sanctionable conduct (*Foxgate, supra,* 26 Cal.4th 1, 108 Cal.Rptr.2d 642, 25 P.3d 1117), criminal conduct (*Doe 1, supra,* 132 Cal.App.4th 1160, 34 Cal.Rptr.3d 248), and statements that purportedly were inconsistent with those made in a mediation (*Eisendrath, supra,* 109

Cal.App.4th at p. 351, 134 Cal.Rptr.2d 716). Cases have rejected a good cause exception (*Rojas, supra,* at pp. 423–424, 15 Cal.Rptr.3d 643, 93 P.3d 260), refused to find implied waivers to mediation confidentiality (*Eisendrath, supra,* at pp. 362–363, 134 Cal.Rptr.2d 716), and acknowledged that in doing so, the mediation participants accused of misconduct might be protected. Even though in each of these cases strong reasons existed to permit the introduction of the evidence, the results were dictated by the comprehensive statutory scheme devised by the Legislature.

In concluding that an exception was warranted so as not to shield perjury and inconsistent statements, the trial court relied upon *Rinaker, supra,* 62 Cal.App.4th 155, 74 Cal.Rptr.2d 464. However, in *Rinaker* the information sought to be introduced was in delinquency proceedings where the minors were being charged with criminal activity. In *Rinaker,* the information to be elicited (admissions made by the victim) could have exonerated the minors. To deny the minors access to the information would have denied them their constitutionally protected rights. In contrast, the proceedings before us involve a civil legal malpractice action where money damages are sought. The present case is no different from the thousands of civil cases routinely resolved through mediation. [14]

*163 Our Supreme Court has clearly and unequivocally stated that we may not craft **219 exceptions to mediation confidentiality. (*Foxgate, supra,* 26 Cal.4th at p. 15, 108 Cal.Rptr.2d 642, 25 P.3d 1117.) The Court has also stated that if an exception is to be made for legal misconduct, it is for the Legislature to do, and not the courts. (*Id.* at p. 17, fn. 13, 108 Cal.Rptr.2d 642, 25 P.3d 1117.) We are bound to follow this precedent (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937), even if we might have concluded that other public policies warrant an approach to confidentiality that is not absolute. Thus, the trial court erred in creating an exception to mediation confidentiality.

[13]   The stringent result we reach here means that when clients, such as Kausch, participate in mediation they are, in effect, relinquishing all claims for new and independent torts arising from mediation, including legal malpractice causes of action against their own counsel. Certainly clients, who have a fiduciary relationship with their lawyers, do not understand that this result is a by-product of an agreement to mediate. We believe that the purpose of mediation is not enhanced

Case 2:13-cv-00278-ABJ   Document 143   Filed 10/30/15   Page 221 of 242

Wimsatt v. Superior Court, 152 Cal.App.4th 137 (2007)
61 Cal.Rptr.3d 200, 07 Cal. Daily Op. Serv. 6994, 2007 Daily Journal D.A.R. 8961...

by such a result because wrongs will go unpunished and the administration of justice is not served. [15]

The inequities of California's mediation statutes have not gone unnoticed. Peter Robinson, the associate director of the Straus Institute for Dispute Resolution and assistant professor of law at Pepperdine University School of Law, has gathered a number of cases across the country in which courts have been asked to enforce or avoid mediated agreements. He suggests strict confidentiality (such as codified in Evidence Code section 1115 et seq.) results in **\*164** absurd enforcement, when contrasted with another approach to the **\*\*220** enforcement of mediated settlements. The nonexhaustive list of cases includes situations raising arguments about whether a mediated agreement was reached, whether there was fraud, duress or mistake, and whether the agreement violated public policy. The situations include cases where a party was lied to by her own attorney, the mediator, and a third party; a scrivener's error in a mediated settlement lead to a $600,000 windfall to one party; parties claimed their own attorney coerced them into signing a settlement agreement; a mother waived parental rights; and the parties agreed to perform an illegal act in the mediated agreement. (Robinson, *Centuries of Contract Common Law Can't Be All Wrong: Why the UMA's Exception to Mediation Confidentiality in Enforcement Proceedings Should be Embraced and Broadened,* 2003 J.Disp. Resol. 135.)

As Professor Robinson notes, a strict approach to mediation confidentiality often prevents courts from "exploring and justly deciding controversies that might arise out of mediated agreements." (Robinson, *Centuries of Contract Common Law Can't Be All Wrong: Why the UMA's Exception to Mediation Confidentiality in Enforcement Proceedings Should be Embraced and Broadened, supra,* 2003 J.Disp. Resol. at p. 138, fn. omitted.) The California cases we discussed above are illustrative. They have allowed to go unpunished sanctionable conduct that frustrated the purpose of mediation (*Foxgate, supra,* 26 Cal.4th 1, 108 Cal.Rptr.2d 642, 25 P.3d 1117), foreclosed litigants from gathering evidence that might prove toxic molds and other microbes created health hazards (*Rojas, supra,* 33 Cal.4th 407, 15 Cal.Rptr.3d 643, 93 P.3d 260), precluded a propria persona litigant from proving the terms of a mediated agreement

(*Eisendrath, supra,* 109 Cal.App.4th 351, 134 Cal.Rptr.2d 716), and shielded from view evidence of criminal conduct (*Doe 1, supra,* 132 Cal.App.4th 1160, 34 Cal.Rptr.3d 248).

Given the number of cases in which the fair and equitable administration of justice has been thwarted, perhaps it is time for the Legislature to reconsider California's broad and expansive mediation confidentiality statutes and to craft ones that would permit countervailing public policies be considered.

**[14]**   In light of the harsh and inequitable results of the mediation confidentiality statutes (Evid.Code, § 1115 et seq.), such as those set out above, the parties and their attorneys should be warned of the unintended consequences of agreeing to mediate a dispute. If they do not intend to be bound by the mediation confidentiality statutes, then they should "make [it] clear at the outset that something other than a mediation is intended." (*Doe 1, supra,* 132 Cal.App.4th at p. 1166, 34 Cal.Rptr.3d 248.)

## \*165 DISPOSITION

Let a writ of mandate issue directing the trial court to enter a new and different order granting the motion of petitioners Magaña, Cathcart & McCarthy and attorney William H. Wimsatt for a protective order prohibiting the disclosure of the mediation briefs and the e-mails, only. A protective order is not to be granted with regard to the conversation in which Wimsatt purportedly lowered Kausch's settlement demand.

We deny the request of Magaña, Cathcart & McCarthy and attorney William H. Wimsatt to seal the documents and we deny the request to redact the documents.

The parties are to bear their own costs in this proceeding.

We concur: KLEIN, P.J., and CROSKEY, J.

**All Citations**

152 Cal.App.4th 137, 61 Cal.Rptr.3d 200, 07 Cal. Daily Op. Serv. 6994, 2007 Daily Journal D.A.R. 8961, 32 A.L.R.6th 741

Footnotes

1    For ease of reference, we refer to the law firm of Magaña, Catchcart & McCarthy and attorney William H. Wimsatt collectively as Magaña. When necessary, we also refer to Wimsatt individually.

2    Magaña's request for a protective order also sought to exclude other items. The parties subsequently reached a consensus on these items. We have detailed only those items remaining in dispute.

3    We granted permission to file amicus curiae briefs to Robert C. Baker of Baker, Keener & Nahra, LLC, Association of Southern California Defense Counsel, and Southern California Mediation Association and the Law Office of Ivan K. Stevenson.

4    "Practitioners and the courts sometimes refer to the confidentiality afforded by [Evidence Code section 1115 et. seq.] to communications made in connection with mediation as a 'mediation privilege.' [Citations.]" (*Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1572, fn. 5, 36 Cal.Rptr.3d 901.) However, because the mediation confidentiality rules are not "privileges" in the traditional sense (*Eisendrath v. Superior Court* (2003) 109 Cal.App.4th 351, 362–363, 134 Cal.Rptr.2d 716 (*Eisendrath* ) [discussing some differences between statutory privileges and Evidence Code section 1115 et seq.] ), and because the Evidence Code does not use the phrase "privilege," we will use the term "mediation confidentiality." (See *Stewart v. Preston Pipeline Inc., supra*, at p. 1572, fn. 5, 36 Cal.Rptr.3d 901.)

5    Evidence Code section 703.5 reads:

   "No person presiding at any judicial or quasi-judicial proceeding, and no arbitrator or mediator, shall be competent to testify, in any subsequent civil proceeding, as to any statement, conduct, decision, or ruling, occurring at or in conjunction with the prior proceeding, except as to a statement or conduct that could (a) give rise to civil or criminal contempt, (b) constitute a crime, (c) be the subject of investigation by the State Bar or Commission on Judicial Performance, or (d) give rise to disqualification proceedings under paragraph (1) or (6) of subdivision (a) of Section 170.1 of the Code of Civil Procedure. However, this section does not apply to a mediator with regard to any mediation under Chapter 11 (commencing with Section 3160) of Part 2 of Division 8 of the Family Code."

6    Evidence Code section 1121 reads:

   "Neither a mediator nor anyone else may submit to a court or other adjudicative body, and a court or other adjudicative body may not consider, any report, assessment, evaluation, recommendation, or finding of any kind by the mediator concerning a mediation conducted by the mediator, other than a report that is mandated by court rule or other law and that states only whether an agreement was reached, unless all parties to the mediation expressly agree otherwise in writing, or orally in accordance with Section 1118."

7    Evidence Code section 1126 reads: "Anything said, any admission made, or any writing that is inadmissible, protected from disclosure, and confidential under this chapter before a mediation ends, shall remain inadmissible, protected from disclosure, and confidential to the same extent after the mediation ends."

8    *Rojas, supra,* 33 Cal.4th 407, 15 Cal.Rptr.3d 643, 93 P.3d 260, held that the actual physical samples collected at the apartment complex were not writings as defined in Evidence Code section 250, and thus, were not protected. (*Id.* at p. 416, 15 Cal.Rptr.3d 643, 93 P.3d 260.)

9    The second case is *Olam v. Congress Mortg. Co.* (N.D.Cal.1999) 68 F.Supp.2d 1110 (*Olam* ). In *Olam,* the plaintiff contended an agreement reached in mediation was not enforceable because she "was incapable (intellectually, emotionally, and physically) of giving legally viable consent." (*Id.* at p. 1118.) In subsequent proceedings, the plaintiff waived confidentiality and the defendant expressly agreed to a limited waiver of confidentiality covering the key facts to be addressed. (*Id.* at pp. 1118–1119, 1129, 1130, fn. 25.) The testimony of the mediator was found to be essential to doing justice and was admissible. (*Id.* at p. 1139.)

10   Evidence Code section 140 reads: " 'Evidence' means testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact."

11   For simplicity, we hereinafter assume that there was only one conversation and it was between Wimsatt and Brotzen.

12   Magaña suggests that the trial court made a factual finding that the conversation was made for the purpose of, in the course of, or pursuant to, the mediation, but that an exception applied. This is a misreading of the trial court's order. Having found that an exception applied, the trial court did not make findings with regard to whether the statement was protected.

13   We have denied a motion to augment the record to include an additional excerpt from Wimsatt's deposition because this excerpt was not before the trial court.

61 Cal.Rptr.3d 200, 07 Cal. Daily Op. Serv. 6994, 2007 Daily Journal D.A.R. 8961...

14    The trial court in the matter before us also referred to Evidence Code section 703.5. As discussed above, section 703.5 precludes mediators from testifying in civil proceedings about mediations over which they presided unless the conduct discussed would give rise to civil or criminal contempt, constitute a crime, be subject to investigation by the State Bar or Commission on Judicial Performance, give rise to disqualification proceedings, or was made in Family Code mediations commencing with Family Code section 3160. (See fn. 5.) The trial court noted that *Foxgate, supra,* 26 Cal.4th 1, 108 Cal.Rptr.2d 642, 25 P.3d 1117, had referenced section 703.5 and that perjury is a crime. However, when *Foxgate* cited to section 703.5, it did so to explain that the Legislature had formulated a statutory scheme that was comprehensive and contained few exceptions. (*Foxgate, supra,* at p. 15, 108 Cal.Rptr.2d 642, 25 P.3d 1117 ["To carry out the purpose of encouraging mediation by ensuring confidentiality, the statutory scheme, which includes sections 703.5, 1119, and 1121, unqualifiedly bars disclosure of communications made during mediation absent an express statutory exception. (Fn.omitted.)"].) *Foxgate* did not cite Evidence Code section 703.5 to suggest that courts could formulate exceptions to the statutory scheme.

15    In at least one jurisdiction that has less stringent mediation statutes than those in California, courts addressing situations akin to the present case have permitted the disclosure of confidential communications made during the course of a mediation. In *Avary v. Bank of America, N.A.* (Tex.App.2002) 72 S.W.3d 779, discovery was permitted when beneficiaries alleged breach of fiduciary duty by an executor in rejecting a higher settlement demand in mediation. *Avary* reasoned that the alleged breach of fiduciary duty was a new and independent tort, separate and apart from the subject of the mediation. Further, despite the public policy to protect confidentiality, there was an equally important policy to preserve significant and well-established procedural and substantive rights. In *Alford v. Bryant* (Tex.App.2004) 137 S.W.3d 916, a client sued his attorney for malpractice in connection with settlement reached in mediation. *Alford* concluded that the testimony of the mediator was admissible over the client's objection because the client waived confidentiality, the information was likely outcome determinative, and the mediator's testimony was critical evidence.

---

End of Document                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:13-cv-00278-ABJ   Document 143   Filed 10/30/15   Page 224 of 242

§ 5314Permissible Uses—Other, 23 Fed. Prac. & Proc. Evid. § 5314 (1st ed.)

23 Fed. Prac. & Proc. Evid. § 5314 (1st ed.)

Federal Practice & Procedure
Federal Rules Of Evidence
Database updated April 2015
Kenneth W. Graham, Jr. [a390]
Federal Rules of Evidence
Chapter 5. Relevancy and Its Limits
Kenneth W. Graham, Jr. [a409]
Rule 408. Compromise Offers and Negotiations

Link to Monthly Supplemental Service

§ 5314 Permissible Uses—Other

**Primary Authority**
**Fed. R. Evid. 408**

The listing of permissible uses of compromise evidence in Rule 408 is illustrative, not exhaustive. [1] Any use of such evidence that is beyond the scope of the rule is permissible even if not mentioned; for this reason it has been suggested that the last sentence is superfluous. [2] In determining the admissibility of evidence offered for some other purpose, courts will have to consider the language that delineates the scope of the rule [3] as well as the policy that supports it. [4] One court has held that a party can be estopped to object to evidence otherwise barred by Rule 408. [4.1] The protections of Rule 408 can be waived. [4.2] Reliance on common law precedents is risky because to some extent the Advisory Committee sought to change the pre-existing law. [5] Even where there was no explicit change in the common law rule, the shift in the underlying rationale may cast doubt on the vitality of the precedents. Often the old cases rely on a mixture of relevance and hearsay analysis that yields results quite different from those one might expect under a privilege analysis. For example, if the offer of compromise was used to show the effect of the offer on some third person or to prove a state of mind of the offeror other than consciousness of liability, [6] the evidence was admissible. [7] But since the use of the evidence for this purpose might tend to deter the making of offers of compromise, a pure privilege rationale would suggest that the evidence ought to be excluded.

A good illustration of the difficulty of reconciling prior authority with the language of Rule 408 is the use of compromise evidence to show agency, ownership, or control. [8] For example, suppose the issue is whether the driver of the car that struck the plaintiff was an employee of the defendant corporation and evidence is offered that the corporation tried to settle the plaintiff's claim for damage arising out of the accident. [9] The evidence was admissible at common law, perhaps because courts felt that the evidence was less ambiguous when offered for this purpose than as evidence of consciousness of fault, [10] perhaps because the implied assertion of agency was seen as an independent fact, [11] or perhaps as a result of a flawed analogy to the subsequent repairs and other crimes rules. [12] But whatever the ground, some writers have assumed that the same result would follow under Rule 408. [13] This is difficult to justify. It would seem that in proving agency, the plaintiff is attempting to prove the validity of his claim of respondeat superior. [14] It can be argued that the identity of the offeror is a prerequisite to compromise negotiations and not a part of them so that the rule is not applicable, [15] but the argument is weak both in terms of the language of the rule and its policy. [16]

Fortunately, it is not always this difficult to reconcile the common law cases with the language of Rule 408. Perhaps the largest group of precedents involves the use of compromise evidence where compromise is the basis for the claim rather than circumstantial evidence of the validity of the claim. [17] For example, if suit is brought for breach of the settlement contract,

Case 2:13-cv-00278-ABJ    Document 143    Filed 10/30/15    Page 225 of 242

§ 5314Permissible Uses—Other, 23 Fed. Prac. & Proc. Evid. § 5314 (1st ed.)

Rule 408 does not prevent the plaintiff from proving the agreement. [18] By parity of reasoning, the same result should follow when the defense to the original claim is predicated on a compromise; [19] e. g., when the defendant pleads the compromise as a release, [20] accord and satisfaction, [21] or novation. [22] Although it can be argued that this use of the compromise involves proof of the "invalidity of the claim", it does so not by using the compromise as circumstantial evidence of the opponent's belief in the invalidity of the claim but as proof of an act whose legal effect is to extinguish his right to recover. [23] Similarly, compromises with third persons can be proved when their legal effect is to release the defendant from liability or to reduce the amount of damages he must pay. [24]

Rule 408 is also inapplicable when the claim is based upon some wrong that was committed in the course of the settlement discussions; [25] e. g., libel, assault, breach of contract, unfair labor practice, and the like. [26] Hence, if an insurer is sued for having breached its obligations under an indemnity policy by failing to make a reasonable settlement within policy limits, [27] Rule 408 does not prevent the plaintiff from proving his case; wrongful acts are not shielded because they took place during compromise negotiations. [28] Similarly, if an attorney sues to recover the value of his services in settling the case, he can show the nature of the negotiations. [29] And if a party's rights to costs are affected by his opponent's refusal to compromise this can be proven. [30] Finally, if the compromise agreement is itself illegal [31] —for example, where an antitrust claim is settled by making the plaintiff a member of the conspiracy—evidence of this is admissible under Rule 408.

Another category of permissible use involves cases in which the compromise activities result in a waiver of or an estoppel to assert some procedural or substantive right. [32] Here the evidence is offered not to prove the state of mind of the offeror but to explain conduct of the recipient of the offer. [33] So, for example, if the failure to demand the retraction of a libellous statement, or to mitigate damages, or to exhaust contract remedies is excused by compromise activities, they may be shown. [34] The use of compromise evidence to show the revival of a debt barred by the statute of frauds or statute of limitations may also fall under this category. [35]

The issue which has generated the most disagreement is whether compromise evidence may be used as a form of prior inconsistent statement to impeach a witness who testifies in a contrary fashion. [36] At common law, statements of fact made in compromise negotiations were admissible as evidence of liability. [37] so there was little reason to consider their use as prior inconsistent statements. [38] The same ambiguity that made an offer of compromise inadmissible to show consciousness of liability would also tend to defeat its use for impeachment. [39] Hence, statements that the common law did not admit compromise evidence for impeachment purposes cannot be taken at face value. [40]

The issue is of considerably greater significance now that Rule 408 makes evidence of statements made in the course of compromise negotiations inadmissible to prove the validity or invalidity of the claim. [41] A federal judge has argued that such statements are admissible to impeach, apparently on the theory that the use of the statement for impeachment purposes does not involve proof of liability or invalidity "substantively." [42] This analysis is not very convincing unless one takes the view that the rule does not forbid the use of compromise evidence to prove an evidentiary fact that tends to prove liability. [43] Moreover, it seems to rest on analogy to the hearsay rule and its distinction between "substantive" evidence and "impeachment," which is not wholly apt in the present context. [44]

Professors Louisell and Mueller take the same position: "Rule 408 does not bar statements in settlement talks when offered to impeach at trial." [45] Although it is possible that this is a reference to impeachment by showing of bias, [46] the context suggests otherwise. [47] They base their conclusion on a paragraph in the Advisory Committee's objection to the House version of Rule 408: [48]

> A further point raised by [government agencies] is that the result of extending the compromise principle to include statements of fact would be encouragement of the making of misrepresentations during the course of settlement negotiations by eliminating responsibility therefore. Of course that is not the case. Reference to the

> language of the rule discloses that its protection applies only when the evidence
> is offered for the purpose of establishing liability for or invalidity of a claim.

This looks more like a calculated effort to obscure the issue than an endorsement of use of negotiation statements for impeachment purposes. [49] The argument to which this paragraph is a response is equally opaque but is subject to the interpretation that the "responsibility" alluded to is criminal liability for the false statement, [50] a use for which the compromise evidence would be admissible on the grounds stated by the Advisory Committee. [51]

Professors Redden and Saltzburg take the contrary position, stating that except where the person being impeached is not a party to the action, courts should "decide against admitting statements made during settlement negotiations as impeachment evidence." [52] Their position is based on the policy of the rule: "Opening the door to impeachment evidence on a regular basis may well result in more restricted negotiations." [53] But this argument ignores an equally important policy: "the end that truth may be ascertained." [54] A party who is impeached at trial by an inconsistent statement made during settlement negotiations, in the absence of some mistake, must have been lying at one time or the other. It is difficult to see why the law would care to encourage falsehood in either venue. [55] The purpose of Rule 408 is to foster "complete candor" between the parties, [56] not to protect false representations. [57]

Since the language of the rule cuts one way, policy another, and the legislative intent is unclear, courts will have to decide the question as best they can. [58] In this situation, it would seem that the injunction in Rule 102 to interpret the rules so as to foster the values of "fairness" and "truth" [59] should lead courts to conclude that prior inconsistent statements in the course of settlement negotiations should be admitted to impeach a party who testifies. [60] If so, then only the fact the statement was made should be admitted, not that it was made during settlement negotiations. The latter fact would still be barred by Rule 408 since it is unnecessary for the purpose for which the evidence is admitted. [61]

A related question concerns the admissibility of compromise evidence offered to show "spoliation" of a civil case. [62] The explicit provision in Rule 408 only applies to attempts to obstruct "a criminal investigation or prosecution." [63] Suppose, however, that the defendant should reach a compromise with one plaintiff that requires him to conceal or destroy evidence that would assist the other plaintiff to prove his case. [64] Recently a spate of court-sealed settlements in products liability cases, has stirred journalistic interest and calls for making the practice illegal, which could presumably effect the willingness of courts to grant Rule 408 protection to such settlements. [64.1] Though it is difficult to justify as a matter of policy, the fact that Rule 408 has a provision that limits the use of such evidence to cases where a criminal prosecution is the target might lead to the conclusion that the drafters intended to exclude the evidence in the example posed. [65] However, a better interpretation would be that an agreement to spoliate the case against another does not involve a "valuable consideration" [66] because of its illegality and is therefore beyond the protection of the rule for that reason. [67]

In addition to those cases in which compromise evidence is admissible because it is beyond the scope of Rule 408, there are also cases in which other rules permit it to be used. [67.1]

In addition to those cases in which compromise evidence is admissible because it is beyond the scope of Rule 408, there are also cases in which other rules permit it to be used. For example, it may come in as a preliminary fact for the admissibility of other evidence under Rule 104(a) [68] or to explain a statement taken out of context under Rule 106. [69] Court can consider statements at the class certification stage because it is not then considering liability or damages. [69.50] In addition, it is possible that the Erie doctrine may make the evidence admissible in some cases in which state law supplies the rule of decision. [70]

One court has held that the "clear reading" of Rule 408 shows that it has no application in criminal cases; hence, compromise negotiations between private parties are admissible in criminal prosecutions irrespective of whether or not they are an attempt to "buy off" a criminal prosecution. [71]

Some states have statutes making evidence of settlement admissible. [72]

Westlaw. © 2015 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Case 2:13-cv-00278-ABJ   Document 143   Filed 10/30/15   Page 227 of 242

§ 5314Permissible Uses—Other, 23 Fed. Prac. & Proc. Evid. § 5314 (1st ed.)

Footnotes

a390    Professor Of Law Emeritus, University of California, Los Angeles.

a409    Professor Of Law Emeritus, University of California, Los Angeles.

1       **Not exhaustive**

Advisory Committee's Note, Rule 408.

Rhoades v. Avon Products, Inc., 504 F.3d 1151, 1162 n. 9 (9th Cir. 2007) (making this point).

Orr v. City of Albuquerque, 531 F.3d 1210, 1219 (10th Cir. 2008) (Rule 408 does not bar evidence of settlement of other pregnancy discrimination claims to show that denial of plaintiff's FMLA leave claim was not result of a mistake); Bridgeport Music, Inc. v. Justin Combs Pub., 507 F.3d 470, 481 (6th Cir. 2007) (not relevant to rebut claim of willfulness); Rosemann v. Roto–Die, Inc., C.A.8th, 2004, 377 F.3d 897, 902 (issue opened up by the objecting party; relevant to explain whether transaction was part of settlement or part of original contract).

To explain absence of settling party: Kennon v. Slipstreamer, Inc., C.A.5th, 1986, 794 F.2d 1067, 1070; Belton v. Fibreboard Corp., C.A.5th, 1984, 724 F.2d 500, 505 (offered by settling plaintiff); Peterson v. Little-Giant Glencoe Portable Elevator Corp., Minn.1985, 366 N.W.2d 111 (midtrial settlement).

To show knowledge: U.S. v. Hauert, C.A.7th, 1994, 40 F.3d 197, 200 (evidence of negotiations with I.R.S. admissible to show defendant's awareness of law); Johnson v. Hugo's Skateway, C.A.4th, 1992, 974 F.2d 1408, 1413 (of racial hostility); Breuer Electric Mfg. v. Toronado Systems of America, C.A.7th, 1982, 687 F.2d 182, 185 (awareness of issues); U.S. v. Gilbert, C.A.2d, 1981, 668 F.2d 94, 97 (of securities laws).

Rule 408 does not bar use of settlement negotiations to prove the workings of the settling defendant's scheme. Broadcort Capital Corp. v. Summa Medical Corp., C.A.10th, 1992, 972 F.2d 1183, 1194 n. 16.

District court did not err in admitting evidence of indemnity agreement to show that two parties were not adverse to each other. Brocklesby v. U.S., C.A.9th, 1985, 767 F.2d 1288, 1293.

Lo Bosco v. Kure Engineering Ltd., 891 F. Supp. 1035, 1039 (D.N.J. 1995) (notion that listing of exceptions in Rule 408 is exclusive so "clearly false" it requires no further comment); Morley-Murphy Co. v. Zenith Electronics Corp., D.C.Wis.1996, 910 F.Supp. 450, 456, reversed C.A.7th, 1998, 142 F.3d 373 (Rule 408 does not bar use of party's own settlement offer to show other party's rejection of offer as ground for termination of dealership).

One court has held that evidence of a prior compromise is excluded under Rule 408 without any attention to the purpose for which the evidence was sought to be admissible. Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc., D.C.N.Y.1980, 486 F.Supp. 414, 423.

Ariz.R.Ev. 408 did not prevent the use of settlement between buyer and seller to determine whether it constituted a default by one party or a mutual recission where this fact was relevant to amount of commission due broker who had arranged the deal that was subject of dispute. Campbell v. Mahany, App.1980, 620 P.2d 711, 127 Ariz. 332.

Evidence of defendant's prior settlement with class of which plaintiff was a member is not inadmissible under Cal.Evid.Code § 1154 when offered to prove that punitive and deterrent effects of exemplary damages had already been satisfied. Lemer v. Boise Cascade, Inc., 1980, 165 Cal.Rptr. 555, 107 Cal.App.3d 1.

Evidence of compromise is admissible to show that employer's failure to pay was intentional and not inadvertent. Miller v. Component Homes, Inc., Iowa 1984, 356 N.W.2d 213, 216.

Evidence of settlement offer of $85,000 is admissible to show why plaintiff thought that $10,000 repair to plane was inadequate. Dodson Aviation v. Rollins, 1991, 807 P.2d 1319, 1324, 15 Kan.App.2d 314.

A similar statement appears in the Comment to Prop.N.Y.Evid.Code § 408.

Personal injury plaintiff's settlement of prior injury claims was relevant to show preexisting injury but was properly excluded as likely to confuse the jury in case where prior injury had been conceded. Callihan v. Burlington Northern, Inc., 1982, 654 P.2d 972, 976, 201 Mont. 350.

Hartman v. Community Responsibility Center, Colo.App.2003, 87 P.3d 202, 206 (list of "exceptions" not exhaustive; evidence of settlement admissible to show constraints on testimony of witness and to rebut claim that losses were cause by excessive compensation of executives when the settlement put the organization in the red); Alexander v. Cahill, Del.Super.2003, 829 A.2d 117, 125 (Rule 408 no bar to explaining to jury that certain defendants are no longer part of the case and instructing them not to speculate why).

Sammons v. Doctors for Emergency Services, Del. 2006, 913 A.2d 519, 534 (Rule 408 does not bar explanation to jury that the reason another participant in the tort was not party to the litigation was that he had settled out); Graber v. City of Ankeny, Iowa 2000, 616 N.W.2d 633, 641 (assuming settlement would be admissible to identify wrongdoer if relevant); In

Case 2:13-cv-00278-ABJ   Document 143   Filed 10/30/15   Page 228 of 242

§ 5314Permissible Uses—Other, 23 Fed. Prac. & Proc. Evid. § 5314 (1st ed.)

re Disciplinary Action Against Landon, No.Dak.1999, 600 N.W.2d 856, 859 (settlement of malpractice claim admissible as possible mitigating factor in disciplinary proceeding).

Hocker v. Hocker, 171 Ohio App. 3d 279, 2007-Ohio-1671, 870 N.E.2d 736, 740 (2d Dist. Montgomery County 2007) (Rule 408 does not bar use of settlement negotiations to explain why a life insurance policy on husband was proposed during divorce proceedings); Schafer v. RMS Realty, 2000, 741 N.E.2d 155, 192, 138 Ohio App.3d 244 (admissible to show motive); Owens-Corning Fiberglas v. American Centennial Ins. Co., 1995, 660 N.E.2d 828, 831, 74 Ohio Misc.2d 272 (where insurance claims could not be understood without reference to coverage of insurers who had settled); Shimola v. Cleveland, 1992, 625 N.E.2d 626, 630, 89 Ohio App.3d 505 (settlement of earlier suit on same issue admissible to show background of current dispute).

Testimony that a client authorized his attorney to try to settle is not inadmissible under Rule 408 when offered to prove the client was aware of the claim. Cannell v. Rhodes, 1986, 509 N.E.2d 963, 967, 31 Ohio App.3d 183.

Citizens Nat. Bank of Texas v. NXS Const., Inc., 387 S.W.3d 74, 86 (Tex. App. Houston 14th Dist. 2012) (corporate resolution ratifying transfer admissible where all references to this as part of settlement were redacted).

Gilman v. Towmotor Corp., 1992, 621 A.2d 1260, 1264, 160 Vt. 116 (admissible where it would be unfair and prejudicial to exclude).

### But see

Court assumes that list in last sentence of Rule 408 is exclusive and does not allow evidence of settlement of state court action against a third person to offset prejudice caused by admission into evidence of the pleading in that action. Vincent v. Louis Marx & Co., Inc., C.A.1st, 1989, 874 F.2d 36, 42.

### Superfluous

See N.Y. Trial Lawyers, Recommendation and Study of the Proposed Federal Rules of Evidence, 1970, p. 25, reprinted in 2 P.L.I., Federal Civil Practice 4th, 1972, p. 287 (suggesting deletion of the last sentence "since the first sentence of the rule clearly sets forth the limited purpose for which such evidence is inadmissible.").

In re Connors, 254 B.R. 230, 256 (Bankr. S.D. Ill. 2000) (court can look at other settlements of asbestos claims to determine if bankrupt's estimates of its liability was reasonable; Rule 408 does not exclude evidence of compromises of other claims by other parties).

Atwell v. RHIS, Inc., 974 A.2d 148, 152 (Del. 2009) (trial judge may need to disclose settlement with third party to avoid jury confusion as to absence of settling tortfeasor).

Since the third sentence of Rule 408 was either superfluous or redundant, its omission from a revision of the rule did not change its meaning. Harriman v. Maddocks, Me.1986, 518 A.2d 1027, 1031.

### Scope

See §§ 5303 to 5309.

Fahrbach v. Diamond Shamrock, Inc., 1996, 928 P.2d 269, 274, 122 N.M. 543 (Rule 408 does not apply where evidence is not admitted but trial judge simply tells jury that absent potential parties to case have settled out; holding unclear).

### Policy

See § 5302.

Policy of Rule 408 precludes use of letters in settlement negotiations to satisfy the statute of frauds. Trebor Sportswear Co., Inc. v. The Limited Stores, Inc., C.A.2d, 1989, 865 F.2d 506, 510.

Social policy of antitrust laws made it clear that Rule 408 was not intended to exclude proof of nolo contendere pleas to antitrust violation offered to show that defendant would engage in anticompetitive behavior if permitted to acquire the plaintiff. Crouse-Hinds Co. v. InterNorth, Inc., D.C.N.Y.1980, 518 F.Supp. 413.

Boehning v. State Bd. of Tax Com'rs, 763 N.E.2d 502, 505 (Ind. Tax Ct. 2001) (allowing taxpayers to use assessor's compromise of other tax appeals would chill incentive to settle cases out of court and thus swell courts already overloaded dockets); State v. DeAngelis, 1995, 657 A.2d 447, 450, 281 N.J.Super. 256 (so interpreting U.R.E. 52); Tucker v. McQuery, 1999, 736 N.E.2d 574, 577, 107 Ohio Misc.2d 38 (relying on policy to bar plaintiff from introducing own settlement with insurance company to prove the validity of claim against another insurance company).

Letters offering settlement and copy of movie "Poltergeist" delivered with plaintiff's demand letter were properly admitted where objections were inadequate to alert trial court that Rule 408 was being invoked. Haney v. Purcell Co., Inc., Tex.App.1990, 796 S.W.2d 782, 789.

### Estopped to object

Genna v. Jackson, 286 Mich. App. 413, 781 N.W.2d 124, 131 (2009) (by initiating much of the testimony about the settlement).

**See also**

Alpha Capital Management, Inc. v. Rentenbach, 287 Mich. App. 589, 792 N.W.2d 344, 365 (2010) (evidence of settlement with third party admissible when party places it in issue).

**4.2**

**Waived**

Hike v. State Department of Roads, 288 Neb. 60, 846 N.W.2d 205 (2014) (but not waived by cross-examining state agent regarding statements purportedly made during negotiations).

**5**

**Change pre-existing law**

The major changes were the expansion of the common law rule to cover completed compromises and statements made during negotiations. Ibid.

Idaho State Bar v. Frazier, 136 Idaho 22, 28 P.3d 363, 367, (2001) (does not allow use of settlement as an admission against interest).

**6**

**Other state of mind**

2 Chamberlayne, The Modern Law of Evidence, 1911, § 1450.

McAuliffe v. U.S., 514 Fed. Appx. 542, 549 (6th Cir. 2013) (statements in civil negotiations admissible to show defendant's knowledge of illegal acts).

Evidence of settlement of prior police brutality by city was admissible under Rule 408 to show that city was aware of practice to support "condoned custom" theory of liability. Spell v. McDaniel, C.A.4th, 1987, 824 F.2d 1380, 1400.

Court assumes that Rule 408 would not bar use of document prepared for compromise negotiations to prove that party had notice of alleged defects in building. Ramada Development Co. v. Rauch, C.A.5th, 1981, 644 F.2d 1097, 1107.

Fidelity & Deposit Co. of Maryland v. Hudson United Bank, 493 F. Supp. 434, 445 (D.N.J. 1980) (not admissible to prove knowledge of bondholder where this was consequential fact in present case).

Houston v. State, Ala.Crim. 2005, 933 So.2d 397, 403 (evidence that fraud accusation arose from a case of buyer's remorse over eBay purchase of lawn tractor and that complaining witness offered not to press charges if defendant would rescind the sale and refund purchase price relevant to show defendant did not intend to defraud, but exclusion was harmless error where other evidence showed charge arose out of civil dispute).

Horner v. Carter, 981 N.E.2d 1210, 1211 (Ind. 2013) (admissible as extrinsic evidence to construe ambiguous agreement).

**7**

**Admissible**

The admissibility to show the state of mind of another follows from the hearsay notion that statements offered to show the effect on the hearer are not offered for the truth of the matter asserted. When offered to show some state of mind other than consciousness of liability, the evidence usually did not have the ambiguity that was the ground for exclusion under the relevance rationale.

Hamilton v. Water Whole Intern. Corp., 302 Fed. Appx. 789, 796 (10th Cir. 2008) (settlement with other employees admissible to prove that defendant had a plan to induce employees to work for nothing).

In civil rights action against city for the shooting death of plaintiff's son, evidence of settlement negotiations between city and mother of another person beaten by the same officer were admissible to show knowledge of the officer's dangerous propensities. Gagliardi v. Flint, C.A.3d, 1977, 564 F.2d 112, 116.

Evidence of settlement offer was admissible to prove mental state of employer in a suit for discrimination. Bulaich v. AT&T Information Systems, 1989, 778 P.2d 1031, 1037, 113 Wash.2d 254.

**8**

**Agency or control**

See Lloyd v. Thomas, C.A.7th, 1952, 195 F.2d 486, 491; Fidelity & Cas. Co. v. Southwest Bell Telephone Co., C.A.8th, 1944, 140 F.2d 724, 727; cf. National Battery Co. v. Levy, C.A.8th, 1942, 126 F.2d 33, 36–37.

Statements in settlement negotiations by the defendant's insurance agent were not admissible under Rule 408 to show that plaintiff was an employee of defendant. Sortino v. Miller, 1983, 335 N.W.2d 284, 214 Neb. 592.

**9**

**Example**

See also the dog-bite hypothetical case used in § 5307, text at note 66.

**10**

**Less ambiguous**

Though it does not seem plausible today, courts may have thought, in the heyday of rugged individualism, that a person was more likely to make an offer of compromise even though he did not believe his actions were blameworthy than he would be to pay damages for the acts of another when there was reason to doubt his responsibility for those acts.

11
**Independent fact**
See § 5307.

12
**Flawed analogy**
The other crimes rule and the subsequent repair rule bar evidence only as proof of conduct in the first case and negligence in the second; hence, evidence to prove the identity of the actor is admissible under those rules. See § 5286; vol. 22, § 5246. Court assumes that since other crimes rule would not bar use of defendant's disregard of property rights of others to show intent in instant outrage, evidence of settlement of claims for such wrongs evidence is also admissible under Rule 408. Bradbury v. Phillips Petroleum Co., C.A.10th, 1987, 815 F.2d 1356, 1364. This overlooks the fact that the only way proof of settlement of other claims proves defendant's contempt for the law is through an assumption that the claims settled were valid, exactly the inference prohibited by Rule 408. Rule 404(b) on the other hand does not prohibit proof of bad acts offered to prove intent rather than conduct.

13
**Same result under 408**
2 Louisell & Mueller, Federal Evidence, 1978, p. 299; 2 Weinstein & Berger, Weinstein's Evidence, 1975, p. 408–26.

14
**Prove validity**
See § 5308.
Fare Deals Ltd. v. World Choice Travel.Com, Inc., 180 F. Supp. 2d 678, 696 (D. Md. 2001) (accord; can't use to prove agency).

15
**Not part of compromise**
See § 5304.

16
**Policy**
It seems difficult to argue that one would be deterred from making an offer of compromise by admissibility to prove direct liability but not when used to show vicarious liability.

17
**Basis for claim**
Compare Model Code of Evidence, Rule 309(4) and U.R.E. 52(b), quoted § 5301 nn. 28, 29.
This seems to have been overlooked in Duse v. International Business Machines, D.C.Conn.1990, 748 F.Supp. 956, 962 (Rule 408 bars plaintiff's suit for interference with his attempt to settle dispute with third party).
Taylor v. Taylor, Fla.App.1995, 650 So.2d 662 (statements made during mediation admissible when party seeks relief from settlement contract).
One court seems to have used Rule 408 to prevent one party from proving statements they claimed were a repudiation of the contract. Conroy v. Book Automation, Inc., Minn.App.1987, 398 N.W.2d 657, 660.

18
**Breach of settlement**
See § 5308.
Rule 408 would not bar evidence of settlement offered to prove breach of settlement agreement. Cates v. Morgan Portable Bldg. Corp., C.A.7th, 1985, 780 F.2d 683, 691.
Roberts v. Green Bay Packaging, Inc., 101 Ark. App. 160, 272 S.W.3d 125, 128, (2008) (to prove whether or not settlement had been reached); Rogers v. Rogers, 2005, 205 S.W.3d 856, 863, 90 Ark.App. 321 (those who repudiate contract of settlement cannot use Rule 408 to prevent suit for breach); Wilson v. Wilson, 53 So. 3d 865, 870 (Miss. Ct. App. 2011) (agreement equitably dividing marital property not barred by Rule 408 in proceeding to enforce agreement); Cyberco Holdings v. Con-Way Transportation, 2007, 159 P.3d 359, 367, 212 Or.App. 576 (accord).

**But see**
Vernon v. Acton, Ind.2000, 732 N.E.2d 805, 810 (Rule 408 bars use of oral mediation settlement agreement in suit to enforce it).

19
**Defense on compromise**
See generally 2 Chamberlayne, The Modern Law of Evidence, 1911, § 1442.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:13-cv-00278-ABJ   Document 143   Filed 10/30/15   Page 231 of 242

§ 5314Permissible Uses—Other, 23 Fed. Prac. & Proc. Evid. § 5314 (1st ed.)

Bankcard America, Inc. v. Universal Bancard Systems, Inc., 203 F.3d 477, 484 (7th Cir. 2000) (Rule 408 does not bar party from testifying that it acted because it believed a settlement of the dispute had been reached that authorized that action); B & B Investment Club v. Kleinert's, Inc., D.C.Pa.1979, 472 F.Supp. 787 (to defeat corporate officer indemnity claim by showing not successful "on the merits").

John C. Lincoln Hosp. v. Maricopa County, App. 2004, 96 P.3d 530, 536 n. 3, 208 Ariz. 532 (estoppel); Worman Enterprises v. Solid Waste Mgt.Dist., Ind.2004, 805 N.E.2d 369, 377 (Rule 408 bars use of interim settlement to prove waiver of claim); Sports Page Inc. v. Punzo, Miss.App. 2004, 900 So.2d 1193, 1209 (dictum: party's settlement check admissible to prove good faith but possible excludible on Rule 403 grounds as tending to show the invalidity of opponent's claim).

**But see**

Stockman v. Oakcrest Dental Center, P.C., C.A.6th, 2007, 480 F.3d 791, 797 (offer to reinstate employment inadmissible in age discrimination action to show failure to mitigate damages because this goes to the "amount"; collecting cases holding to the contrary).

20

**Release**

Reporter's Note, Prop.Vt.R.Ev. 408.

21

**Accord and satisfaction**

Cal.Evid.Code § 1152 does not bar evidence of a compromise offered as proof of an accord and satisfaction. Moving Picture Machine Operators Union Local No. 162 v. Glasgow Theatres, Inc., 1970, 86 Cal.Rptr. 33, 37, 6 Cal.App.3d 395 (dictum). Union River Associates v. Budman, Me. 2004, 850 A.2d 334, 340 (error to exclude evidence offered to prove accord and satisfaction under Rule 408).

Welched accord and satisfaction was admissible in suit on original contract. Tag Resources v. Petroleum Well Services, Tex.App.1990, 791 S.W.2d 600, 606.

22

**Novation**

The Wisconsin drafters added "accord and satisfaction, novation, or release" to the last sentence of Rule 408. See Wis.Stats.Ann. § 904.08, quoted in § 5031 n. 33.

West's Ann.Cal.Evid.Code § 1152 does not bar evidence of settlement of another lawsuit when offered as evidence of an account stated. Truestone, Inc. v. Simi West Industrial Park II, 1984, 209 Cal.Rptr. 757, 764, 163 Cal.App.3d 715.

23

**Legal effect**

Under the hearsay analysis used at common law, the opponent's admission is offered not for the truth of the matter asserted but as legally operative conduct. See discussion under Rule 801.

24

**Third persons**

Reporter's Note, Prop.Vt.R.Ev. 408: "Note that the rule is not intended to change Quesnel v. Raleigh ... which held that any amount paid by a joint tortfeasor could be shown in mitigation of damages, nor to alter the more general proposition that unqualified release of one joint tortfeasor releases the others. These doctrines do not involve circumstantial use of the settlement which the rule seeks to prevent ...."

Barker v. Niles Bolton Associates, Inc., 316 Fed. Appx. 933, 937 (11th Cir. 2009) (settlement agreement with University redacted to hide amount of settlement admissible to show nature of injury suffered at the hands of the builder from violation of Fair Housing Act).

Evidence of insurer's settlement with insured would not be barred by Rule 408 when offered to show that payment was voluntary and thus not a proper element of damages in subrogation claim against tortfeasor. Weir v. Federal Insurance Co., C.A.10th, 1987, 811 F.2d 1387, 1395.

House v. Volunteer Transport, Inc., 2006, 223 S.W.3d 798, 365 Ark. 11 (demand letter from prior accident admissible to show pre-existing nature of injury claimed in present accident).

Rule 408 does not bar evidence of compromise of claim with third person to show costs that had been incurred by partners. Jensen v. Westberg, App.1988, 772 P.2d 228, 236, 115 Idaho 1021.

Financial Indem. Co. v. Cordoba, 2012-NMCA-016, 271 P.3d 768, 769 (N.M. Ct. App. 2011) (bad faith or unfair claim settlement practices).

Langness v. Fencil Urethane Systems, Inc., 2003 ND 132, 667 N.W.2d 596, 607 (N.D. 2003) (admissible to explain absence of parties named in complaint).

Case 2:13-cv-00278-ABJ   Document 143   Filed 10/30/15   Page 232 of 242

§ 5314Permissible Uses—Other, 23 Fed. Prac. & Proc. Evid. § 5314 (1st ed.)

Hensrude v. Sloss, 150 Wash. App. 853, 209 P.3d 543, 546 (Div. 1 2009) (where case involves multiple tortfeasors, settlement with one admissible to offset that recovery from plaintiff's damages).

**But see**
Wardell v. McMillan, Wyo.1992, 844 P.2d 1052, 1065 (admissibility not required by comparative negligence law).

**25**

**Wrong in settlement**
This is because Rule 408 only bars the use of compromise evidence to prove the validity or invalidity of the claim that was the subject of the compromise, not some other claim. See § 5308.

Arnold v. Wilder, 657 F.3d 353, 366 (6th Cir. 2011) (that criminal defendant refused to sign a release of her accusers in order to get criminal charges dismissed in an action for malicious prosecution).

WFD Partners v. North Star Steel, C.A.3d 2007, 216 Fed.Appx. 196, 200 n. 1 (settlement letters admissible to show that defendant had made a business decision to terminate deal so claims of breach of contract were spurious).

Rule 408 does not bar the use of an affidavit submitted in settlement negotiations to impose Rule 11 sanctions. Eisenberg v. University of New Mexico, C.A.10th, 1991, 936 F.2d 1131, 1134.

Evidence of settlement negotiations was properly admitted under Rule 408 on the issue of whether party acting on behalf of defendant had interfered with efforts of plaintiff to mitigate damages. Urico v. Parnell Oil Co., C.A.1st, 1983, 708 F.2d 852, 855.

Rule 408 does not exclude evidence of settlement negotiations in proceeding under Civil Rule 23(e) to obtain judicial approval of class action settlement. In re General Motors Corporation Engine Interchange Litigation, C.A.7th, 1979, 594 F.2d 1106, 1124 n. 20.

Christman v. Brauvin Realty Advisors, Inc., D.C.Ill. 1999, 191 F.R.D. 142, 152 (that lead plaintiffs and their lawyers intended to sell out the other members of the class); Eugene Burger Mgt. Co. v. U.S.H.U.D., D.C.D.C.1999, 192 F.R.D. 1, 10; Resolution Trust Corp. v. Blasdell, D.C.Ariz.1993, 154 F.R.D. 675, 681 (Rule 408 does not bar use of settlement statements to prove that suit was filed in retaliation for refusal to settle).

In action for malicious prosecution, evidence of insurer's statements in settlement negotiations were admissible to show that it filed an action in name of its insured that it knew to be meritless as a method of strongarming plaintiff into a settlement. Bradshaw v. State Farm Mut. Auto. Ins., 1988, 758 P.2d 1313, 1322, 157 Ariz. 411.

Thomas v. Thomas, Ind.App.1996, 674 N.E.2d 23, 26 (settlement offers admissible to show figure shown in settlement agreement was a mistake).

Trial judge properly ruled that letter sent to insurance company by lawyer was not admissible as proof of an attempt to inflate client's damages. Petersen v. State Farm Auto. Ins. Co., La.App.1989, 543 So.2d 109, 115.

Rule 408 permits use of statements in negotiation to show that release was signed as a result of fraud. Harriman v. Maddocks, Me.1986, 518 A.2d 1027, 1031.

For a case in which the court used Rule 408 to prevent the plaintiff from proving what it claimed was the repudiation of the contract by the defendant, see Conroy v. Book Automation, Inc., Minn.App.1987, 398 N.W.2d 657, 660.

Rule 408 did not bar use of evidence of settlement negotiations to prove that parties were fraudulently induced to enter agreement. Gorman v. Soble, 1982, 328 N.W.2d 119, 120 Mich.App. 831.

Flood v. Katz, 294 S.W.3d 756, 762 (Tex. App. Dallas 2009) (fraud on creditors done during settlement talks not shielded by Rule 408); Avary v. Bank of America, N.A., Tex.App.2002, 72 S.W.3d 779, 799 n. 4 (accord); Tarrant County v. English, Tex.App.1998, 989 S.W.2d 368, 378 (admissible to show that recipient was misled by offeror).

Rule 408 does not bar proving representations made during settlement negotiations when these are the basis of claims of fraud being sued on. Portland Savings & Loan Association v. Bernstein, Tex.App.1985, 716 S.W.2d 532, 537.

For an illustration of the sort of heavy-handed tactics that ought not to be shielded by Rule 408, see Goodman, All The Justice I Could Afford, 1983, p. 58 (employer opposed fired employee's claim for unemployment compensation benefits as tactic to coerce agreement on settlement of age discrimination action).

**26**

**Unfair labor practice**
This list is suggested by a former member of the Advisory Committee, 2 Weinstein & Berger, Weinstein's Evidence, 1975, p. 408–28.

Starter Corp. v. Converse, Inc., C.A.2d, 1999, 170 F.3d 286, 294 (to prove estoppel arising from prior settlement); Carney v. American University, C.A.D.C.1998, 151 F.3d 1090, 1095 (withholding plaintiff's severance pay in retaliation for her filing claim for employment discrimination in her firing); West v. Club at Spanish Peaks, L.L.C., 2008 MT 183, 343 Mont. 434, 186 P.3d 1228, 1242, (2008) (proposed settlement agreement admissible to prove that firing of defendant was a pretext to

Case 2:13-cv-00278-ABJ   Document 143   Filed 10/30/15   Page 233 of 242

§ 5314Permissible Uses—Other, 23 Fed. Prac. & Proc. Evid. § 5314 (1st ed.)

avoid paying him commissions due on sales); Brothers v. Public School Employees of Washington, 1997, 945 P.2d 208, 212, 88 Wash.App. 398 (contract repudiated during settlement talks).

**Failure to settle**

Ehrhardt, Florida Evidence, 1977, p. 92.

Athey v. Farmers Insurance Exchange, C.A.8th, 234 F.3d 357, 362 (where state law makes attempt to settle breach of contract claim conditional on release of bad faith claim evidence of bad faith, such evidence not barred by Rule 408); ABM Industries, Inc. v. Zurich American Ins. Co., D.C.Cal. 2006, 237 F.R.D. 225, 228 (Rule 408 does not bar evidence of settlement negotiations to show that insurer unreasonable denied coverage); White v. Western Title Ins. Co., 1985, 221 Cal.Rptr. 509, 518, 40 Cal.3d 870, 887, 710 P.2d 309, 318; American Guarantee & Liab. Ins. Co. v. King, Colo.App.2003, 97 P.3d 161, 170 (mediator's statement that plaintiff had no right of subrogation admissible to prove abuse of process and bad faith by insurer); Pattison v. Valley Forge Ins. Co., La.App.1992, 599 So.2d 873, 877 (but excludible under Rule 403); Chouman v. Home Owners Ins. Co., 293 Mich. App. 434, 810 N.W.2d 88, 91 (2011) (evidence of denial of benefits admissible to show why stopped receiving treatment); Gelinas v. Metropolitan Property & Liability Ins. Co., 1988, 551 A.2d 962, 968, 131 N.H. 154; In re Texas Farm Bureau Underwriters, 374 S.W.3d 651, 657 (Tex. App. Tyler 2012) (settlement offer admissible to rebut claim of insurer bad faith); Texas Farmers Ins. Co. v. Stem, Tex.App.1996, 927 S.W.2d 76, 79; U.S. Fire Ins. Co. v. Millard, Tex.App.1993, 847 S.W.2d 668, 672; State Farm Mutual Auto. Ins. Co. v. Shrader, Wyo.1994, 882 P.2d 813, 830. Offers to settle entire case were not admissible to refute bad faith claim with respect to only one element. Martin v. Principal Casualty Ins. Co., Colo.App.1991, 835 P.2d 505, 511.

After a thorough review of the conflicting cases from other jurisdictions, court holds that a defendant cannot introduce evidence of its own offer to settle to mitigate a claim for punitive damages. Ettus v. Orkin Exterminating Co., Inc., 1983, 665 P.2d 730, 233 Kan. 555.

Settlement negotiations are admissible in defense of claim for attorney's fees for failure to make a timely tender under an uninsured motorists policy. Benoit v. State Farm Auto. Ins. Co., La.App.1992, 602 So.2d 53, 55.

Rule 408 does not bar proof of settlement offers and discussions in a suit for wrongful failure to settle by insurer. Gelinas v. Metropolitan Property & Liability Ins. Co., 1988, 551 A.2d 962, 968, 131 N.H. 154.

**Wrongful acts not shielded**

Perhaps the most dramatic illustration of this is Fletcher v. Western Nat. Life Ins. Co., 1970, 89 Cal.Rptr. 78, 10 Cal.App.3d 376, where the court held that Cal.Evid.Code § 1152 did not exclude evidence of intentional infliction of emotional harm brought about when an insurer "embarked upon a concerted course of conduct to induce plaintiff to surrender his insurance policy or enter into a disadvantageous 'settlement' of a nonexistent dispute by means of false and threatening letters and the employment of economic pressure based upon his disabled and, therefore impecunious, condition (the very thing insured against) …."

Rural Water Dist. No. 4, Douglas County, Kan. v. City of Eudora, Kan., 659 F.3d 969, 986 (10th Cir. 2011) (threat to de-annext land if city was not given right to provide water).

Giganti v. Gen–X Strategies, Inc., D.C.Va. 2004, 222 F.R.D. 299, 313 (Rule 408 does not bar use of settlement letters in a hearing to impose sanctions on attorney; collecting cases).

Rule 408 does not shield wrongful acts during settlement negotiations; a party can prove that he or she was induced to sign by fraudulent misrepresentations. Harriman v. Maddocks, Me. 1986, 518 A.2d 1027, 1031.

Flood v. Katz, 294 S.W.3d 756, 762 (Tex. App. Dallas 2009) (lying about assets not shielded by Rule 408 because done during settlement negotiations).

Avary v. Bank of America, N.A., Tex.App.2002, 72 S.W.3d 779, 799 (Rule 408 does not prevent a party from proving a separate cause of action simply because some of the acts took place during compromise negotiations).

**Attorney's fees**

McCormick, Evidence, Cleary ed. 1972, § 274, p. 664.

Dillen v. Healthone, L.L.C., Colo.App.2004 (Rule 408 does not bar use of settlement offer under a state statute awarding attorney's fees to a party who prevails after opposing party rejects a formal offer offer of settlement).

**Costs**

Rule 408 does not apply to a determination by the trial court as to whether to allow pre-judgment interest because of the defendant's refusal to settle. Iberian Tankers v. Gates Constr. Corp., D.C.N.Y.1975, 388 F.Supp. 1190, 1192. See also 2 Chamberlayne, The Modern Law of Evidence, 1911, p. 1836.

In re Marriage of Bidwell, 173 Or. App. 288, 21 P.3d 161, 163, (2001) (admissible to prove husband's liability for wife's attorney fees on appeal).

31

**Illegal compromise**

Overseas Motors, Inc. v. Import Motors Ltd., Inc., D.C.Mich.1974, 375 F.Supp. 499 (dictum).

**Compare**

Comment, Can You Keep A Secret?; Discoverability and Admissibility of Confidential Settlement Agreement Amounts in Ohio, 52 Case W.Res.L.Rev. 833 (2002).

32

**Waiver or estoppel**

If the conduct of the opponent in compromise is such as to constitute a waiver or estoppel with respect to some procedural right, it is probably also sufficient to estop him from asserting Rule 408 to bar proof of the conduct. See generally vol. 21, § 5039. PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc., 520 F.3d 109, 113 (2d Cir. 2008) (estoppel to claim trademark infringement).

33

**Explain conduct**

2 Chamberlayne, The Modern Law of Evidence, 1911, p. 1836.

34

**Mitigation or exhaustion**

Warner Constr. Corp. v. City of Los Angeles, 1970, 466 P.2d 996, 1104 n. 12, 2 Cal.3d 285, 297 n. 12, 85 Cal.Rptr. 444, 452 n. 12 (dictum; applying Cal.Evid.Code § 1152).

Evidence of settlement negotiations was admissible to prove the plaintiff's failure to mitigate damages. Bhandari v. First National Bank of Commerce, C.A.5th, 1987, 808 F.2d 1082, 1103.

Evidence of settlement negotiations was admissible to show that defendant's insurer had interfered with efforts of plaintiff to mitigate damages. Urico v. Parnell Oil Co., C.A.1st, 1983, 708 F.2d 852, 855.

Rule 408 does not bar introduction of employer's offer to take back employee to prove failure to mitigate damages for wrongful discharge. Thomas v. Resort Health Related Facility, D.C.N.Y.1982, 539 F.Supp. 630.

Rule 408 does not bar admission of offer to return converted property to show mitigation of damages. McKenzie v. Tom Gibson Ford, Inc., 1988, 749 S.W.2d 653, 657, 295 Ark. 326.

Idaho State Bar v. Frazier, 136 Idaho 22, 28 P.3d 363, 367, (2001) (evidence that lawyer agreed to pay back amount stolen from trust may be used as a mitigating factor in determining sanctions to be imposed).

Evidence of insurance company settlement offer was not admissible to show that plaintiff could have had money to repair truck and thus mitigate consequential damages. Waseca Sand & Gravel, Inc. v. Olson, Minn.App.1985, 379 N.W.2d 592, 594.

**But see**

S Development Co. v. Pima Capital Management Co., 201 Ariz. 10, 31 P.3d 123, 135, (Ct. App. Div. 1 2001) (Rule 408 bars evidence of settlement offer to prove failure to mitigate as this goes to the amount of damages).

35

**Revival of debt**

2 Weinstein & Berger, Weinstein's Evidence, 1975, p. 408–28; cf. Model Code of Evidence, Rule 309(4) and U.R.E. 52(b), quoted in § 5031 nn. 28, 29, both of which treat this use as an exception to the rule. For a criticism of the Model Code's treatment of this issue, see Likert, Precautionary Measures and Compromises, 1945 Wis.L.Rev. 399, 401.

36

**Inconsistent statement**

Distinguish the use of the compromise to impeach by showing a bias in the witness toward the offeror, admissible because it is offered to show the effect of the compromise on the state of mind of the witness, not as evidence of consciousness of liability by the offeror. See § 5311. Distinguish also the use of the fact that the party had made an inconsistent claim, admissible because Rule 408 covers offers of compromise, not claims. See § 5304.

Where plaintiff claimed that another baseless libel suit had been settled, evidence that the suit had in fact been abandoned when the defendant agreed to publish a letter-to-the-editor it would have published anyway was admissible to impeach. American Family Life Assur. Co. v. Teasdale, C.A.8th, 1984, 733 F.2d 559, 568.

After canvassing competing views, court holds that statements made in settlement negotiations may be admitted to impeach testimony given at trial. Davidson v. Beco Corp., App.1986, 733 P.2d 781, 786, 112 Idaho 560.

In re Buckmaster, 755 N.W.2d 570, 580 (Minn. Ct. App. 2008) (detailed exploration of issue).

Evidence of negotiations with insurance carrier could be admitted under Minn.R.Ev. 408 as impeachment of trial testimony concerning the loss. In re Commodore Hotel Fire and Explosion, Minn.1982, 324 N.W.2d 245.

Stockman Bank of Montana v. Potts, 2006, 132 P.3d 546, 549, 331 Mont. 381 (not admissible where no statement introduced inconsistent with settlement offer).

Defense offer to get "get" for $25,000 was admissible to show that refusal to obtain divorce was based on monetary rather than religious considerations. Burns v. Burns, 1987, 538 A.2d 438, 440, 223 N.J.Super. 219.

Anderson v. Thompson, 2008 UT App 3, 176 P.3d 464, 472 (Utah Ct. App. 2008) (trend in federal and other state caselaw to admit).

**See also**

Rambo, Impeaching Lying Parties With Their Statements During Negotiations: Demysticizing The Public Policy Rationale Behind Rule 408 and The Mediation-Privilege Statutes, 75 Wash.L.Rev. 1037 (2000).

A.B.A. Litigation Sec., Emerging Problems Under The Federal Rules of Evidence, 1983, p. 78.

37
**Statements of fact**
See §§ 5302, 5307.

38
**Little reason**
A statement in a settlement offer that certain bonds were owned by the defendant should have been admitted to impeach his testimony at trial that his son was the owner. U. S. v. Tuschman, C.A.6th, 1969, 405 F.2d 688.

39
**Defeat use**
2 Chamberlayne, The Modern Law of Evidence, 1911, p. 1827.

In re Buckmaster, 755 N.W.2d 570, 581 (Minn. Ct. App. 2008) (since doctor never admitted any wrongdoing, his compromise with regulatory agency provides no basis to impeach his denials of wrongdoing in malpractice case).

40
**Did not admit**
Compare Wigmore's ambiguous treatment of the question. 4 Wigmore, Evidence, Chadbourn rev. 1972, § 1062, n. 1.

41
**Now inadmissible**
See §§ 5307, 5308.

42
**"Substantively"**
See Redden & Saltzburg, Federal Rules of Evidence Manual, 2d ed. 1977, p. 179.

Berg v. Dakota Boys Ranch Ass'n, 2001 ND 122, 629 N.W.2d 563, 567 (N.D. 2001) (evidence of release admissible to rebut claim that plaintiff was fired for excessive leave by showing that he had ample accrued leave).

43
**Evidentiary fact**
If the witness testifies to facts that are relevant to the validity or invalidity of the claim, evidence that impairs his credibility would also seem to bear on the same ultimate issue. One can escape this reading only by arguing that Rule 408 excludes statements only when offered as direct proof of the ultimate issue, not as circumstantial evidence in a line of proof that leads to validity or invalidity. For reasons stated in § 5308, this does not appear to be a proper interpretation of the rule.

Saleeby v. Rocky Elson Const., Inc., 3 So. 3d 1078, 1081 (Fla. 2009) (rejecting this view).

44
**Not wholly apt**
The purpose of the hearsay rule is to prevent the testimonial use of extrajudicial statements; the policy of that rule is satisfied when the use of the statement does not require any inference as to the truth of the matter asserted. In the context of prior inconsistent statements, this distinction is cast in terms of "substantive use" and use for "impeachment" because in that context the use for impeachment does not require the testimonial use of the statement. But this distinction makes no sense even with other uses of hearsay statements for impeachment; for example, one could not prove that a witness was biased by a hearsay statement; i. e., one could not prove that a witness was biased by a hearsay statement of some third person to that effect.

Rule 408, however, does not exclude statements made during settlement negotiations because of the fear that they will be used testimonially but because it is thought that admitting the statement will tend to discourage "freedom of communication" that is necessary for successful compromises. See Advisory Committee's Note, Rule 408. There is no reason to suppose that a party will be any less deterred from making the statement if it is only used for purposes of impeachment.

45
**"Rule 408 does not bar"**
2 Louisell & Mueller, Federal Evidence, 1978, p. 277.

Hernandez v. State, 2002, 52 P.3d 765, 767, 203 Ariz. 196 (admissible so long as not used to proved validity or invalidity of claim; use to impeach witness does not prove validity or invalidity of claim).

**46**

**Impeachment by bias**
A footnote appended to the quoted statement refers the reader to their discussion of impeachment by bias. Id. at n. 29.

**47**

**Context**
The quoted statement purports to be a paraphrase of the Advisory Committee's argument referred to in the text; that argument is clearly not aimed at impeachment for bias, whatever it may mean.

**48**

**Objection to House version**
Senate Hearings, p. 59.
Hernandez v. State, 2002, 52 P.3d 765, 769, 203 Ariz. 196 (making similar argument).

**49**

**Obscure**
"Responsibility" is surely an unusual way to characterize the susceptibility of a witness to impeachment by prior inconsistent statements. One suspects that the drafter of this paragraph felt that the government had clumsily attempted to raise a difficult question that the Advisory Committee did not want to or could not answer and therefore seized upon the inartfulness of his opponent as a device for evading the issue.

**50**

**Criminal liability**
"I am aware of no criminal penalties for factual misrepresentations made during negotiations to settle a controversy between two private parties. On the other hand there is a strong public policy, implemented by various criminal sanctions, of discouraging false statements to federal Government agencies. ... I do not suggest that enactment of Rule 408 would encourage direct violations of these criminal statutes. But the public policy they express would certainly be undermined by assuring taxpayers that, unless criminal intent can be shown, they have no responsibility for the accuracy of any factual representations they may make in the course of settlement negotiations with the Internal Revenue Service." 2 House Hearings, p. 302 (letter from General Counsel of the Treasury).

**51**

**Admissible**
See § 5308.

**52**

**"Decide against"**
Redden & Saltzburg, Federal Rules of Evidence Manual, 2d ed. 1977, p. 172.
DirectTV, Inc. v. Carrera, C.A.4th, 2006, 185 Fed.Appx. 266, 267 (court properly excluded evidence it did not think would have affected its view of the credibility of other evidence).
After one-sided review of the literature, court concludes that letter in which defendant claimed that its mandatory retirement program was legal could not be used to impeach testimony of executives at trial that there was no such program. E.E.O.C. v. Gear Petroleum, Inc., C.A.10th, 1991, 948 F.2d 1542, 1545.
Graber v. City of Ankeny, Iowa 2000, 616 N.W.2d 633, 639 (Iowa court has been very reluctant to allow settlement evidence to be used to impeach; collecting cases).
"The clear import of the Conference Report as well as the general understanding among lawyers is that such conduct or statements may not be admitted for impeachment purposes." M. Graham, Handbook of Federal Evidence, 1981, pp. 255–256 (emphasis in original).
This is the position taken in Tenn.R.Ev. 408, discussed in § 5301, note 33, this supplement.
For a somewhat evasive embrace of this position, see Waltz & Huston, The Rules of Evidence in Settlement, 1981, 5 Litigation 11, 16 (courts should "almost never" admit compromise evidence to impeach).

**53**

**"Restricted negotiations"**
Ibid.
Anderson v. Thompson, 2008 UT App 3, 176 P.3d 464, 472 (Utah Ct. App. 2008) (similar argument).

**54**

**"Truth ascertained"**
See Rule 102.
Hernandez v. State, 2002, 52 P.3d 765, 768, 203 Ariz. 196 (invoking Rule 102 this way).

§ 5314Permissible Uses—Other, 23 Fed. Prac. & Proc. Evid. § 5314 (1st ed.)

55

**Either venue**

Since most falsehoods in negotiations would probably favor the party making them, it is doubtful that the opponent would ever care to use them to impeach an honest statement at trial. Hence, most cases in which the issue is likely to arise will be cases in which the party attempts to mislead his opponent with a spurious candor in negotiations or honestly admits a weakness during negotiations and attempts to cover it with a lie at trial.

56

**"Complete candor"**

Comment, Cal.Evid.Code § 1152. This section was the model for the provision in Rule 408 barring evidentiary use of negotiation statements.

Cal.Evid.Code § 1155 justified exclusion of evidence of statement made by defendant's agent during settlement negotiations that would have impeached direct testimony of another agent. C & K Engineering Contractors v. Amber Steel Company, Inc., 1978, 151 Cal.Rptr. 323, 23 Cal.3d 1, 587 P.2d 1136.

57

**False representations**

It might be claimed that the argument in the text fails to distinguish between the party who takes the stand on his own to testify contrary to his statement in negotiations and one who is called by the opponent for the express purpose of using the statement to impeach him if he does not testify in accordance with it. But the notion that the law ought to distinguish between a person who lies to carry his own burden of proof and one who testifies falsely so as to deny his opponent the right to prove his case seems to be based upon a supposedly outmoded theory of the nature of trials. Cf. discussion of "discoverable evidence" in § 5310. Hernandez v. State, 2002, 52 P.3d 765, 768, 203 Ariz. 196 (accord).

58

**Courts decide**

It would certainly seem to be an anomalous result if Rule 408 is interpreted to admit evidence of a compromise to show a possible reason for a witness to falsify under the rubric of "bias," despite the fact that this may unfairly prejudice the party's case, see § 5311, while a statement made in negotiations offered to show that the witness did lie is excluded, despite the lack of any unfairness to the party.

Court assumes that evidence of settlement from others was admissible to impeach the plaintiff's testimony that he could not afford needed surgical procedure. Williams v. Chevron U.S.A., Inc., C.A.5th, 1989, 875 F.2d 501, 504.

F.R.Ev. 408 codifies a trend in the caselaw that permits evidence of settlement to be used to impeach. County of Hennepin v. AFG Industries, Inc., C.A.8th, 1984, 726 F.2d 149, 153.

Worbetz v. Ward North America, Inc., C.A.3d, 2002, 54 Fed.Appx. 526, 536 (proper to use settlement documents to show that plaintiff was hot to litigate with his former employer only a few days after he quit).

For an illustration of how not to decide the question, see F.D.I.C. v. Refco Group, Ltd., D.C.Colo.1999, 184 F.R.D. 623, 628 (borrowing exception from Rule 407 to admit evidence that falls within Rule 408).

Court opines that First Circuit would not allow use of compromise statements for impeachment. Derderian v. Polaroid Corp., D.C.Mass.1988, 121 F.R.D. 9, 12 n. 1.

Fidelity & Deposit Co. of Maryland v. Hudson United Bank, 493 F. Supp. 434, 445 (D.N.J. 1980) (Rule 408 bars use of settlement in suit against another insurer to prove that insured was aware of dishonesty of employees prior to issuance of current bond).

Hernandez v. State, 2002, 52 P.3d 765, 767, 203 Ariz. 196 (collecting state and federal cases allowing use to impeach).

Edwards v. Stills, 1998, 984 S.W.2d 366, 380, 335 Ark. 470 (admissible if relevant to impeach).

Ozark Auto Transportation v. Starkey, 1997, 937 S.W.2d 175, 178, 327 Ark. 227 (on record presented no error in allowing impeachment by specific contradiction with portion of settlement letter).

Evidence that lawyer referred to purported will as a "shopping list" during settlement negotiations was admissible to impeach his testimony that he had never made such a reference. Matter of Estate of O'Donnell, 1991, 803 S.W.2d 530, 531, 304 Ark. 460.

Bovat v. City of Waterbury, 258 Conn. 574, 783 A.2d 1001, 1014, (2001) (evidence that plaintiff had settled with X's insurer admissible to impeach plaintiff's testimony that he had made no claim against X).

Almost all courts have held that statements made in compromise negotiations can be used for impeachment. Davidson v. Beco Corp., 1987, 753 P.2d 1253, 1255, 114 Idaho 107 (collecting cases).

Graber v. City of Ankeny, Iowa 2000, 616 N.W.2d 633, 641 (if settlement were automatically admissible to show bias of parties to it, this would render Rule 408 a nullity).

Case 2:13-cv-00278-ABJ   Document 143   Filed 10/30/15   Page 238 of 242

§ 5314Permissible Uses—Other, 23 Fed. Prac. & Proc. Evid. § 5314 (1st ed.)

Simmons v. Small, Ky.App.1998, 986 S.W.2d 452, 455 (Rule 408 bars use of settlement to impeach where inconsistency was manufactured by party for purpose of getting settlement before jury).

Green River Electric Corp. v. Nantz, Ky.App.1995, 894 S.W.2d 643, 647 (not admissible where not inconsistent with testimony).

Rule 408 does not bar use of compromise evidence when offered to impeach. El Paso Electric Co. v. Real Estate Mart, Inc., App.1982, 651 P.2d 105, 109, 98 N.M. 570.

Vivian Scott Trust v. Parker, So.Dak. 2004, 687 N.W.2d 731, 736 (excluding statements made in settlement negotiations as prior inconsistent statements on grounds of policy of Rule 408 without considering the policy against dishonesty in either venue).

Stam v. Mack, Tex.App.1999, 984 S.W.2d 747, 752 (Rule bars use of settlements with other physicians to impeach their testimony that they were not negligent because this involves proof of their liability).

State, Dept. of Ecology v. Tiger Oil Corp., 166 Wash. App. 720, 271 P.3d 331, 345 n.41 (Div. 2 2012) (not admissible for impeachment).

Northington v. Sivo, 2000, 8 P.3d 1067, 1069, 102 Wash.App. 545 (not admissible where there is no inconsistency between testimony at trial and complaint).

Opinion, though vague, suggests that court is not sure if evidence of compromise ought to be admitted to impeach. Hursh Agency, Inc. v. Wigwam Homes, Inc., Wyo.1983, 664 P.2d 27, 36.

It has been suggested that the rule should be amended to preclude the use of evidence for impeachment purposes. Kirkpatrick, Reforming Evidence Law in Oregon, 1980, 59 Ore.L.Rev. 43, 67.

59

### "Fairness" and "truth"

See vol. 21, §§ 5023, 5026.

60

### Admitted to impeach

Of course, if the party objecting to the statement was not a party to the compromise, he has no standing to object. See § 5315.

Cochenour v. Cameron Savings & Loan, C.A.8th, 1998, 160 F.3d 1187, 1190 (statement made in offer to compromise admissible to impeach offeror by specific contradiction); Commodity Futures Trading Com'n v. Rosenberg, 85 F. Supp. 2d 424, 435 (D.N.J. 2000) (admissible to impeach; collecting cases).

Settlement documents were admissible to impeach by specific contradiction testimony that the bank never gave reasons for its actions regarding foreclosure. Freidus v. First National Bank of Council Bluffs, C.A.8th, 1991, 928 F.2d 793, 795.

Sexton Law Firm v. Milligan, 1997, 948 S.W.2d 388, 396, 329 Ark. 285 (settlement evidence admissible to show that law firm made no claim then for amounts it now claims are due it).

Where husband testified he was not aware of award of spousal maintenance until he was ordered to pay it, evidence of settlement agreement providing for award was admissible to impeach. DeForest v. DeForest, App.1985, 694 P.2d 1241, 1247, 143 Ariz. 627.

House v. Volunteer Transport, Inc., 2006, 223 S.W.3d 798, 365 Ark. 11 (demand letter from an earlier accident admissible under Rule 408 to impeach plaintiff's testimony that injury was suffered in accident in issue and did not pre-exist); Gailey v. Allstate Ins.Co., 2005, 210 S.W.3d 40, 45, 362 Ark. 568 (Rule 408 does not bar use of settlement of another claim with a different insurer arising from a different accident to show that plaintiff submitted same medical bills to both insurers to impeach his testimony that injury was suffered in present, not past accident).

The Rule 102 rationale is adopted in Davidson v. Beco Corp., 1987, 753 P.2d 1253, 114 Idaho 107 and Missouri Pacific R. Co. v. Arkansas Sheriff's Boys' Ranch, 1983, 655 S.W.2d 389, 280 Ark. 53.

A prior inconsistent statement made during settlement negotiations should be admitted only if it strongly suggests that the witness has lied or if prejudice is likely to be slight. Davidson v. Beco Corp., App.1986, 733 P.2d 781, 787, 112 Idaho 560.

Hawley v. Wayne Dale Const., 146 N.C. App. 423, 552 S.E.2d 269, 272, (2001) (offer to pay benefits admissible to rebut claim that defendants refused to pay).

Where plaintiff testified at trial that he never got any closer than 40 feet to escaped hamburgers-on-the-hoof, admission in demand letter that he came within ten feet of the steer was admissible to impeach him. Davidson v. Prince, Utah App.1991, 813 P.2d 1225, 1233 n. 9.

This position is approved in Blakely, Article IV: Relevancy and Its Limits, 1983, 20 Hous.L.Rev. 151, 242.

### See also

Other cases may be found in § 5311, this Supplement, note 29.

**But see**

Acker Const., LLC v. Tran, 2012 Ark. App. 214, 396 S.W.3d 279, 291 (2012) (not where statements in negotiations not demonstrably inconsistent with trial testimony); In re Buckmaster, 755 N.W.2d 570, 579 (Minn. Ct. App. 2008) (where doctor never admitted any impropriety, use of his settlement with regulatory agency would impeach his testimony only via the forbidden inference that compromise proves consciousness of liability); Anderson v. Thompson, 2008 UT App 3, 176 P.3d 464, 473 (Utah Ct. App. 2008) (barring use to impeach based on F.R.E.2d 408 and minority view).

61

**Unnecessary**

There would be no need to adhere to this distinction if the existence of compromise negotiations had already been disclosed to the jury for some other purpose permitted by rule 408.

Simmons v. Small, Ky.App.1998, 986 S.W.2d 452, 455 (since wife's deposition testimony that she was unaware of any damage payments to her husband was a collateral matter, Rule 408 bars use of her signing of settlement check to impeach her).

62

**"Spoliation"**

See generally vol. 22, § 5178.

Lewis v. Alfa Laval Separation, Inc., 1998, 714 N.E.2d 426, 432, 128 Ohio App.3d 200 (admissible to show why recipient of settlement largesse interfered with plaintiff's efforts to prove case).

**Compare**

Millenkamp v. Davisco Foods Intern., Inc., 562 F.3d 971, 980 (9th Cir. 2009) (threat to use scorched earth tactics if defendant did not settle not relevant and should have been excluded under Rule 403).

63

**"Criminal investigation"**

See § 5313.

64

**Conceal or destroy**

Rule 408 would not prevent the plaintiff from showing that the evidence was destroyed, but this will do him little good if he cannot show that it was done at the defendant's behest.

Court assumes that Mary Carter agreement would be admissible under Rule 408 in Soria v. Sierra Pacific Airlines, Inc., 1986, 726 P.2d 706, 717, 111 Idaho 594.

There is an exception to rule excluding evidence of settlement for "Mary Carter" agreements; i.e., agreements where party to the settlement continues in case as a pretended adversary while in fact having an interest in the putative adversary's victory. Turner v. Monsanto Co., Tex.App.1986, 717 S.W.2d 378, 380 (but finding agreement at issue did not qualify).

Rule 408 does not bar revealing to jury that directed verdict on plaintiff's claim against one defendant was pursuant to a settlement in which that defendant had an interest in the plaintiff's recovery from remaining defendant. Sampson v. Karpinski, 1986, 515 A.2d 1066, 1069, 147 Vt. 315.

64.1

**Secret settlements**

Christensen, Federal Judges Order Study of Secrecy in Settlements, Miami Daily Business Review, Sept. 19, 2002 (online); Liptak, Abuse Victims Sue to Void Secrecy Provisions of Settlements With Church, New York Times, June 7, 2002 (online) (class action by abused persons seeks to strike secrecy provisions in settlements as against public policy); Liptak, South Carolina Judges Seek to Ban Secret Settlements, New York Times, Sept. 2, 2002 (online); McDonald, Media Petition For Release of Firestone Files, Fulton County Daily Report, Nov. 22, 2000 (online); Dolan, State Judicial Panel Limits Secrecy in Law Suits, Los Angeles Times, Oct. 28, 2000 (online) (California Judicial Council adopts rule regulating practice that would bar sealing records merely because both parties agree to it); Maharaj, Tire Recall Fuels Drive to Bar Secret Settlements, Los Angeles Times, Sept. 10, 2000 (online).

**See also**

Comment, Can You Keep A Secret?; Discoverability and Admissibility of Confidential Settlement Agreement Amounts in Ohio, 52 Case W.Res.L.Rev. 833 (2002).

Goldfarb, SEC May Require More Details of Wrongdoing to be Disclosed in Settlements, Washington Post, April 1, 2010, p. A11 (agency thinking of disclosing results of its investigations of corporate wrongdoing where company settles rather than going to trial).

65

**Intended to exclude**

Case 2:13-cv-00278-ABJ   Document 143   Filed 10/30/15   Page 240 of 242

§ 5314Permissible Uses—Other, 23 Fed. Prac. & Proc. Evid. § 5314 (1st ed.)

Unless, of course, the agreement involved testimony the other plaintiff was to give; presumably the agreement would then be admissible to show "bias or prejudice." See § 5311.

66

**"Valuable consideration"**

See § 5305.

67

**That reason**

Alternatively, it can be argued that the evidence is admissible because it proves the invalidity of the defense not by an inference from the defendant's desire to settle the related case but as an inference from his desire to spoliate the present case.

Trial court properly admitted statement of cab company official on arriving on the scene of accident involving cab that he would give the other driver money "to forget about the incident." Frias v. Valle, 1985, 698 P.2d 875, 877, 101 Nev. 219 (apparently assuming Rule 408 did not apply).

67.1

**Other rules permit**

Lively v. Rufus, 2000, 533 S.E.2d 662, 673, 207 W.Va. 436 (assuming that if expert relied on settlement evidence in forming opinion, Rule 705 would make it admissible on cross-examination).

68

**Preliminary fact**

See vol. 21, § 5055.

In determining trustworthiness of hearsay, the court can consider that party compromised a claim in reliance thereon despite Rule 408 as that rule does not apply to preliminary fact determinations under Rule 104. In re Japanese Electronic Products Antitrust Litigation, C.A.3d, 1983, 723 F.2d 238, 275, decision reversed on other grounds 1986, 106 S.Ct. 1348, 475 U.S. 574, 89 L.Ed.2d 538.

69

**Out of context**

See vol. 21, § 5078.

69.50

**Class certification**

Sobel v. Hertz Corp., 291 F.R.D. 525, 541 n.23 (D. Nev. 2013).

70

**Erie doctrine**

See § 5315.

71

**Admissible in criminal**

U.S. v. Prewitt, C.A.7th, 1994, 34 F.3d 436, 439 (attempt to negotiate with state regulators).

For more sophisticated analysis, see § 5306, note 88 & § 5308, note 76.1, this supplement.

**But see**

U.S. v. Levinson, 504 Fed. Appx. 824, 828 (11th Cir. 2013) (court has held applies in both civil and criminal cases); U.S. v. Roti, C.A.7th, 2007, 484 F.3d 934, 935 (declining to apply Prewitt, above, where defendant did not invoke decision in trial court and reversal by Rule 408 2d shows failure to apply the decision would not affect the fairness or integrity of judicial proceedings so as to constitute plain error); U.S. v. Logan, 250 F.3d 350, 367 (6th Cir. 2001) (because public interest in punishing crime outweighs policy of encouraging settlement of criminal cases; collecting cases); Crimm v. State, Miss.App. 2004, 888 So.2d 1178, 1185 (treating manager's offer to pay back embezzlement loss because it happened on his watch as an attempt settle criminal case and inadmissible under Rule 408; but court could have reached same result by treating it as an offer to settle manager's civil liability that was irrelevant in the criminal case because by hypothesis it does not depend on his guilt of the criminal charge); Armstead v. State, 805 So. 2d 592, 597 (Miss. Ct. App. 2001) (crime victim cannot "settle" a criminal prosecution despite her de facto power to do so by refusing to testify; hence, her attempt to extort money from defendant does not fall within Rule 408); State v. Mead, 2001 UT 58, 27 P.3d 1115, 1127 (Utah 2001) (after examining conflicting federal cases, sides with those holding that civil settlement is admissible in criminal case despite Rule 408).

**Compare**

Arnold v. Wilder, 657 F.3d 353, 367 (6th Cir. 2011) (evidence that defendant participated in an attempt to coerce plaintiff to sign a release to get criminal charges dismissed admissible in suit for malicious prosecution).

Buric v. Kelly, C.A.2d, 2005, 157 Fed.Appx. 391, 393 (settlement of arrest for impersonating a police officer not admissible in suit for wrongful discharge arising from that incident).

Case 2:13-cv-00278-ABJ   Document 143   Filed 10/30/15   Page 241 of 242

§ 5314Permissible Uses—Other, 23 Fed. Prac. & Proc. Evid. § 5314 (1st ed.)

72

**State statutes**

See, e.g., RCW &.70.080:

> "Any party may present evidence to the trier of fact that the plaintiff has already
> been compensated for the injury complained of from any source except the assets
> of the plaintiff, the plaintiff's representative, or the plaintiff's immediate family.
> In the event such evidence is admitted, the plaintiff may present evidence of an
> obligation to repay such compensation and evidence of any amount paid by the
> plaintiff, or his or her representative or immediate family, to secure the right to
> the compensation. Compensation as used in this section shall mean payment of
> money or other property to or on behalf of the plaintiff, rendering of services
> to the plaintiff free of charge to the plaintiff, or indemnification of expenses
> incurred by or on behalf of the plaintiff. Notwithstanding this section, evidence
> of compensation by a defendant health care provider may be offered only by that
> provider."

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

1   Re: *Interstate Fire & Casualty Co., v. Apartment Management Consultants*
    Case No. 13-CV-278

2                        **CERTIFICATE OF SERVICE**

3          **I hereby certify that on October 30, 2015, I electronically filed the foregoing
    document entitled  APARTMENT MANAGEMENT CONSULTANTS LLC'S AND**

4   **SUNRIDGE PARTNERS LLC'S OPPOSITION TO INTERSTATE'S AND
    FFIC'S MOTION FOR SUMMARY JUDGMENT  with the United States District**

5   **Court, District of Wyoming. Notice will be automatically e-mailed to the following
    individuals registered with the Court's CM/ECF System:**

6

7   Robert Tiedeken, Esq.
    WOLF TIEDEKEN & WOODARD, P.C.

8   401 W. 19th Street, Suite 300
    P.O. Box 491

9   Cheyenne, WY  82003

10

11  Corinne E. Rutledge, Esq.
    J. Kent Rutledge, Esq.

12  Erin A. Barkley, Esq.
    LATHROP & RUTLEDGE, P.C.

13  1920 Thomes, Suite 500
    P. O. Box 4068

14  Cheyenne, WY  82003-4068

15

16  Shawn Hanson, Esq.
    Danielle Crockett, Esq.

17  AKIN GUMP STRAUSS HAUER & FELD
    580 California Street, Suite 1500

18  San Francisco, CA  94104

19

20  G. Bryan Ulmer, Esq.
    Tyson E. Logan, Esq.
    THE SPENCE LAW FIRM, LLC

21  15 S. Jackson Street

22  P.O. Box 548
    Jackson, WY  83001

23

24          I declare that I am employed in the office of a member of the bar of this court at whose
    direction the service was made.

25  Executed on **October 30, 2015,** at Claremont, California.

26
                    _____/s/ Debbie Hunter_____

27                  DEBBIE HUNTER

28