Corinne E. Rutledge, #5-2480
J. Kent Rutledge, #5-1392
Erin Arnold Barkley, #6-4216
LATHROP & RUTLEDGE, P.C.
1920 Thomes Avenue, Suite 500
P.O. Box 4068
Cheyenne, Wyoming 82003-4068
Tel: (307) 632-0554
Fax: (307) 635-4502
Email:  crutledge@lr-law.org
        krutledge@lr-law.org
        ebarkley@lr-law.org

Shawn Hanson, *admitted pro hac vice*
Ashley Vinson Crawford, *admitted pro hac vice*
Danielle Crockett Ginty, *admitted pro hac vice*
AKIN GUMP STRAUSS HAUER & FELD LLP
580 California Street, Suite 1500
San Francisco, CA  94104
Tel:  (415) 765-9500
Fax:  (415) 765-9501
Email:  shanson@akingump.com
        avcrawford@akingump.com
        dginty@akingump.com

Attorneys for Plaintiffs INTERSTATE FIRE &
CASUALTY COMPANY and
FIREMAN'S FUND INSURANCE COMPANY

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| **INTERSTATE FIRE & CASUALTY COMPANY, AND FIREMAN'S FUND INSURANCE COMPANY,**<br><br>       **Plaintiffs,**<br><br>**v.**<br><br>**APARTMENT MANAGEMENT CONSULTANTS, LLC, SUNRIDGE PARTNERS, LLC, and AMBER NICOLE LOMPE,**<br><br>       **Defendants.** | **Case No.  2:13-CV-00278-ABJ** |

**INTERSTATE FIRE & CASUALTY CO. AND FIREMAN'S FUND INSURANCE CO.'S OPPOSITION TO APARTMENT MANAGEMENT CONSULTANT AND SUNRIDGE PARTNERS' MOTION FOR PARTIAL SUMMARY JUDGMENT #2 REGARDING ATTORNEYS' FEES AND INTEREST**

## TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................................1

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................................1

    A.    The Insurance Polices Exclude Coverage for Punitive Damages. ...........................1

    B.    Interstate Provided AMC and Sunridge a Defense Under the Primary
        Policy. ..................................................................................................................3

III.    ARGUMENT .................................................................................................................5

    A.    Interstate and Fireman's Fund Denial of Coverage for the Punitive
        Damage Awards Was Not Unreasonable or Without Cause. ..................................5

        1.    Coverage for punitive damages was fairly debatable. ................................6

        2.    The delayed reservation of rights does not support a finding that
            Interstate and Fireman's Fund denied coverage for the punitive
            damage awards unreasonably or without cause. .........................................9

        3.    Interstate and Fireman's Fund Were Not Required to Post a Bond
            for the Punitive damage awards. ...............................................................10

    B.    The Attorneys' Fee Statute Does Not Apply Here. ...............................................13

    C.    Sunridge and AMC Cannot Obtain Summary Adjudication of an Un-
        pleaded Claim. ....................................................................................................15

IV.    CONCLUSION............................................................................................................19

# TABLE OF AUTHORITIES

## Cases

*Bruegger v. Nat'l Old Line Ins. Co.,* 387 F.Supp. 1177 (D. Wyo. 1975) ...................................... 6

*Cansler v. Harrington*, 643 P.2d 110 (Kan. 1982) ...................................................................... 11

*Claman v. Popp*, 279 P.3d 1003 (Wyo. 2012) ............................................................................. 12

*Cornhusker Cas. Co. v. Skaj,* 786 F.3d 842 (10th Cir. 2015) .................................................. passim

*Crawford v. Infinity Ins. Co.,* 139 F.Supp. 2d 1226 (D. Wyo. 2001) ................................... 14, 15

*Farmers Ins. Exch. v. Henderson*, 313 P.2d 404 (Ariz 1957)...................................................... 11

*Fisher v. Metropolitan Life Ins. Co.*, 895 F.2d 1073 (5th Cir. 1990) .......................................... 17

*Fitzgerald v. Addison*, 287 So.2d 151 (Fla. App. 1973) ............................................................. 11

*Fletcher v. Ratcliffe*, 1995 Del. Super. LEXIS 560, *5, 1995 WL 790992 (Del. Super. Ct. Dec. 7, 1995) ................................................................................................................................... 11, 13

*FPI Dev., Inc. v. Nakashima*, 282 Cal. Rptr. 508 (Cal. Ct. App. 1991) ...................................... 17

*Green Country Food Market, Inc. v. Bottling Group, LLC,* 371 F.3d 1275 (10th Cir. 2004)...... 17

*Herrig v. Herrig,* 844 P.2d 487 (Wyo. 1992) ............................................................................. 15

*Johnson v. Life Investors Ins. Co. of Am.*, 2000 U.S. App. LEXIS 15049, *25, Nos. 98-4120, 98-4121, 98-4122 (10th Cir. July 11, 2000)..................................................................................... 14

*Marten v. Yellow Freight Sys. Inc.*, 993 F. Supp. 822 (D. Kan. 1998) ........................................ 17

*Martinez v. Potter*, 347 F.3d 1208 (10th Cir. 2003) ................................................................... 18

*Meritxell, Ltd. v. Saliva Diagnostic Sys.*, 1998 WL 40149, *32 No. 96-cv-2759 (AJP) (JFK) (S.D.N.Y. Feb. 2, 1998)................................................................................................................ 14

*Merritt v. J A. Stafford Co.*, 440 P.2d 927 (Cal. 1968) ............................................................... 11

*Moncrief v. Williston Basin Interstate Pipeline Co.,* 174 F.3d 1150 n.7 (10th Cir. 1999) ........... 18

*O'Donnell v. McGann*, 529 A.2d 372 (Md. 1987)...................................................................... 11

*Snyder v. Minneapolis*, 441 N.W.2d 781 (Minn. 1989)............................................................. 14

*St. Paul Fire & Marine Ins. Co. v. Nolen Group, Inc.*, 2007 U.S. Dist. LEXIS 88025, *13, 2007

WL 4245740 (E.D. Pa. Nov. 30, 2007) .................................................................. 13

*State Farm Mut. Auto. Ins. Co. v. Hollis*, 554 So. 2d 387 (Ala. 1989) ......................................... 11

*State Surety Co. v. Lamb Construction Co.,* 625 P.2d 184 (Wyo. 1981) ....................................... 6

*Stewart Title Guar. Co. v. Tilden,* 110 P.3d 865 (Wyo. 2005) ..................................................... 15

*Todd v. Kelly*, 837 P.2d 381 (Kan. 1992) ..................................................................................... 11

*United Fire & Cas. Co. v. Shelly Funeral Home, Inc.* 642 N.W.2d 648 (Iowa 2002) .......... 11, 12

W.S. § 26-15-101(a) ....................................................................................................................... 14

## Statutes

Wyoming Statute § 26-15-124(c) ......................................................................................... passim

## Rules

F.R.C.P. Rule 15(b) ......................................................................................................................... 18

I.      **INTRODUCTION**

AMC and Sunridge seek to recover attorneys' fees under a statute that does not apply and for a claim that they have neither pleaded nor proven. AMC and Sunridge base their claim for fees on Wyoming Statute section 26-15-124(c), which gives the court discretion to award attorneys' fees for an insurer's unreasonable refusal to pay a judgment covered by an insurance policy. Summary judgment should be denied for the following reasons.

First, AMC and Sunridge cannot prove that Interstate and Fireman's Fund's denial of coverage for the punitive damage awards was unreasonable or without cause. To the contrary, in light of the policies' unambiguous exclusion of punitive damages and the lack of Wyoming precedent applying equitable estoppel where an insurer fails to reserve its rights, Interstate and Fireman's Fund's denial of the punitive damage awards was reasonable.

Second, Wyoming Statute section 26-15-124(c) does not apply to this case. The statute only applies where the insurer is "obligated by a liability insurance policy" to pay a judgment "covered by the policy." It is undisputed that Interstate and Fireman's Fund denied coverage for the punitive damage awards because the policies unambiguously exclude coverage for punitive damages. Moreover, regardless of whether punitive damages were covered by the policies, the statute only applies to insurance policies issued or delivered in Wyoming, and the policies at issue here were neither issued nor delivered in Wyoming.

Finally, AMC and Sunridge failed to plead a claim for relief under the statute in their Counterclaim. Because a party cannot move for summary judgment on a claim they have not pleaded, summary judgment is not permitted.

II.     **STATEMENT OF UNDISPUTED MATERIAL FACTS**

       A.      **The Insurance Polices Exclude Coverage for Punitive Damages.**

       1.      Since 2007, Sunridge has owned, and AMC has managed, the Sunridge Apartments. Joint Pretrial Mem. (Docket No. 106), Uncontroverted Fact ("UF") 1.

       2.      From March 31, 2010 to March 31, 2011, AMC and Sunridge were insured for the Sunridge Apartments under three general liability policies: (1) an Interstate primary policy

1

with a per occurrence limit of $1 million (the "Primary Policy"); (2) an Interstate excess policy with a $10 million per occurrence limit in excess of the $1 million Primary Policy; and (3) a Fireman's Fund excess policy with a $15 million per occurrence limit in excess of the $1 million Primary Policy and the $10 million Interstate Excess Policy (the "Insurance Policies").  UF 4, 5.

3.      The Primary Policy provides, "We will pay those sums that the insured becomes legally obligated to pay as damages . . . No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments-Coverages A and B." Ex. 1 at JX032-006.[1]  The Supplementary Payments- Coverages A and B section provides, in relevant part, "We will pay, with respect to any claim we investigate or settle, or any 'suit' against an insured we defend. . . . The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance.  We do not have to furnish these bonds."  *Id.* at JX032-011.

4.      Under an endorsement entitled "EXCLUSION – PUNITIVE OR EXEMPLARY DAMAGES" the Primary Policy includes the following exclusion:  "This insurance does not apply to fines, penalties, punitive damages, exemplary damages, treble damages or the multiplication of compensatory damages."  UF 10; Ex. 1 at JX032-062.

5.      The excess policies "follow form" such that the policies cover claims covered under the Primary Policy and the exclusions contained in the Primary Policy apply to the excess policies.  UF 11; Ex. 2 at JX152-025; Ex. 3 at JX153-028.

6.      Interstate and Fireman's Fund issued the Insurance Policies to the Commercial Industrial Building Owner's Alliance, Inc. ("CIBA"), a commercial real estate insurance program that offers insurance to commercial real estate property owners and managers.  UF 6.

7.      Interstate is an Illinois company with its principle place of business in Illinois. Docket No. 26 (Am. Counterclaim), ¶ 8.

---

[1] All exhibits referenced herein are attached to the Declaration of Danielle Crockett Ginty submitted with this Motion.

8.      Fireman's Fund is a California company with its principle place of business in California.  *Id.*, ¶ 7.

9.      CIBA is a California company with its principle place of business in California. Exs. 4, 5.

10.     AMC and Sunridge are Utah companies with their principle places of business in Utah.  Docket No. 26 (Am. Counterclaim), ¶¶ 5, 6.

11.     CIBA issued certificates of liability insurance for each of the Insurance Policies to AMC and Sunridge for the policy period of March 31, 2010 to March 31, 2011.  UF 7.  The Certificate of Insurance identifies CIBA as the producer and lists CIBA's California address.  Ex. 4.  The Certificate identifies "Sunridge c/o AMC, LLC" as the named insured and lists AMC's Utah address.  *Id.*

**B.      Interstate Provided AMC and Sunridge a Defense Under the Primary Policy.**

12.     On February 1, 2011, Amber Lompe, a tenant at the Sunridge Apartments, suffered carbon monoxide poisoning inside her apartment.  UF 15.

13.     On June 20, 2011, Sunridge notified CIBA of Ms. Lompe's claim.  UF 20.  Two days later, CAG informed AMC and Sunridge that it would handle the claim.  UF 21.

14.     On May 2, 2012, Ms. Lompe sued AMC and Sunridge, seeking punitive and other damages as a result of the carbon monoxide poisoning (the "Lompe action").  Ex. 6.

15.     Shortly after Ms. Lompe filed her complaint, CIBA agreed to provide a defense to AMC and Sunridge under the Primary Policy.  Ex. 7; UF 25, 26.

16.     CAG retained Peter Dusbabek of Montgomery, Kolodny, Amatuzio & Dusbabek to defend AMC and Sunridge.  UF 23, 28.

17.     On May 21, 2012, Mr. Dusbabek wrote to AMC and Sunridge, stating his basic understanding of Ms. Lompe's allegations and the available insurance:

> The insurance information we have for Sunridge indicates that there is a $1 Million per occurrence primary liability limit with $75 million in excess liability . . . These limits are far in excess of any anticipated damage in this case.  Whether the damage claim presents an exposure that would exceed the primary $1 million

> limit is unknown, however, any excess carrier whose policy may come into play should be placed on notice of the claim immediately.  Notably, the complaint contains a punitive damage claim.  **We do not view this as a punitive damage case, but liability policies generally do not cover punitive damages.**

Ex. 8 (emphasis added); UF 29.

18.    In November and October of 2013, Mr. Dusbabek and Mr. Baker communicated to Ms. Knudson that punitive damages were not covered by the Insurance Policies.  See Exs. 6, 15, and 30 filed in support of Interstate's Motion for Summary Judgment on Bad Faith (Docket Nos. 141-9, 141-18, 141-19, 141-34).

19.    On October 24, 2013, Ms. Knudson wrote to Mr. Baker on behalf of AMC and Sunridge, stating, "While we appreciate and understand our defense counsel's opinion and assessment of Ms. Lompe's credibility and the liability issues in this matter, it is AMC and Sunridge that are the ones at risk for a punitive damage and an excess judgment in this case. . . . [I]t is our position that the only reasonable course of action is for this case to be settled." Ex. 9.

20.    On November 20, 2013, CAG sent AMC and Sunridge a letter stating again what Mr. Baker has told them previously – that the Interstate policy did not cover punitive damages. Ex. 10.  CAG noted that it would continue to provide a full and complete defense, but an award of punitive damages would be the insureds' responsibility, and AMC and Sunridge may wish to hire an attorney to represent them with respect to the punitive damage allegations.  *Id.*  CAG's delay in sending the November 20, 2013 letter was the result of an oversight. Ex. 11 at 94:6-96:18.

21.    Ms. Knudson responded on behalf of AMC and Sunridge the following day, stating, "We are aware of the exclusion for punitive damages under the policy" and demanded that CAG "place policy limits on the table and settle the matter." Ex. 12.

22.    The case proceeded to a jury trial on December 2, 2013.  UF 39.

23.    On December 19, 2013, the jury returned a $3 million verdict in Ms. Lompe's favor and apportioned fault as follows:  65% AMC, 25% Sunridge, and 10% Lompe.  Ex. 13. The jury also found that AMC and Sunridge had engaged in "willful and wanton misconduct."

*Id.*

24.     On December 20, 2013, the jury awarded Ms. Lompe $22.5 million in punitive damages against AMC and $3 million in punitive damages against Sunridge.  Ex. 13.

25.     After the Court entered judgment on December 20, 2013, Interstate immediately agreed to obtain a bond to stay execution of the compensatory awards, and provided the bond to AMC and Sunridge on or around February 4, 2014.  Ex. 14; Ex. 15.  On December 30, 2013, Interstate informed AMC and Sunridge that it would not obtain a bond for the punitive awards because its policies did not cover punitive damages.  Ex. 16.

26.     AMC and Sunridge appealed the Court's rulings with respect to the punitive damage awards, but did not appeal the compensatory damage awards.  Ex. 17.  Interstate continues to defend AMC and Sunridge during the appeal.  UF 26.  In May 2015, Interstate paid Ms. Lompe the compensatory awards.  Ex. 18.

27.     Immediately following the verdict in the Lompe action, on December 24, 2013, Interstate and Fireman's Fund filed this action seeking a declaration that they were not required to indemnify AMC and Sunridge for the punitive damage awards.  Dkt. No. 1.

28.     On March 3, 2014, AMC and Sunridge filed their Amended Answer and Counterclaim.  AMC and Sunridge did not assert a claim against Interstate and Fireman's Fund for violation of Wyoming Statute section 26-15-124.  Dkt. No. 26.

29.     On September 1, 2015, the Court entered an order granting AMC and Sunridge's Motion for Partial Summary Judgment and finding that Interstate and Fireman's Fund were estopped from relying on the punitive damages exclusion in the Insurance Policies to deny indemnity for the punitive damage awards in the Lompe action.  Dkt. No. 131.

III.     **ARGUMENT**

   A.     **Interstate and Fireman's Fund Denial of Coverage for the Punitive Damage Awards Was Not Unreasonable or Without Cause.**

AMC and Sunridge's Motion should be denied because Interstate and Fireman's Fund's denial of coverage for the punitive damage awards in the Lompe action (and in turn their

5

decision not to post a supersedeas bond for those awards) was not unreasonable or without cause.

    1.    Coverage for punitive damages was fairly debatable.

Wyoming Statute section 26-15-124(c) provides that if an insurer is obligated but fails to pay a judgment on behalf of a named insured, attorneys' fees may be awarded if (and only if) the refusal to pay was unreasonable or without cause.  W.S. § 26-15-124(c).  "It is well-settled Wyoming law that '[t]he policy behind [the attorneys' fees statute] is not to penalize insurance companies,' but, rather, to 'chill any tendencies upon the part of insurance companies to unreasonably reject claims.'"  *Cornhusker Cas. Co. v. Skaj,* 786 F.3d 842, 865 (10th Cir. 2015).

In evaluating whether an insurer's refusal to indemnify an insured for a third party claimant's judgment is unreasonable or without cause under the statute, courts look to Wyoming's bad faith standard for guidance.  *Cornhusker, supra,* 786 F.3d at 865.  In determining whether to award attorneys' fees under the statute, the question is whether "a reasonable and prudent man would have refused to pay the claim."  *See State Surety Co. v. Lamb Construction Co.,* 625 P.2d 184, 189-191 (Wyo. 1981).  The focus is therefore "whether or not the validity of the denied claim was fairly debatable" such that "a reasonable insurer would have denied or delayed payment of benefits under the facts and circumstances."  *Cornhusker, supra,* 786 F.3d at 858.  The "'fairly debatable' standard 'is not the same as asking whether there actually was coverage under the policy,'" and therefore "under Wyoming law, 'it is not necessarily an act of bad faith for an insurer to deny… payment of benefits where the underlying incident objectively may be seen as being covered by a policy exclusion, particularly where there is not controlling authority within the jurisdiction.'"  *Id.; see also Bruegger v. Nat'l Old Line Ins. Co.,* 387 F.Supp. 1177, 1184 (D. Wyo. 1975) (finding plaintiff was entitled to coverage but that the insurer's refusal to pay benefits did not appear to be "unreasonable or without cause or that it was made other than in good faith" in light of the fact that the case presented "issues not heretofore decided in this jurisdiction.").  Under this standard, AMC and Sunridge must establish "(1) the absence of any reasonable basis for denying the claim and (2) [the insurer's] knowledge or reckless disregard of the lack of a reasonable basis for denying the claim."  *Id.*

The Tenth Circuit's decision in *Cornhusker Cas. Co. v. Skaj,* 786 F.3d 842 (10th Cir. 2015), is directly on point. There, the insured's employee was involved in an automobile accident. The insurer initially agreed to defend the employee, but then did not appear or otherwise provide a defense. *Id.* at 847-48. Following entry of default judgment against the employee, the insurer refused to pay the judgment based on, among other things, its contention that the employee was not covered by the policy. *Id.* at 848. The insurer brought an action for declaratory relief against the employee and the accident victim seeking a declaration that it did not have a duty to indemnify the employee for the default judgment. *Id.* at 849. The accident victim brought a counterclaim for payment of the underlying judgment and attorneys' fees, and the employee brought various counterclaims, including one for bad faith. *Id.*

In assessing the insureds' claim that the insurer unreasonably denied coverage, the Court found that the insured failed to establish the first element of its substantive bad faith claim because the insurer had a reasonable basis for denying coverage based on the uncertainty as to whether the Wyoming Supreme Court would employ estoppel to prohibit the insurer from relying on a policy exclusion to deny coverage. *Id.* The Court reasoned that this question presented a "significant potential for disagreement regarding the propriety of an insurer's denial of coverage" and, as a result, found that the insurer did not act in bad faith when it denied coverage. *Id.*

In addressing the accident victim's claim for attorneys' fees pursuant to section 26-15-124(c), the court found no error in the lower court's ruling, which "grounded its denial of attorneys' fees here on its conclusions that (1) [the insurer's] denial of coverage was reasonable and fairly debatable, and (2) [the insurer's] conduct did not rise to the level of bad faith." *Id.* at 862. In so holding, the *Cornhusker* court stated that the lower court correctly looked to Wyoming's bad faith standard for guidance in addressing the statutory attorneys' fees claim. *Id.* at 865. The Court concluded that attorneys' fees were not warranted under section 26-15-124(c) because the insurer had a reasonable basis for rejecting coverage given the uncertainty of Wyoming law on the estoppel issue.

Likewise, here, AMC and Sunridge cannot establish that Interstate and Fireman's Fund's denial of coverage for the punitive damage awards was unreasonable or without cause.  To the contrary, Interstate and Fireman's Fund's denial of coverage for the punitive damage awards was entirely reasonable because punitive damages are excluded by the clear, unambiguous language of the policy.  As in *Cornhusker,* Interstate and Fireman's Fund were entitled to reasonably pursue their argument that the punitive damages exclusion applied and deny coverage for the punitive damage awards because the awards "objectively may be seen as being covered by a policy exclusion[.]"  *See Cornhusker, supra,* 786 F.3d at 858.  Given the lack of Wyoming precedent applying estoppel principles to the failure to timely issue a reservation of rights, Interstate and Fireman's Fund reasonably denied coverage for punitive damages with the understanding that the Wyoming Supreme Court would not employ estoppel to prohibit the insurers from relying on the punitive damage exclusion.  Ex. 16.  Pursuant to *Cornhusker,* Interstate and Fireman's Fund's denial of coverage for punitive damages under these facts was reasonable as a matter of law.

AMC and Sunridge's attempts to distinguish *Cornhusker* are unavailing.  Contrary to their argument, the fact that the parties seeking attorneys' fees in *Cornhusker* were third-party claimants had no bearing on the court's ruling.  Rather, as previously explained, the *Cornhusker* court found that the insurer's actions in denying coverage to its insured were "eminently reasonable" and upheld the lower court's ruling denying attorneys' fees under section 26-15-124(c) because coverage was "fairly debatable" given unsettled Wyoming law.  Whether an insurer's denial of a claim is "unreasonable or without cause" is the test to be applied regardless of whether the party seeking fees is an insured or a third party claimant.  *Cornhusker*, 786 F.3d at 865.  Although AMC and Sunridge claim (without citation to any authority) that as insureds they "are entitled to much broader protections," they fail to explain exactly what those protections are or how they could be applied here to reach a different result.  *See* Motion at 13.

AMC and Sunridge further attempt to distinguish *Cornhusker* by comparing Interstate's claims handling practices with those of Cornhusker.  But the Tenth Circuit in *Cornhusker* did not

base its decision to deny attorneys' fees on the insurer's actions in defending (or failing to defend) the insured in the underlying case. Instead, the Court analyzed whether the insurer's denial of coverage after entry of judgment against the insured was unreasonable or without cause under Wyoming bad faith principles. 786 F.3d at 862, 865. Similarly, here, the key question is whether Interstate and Fireman's Fund acted reasonably in denying coverage for the punitive damage awards following the judgment.

Moreover, even if pre-judgment claims handling were relevant to the question of attorneys' fees, Interstate's conduct in handling the Lompe claim was eminently more reasonable than the insurer's conduct in *Cornhusker*. In *Cornhusker*, the insurer informed the insured's employee that it would defend him against the plaintiff's claims, did nothing to provide such a defense, and then waited until after default judgment was entered to inform the employee that he was not covered under the policy. 786 F.3d at 847-48. In contrast, here, Interstate provided AMC and Sunridge a full and complete defense through trial (and continuing through the appeal), and reminded AMC and Sunridge that punitive damages were not covered before the trial began. Ex. 10. As in *Cornhusker*, because Interstate and Fireman's Fund reasonably denied coverage for punitive damages, attorneys' fees are not warranted.

     2.     The delayed reservation of rights does not support a finding that Interstate and Fireman's Fund denied coverage for the punitive damage awards unreasonably or without cause.

AMC and Sunridge repeatedly cite Interstate's alleged "obligation . . . to issue a reservation of rights within 45 days of the tender of the *Lompe* Action" as misconduct warranting attorneys' fees. Motion at 1, 11, 14. AMC and Sunridge's focus on Interstate's conduct in reserving its right to deny coverage for punitive damages is misplaced. The relevant question under section 26-15-124(c) is whether Interstate denied coverage for the punitive damage claim unreasonably or without cause. Whether Interstate properly reserved its rights may be relevant to AMC and Sunridge's claim of procedural bad faith, *see* Motion for Summary Judgment (Docket No. 141) at 28-30, but it has no impact on whether, once a judgment was entered against its insured, Interstate and Fireman's Fund denied coverage unreasonably or without cause. As

demonstrated above, Interstate and Fireman's Fund's denial of coverage for the punitive damage awards was entirely reasonable given the punitive damage exclusion and their reasonable, good faith belief that the Wyoming courts would not apply estoppel principles to prohibit them from relying on the exclusion.

Moreover, even if the "45-day statute" upon which AMC and Sunridge rely were relevant to attorneys' fees, Interstate and Fireman's Fund fully complied with the statute.[2] The statute provides, "Claims for benefits under a property or casualty insurance policy shall be rejected or accepted and paid by the insurer or its agent designated to receive those claims within forty-five (45) days after receipt of the claim and supporting bills." The statute does not address when or how insurers are required to raise potential coverage defenses. Consistent with the statute, Interstate properly accepted defense of the claim within 45 days of being notified of Lompe's complaint. Interstate and Fireman's Fund's duty to indemnify AMC and Sunridge did not arise until judgment was entered and the insureds actually suffered a loss under the policies for which they could seek indemnification. Accordingly, Interstate and Fireman's Fund promptly and properly agreed to pay the $2.7 million compensatory award immediately upon entry of the judgment and rejected AMC and Sunridge's claim for indemnification of the punitive damage claim well within 45 days of the judgment. Ex. 14; Ex. 16.

3.     Interstate and Fireman's Fund Were Not Required to Post a Bond for the Punitive damage awards.

Finally, AMC and Sunridge's argument that they are entitled to attorneys' fees because Interstate and Fireman's Fund failed to provide a bond to stay execution of the punitive damage awards pending appeal is likewise wrong. An insurer's duty to post an appeal bond depends on the language of its policy, and unless a policy provides otherwise, an insurer is not required to

---

[2] AMC and Sunridge incorrectly suggest that Interstate and Fireman's Fund's bad faith expert, Ray Johnson, agreed that the 45-day statute required Interstate and Fireman's Fund to issue a reservation of rights within 45 days of receipt of Ms. Lompe's complaint. Motion at 11. However, Mr. Johnson plainly testified that Interstate and Fireman's Fund complied with the statute by accepting defense of the Lompe claim within 45 days of the complaint and making its coverage decision within 45 days of the judgment. Ex. 20 at 98:2-101:8; Ex. 19 at JX127-016.

post a supersedeas bond on behalf of an insured.  *See, e.g., United Fire & Cas. Co. v. Shelly Funeral Home, Inc.* 642 N.W.2d 648, 648 (Iowa 2002) (insurer not required to post bond where coverage is in question and policy did not require posting of a bond); *State Farm Mut. Auto. Ins. Co. v. Hollis*, 554 So. 2d 387, 392 (Ala. 1989) ("The parties agree that there was no contractual duty to file a supersedeas bond."); *Farmers Ins. Exch. v. Henderson*, 313 P.2d 404, 408 (Ariz 1957) ("Under the contract of insurance it was expressly agreed that the company was not obligated to furnish supersedeas.").

Moreover, even where an insurer elects to post a supersedeas bond, it is only required to bond an amount sufficient to cover the amount of its liability under the policy.  *Merritt v. J A. Stafford Co.*, 440 P.2d 927, 931 (Cal. 1968) ("[T]he insurer cannot be required to post a bond for the entire judgment when its liability does not extend to the entire judgment.  Fairness to the insurer and the insured requires that the insurer be permitted to fulfill its covenant of good faith and fair dealing by filing an appeal bond in an amount sufficient to cover the part of the judgment for which it is liable."); *Fletcher v. Ratcliffe*, 1995 Del. Super. LEXIS 560, *5, 1995 WL 790992 (Del. Super. Ct. Dec. 7, 1995) ("The courts which have examined this issue have generally permitted insurers to file supersedeas bonds which are equal to their policy limits, but less than the underlying judgment.  In doing so, these courts have granted partial stays to the extent of the amount of insurance available, while leaving the insured herself subject to execution.") (citations omitted); *Todd v. Kelly*, 837 P.2d 381, 390 (Kan. 1992) (explaining that insurer can file appeal bond up to the amount insurer could be liable under its policy); *Cansler v. Harrington*, 643 P.2d 110, 115 (Kan. 1982) (same); *O'Donnell v. McGann*, 529 A.2d 372, 377 (Md. 1987) (same).  If the rule were otherwise, insurers would be unfairly forced to put funds at risk that may not be contractually owed to their insureds.  *Fitzgerald v. Addison*, 287 So.2d 151, 152 (Fla. App. 1973).

Here, the policies provide, "We will pay those sums that the insured becomes legally obligated to pay as damages . . . No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A

11

and B."  Ex. 1 at JX032-006.  The Supplementary Payments - Coverages A and B section

provides, in relevant part, "We will pay, with respect to any claim we investigate or settle, or any

'suit' against an insured we defend. . . . The cost of bonds to release attachments, but only for

bond amounts within the applicable limit of insurance.  We do not have to furnish these bonds."

*Id.* at JX032-011.

      Although the policies provide that Interstate and Fireman's Fund will pay the "cost of

bonds to release attachments[,]" the policies do not require that Interstate and Fireman's Fund (1)

obtain *appeal* bonds or (2) actually furnish any bond.[3]  The policies' bonding requirements are

limited to paying the *costs of bonds to release attachments*, and the policies expressly provide

that Interstate and Fireman's Fund need not obtain the bonds themselves.  In contrast, under the

Primary Policy's Employer's Liability Coverage, the policies provide for payment of "Premiums

on bonds to release attachments and for appeal bonds in bond amounts up to the limit of our

liability under this coverage."  *Id.* at JX032-026 (emphasis added).  The use of "appeal bonds"

elsewhere in the policy confirms that the policies do not require the posting of appeal bonds here.

"[Wyoming] rules of interpretation require that we interpret a contract as a whole, reading each

provision in light of all the others to find their plain meaning.  [The court] presumes each

provision in a contract has a purpose, and . . . avoid interpreting a contract so as to find

inconsistent provisions or so as to render any provision meaningless."  *Claman v. Popp*, 279 P.3d

1003, 1013 (Wyo. 2012) (citations omitted).

      Courts throughout the country considering similar policy language have consistently held

that such language does not require an insurer to post a supersedeas bond.  *See, e.g., United Fire

& Cas. Co. v. Shelly Funeral Home, Inc.*, 642 N.W.2d 648, 648 n.4 (Iowa 2002) (policy

language stating, "We do not have to furnish these bonds[,]" indicated that insurer was not

required to post a bond); *St. Paul Fire & Marine Ins. Co. v. Nolen Group, Inc.*, 2007 U.S. Dist.

---

     [3]  An appeal bond is a "bond that an appellate court may require from an appellant in a civil case to ensure
payment of the costs of appeal."  Black's Law Dictionary (10th Ed.), p. 211.  An appeal bond is also referred to as a
"supersedeas bond."  *Id.*  In contrast, an attachment bond is a "bond that a defendant gives to recover attached
property."  *Id.*

LEXIS 88025, *13, 2007 WL 4245740 (E.D. Pa. Nov. 30, 2007) (finding that insurer was "under no compulsion to post a bond for the full (or any) amount of the judgment," where policy provided that the insurer would pay the "costs of bonds to release attachments" but did "not have to furnish these bonds."); *Fletcher v. Ratcliffe*, 1995 Del. Super. LEXIS 560, *7, 1995 WL 790992 (Del. Super. Ct. Dec. 7, 1995) ("In addition to our limit of liability, we will pay on behalf of an 'insured:' '3. Premiums on appeal bonds and bonds to release attachments in any suit we defend.' Assuming [the insured] qualifies for and procures a bond in an amount representing the difference between her insurance limits and the full judgment amount, this provision requires Harleysville to pay the premiums of such bond.  This provision does not require Harleysville to become the principle obligor on the bond.").

Thus, Interstate and Fireman's Fund fully complied with their obligations when they immediately agreed to bond the compensatory damage awards, the only portion of the judgment covered under the policies.  Ex. 14; Ex. 15.  Because the policies did not require Interstate and Fireman's Fund to bond any portion of the judgment, let alone the uncovered punitive damage portion of the judgment, Interstate and Fireman's Fund's refusal to post a bond to stay execution of the punitive damage awards was reasonable and does not support a claim for fees under Wyoming law.

### B.    The Attorneys' Fee Statute Does Not Apply Here.

AMC and Sunridge's Motion should be denied for the additional reason that Wyoming Statute section 26-15-124(c) does not apply here.  Section 26-15-124(c) provides that "in any case where an insurer is *obligated by a liability insurance policy* to… pay any judgment on behalf of a named insured, if it is determined that the company refuses to pay the full amount of *a loss covered by the policy* and that the refusal is unreasonable or without cause, any court in which judgment is rendered for a claimant may also award a reasonable sum as an attorney's fee and interest at ten percent (10%) per year."  (emphasis added).  The statute does not apply here for two reasons.

<u>First</u>, the clear language of the statute does not apply on its face because the punitive

<div align="center">13</div>

damage awards were not at any time losses *covered by the policies*.  The policies contain a clear and conspicuous exclusion for punitive damages and thus, are not covered losses.  Ex. 1 at JX032-062; Ex. 2 at JX152-025; Ex. 3 at JX153-028.  Interstate and Fireman's Fund only became obligated to pay the uncovered punitive damage awards due to the Court's ruling that they were estopped from relying on the otherwise valid coverage exclusion.  Docket No. 131. Although estoppel operates to prevent one party to a contract from enforcing the terms of the contract, it does not alter the terms of the contract.  *Johnson v. Life Investors Ins. Co. of Am.*, 2000 U.S. App. LEXIS 15049, *25, Nos. 98-4120, 98-4121, 98-4122 (10th Cir. July 11, 2000) (applying Utah law) ("[E]stoppel does not operate to alter the terms of the contract as originally written.  Rather, estoppel is normally asserted as a defense to a claim or right and does not create an independent cause of action . . . Estoppel merely abates the insurer's right to defend against the insured's claim for breach of contract by relying on the language in its policy.") (citations omitted); *Meritxell, Ltd. v. Saliva Diagnostic Sys.*, 1998 WL 40149, *32 No. 96-cv-2759 (AJP) (JFK) (S.D.N.Y. Feb. 2, 1998) ("It is elementary that [the plaintiff] cannot be permitted to use the doctrine of estoppel to make a new contract or change the terms of the old.") (citations omitted); *Snyder v. Minneapolis*, 441 N.W.2d 781, 790-91 (Minn. 1989) ("The word estoppel 'means simply that someone is 'stopped' from claiming or saying something; usually he is stopped from saying the true facts or claiming a lawful claim.'").

Second, the statute does not apply because the Insurance Policies were not issued or delivered in Wyoming.  Issuance or delivery of the relevant insurance policy in Wyoming is a straightforward and unambiguous prerequisite to recovery under the statute.  *See* W.S. § 26-15-101(a) ("This chapter applies to all insurance contracts . . . except:  (ii) policies or contracts *not issued for delivery in this state nor delivered in this state.*") (emphasis added); *Crawford v. Infinity Ins. Co.,* 139 F.Supp. 2d 1226, 1234 (D. Wyo. 2001) (applying Wyoming law to plaintiff's bad faith claims but holding that section 26-15-124(c) did not apply because the policy at issue was neither issued nor delivered in Wyoming).

Here, Interstate (an Illinois company) and Fireman's Fund (a California company), issued

and delivered the policies to CIBA in California, who in turn issued certificates of insurance to

AMC and Sunridge in Utah.  Docket No. 26 (Am. Counterclaim), ¶¶ 5-8; Ex. 4.  Accordingly,

section 26-15-124(c) does not apply because the relevant policies were neither issued nor

delivered in Wyoming.  *See Crawford, supra,* 139 F.Supp. 2d at 1234.

   For either of the above independent reasons, the Wyoming statute pursuant to which

AMC and Sunridge seek the entry of partial summary judgment does not apply.  Their Motion

should be denied.

   **C.**  **Sunridge and AMC Cannot Obtain Summary Adjudication of an Un-pleaded Claim.**

   AMC and Sunridge improperly seek summary judgment of a claim they never pleaded.

In enacting Wyoming Statute section 26-15-124(c), the Wyoming legislature created a private

cause of action allowing an insured to recover attorneys' fees and prejudgment interest for an

insurer's improper denial of policy benefits.  *Stewart Title Guar. Co. v. Tilden,* 110 P.3d 865,

874 (Wyo. 2005); *Herrig v. Herrig,* 844 P.2d 487, 494 (Wyo. 1992).  To state a cause of action

under the statute, AMC and Sunridge must show that Interstate and Fireman's Fund's denial of

coverage for punitive damages was unreasonable or without cause.  W.S. § 26-15-124(c).

Because this is an independent statutory cause of action – distinct from the tort of bad faith –

requiring separate proof that Interstate and Fireman's Fund's denial of coverage for the punitive

damage awards was unreasonable or without cause, insureds must include a separate count in

their complaints for violation of the statute.  *See, e.g., Cornhusker Cas. Co. v. Skaj,* 786 F.3d

842, 849 (10th Cir. 2015) ("The Skajs filed their own counterclaim, seeking a declaration 'that

Cornhusker [was] required to pay the judgment in the underlying action,' and, given

Cornhusker's refusal to pay the judgment, attorneys' fees pursuant to Wyo. Stat. Ann. § 26-15-

124(c).").  Indeed, Interstate and Fireman's Fund could locate no authority entertaining or

adjudicating an un-pleaded claim under section 26-15-124(c).

AMC and Sunridge failed to plead a claim for violation of section 26-15-124(c) or even mention its potential application in this case prior to filing their Motion.[4]  *See* Docket No. 26. Rather, they assert claims for: (1) bad faith refusal to settle the Lompe action within policy limits and refusal to indemnify the punitive damage awards in the Lompe action; (2) breach of contract for failure to settle within policy limits; and (3) a declaration that the policies cover the punitive damage awards.  *Id.*  Their breach of contract claim does not mention any unreasonable failure to pay the punitive damage awards under section 26-15-124.  *Id.*  This is an entirely new legal theory based on a statutory cause of action distinct from their currently asserted causes of action.

Although a plaintiff need not have "every legal theory or fact developed in detail before a complaint is filed," a defendant is entitled to "fair notice" of the plaintiff's claims. *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1091 (10th Cir. 1991).  AMC and Sunridge's Counterclaim – operative for the last two years – fails to give fair notice to Interstate and Fireman's Fund that AMC and Sunridge intended to assert a statutory claim under section 26-15-124(c).

The Tenth Circuit's decision in *Dunn v. Ewell,* 611 F.2d 815, 816 (10th Cir. 1980), is on point.  There, the complaint cited one section of the Bankruptcy Act but the plaintiffs attempted to introduce evidence pertaining to a second section at trial.  The Tenth Circuit held that the plaintiffs had not properly stated a claim under the second section, noting that "[w]e cannot say that the incorrect statutory citation was an unimportant detail implicitly corrected by the facts alleged in the complaint." *Id*.  "[A] fundamental statutory citation is not a mere fact and, if incorrect, may topple the structure of the complaint, particularly where the citation appears to represent the legal theory upon which the plaintiff relies." *Id.*  As in *Dunn*, AMC's and Sunridge's failure to cite or bring a cause of action for violation of section 25-16-124 in their Counterclaim was not "an unimportant detail implicitly corrected by the facts alleged in the [Counterclaim]."

---

[4]  Although their Counterclaim seeks attorneys' fees as consequential damages due to the alleged bad faith conduct of Interstate and Fireman's Fund, AMC and Sunridge do not allege they are entitled to fees under section 26-15-124(c).  Nor do they mention recovery under the statute in connection with their breach of contract claim.

The pleadings define the scope of issues available for summary judgment. *See, e.g., FPI Dev., Inc. v. Nakashima*, 282 Cal. Rptr. 508, 515 (Cal. Ct. App. 1991) (applying California summary judgment rules, which are similar to Federal Rule 56 procedure).  As the court noted in *Nakashima*, the summary judgment procedure "presupposes that the pleadings are adequate to put in issue a cause of action or a defense thereto." *Id*. at 516.  Accordingly, courts have consistently recognized that it is unfair to allow a party to attempt to defeat summary judgment by asserting a previously unpleaded theory or claim. *See, e.g., Evans, supra*, 936 F.2d at 1091 (*citing Fisher v. Metropolitan Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990) (claim raised not in amended complaint, but in plaintiff's response to defendant's motion for summary judgment, was not properly before district court)); *Green Country Food Market, Inc. v. Bottling Group, LLC,* 371 F.3d 1275, 1280 (10th Cir. 2004) (plaintiffs failed to cite certain statutory subsection in their complaint and citation in their summary judgment opposition "did not cure that error") (citing *Evans, supra*); *Marten v. Yellow Freight Sys. Inc.*, 993 F. Supp. 822, 829 (D. Kan. 1998) ("A claim not raised in the complaint and initially asserted in a response to a summary judgment motion is not properly before the court").   If parties cannot use an unpleaded claim or defense to respond to summary judgment, they certainly should not be allowed to use an unpleaded claim to ask for summary judgment.

Nor can AMC and Sunridge be allowed to impliedly amend their Counterclaim via a motion for summary judgment.  "Rule 15(b) contains two mechanisms for amending the complaint to conform to the evidence.  First, a complaint may be impliedly amended under Rule 15(b) 'if an issue has been tried with the express or implied consent of the parties and not over objection.'  A party impliedly consents to the trial of an issue not contained within the pleadings either by introducing evidence on the new issue or by failing to object when the opposing party introduces such evidence." *Green Country, supra,* 371 F.3d at 1280-81.  Implied amendment "is not available if the opposing party objects to evidence pertaining to a new claim.  Instead, upon objection by the opposing party, the party wishing to amend the pleadings must employ the second mechanism of Rule 15(b)" and file a formal motion to amend. *Id.* at 1281; *see also,*

17

*Moncrief v. Williston Basin Interstate Pipeline Co.,* 174 F.3d 1150, 1163, n.7 (10th Cir. 1999)

("A court may not sua sponte invoke the second portion of Rule 15(b)."); *Martinez v. Potter,* 347

F.3d 1208 (10th Cir. 2003) (although issues raised for the first time in a plaintiff's response to a

motion for summary judgment may be considered a request to amend the complaint, this "does

not preclude the [other] party from notice and an opportunity to be heard on whether an

amendment should be permitted" and if the other party objects to amendment,  "the federal rules

contemplate a formal amended complaint, an amended answer, and inclusion of the issue in the

initial pretrial report and the pretrial order.").

    Here, AMC and Sunridge have not filed a formal motion to amend their complaint to add

a statutory claim for violation of section 26-15-124(c) and have not afforded Interstate and

Fireman's Fund a full and fair opportunity to be heard on whether such an amendment should be

permitted.  The Court should not treat the Motion for Partial Summary Judgment as a motion to

amend.  AMC and Sunridge bear the burden of establishing why an amendment is warranted,

and they have failed to do so in their brief.  Interstate and Fireman's Fund should not be required

to substantively challenge an amendment under these circumstances.  Moreover, even if properly

requested, an amendment at this late stage in the proceedings should be denied, as discovery has

closed, the time for amendment has long passed, and AMC and Sunridge have no excuse for

their delay.

    For the foregoing reasons, the Motion should be denied.  In an abundance of caution,

Interstate and Fireman's Fund have responded to the Motion substantively above.  However, by

doing so, they do not intend to waive their objections to AMC's and Sunridge's improper attempt

to obtain summary judgment on an un-pleaded claim or waive their right to be heard on the

propriety of an amendment to their Counterclaim to add a cause of action under section 26-15-

124(c) by way of a formal motion to amend pursuant to Federal Rule of Civil Procedure 15(b).

IV.        **CONCLUSION**

For the foregoing reasons, Interstate respectfully requests that the Court deny the Motion for Partial Summary Judgment.[5]

Dated: October 30, 2015                          AKIN GUMP STRAUSS HAUER & FELD LLP

                                                 By:    /s/ Danielle Crockett Ginty
                                                 Shawn Hanson, *admitted pro hac vice*
                                                 Ashley B. Vinson, *admitted pro hac vice*
                                                 Danielle Crockett Ginty, *admitted pro hac vice*

                                                 LATHROP & RUTLEDGE, P.C.

                                                 Corinne E. Rutledge, #5-2480
                                                 J. Kent Rutledge, #5-1392
                                                 Erin Arnold Barkley, #6-4216

                                                 Attorneys for Plaintiffs
                                                 INTERSTATE FIRE & CASUALTY
                                                 COMPANY, and FIREMAN'S FUND
                                                 INSURANCE COMPANY

---

[5] AMC and Sunridge have not offered any evidence of the amount of attorneys' fees they request. Interstate and Fireman's Fund reserve the right to object to the amount of requested fees.

1995 WL 790992
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Delaware, New Castle County.

Rebecca FLETCHER, Plaintiff,
v.
Elizabeth A. RATCLIFFE and James J. Weikel, Jr.,
Defendants.

Civ. A. No. 89C-06-160 SCD. | Submitted: Nov. 16,
1995. | Decided: Dec. 7, 1995.

Upon Defendant's Motion to Stay: Granted in Part,
Denied in Part. Upon Defendant's Motion to Quash:
Denied.

**ORDER**

DEL PESCO, Judge.

**\*1** This 7th day of December, 1995, upon consideration
of defendants' renewed motion to stay, it appears to the
Court that:

(1) After a jury trial, a $1.5 million judgment was entered
against defendant Elizabeth A. Ratcliffe ("Ratcliffe"). She
appealed the matter, which is scheduled for oral
arguments before the Supreme Court on December 19,
1995. On the date of the accident, Ratcliffe carried
$40,000 in automobile liability insurance with
Harleysville Mutual Insurance Company ("Harleysville").

(2) On August 10, 1995, Ratcliffe filed a motion to stay
execution on the judgment after receiving a request for
production of her insurance policy. On October 25, 1995,
I denied the motion to stay without prejudice and ordered
the defendant to produce her insurance policy. Ratcliffe
complied with my order. On November 13, 1995, plaintiff
noticed the deposition of Sutton-Loder & Associates,
a/k/a Sutton-Loder Insurance ("Sutton-Loder").
Sutton-Loder is the agency from which Ratcliffe
purchased her Harleysville insurance. Shortly thereafter,
Ratcliffe responded with a motion to quash and a renewed
motion to stay.

(3) In order to grant a stay in this action, the Court must
be presented with a supersedeas bond by the appellant.
Supr. Ct. R. 32(c). Ratcliffe acknowledges this, but
maintains that the principle amount of the bond should be
limited to the limits of her liability insurance. Plaintiff
responds that the Delaware Constitution requires that the
bond be in the full amount of the judgment, and further
that the language of the liability policy requires
Harleysville to be the principal obligor on the bond.

(4) In order to receive a stay pending appeal, the
Delaware Constitution requires that the appellant give
"sufficient security" in order to cover the "condemnation
money" should the appeal fail. Del. Const. art. IV, §24.
The terms "sufficient security" and "condemnation
money" were defined by the Supreme Court to mean the
amount of the judgment. *Ownbey v. Morgan et al.,* Del.
Supr., 105 A. 838, 843 (1919).

(5) Shortly after *Ownbey* was decided, Supreme Court
Rule 22(4)(b) went into effect. That Rule stated:

> In civil causes the form of the bond
> shall bind the principal obligor to
> prosecute his appeal or writ to
> effect, according to law and the
> rules of this Court, and pay the
> condemnation money and all costs
> or otherwise abide the decree in
> appeal or the judgment in error, if
> he fails to make his plea good. *Such
> indemnity, where the judgment or
> decree is for the recovery of money
> not otherwise secured, must be for
> the whole amount of the judgment
> or decree,* including just damages
> for delay and costs and interest on
> appeal.... (emphasis added).

Rule 22(4)(b) governed the posting of supersedeas bonds
for over 60 years. It was in effect in 1956, when the
Supreme Court decided the case of *Blackwell v. Sidwell,*
Del. Supr., 126 A.2d 237 (1956). In *Blackwell,* the Court
held that notwithstanding the existence of a liability
policy with limits below the value of the judgment, the
supersedeas bond must be for the entire judgment amount
in order for a stay to issue. *Id.* at 238.The Court relied on
the interpretation of the Delaware Constitution found in
*Ownbey* as well as Supreme Court Rule 22(4)(b) for its
ruling. *Id.*

**\*2** (6) In 1987, the Rule was substantially revised, and

renamed Supreme Court Rule 32. Now, the provision governing supersedeas bonds reads, in pertinent part:

> In a civil case, the form of the bond shall bind the principal obligor to prosecute the appeal to effect, according to law and the Rules of this Court, and pay the condemnation money and all costs and damages, including damages for delay, and otherwise abide the decree if the principal obligor fails to make the principal obligor's plea good. *The form of the bond and the sufficiency of security shall be determined in the first instance by the trial court....* (emphasis added).

Supr. Ct. R. 32(c). As substantive changes, the new Rule eliminated the italicized language in the old Rule and added the language emphasized above. I find that these changes reflect an intent on the part of the Supreme Court to disavow the rigidity of *Ownbey* and *Blackwell* in favor of a grant of discretion to the trial court to determine the sufficiency of the amount of the bond. Accordingly, I will exercise my discretion in determining whether a bond tendered in the amount of the limits on Ratcliffe's liability policy would constitute sufficient security to stay execution pending her appeal.

(7) When setting supersedeas bonds, courts seek to protect judgment creditors as fully as possible without irreparably injuring judgment debtors. *See Texaco, Inc. v. Pennzoil Co.,* 2d Cir., 784 F.2d 1133, 1154 (1986)*rev'd on other grounds*481 U.S. 1 (1987). The record in this case demonstrates that Ratcliffe's only substantial asset is her insurance policy with Harleysville. Thus, setting bond in the amount of that policy will have the effect of providing significant protection to the plaintiff. Furthermore, Harleysville is protected from irreparable injury by not being required to post bond in the full amount of the judgment. The courts which have examined this issue have generally permitted insurers to file supersedeas bonds which are equal to their policy limits, but less than the underlying judgment.[1] In doing so, these courts have granted partial stays to the extent of the amount of insurance available, while leaving the insured subject to execution. As one court has stated,

Fairness to the insurer and the insured requires that the insurer be permitted to fulfill its covenant of good faith and fair dealing by filing an appeal bond in an amount sufficient to cover the part of the judgment for which it is liable and that the [judgment creditor] be denied his right to seek execution with regard to such part of the judgment. As to the excess part of the judgment he may seek execution.

*Merritt v. J.A. Stafford Co.,* Cal. App., 440 P.2d 927, 931-32 (1968). I am satisfied that this is a fair and equitable method of dealing with the present situation.

(8) Plaintiff argues that Harleysville has a contractual duty to post the bond in the full amount of the judgment. She relies on the following policy language:

> **\*3** In addition to our limit of liability, we will pay on behalf of an "insured:"
>
> > 3. Premiums on appeal bonds and bonds to release attachments in any suit we defend.

Assuming Ratcliffe qualifies for and procures a bond in an amount representing the difference between her insurance limits and the full judgment amount, this provision requires Harleysville to pay the premiums of such bond. This provision does not require Harleysville to become the principle obligor on the bond.

(9) For the foregoing reasons, I direct Harleysville to post a supersedeas bond in an amount representing the limits of Ratcliffe's automobile liability insurance policy, plus costs and interest on the appeal. Upon posting such bond, plaintiff's execution against Harleysville is stayed. In order for Ratcliffe to obtain a stay, she must post a supersedeas bond in an amount equal to the full amount of the judgment, less the amount of the bond posted by Harleysville. In the absence of such a bond, execution may proceed against Ratcliffe and she will be subject to plaintiff's discovery efforts in aid of execution.

IT IS SO ORDERED.

### All Citations

Not Reported in A.2d, 1995 WL 790992

---

Footnotes

1    *See Miami Inter. Realty Co. v. Paynter,* 10th Cir., 807 F.2d 871, 874 (1986)(allowing malpractice carrier to post $500,000 bond, representing its liability limits, on a $2.1 million judgment); *Fitzgerald v. Addison,* Fla. App., 287 So.2d 151, 153 (1973)(permitting insurer to post supersedeas bond in amount of $11,324.89, its policy limits, plus interest

and costs, on judgment of $35,000); *Cansler v. Harrington,* Kan. Supr., 643 P.2d 110, 115 (1982)($15,000 bond representing amount of liability policy limits will stay execution on $25,000 judgment, but only as against insurer); *State ex rel. Brickner v. Saitz,* Mo. Supr., 664 S.W.2d 209, 214 (1984)(en banc)(supersedeas bond set at $200,000, insurer's policy limits plus interest on appeal on a $800,000 judgment); *Rosato v. Penton,* N.J. Super. Law Div., 442 A.2d 656, 657 (1981)(bond of $15,000, plus interest and costs, representing limits of automobile liability policy, sufficient to stay execution on judgment of $38,000, but only as against insurer). In the case of *O'Donnell v. McGann,* the Maryland Court of Appeals reinstated a trial court order which permitted a malpractice carrier to post a $1 million supersedeas bond, representing the limits of the policy, on a $2.75 million judgment. Unlike the cases cited above however, the court held that the trial judge had the discretion to stay execution *in toto* even though the bond was considerably less than the judgment, due to the fact that the defendant had few assets of his own. *O'Donnell v. McGann,* Md. Ct. App., 529 A.2d 372, 377 (1987). I regard this decision as a minority rule and therefore choose to follow the reasoning of those courts which grant the stay only as against the insurance carrier.

---

**End of Document**                               © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---



**User Name:**  Jay Sheperd
**Date and Time:**  Oct 30, 2015   4:20 p.m. EDT
**Job Number:**  25654255

## Document(1)

1.  _Johnson v. Life Investors Ins. Co. of Am., 2000 U.S. App. LEXIS 16049_

   **Client/Matter:**  688477.0021
   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | -None- |

⚠️ Caution
As of: October 30, 2015 4:20 PM EDT

# *Johnson v. Life Investors Ins. Co. of Am.*

United States Court of Appeals for the Tenth Circuit

*July 11, 2000*, Filed

Nos. *98-4120*, *98-4121*, *98-4122*

**Reporter**

2000 U.S. App. LEXIS 16049; 2000 Colo. J. C.A.R. 4282

LAJUAN C. JOHNSON and STEVEN JOHNSON, Plaintiffs-Appellees and Cross-Appellants, v. LIFE INVESTORS INSURANCE COMPANY OF AMERICA, an Iowa corporation, and MONUMENTAL LIFE INSURANCE COMPANY, a Maryland corporation, Defendants-Appellants and Cross-Appellees.

**Notice: [\*1]** RULES OF THE TENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**Subsequent History:** Reported in Table Case Format at: *2000* U.S. App. LEXIS 25077.

**Prior History:** (D. Utah). (D.Ct. No. 96-CV-283-K). *Johnson v. Life Investors Ins. Co. of Am., 216 F.3d 1087, 2000* U.S. App. LEXIS 25077 (*10th Cir*. Utah, *2000*)

**Disposition:** AFFIRMED in part, REVERSED in part, and REMANDED.

## Core Terms

regulation, district court, disclosure, attorney's fees, coverage, sickness, accidental death, insured, certificate, benefits, insurance policy, policies, summary judgment, companies, disability insurance, breached, estoppel, insurance company, estopped, premium, argues, granting summary judgment, insurance contract, insurance regulation, denying coverage, fair dealing, contends, express terms, matter of law, new policy

## Case Summary

**Procedural Posture**

Defendants appealed from an order of the district court (Utah) granting summary judgment in favor of the plaintiffs and beneficiaries of insurance policies issued by defendants. Plaintiffs cross-appealed from the denial of attorney fees.

**Overview**

Plaintiff wife's husband bought two accidental death insurance policies. Prior to that, the husband was diagnosed with muscular dystrophy. Several years later, the husband fell. While in the hospital, he caught pneumonia and died. Plaintiffs filed their claims under the policies. When defendants denied the claims, plaintiffs sued for breach of contract. The district court granted summary judgment for plaintiffs, but denied their request for attorney fees. The mandatory disclosure provision in Utah Code Ann. § R590-126-6G applied to the policy of one of the defendants. Because that policy did not comply with the regulation, the lower court appropriately struck the exclusionary language of the policy. However, as to the other defendant's policy, the increase in benefits did not change the nature of the coverage. Thus, the district court erred by finding that the defendant was estopped from refusing to honor plaintiffs' claim. Also, the court reversed the denial of attorney fees as to one defendant, and affirmed as to the other.

**Outcome**

The order granting summary judgment to plaintiffs against one of the defendants was reversed and remanded. As to the issue of attorney fees, denial of attorney fees was reversed and remanded as to that same defendant. The order granting summary judgment in favor of plaintiffs against the other defendant was affirmed, and the denial of attorney fees as to that defendant was also affirmed.

2000 U.S. App. LEXIS 16049, *1

## LexisNexis® Headnotes

Civil Procedure > ... > Diversity Jurisdiction > Citizenship > General Overview

*HN1* Where a district court's jurisdiction over a particular matter is based on diversity of citizenship, it is required to discern and apply the substantive law of the forum state, with the objective of reaching the same result as would a that state's court.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN2* The court of appeals reviews de novo the district court's determinations of the substantive law of the forum state. However, although the substantive law of that state governs the analysis of the underlying claim in a case, federal law controls the ultimate procedural question - whether summary judgment is appropriate.

Civil Procedure > Appeals > Summary Judgment Review > General Overview

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN3* A court of appeals reviews the grant of summary judgment de novo, applying the same standard as did the district court. Summary judgment is then appropriate if, after reviewing all of the evidence submitted in the light most favorable to the non-movant, no genuine issue of material fact survives to merit a trial. Fed. R. Civ. P. 56(c).

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > Cross Motions

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > Appeals > Standards of Review

*HN4* Where the parties file cross motions for summary judgment, the court of appeals is entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts. Where different ultimate inferences may properly be drawn, the case is not one for a summary judgment.

Insurance Law > Claim, Contract & Practice Issues > General Overview

Insurance Law > Types of Insurance > Disability Insurance > General Overview

*HN5* See Utah Admin. Code R590-126-6G.

Insurance Law > Claim, Contract & Practice Issues > General Overview

Insurance Law > Types of Insurance > Disability Insurance > General Overview

Labor & Employment Law > ... > Disability Benefits > Scope & Definitions > General Overview

Labor & Employment Law > ... > Disability Benefits > Scope & Definitions > Types of Disabilities

*HN6* See Utah Admin. Code R590-126-2B.

Insurance Law > Types of Insurance > Disability Insurance > General Overview

Insurance Law > Types of Insurance > Disability Insurance > Disclosure Obligations

Labor & Employment Law > ... > Disability Benefits > Scope & Definitions > General Overview

Labor & Employment Law > ... > Disability Benefits > Scope & Definitions > Types of Disabilities

*HN7* The term "disability insurance" is defined in the general provisions of the Utah Insurance Code as: insurance written to indemnify for losses and expenses resulting from accident or sickness, to provide payments to replace income lost from accident or sickness, and to pay for services resulting directly from accident or sickness, including medical, surgical, hospital, and other ancillary expenses. *Utah Code Ann. § 31A-1-301(26)* (Supp. 1996).

Insurance Law > Industry Practices > General Overview

Labor & Employment Law > ... > Disability Benefits > Scope & Definitions > General Overview

Labor & Employment Law > ... > Disability Benefits > Scope & Definitions > Types of Disabilities

2000 U.S. App. LEXIS 16049, *1

*HN8* In Utah, insurance regulations passed pursuant to a statutory grant of authority have the full force and effect of law.

> Governments > Legislation > Effect & Operation > Prospective Operation

> Governments > Legislation > Effect & Operation > Retrospective Operation

> Insurance Law > Industry Practices > General Overview

*HN9* Under Utah law, substantive statutes affecting vested rights do not apply retroactively.

> Insurance Law > Claim, Contract & Practice Issues > Premiums > General Overview

*HN10* The term "coverage" when used in the context of an insurance contract is widely held to mean inclusion of a risk under an insurance policy; the risks within the scope of an insurance policy. On the other hand, the term "benefit" is defined as: financial assistance that is received from an employer, insurance, or a public program (such as social security) in time of sickness, disability, or unemployment.

> Civil Procedure > Remedies > Costs & Attorney Fees > General Overview

> Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards

> Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

> Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

> Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN11* In a diversity suit, the issue of attorney fees is considered a substantive matter and is controlled by state law. However, the court of appeals' standard of review is a matter of federal law and the appellate court reviews a district court's award of attorney fees for abuse of discretion. The district court's factual findings are only reversed if clearly erroneous. Legal conclusions and statutory analysis are reviewed de novo.

> Civil Procedure > Remedies > Costs & Attorney Fees > General Overview

> Contracts Law > Breach > General Overview

> Contracts Law > ... > Damages > Types of Damages > Consequential Damages

> Contracts Law > Types of Contracts > Covenants

> Insurance Law > Remedies > Damages > Consequential Damages

> Insurance Law > Claim, Contract & Practice Issues > General Overview

> Insurance Law > Remedies > Costs & Attorney Fees > General Overview

> Legal Ethics > Client Relations > Attorney Fees > Fee Agreements

*HN12* In Utah, the general rule is attorney fees are recoverable only if provided for in a contract at issue or by statute. However, exceptions to this general rule exist. In an insurance contract dispute where the insured sues the insurer for breach of contract, attorney fees may be recovered as consequential damages for either a breach of the express terms of the contract or for a breach of the implied covenant of good faith and fair dealing.

> Civil Procedure > Remedies > Costs & Attorney Fees > General Overview

> Contracts Law > Breach > General Overview

> Contracts Law > ... > Damages > Types of Damages > Consequential Damages

> Insurance Law > Claim, Contract & Practice Issues > General Overview

> Insurance Law > Remedies > Costs & Attorney Fees > General Overview

> Legal Ethics > Client Relations > Attorney Fees > Fee Agreements

*HN13* An insured may recover attorney fees as consequential damages for the breach of an express term in the insurance contract if the fees were reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made.

> Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview

> Contracts Law > Breach > General Overview

> Insurance Law > Remedies > Costs & Attorney Fees > Failure to Defend

> Insurance Law > Remedies > Costs & Attorney Fees > Failure to Pay Claims

> Insurance Law > Claim, Contract & Practice Issues > Estoppel & Waiver > General Overview

Insurance Law > Types of Insurance > Life Insurance > Credit Life Insurance

Insurance Law > ... > Life Insurance > Exclusions > General Overview

***HN14*** Estoppel does not operate to alter the terms of a contract as originally written. Rather, estoppel is normally asserted as a defense to a claim or right and does not create an independent cause of action. Estoppel merely abates the insurer's right to defend against the insured's claim for breach of contract by relying on the language in its policy. Moreover, unlike breach of contract where the award of attorney fees is reasonably contemplated at the time of the contract, estoppel is not an independent cause of action like breach of contract, or a circumstance in which attorney fees are ever contemplated. It is not the same as breach of contract for the purpose of awarding attorney fees.

Civil Procedure > Remedies > Costs & Attorney Fees > General Overview

Contracts Law > Types of Contracts > Covenants

Insurance Law > Remedies > Damages > Consequential Damages

Insurance Law > Liability & Performance Standards > Good Faith & Fair Dealing > General Overview

Business & Corporate Compliance > ... > Industry Practices > Unfair Business Practices > Claims Investigations & Practices

***HN15*** Attorney fees may be available as consequential damages flowing from a breach of the implied covenant of good faith and fair dealing by an insurance company. An insurer may be found to breach the implied covenant of good faith and fair dealing if it fails to diligently investigate the facts underlying a claim, fairly evaluate the claim, or act promptly and reasonably in rejecting or settling the claim. The overriding requirement imposed by the implied covenant is that insurers act reasonably in dealing with their insureds. However, when an insured's claim is fairly debatable, the insurer is entitled to debate it and cannot be held to have breached the implied covenant if it chooses to do so.

**Counsel:** For LAJUAN C. JOHNSON, STEVEN JOHNSON, Plaintiffs - Appellees (***98-4120***): Timothy C. Houpt, Jones, Waldo, Holbrook & McDonough, Salt Lake City, UT. Marci Batty, Jones, Waldo, Holbrook & McDonough, Salt Lake City, UT.

For LIFE INVESTORS INSURANCE COMPANY OF AMERICA, Defendant - Appellant (***98-4120***) (***98-4122***): Claudia F. Berry, J. Angus Edwards, Suitter & Axland, Salt Lake City, UT.

For LAJUAN C. JOHNSON, Plaintiff - Appellee (***98-4121***): Timothy C. Houpt, Jones, Waldo, Holbrook & McDonough, Salt Lake City, UT. Marci Batty, Jones, Waldo, Holbrook & McDonough, Salt Lake City, UT.

For MONUMENTAL LIFE INSURANCE COMPANY, Defendant - Appellant (***98-4121***): Joy L. Clegg, Julianne R. Blanch, Snow, Christensen & Martineau, Salt Lake City, UT.

For LAJUAN C. JOHNSON, STEVEN JOHNSON, Plaintiffs - Appellants (***98-4122***): Timothy C. Houpt, Jones, Waldo, Holbrook & McDonough, Salt Lake City, UT. Marci Batty, Jones, Waldo, **[*2]** Holbrook & McDonough, Salt Lake City, UT.

For LIFE INVESTORS INSURANCE COMPANY OF AMERICA, Defendant - Appellee (***98-4122***): Claudia F. Berry, J. Angus Edwards, Suitter & Axland, Salt Lake City, UT.

For MONUMENTAL LIFE INSURANCE COMPANY, Defendant - Appellee (***98-4122***): Joy L. Clegg, Julianne R. Blanch, Snow, Christensen & Martineau, Salt Lake City, UT.

**Judges:** Before TACHA, BRORBY, and EBEL, Circuit Judges.

**Opinion by:** WADE BRORBY

# Opinion

**ORDER AND JUDGMENT** *

This case arises out of a dispute over insurance policies issued by Life Investors Insurance Company of America (Life Investors), and Monumental Life Insurance Company (Monumental) in favor of Marvin Johnson, deceased. Life Investors and Monumental **[*3]** appeal

* This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of ***10th Cir***. R. 36.3.

the order of the district court granting summary judgment in favor of LaJuan Johnson and Steven Johnson, the plaintiffs and beneficiaries of insurance policies issued by the two insurance companies. LaJuan and Steven Johnson (the Johnsons) cross-appeal the denial of attorney fees. We exercise jurisdiction pursuant to _28 U.S.C. § 1291_ and affirm the grant of summary judgment in favor of the Johnsons in their case against Monumental, affirm the denial of attorney fees to the Johnsons from Monumental, and reverse and remand the grant of summary judgment against Life Investors, and denial of attorney fees to the Johnsons from Life Investors, to the district court for further proceedings in accordance with this opinion.

I. FACTUAL BACKGROUND

For the purpose of ruling on the summary judgment motions, the district court relied on the following undisputed material facts. In February 1989, Mr. Johnson bought an accidental death policy from American Express Life Assurance Company (AMEX). In December 1989, Mr. Johnson and his wife, LaJuan Johnson, completed a "request for increased benefits" form in response to a request they received from AMEX. In February **[*4]** 1993, Life Investors assumed responsibility for the insurance policy issued by AMEX to Mr. Johnson. Also in 1993, Mr. Johnson purchased a policy for accidental death insurance from Monumental, designating his wife, LaJuan, and his son, Steven, as beneficiaries.

Years prior to his purchase of these policies, Mr. Johnson had been diagnosed with myotonic dystrophy, a form of muscular dystrophy. He received treatment for this disease until his death in 1995. Mr. Johnson developed muscle weakness as a result of the myotonic dystrophy. Although he remained relatively active, Mr. Johnson did occasionally stumble and fall down. In

1991, Mr. Johnson fell down the stairs in his home and received treatment in the hospital for his injuries.

On **_July_** 29, 1995, Mr. Johnson stumbled and fell while carrying a tray up the stairs in his home, causing a cervical neck fracture and a possible thoracic rib fracture. Mr. Johnson was admitted to the hospital in the early morning hours of **_July_** 30, 1995 and was treated for his injuries. On August 1, 1995, while still in the hospital, Mr. Johnson began to experience symptoms of pneumonia. His doctor transferred him to the care of a pulmonologist in the intensive **[*5]** care unit. Because Mr. Johnson began experiencing difficulty breathing, physicians attempted to intubate him to clear his lungs. However, this proved extremely difficult due to his neck fracture. During the next day, it became apparent Mr. Johnson could no longer breathe on his own and would survive only with the assistance of long-term ventilatory support. On August 2, 1995, authorized hospital staff withdrew artificial life support measures and Mr. Johnson passed away. Dr. Edward Campbell filled out the death certificate and listed the immediate cause of death as pneumonia, due to or as a consequence of a cervical spine fracture, and the underlying cause of death as myotonic dystrophy. He identified the manner of death as an "Accident."

Mrs. Johnson and Steven Johnson made claims under the insurance policies following Mr. Johnson's death. Both insurance companies denied these claims, relying on language in their policies excluding death caused by sickness and defining an "injury" as a bodily injury caused by an accident "independent of all other causes." [1]

**[*6]** II. PROCEDURAL BACKGROUND

Following the insurance companies' denial of coverage, the Johnsons filed suit in the district court, claiming the

---

[1]   The relevant language in the Monumental policy is as follows:

DEFINITIONS

….

INJURY means bodily injury caused by an accident. The accident must occur while the Covered Person's insurance is in force under the Group Policy. The Injury must be the direct cause of the Loss and must be independent of all other causes. The Injury must not be caused by or contributed to by Sickness.

….

EXCLUSIONS

2000 U.S. App. LEXIS 16049, *6

companies breached their contracts. However, rather than making a determination on whether the companies breached the contracts, the district court instead concluded the companies were estopped from relying on the sickness exclusions to deny coverage because the companies failed to disclose the sickness exclusions in the manner required by Utah insurance regulations. Consequently, the district court granted the Johnsons' motions for summary judgment in both cases, and denied the companies' cross-motions for summary judgment. The district court also denied the Johnsons' request for attorney fees.

Monumental and Life Investors now appeal the district court's grant of summary judgment to the Johnsons and denial of their motions for summary judgment. Neither company denies it failed to disclose the sickness exclusion in the manner required by the regulation. [2] Instead, each argues the regulation is inapplicable to its policy. Monumental contends the disclosure obligations do not apply to accidental death policies. Life Investors concedes the [*7] disclosure regulation applies to accidental death policies but contends the regulation is inapplicable to its policy because Utah adopted the rule after AMEX issued the original policy to Mr. Johnson. Both companies argue they are entitled to summary judgment because the Johnsons failed to show Mr. Johnson's death resulted from an accident and independently of all other causes. The Johnsons cross-appeal the denial of their request for attorney fees.

---

We will not pay a benefit for a loss which is caused by, results from, or [is] contributed to by:

….

(5) Sickness or its medical or surgical treatment, including diagnosis ….

The pertinent language from the Life Investors/AMEX policy is as follows:

Definitions

….

"Injury" means bodily injury of a Covered Person which:

1. is caused by an accident which occurs when the Covered Person's insurance is in force under the Policy; and

2. results in loss insured by the Policy; and

3. creates loss due, directly and independently of all other causes, to such accidental bodily injury.

….

General Exclusions

The Policy does not insure for any loss resulting from any Injury caused or contributed to by, or as a consequence of …

….

3. any sickness or infirmity unless the treatment of such is required as the direct result of an accidental bodily injury

….

---

[2]   The district court determined the language of the exclusionary provisions is buried in each policy and not in bold or color typeface as required by Utah's regulations. The court also concluded the exclusions do not clearly inform laymen as to what coverage exists.

III. APPLICATION OF THE DISCLOSURE REQUIREMENT TO THE POLICIES

A. Standard of Review

**HN1** Because the district court's jurisdiction over this matter was based on diversity of citizenship, it was required to discern and apply the substantive law of Utah, the forum state, with the objective of reaching **[*8]** the same result as would a Utah court. *See Brodie v. General Chem. Corp., 112 F.3d 440, 442 (10th Cir. 1997).* **HN2** We review *de novo* the district court's determinations of the substantive law of Utah. *See id.* However, although the substantive law of Utah governs the analysis of the underlying claim in this case, federal law controls the ultimate procedural question - whether summary judgment is appropriate. *See Oja v. Howmedica, Inc., 111 F.3d 782, 792 (10th Cir. 1997); May v. National Union Fire Ins. Co., 84 F.3d 1342, 1345 (10th Cir. 1996).* **HN3** "We review the grant of summary judgment de novo, applying the same standard as did the district court. Summary judgment is then appropriate if, after reviewing all of the evidence submitted in the light most favorable to the non-movant, no genuine issue of material fact survives to merit a trial." *Chambers v. Colorado Dep't of Corrections, 205 F.3d 1237, 1241 (10th Cir. 2000)* (citations omitted); Fed. R. Civ. P. 56(c). **HN4** "Where, as here, the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed **[*9]** by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *James Barlow Family Ltd. Partnership v. David M. Munson, Inc.,* 132 F.3d 1316, 1319 (*10th Cir*. 1997), *cert. denied, 523 U.S. 1048, 140 L. Ed. 2d 513, 118 S. Ct. 1364 (1998).* "Where different ultimate inferences may properly be drawn, the case is not one for a summary judgment." *Seamons v. Snow, 206 F.3d 1021, 1026 (10th Cir. 2000)* (quotation marks and citation omitted).

B. Monumental

We first address Monumental's argument the Utah disclosure regulation does not apply to its accidental death policy. The regulation at issue is found in the portion of the Utah Administrative Code dealing with insurance administration, and entitled "Individual and Franchise Disability Insurance, Minimum Standards." Utah Admin. Code R590-126. The disclosure regulation **HN5** provides:

> Accident-Only Disclosure. All accident-only policies shall contain a prominent statement on the first

page of the policy, or attached thereto, in either contrasting color or in boldface type at least equal to the size of type used for policy captions, as follows: **[*10]** "This is an accident-only policy, and it does not pay benefits for loss from sickness."

Utah Admin. Code R590-126-6G. The scope of Rule 590 is described as **HN6** follows:

> This rule shall apply to all individual and franchise *disability* insurance policies …. The rule shall apply only to coverage issued after the effective date of the rule.

Utah Admin. Code R590-126-2B (emphasis added). Rule 590 provides a list of definitions "in addition to the definitions of *Sections 31A-1-301* and *31A-22-605(2),* U.C.A. [the general provisions of the Utah Insurance Code]," which are to "apply for the purposes of this rule." Utah Admin. Code R590-126-3A. **HN7** The term "disability insurance" is defined in the general provisions of the Utah Insurance Code as:

> insurance written to indemnify for *losses and expenses resulting from accident* or sickness, to provide payments to replace income lost from accident or sickness, and to pay for services resulting directly from accident or sickness, including medical, surgical, hospital, and other ancillary expenses.

*Utah Code Ann. § 31A-1-301(26)* (Supp. 1996) (emphasis added). Monumental contends the term "disability insurance" **[*11]** as defined above, is too narrow to encompass an accidental death policy, and thereby argues the disclosure requirement contained in the regulation section entitled "disability insurance," does not apply to its policy.

The Utah courts have never determined whether the rules set forth in the "Individual and Franchise Disability Insurance" section of the insurance code apply only to disability insurance policies or to other types of insurance policies such as those addressing accidental death insurance. However, the general provisions of the Utah Insurance Code define "disability insurance" broadly to include insurance policies covering "losses" resulting from accident or sickness. *See Utah Code Ann. § 31A-1-301(26).* Nothing in the regulations indicates that "losses" resulting from accident or sickness do not include death. Moreover, as the district court noted, the regulations dealing with "disability

2000 U.S. App. LEXIS 16049, *13

insurance" specifically mention policies providing for accidental death benefits in several subsections. [3] Thus, it is clear Utah implemented the "disability insurance" regulations with the intent to cover accidental death policies. Even though these regulations are not codified, *HN8* **[\*12]** in Utah, insurance regulations "passed pursuant to a statutory grant of authority have the full force and effect of law." *Horton v. Utah State Retirement Bd., 842 P.2d 928, 932 n. 2 (Utah Ct. App. 1992)* (citations omitted); *see also V-1 Oil Co. v. Department of Envtl. Quality, 904 P.2d 214, 218-19 (Utah Ct. App. 1995)*. Consequently, we conclude the mandatory disclosure provision contained in section R590-126-6G of the Utah Administrative Code applies to Monumental's accidental death policy.

**[\*13]** Because Monumental's policy did not comply with the disclosure regulation when issued, we also conclude the district court applied the appropriate remedy by striking the exclusionary language of the policy. *See General Motors Acceptance Corp. v. Martinez, 668 P.2d 498, 502 (Utah 1983)* (holding the insurance company was estopped as a matter of law from denying coverage under its policy due to its failure to comply with Utah insurance law). [4] *See also Cullum v. Farmers Ins. Exch., 857 P.2d 922, 926-27 (Utah 1993)* (concluding failure to comply with Utah insurance law rendered an exclusion provision in the insurance contract unenforceable). [5] **[\*15]** As a result, under the circumstances presented, Monumental's claim Mr. Johnson's myotonic dystrophy caused or contributed to the fall which led to his death is irrelevant to our determination. [6] Because no material, controverted facts

---

[3]   For example, the subsection entitled "Disability, Minimum Standards for Benefits," defines and sets the minimum standards for "Accident-Only Coverage" as follows:

a policy of accident insurance which provides coverage, singly or in combination, *for death*, dismemberment, disability, or hospital and medical care caused by accident. *Accidental death* and double dismemberment amounts under such a policy shall be at least $ 1,000 and a single dismemberment amount shall be at least $ 500.

Utah Admin. Code R590-126-7H (emphasis added). Likewise, "Specified Accident Coverage" is defined as:

an accident insurance policy which provides coverage for a specifically identified kind of accident (or accidents) for each person insured under the policy for *accidental death* or accidental death and dismemberment, combined with a benefit amount not less than $ 1,000 for accidental death, $ 1,000 for double dismemberment and $ 500 for single dismemberment.

Utah Admin. Code R590-126-7I(1) (emphasis added).

[4]   We reject Monumental's argument *Martinez* cannot apply because it involved an insurance company's failure to comply with Utah codified law as opposed to mere insurance regulations. In support of its argument, Monumental also contends estoppel cannot apply to violation of an agency rule which it claims prohibits private relief. Contrary to these contentions, nothing in Utah's insurance regulations prohibits private relief. Given Utah's insurance regulations maintain the full force and effect of law, *Horton, 842 P.2d at 932 n.2*, we see no difference in whether Monumental violated codified or regulatory provisions. As a consequence, it follows that if the private remedy of estoppel is available for one, it is also available for the other.

[5]   Monumental argues the district court erred by striking the language defining "injury" in its policy. Monumental argues the district court acted overzealously by striking this language as a consequence of its violating the disclosure regulation. Monumental also contends even if the district court correctly determined its definition was more restrictive than allowed by Utah insurance regulations, the proper remedy would have been to substitute the statutory definition of "injury" provided in Utah Admin. Code R590-126-3A(1)(a). Monumental further argues even if the district court substituted the less restrictive language to define injury under the contract, it still would not have been required to pay death benefits to the Johnsons. We disagree.

The purpose of the disclosure regulation is to alert the insured to the sickness exclusion. *See* Utah Admin. Code R590-126-2A. It is nonsensical to assert the insurer may violate the disclosure regulation and be estopped from relying on the sickness exclusion, but then allow the insurer to nevertheless deny coverage based on other language in the policy which effectively excludes injuries allegedly resulting, in part, from sickness. Thus, we reject Monumental's argument it is entitled to summary judgment because myotonic dystrophy contributed to Mr. Johnson's death.

[6]   Despite Monumental's contentions, the district court's ruling did not turn the policy into a "disability" or "life insurance" policy. Rather, the district court recognized the policy extended only accidental death insurance, but under the circumstances,

2000 U.S. App. LEXIS 16049, *15

are left for a jury to decide in Monumental's case, the district court properly granted summary judgment in favor of the Johnsons.

**[*16]** D. Life Investors

Life Investors asserts the disclosure regulation does not apply to its policy because AMEX issued the original policy before the disclosure regulation became effective. [7] The district court concluded Life Investors/AMEX subjected itself to the provisions of the regulation by accepting additional premiums for increased benefits after the effective date of the disclosure rule. [8] Life Investors argues the district court made this determination in error, and suggests the subsequent agreement did not constitute the formation of a wholly new contract that brought it under the auspices of the mandatory disclosure regulation.

**[*17]** *HN9*

Under Utah law, substantive statutes affecting vested rights do not apply retroactively. *See Olsen v. Samuel McIntyre Inv. Co., 956 P.2d 257, 260 (Utah 1998).* However, because the Utah courts have never addressed whether an agreement to increase benefits in a life insurance contract creates a new policy, subject to statutes and regulations enacted after issuance of the original policy, we look to "other state court decisions, federal decisions, and the general weight and trend of authority" to determine how the Utah courts would resolve this issue. *May, 84 F.3d at 1345* (quotation marks and citations omitted). Other courts, analyzing similar issues, have held an increase in premiums, benefits, or coverage, does not constitute the creation of a new certificate of insurance subject to regulations enacted after the original date the policy became effective. *See, e.g., Gahn v. Allstate Life Ins. Co., 926 F.2d 1449, 1456 (5th Cir. 1991)* (applying Louisiana law and holding the modification of the terms of an insurance policy does not create a new policy); *Metropolitan Property and Liability Ins. Co. v. Gray, 446 So. 2d 216, 219-20 (Fla. Dist. Ct. App. 1984)* **[*18]** (holding the mere addition of another person on a policy does not amount to a reissuance of the policy and thus, does not make the policy subject to statutes effective after the issuance of the original policy); *Crow v. Capitol Bankers Life Ins. Co., 119 N.M. 452, 891 P.2d 1206, 1211 (N.M. 1995)* (construing the insurance policy and rider as part of same contract for insurance); *Massachusetts Mut. Life Ins. Co. v. Thacher, 15 A.D.2d 242, 222 N.Y.S.2d 339, 343 (N.Y. App. Div. 1961)* (determining a rider attached to the face of a policy containing an option for extended benefits on the payment of additional premium merely amounts to an extended privilege and does not create a new policy); *Hidary v. Maccabees Life Ins. Co., 155 Misc. 2d 993, 591 N.Y.S.2d 706, 710 (N.Y. Sup. Ct. 1992)* (finding increases in face amount of coverage for

---

extended such coverage without determining if an underlying illness caused the "accident," given the policy's failure to follow Utah's disclosure requirements. While Monumental argues the district court should have applied the exclusion and denied benefits under our holding in *Winchester v. Prudential Life Ins. Co. of America, 975 F.2d 1479 (10th Cir. 1992)*, it misses the point. First, the district court never reached the issue on whether *Winchester* applied to this case given Monumental's failure to comply with Utah's disclosure requirements. Consequently, even if we determined the exclusion adequately discloses that coverage does not extend to accidents resulting from pre-existing conditions, Monumental nevertheless violated Utah's disclosure regulations by burying the disclosure in the policy and not setting it out in bold or colored type.

[7]   As stated previously, Mr. Johnson bought the accidental death policy from AMEX in February 1989. Utah enacted the Regulations at issue on June 20, 1989. Mr. Johnson increased his benefits in December 1989. In February 1993, Life Investors assumed responsibility for the AMEX insurance policy.

[8]   Life Investors points out the district court relied on the wrong certificate when rendering its decision. This mistake arose from the confusion generated when, during discovery, Life Investors mistakenly produced a copy of a specimen certificate which it did not send to the Johnsons. However, Life Investors drew the court's attention to this error in a motion to file a supplemental memorandum in support of its motion for summary judgment. The district court granted Life Investors' motion, and Life Investors subsequently filed a supplemental memorandum in support of its motion for summary judgment and attached the correct certificate. Although Life Investors maintains the district court committed plain error by relying on the incorrect certificate in rendering its decision, it contends the court would have reached the same decision even if it relied on the correct certificate, and asks us to review the district court's decision as if it relied on the correct certificate. The district court reasoned the definition of a "covered injury" contained on page five of the wrong certificate acted as an exclusion for sickness and struck the provision because it lacked bold-faced or colored type as required by the disclosure regulation. We agree the reasoning of the district court concerning the applicability of the disclosure regulation to Life Investors' policy would have been the same whether it relied on the correct or incorrect certificate, and thus, in the interest of resolving this dispute, we review the district court's decision as if based on the correct certificate.

payment of additional premiums did not constitute separate new policies); *French v. Insurance Co. of N. Am., 591 S.W.2d 620, 621-22 (Tex. Civ. App. 1979)* (reasoning the addition of a car to insurance policy did not create a new policy subject to a statute which became effective after the issuance **[*19]** of the original policy). We can see no reason why Utah would depart from the majority view on this point of law. Nevertheless, we turn to the Johnsons' argument the increase in benefits amounted to new "coverage" and thus, became subject to the disclosure regulation.

In support of their argument Life Investors became subject to the disclosure regulation when it accepted the Johnsons' additional premium payment after the disclosure regulation became effective, the Johnsons focus on the word "coverage" and point out the disability insurance rules "apply only to *coverage* issued after the effective date of the rule." Utah Admin. Code R590-126-2B (emphasis added). In applying this provision to their policy, the Johnsons point out AMEX sent them a letter after it received the additional premium payment stating:

> I have enclosed your revised Data Page for your Certificate APG1000984 which reflects your *increase in coverage*. Please replace the original Data Page with this new one.
>
> Your new quarterly premium will be $ 82.32. A charge of $ 56.95 has been placed on your American Express Card account. This represents the difference in premium due for your *additional coverage.* **[*20]**

(Emphasis added.) Based on this language, the Johnsons maintain that by increasing the benefits under the policy, AMEX issued new "coverage" after the effective date of the disclosure regulation, making Life Investors subject to the disclosure regulation. We disagree.

**HN10** The term "coverage" when used in the context of an insurance contract is widely held to mean "inclusion of a risk under an insurance policy; the risks within the scope of an insurance policy." Black's Law Dictionary 372 (7th ed. 1999). *See Traders State Bank v. Conti-*

*nental Ins. Co., 448 F.2d 280, 283 (10th Cir. 1971)* ("The word coverage is, indeed, a term of art in the insurance industry, meaning the sum of all the risks assumed under the policy.") (quotation marks and citation omitted); *see also In re Joint E. and S. Dist. Asbestos Litig., 993 F.2d 313, 315 (2d Cir. 1993); Guaranty Nat'l Ins. Co. v. Bayside Resort, Inc., 635 F. Supp. 1456, 1458 (V.I. 1986); Illinois Farmers Ins. Co. v. Tabor, 267 Ill. App. 3d 245, 642 N.E.2d 159, 163, 204 Ill. Dec. 697 (Ill. App. Ct. 1994); Delcampo v. New Jersey Auto. Full Ins. Underwriting Ass'n, 266 N.J. Super. 687, 630 A.2d 415, 422 (N.J. Super. Ct. Law Div. 1993);* **[*21]** *Farmers Ins. Co. of Washington v. Frederickson, 81 Wn. App. 319, 914 P.2d 138, 140 (Wash. Ct. App. 1996).* On the other hand, the term "benefit" is defined in Black's Law Dictionary as: "Financial assistance that is received from an employer, insurance, or a public program (such as social security) in time of sickness, disability, or unemployment." Black's Law Dictionary 151 (7th. ed. 1999). *See Vogel v. Wells, 57 Ohio St. 3d 91, 566 N.E.2d 154, 161 (Ohio 1991)* (quoting Black's Law Dictionary to define "benefit"); *Kratz v. Kratz, 905 P.2d 753, 755 (Okla. 1995)* (relying on Black's Law Dictionary to define "benefit" in the context of an insurance contract).

Hence, neither definition persuades us an increase in "benefits" alone increases the "coverage" or assumed risks of an insurance contract, thereby creating a new or different contract or policy. Under the circumstances presented we conclude the increase in premiums and benefits did not change the nature of the coverage or create a new policy subject to the disclosure regulation because it did not alter the type of risk Life Investors assumed under the policy - it only altered the **[*22]** amount of the benefits Life Investors was obligated to pay in the event a legitimate claim arose under the policy. For these reasons, the district court erred by determining Life Investors was estopped as a matter of law from refusing to honor the Johnson's claim. We therefore remand to the district court for further proceedings in accordance with this opinion on the Johnsons' claims against Life Investors, including their breach of contract claim. [9]

**[*23]**  IV. ATTORNEY FEE ISSUE

---

[9]   The Johnsons contend they are entitled to summary judgment even if the district court erred by determining Life Investors was estopped from relying on the sickness exclusion to deny coverage. In support, the Johnsons argue the majority of jurisdictions, examining language in insurance contracts similar to the exclusionary language contained in their policy, refused to allow the insurance companies to rely on such language to deny coverage unless the preexisting illness constituted the "predominant cause" of the injury, or the preexisting illness "substantially contributed to the loss." In response, Life Investors

Finally, we address the Johnsons' contention the district court erred by denying them attorney fees. *HN11* In a diversity suit, the issue of attorney fees is considered a substantive matter and is controlled by state law. *Jones v. Denver Post Corp., 203 F.3d 748, 757 (10th Cir. 2000)*. However, our standard of review is a matter of federal law and "we review a district court's award of attorney fees for abuse of discretion. The district court's factual findings are only reversed if clearly erroneous. Legal conclusions and statutory analysis are reviewed de novo." *Parks v. American Warrior, Inc., 44 F.3d 889, 892 (10th Cir.1995)* (citations omitted).

*HN12* In Utah, the general rule is attorney fees are recoverable only if provided for in a contract at issue or by statute. *Occidental/Nebraska Fed. Sav. Bank v. Mehr, 791 P.2d 217, 221 (Utah Ct. App. 1990)*. However, exceptions to this general rule exist. In an insurance contract dispute where the insured sues the insurer for breach of contract, attorney fees may be recovered as consequential damages for either a breach of the express terms of the contract or for a breach **[*24]** of the implied covenant of good faith and fair dealing. *Billings v. Union Bankers Ins. Co., 918 P.2d 461, 468 (Utah 1996)*.

A. Breach of the Express Terms of the Contract

*HN13* An insured may recover attorney fees as consequential damages for the breach of an express term in the insurance contract if the fees "were reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made." *Billings, 918 P.2d at 468* (quotation marks and citation omitted). Thus, in order to recover attorney fees as consequential damages flowing from a breach of express terms in the contracts, the Johnsons need to first show the companies breached the contracts. However, the district court never ruled on whether either

company breached the express or implied terms of its contract. The district court instead found Monumental and Life Investors were estopped from relying on the sickness exclusions in their policies, and under the doctrine of estoppel, held the Johnsons could not recover attorney fees.

Given our and the district court's holdings that Monumental is estopped from denying coverage, we must examine the principles of estoppel **[*25]** to determine if attorney fees from Monumental are warranted in this case. To begin, *HN14* estoppel does not operate to alter the terms of the contract as originally written. *See Perkins v. Great-West Life Assurance Co., 814 P.2d 1125, 1131 (Utah Ct. App. 1991)*. Rather, estoppel is normally asserted as a defense to a claim or right and does not create an independent cause of action. *See Raymond v. Halifax Hosp. Med. Ctr.*, 466 So. 2d 253, 255 (Fla. Dist. Ct. App. 1985); *Lohse v. Atlantic Richfield Co., 389 N.W.2d 352, 357-58 (N.D. 1986)*; *see also General Motors, 668 P.2d at 502* ("Although estoppel is usually a factual defense, it may be established as a matter of law to preclude an insurance company from relying on an exclusion in a credit life and accident policy."). Estoppel merely abates the insurer's right to defend against the insured's claim for breach of contract by relying on the language in its policy. *See id.* Moreover, unlike breach of contract where the award of attorney fees is reasonably contemplated at the time of the contract, *Billings, 918 P.2d at 468*, estoppel is not an independent cause **[*26]** of action like breach of contract, or a circumstance in which attorney fees are ever contemplated. It is not the same as breach of contract for the purpose of awarding attorney fees.

In applying this conclusion to the facts of this case, we note neither we nor the district court ever reached the issue of whether Monumental breached its contract with the Johnsons when holding Monumental is

argues the Utah Supreme Court would interpret the definition of "injury" in its policy to preclude coverage. Relying on *Winchester v. Prudential Life Ins. Co. of America, 975 F.2d 1479 (10th Cir. 1992)*, Life Investors urges us to reverse the district court's denial of its cross-motion for summary judgment and rule the Johnsons are not entitled to coverage under the policy as a matter of law because they cannot prove Mr. Johnson's death resulted directly from an accident, independent of all other causes. We leave the determination of this issue to the district court on remand.

After filing their brief with this Court, the Johnsons filed a motion for us to certify this issue to the Utah Supreme Court, contending certification is proper because the Utah courts have not yet determined "how, under state law, language limiting coverage under accidental death policies where an insured suffers a preexisting disease should be interpreted …." Life Investors filed no response to the Johnsons' motion to certify, but in its opposition to the Johnsons' motion for certification, Monumental argues this Court should interpret the "direct cause of loss, independent of all other causes" language as allowing it to deny coverage based on *Winchester* and without resorting to certification to the state court. We deny the Motion for Certification without reaching its merits, and decline addressing Monumental's motion in opposition, leaving the Johnsons free to reassert their motion to certify in the district court on remand.

Jay Sheperd

estopped as a matter of law from relying on the sickness exclusion. Therefore, the Johnsons are not entitled to attorney fees from Monumental under the theory Monumental breached the express terms of the contract. However, because we are reversing and remanding the district court's grant of summary judgment in favor of the Johnsons on their claim against Life Investors, we leave the determinations of whether Life Investors breached the express terms of its contract, and whether the Johnsons are entitled to attorney fees under Utah law, to the district court.

B. Implied Covenant of Good Faith and Fair Dealing

The Johnsons alternatively assert an award of attorney fees is proper because the companies breached the implied covenant of good faith and fair dealing. [10] In *Beck v. Farmers Ins. Exch., 701 P.2d 795 (Utah 1985)*, [*27] the Utah Supreme Court recognized **HN15** attorney fees may be available as consequential damages flowing from a breach of the implied covenant of good faith and fair dealing by an insurance company. *Id. at 801*. Under *Beck*, an insurer may be found to breach the implied covenant of good faith and fair dealing if it fails to diligently investigate the facts underlying a claim, fairly evaluate the claim, or "act promptly and reasonably in rejecting or settling the claim." *Id*. "The overriding requirement imposed by the implied covenant is that insurers act reasonably … in dealing with their insureds." *Billings, 918 P.2d at 465*. However, "when an insured's claim is fairly debatable, the insurer is entitled to debate it and cannot be held to have breached the implied covenant if it chooses to do so." *Id*.

[*28] The Johnsons contend "as a matter of law, the Companies could not have acted diligently, fairly or reasonably in rejecting the Johnsons' claims, as they violated applicable Utah Insurance Department Regulations by which they were bound, and denied the claims in the face of the Regulations." However, they

cite no case where failing to comply with insurance regulations has been found to be the equivalent of failing to fairly evaluate a claim or act promptly and reasonably in rejecting the claim. Nor are we persuaded by the Johnsons' argument. Monumental's contention the disclosure regulation did not apply to its contract is "fairly debatable" as the Utah courts have not ruled directly on the issue of whether the disability insurance regulations apply to accidental death policies. Obviously, because we agree with Life Investors that the regulation does not apply to its contract, we cannot hold Life Investors violated the covenant of good faith and fair dealing by asserting it is not estopped from relying on the sickness exclusion. However, on remand, the Johnsons might prove Life Investors breached the covenant of good faith and fair dealing on other grounds and that they are entitled [*29] to attorney fees in accordance with Utah law.

V. CONCLUSION

For the foregoing reasons, and applying the principles for reviewing summary judgment determinations, we **REVERSE** the district court's order granting summary judgment to the Johnsons in their suit against Life Investors, and **REMAND** for further proceedings consistent with this opinion. As to the issue of attorney fees, we **REVERSE** and **REMAND** the district court's denial of attorney fees to the Johnsons from Life Investors for further proceedings consistent with this opinion. We **AFFIRM** the district court's grant of summary judgment in favor of the Johnsons against Monumental and **AFFIRM** the denial of attorney fees to the Johnsons from Monumental.

**Entered by the Court:**

**WADE BRORBY**

United States Circuit Judge

---

[10]   The Johnsons assert because Life Investors did not answer their cross-appeal from the denial of attorney fees, it waived the issue. Although an appellant who chooses not to brief an issue may be deemed to waive the issue, *see Sheets v. Salt Lake County*, 45 F.3d 1383, 1390 (*10th Cir*.), *cert. denied*, *516 U.S. 817, 133 L. Ed. 2d 34, 116 S. Ct. 74 (1995)*, this rule does not apply to appellees. The Johnsons, as the appellants, retain the burden to prove on appeal the trial court erred. If the insurance companies, as the appellees, choose not to defend the trial court's decision, this does not relieve the Johnsons of their burden to convince us of the district court's errors.

1998 WL 40148
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

**MERITXELL**, LTD., Plaintiff,
v.
**SALIVA DIAGNOSTIC** SYSTEMS, INC.,
Defendant.

No. 96CIV.2759(AJP)(JFK). | Feb. 2, 1998.

**OPINION AND ORDER**

PECK, Magistrate J.

**\*1** Plaintiff **Meritxell** filed this action for breach of contract of a $100,000 convertible debenture it purchased from defendant **Saliva Diagnostic** Systems ("SDS"). The debenture provided for a conversion rate triggered by the earlier of the date the debenture holder delivered the original debenture to SDS or the date of the conversion notice if the original debenture is received by SDS within five business days of the conversion notice. Presently before the Court are the parties' cross-motions for summary judgment. **Meritxell** claims that SDS improperly used March 26, 1996 (the date **Meritxell** delivered an affidavit of loss of the original debenture and an indemnity bond) as the conversion date, rather than January 30, 1996 (the conversion notice date). **Meritxell** makes three arguments in support of this position: (1) in dealing with another debenture holder, SDS interpreted the conversion date as the date the conversion notice was received, even though the original debenture was surrendered more than five days later, and SDS's interpretation is controlling; (2) production of the original debenture is an immaterial term of the contract; and (3) SDS is estopped from applying the terms of the debenture, because SDS lead **Meritxell** to believe it would convert the debenture based on the January 30 date and in reliance **Meritxell** sold SDS stock short. (**Meritxell** Br. at 5–9.) SDS counters that (a) production of the original debenture within five days of sending a conversion notice is a clear, unambiguous and material condition precedent to conversion, and (b) **Meritxell** has not proven estoppel.

The parties have consented to disposition of this action by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

For the reasons set forth below, SDS's summary judgment motion is granted and **Meritxell's** summary judgment motion is denied. Production of the original debenture is unambiguously required by the parties' agreement, and **Meritxell** has not proved estoppel.

**FACTS**

SDS is a Delaware corporation which develops, manufactures and markets specimen collection devices test for the presence of antibodies in blood or **saliva**. (SDS Br. at 2.) In October 1995, SDS conducted a private placement of convertible debenture securities to non-United States investors under Regulation S of the 1933 Securities Act. (SDS Rule 56.1 Stmt. ¶¶ 1–3; **Meritxell** Response to SDS 56.1 Stmt. ¶¶ 1–3; Levine Dep. at 6.)

On November 27, 1995, **Meritxell**, a Gibraltar investment company, through its director Anthony Courtney, purchased a $100,000 convertible debenture from SDS. (*See* SDS Rule 56.1 Stmt. ¶ 14; **Meritxell** Response to SDS Rule 56.1 Stmt. ¶ 14; Banner Aff. Ex. G & Courtney Aff. Ex. A: Debenture; Courtney Aff. ¶ 2.) *See also Meritxell, Ltd. v. Saliva Diagnostic Sys., Inc.,* 96 Civ. 2759, 1997 WL 411466 at \*1 (S.D.N.Y. July 18, 1997).

On December 11, 1995, Barry Globerman, SDS's placement agents' representative, sent the original debenture to Mark Anthony, who managed **Meritxell's** account at Suppes Securities.[1] (Anthony Dep. at 40–44; Banner Aff. Ex. H: 12/11/95 Globerman Letter to Anthony.)

**\*2** It was Globerman's practice to send the subscription agreements to the potential investor's representative. (Globerman Dep. at 10.) When an executed subscription agreement was returned to Globerman, he prepared a debenture and sent the subscription agreement with the debenture to SDS's counsel. (*Id.* at 10–11.) The investors then sent money to Globerman's escrow account. (*Id.*) When Globerman received the funds, he collected the original debenture from SDS's counsel and delivered it to the party whom the investor indicated was to keep the debenture. (*Id.* at 15, 17.) SDS maintained a "Debenture Register" which listed the names and addresses of the debenture holders. (Banner Aff. Ex. G & Courtney Aff. Ex. A: Debenture at p. 1; *see also* Courtney Aff. ¶¶ 11–12; Levine Dep. at 58–60.)

***The Debenture's Conversion Terms***
The terms of the debenture entitled a debenture holder such as **Meritxell** to convert the principal amount of the debenture into shares of SDS's common stock any time after 45 days of issuance and prior to the October 31, 1996 debenture maturity date. (Banner Aff. Ex. G & Courtney Aff. Ex. A: Debenture ¶ 4(a); *see also* SDS Rule 56.1 Stmt. ¶ 4; **Meritxell** Response to SDS Rule 56.1 Stmt. ¶ 4.) The conversion price was 70% of SDS's "market price," defined in the debenture as:

> the lower of (i) the average closing bid price of the [SDS] Common Stock for the five (5) business days immediately preceding the conversion date, or (ii) the average closing bid price of the Common Stock for the five (5) business days prior to subscription by the Holder as reported by the National Association of Securities Dealers Automated Quotation System ("NASDAQ").

(*Id.*) According to the debenture, the conversion mechanics are as follows:

> Such conversion shall be effectuated by surrendering the Debentures to be converted (with a copy, by facsimile or courier, to the Company) with the form of conversion notice attached hereto as Exhibit I, executed by the Holder of this Debenture evidencing such Holder's intention to convert this Debenture or a specified portion.... *The date on which notice of conversion is given shall be deemed to be the date on which the Holder has delivered this Debenture, with the conversion notice duly executed, to the Company or, if earlier, the date set forth in such notice of conversion if the Debenture is received by the Company within five (5) business days thereafter.*

(*Id.,* emphasis added.)

The Notice of Conversion form attached to the debenture also states that the original debenture must be received by SDS by the fifth business day following the date of conversion. (Debenture, Notice of Conversion; *see* SDS Rule 56.1 Stmt. ¶ 23; **Meritxell** Response to SDS Rule 56.1 Stmt. ¶ 23.)

***Meritxell's Conversion Notice***
In a January 27, 1996 letter, **Meritxell** director Courtney notified SDS that **Meritxell** was converting the debenture into common stock. (Courtney Aff. Ex. D & Banner Aff. Ex. I: 1/27/96 Courtney Letter; Courtney Aff. ¶ 15.) SDS received the letter and conversion notice, with a photocopy of the debenture, by fax on January 30, 1996. (Courtney Aff. ¶ 15; Levine Dep. at 74–75; Banner Aff. Ex. I: 1/30/96 Courtney Fax Transmittal Letter; *see also* SDS Rule 56.1 Stmt. ¶¶ 18–20; **Meritxell** Response to SDS Rule 56.1 Stmt. ¶¶ 18–20; **Meritxell** Rule 56.1 Stmt. ¶ 4; SDS Response to **Meritxell** Rule 56.1 Stmt. ¶ 4.)

**\*3** The conversion notice stated a conversion date of January 17, 1996. (Banner Aff. Ex. I: Notice of Conversion.)[2] Upon receiving the conversion notice, SDS attorney Levine called Globerman, as agent for all the debenture holders, and told him that "the amount on the conversion notice was miscalculated because the dates were incorrectly stated," and that "in order to convert, [she] needed the original Debenture." (Levine Aff. ¶ 3; Levine Dep. at 74–75, 93.) According to Levine, "I think in every conversation I said, 'but I need the [original] debenture.' " (Levine Dep. at 111.)

Levine was out of the office from February 1 to February 6, 1996, returning to her office on February 7, 1996. (Levine Dep. at 159.) Around February 13 or 14, there were telephone conversations among SDS counsel Levine, **Meritxell** director Courtney and **Meritxell** counsel Steinman regarding the conversion date and production of the original debenture. (Courtney Aff. ¶ 16; Levine Aff. ¶ 7; Levine Dep. at 89–90; Steinman Dep. at 8–9.) Eventually (the parties do not cite to any precise date), **Meritxell** "accepted that the relevant date of conversion would be January 30, 1996," not January 17, 1996. (Courtney Aff. ¶ 16; *see also* Levine Aff. ¶ 7.) If January 30, 1996 were the conversion date, **Meritxell** would have received 212,766 shares of SDS common stock. (**Meritxell** Rule 56.1 Stmt. ¶ 6; SDS Response to **Meritxell** Rule 56.1 Stmt. ¶ 6.)

***The Missing Debenture***
Neither party has stated the exact date when the issue

arose as to the requisite production of the original debenture. **Meritxell's** Mr. Courtney really "didn't think about it," because he assumed that the original debenture would be delivered to SDS by **Meritxell's** broker, Mr. Anthony of Suppes Securities. (Courtney Dep. at 48.) **Meritxell's** Courtney, moreover, conceded that "[d]uring the course of initial conversations regarding the appropriate conversion date, [SDS counsel] Ms. Levine requested production of the original Debenture." (Courtney Aff. ¶ 18; *see* Levine Dep. at 81–83.)[3] **Meritxell** could not send SDS the original debenture, however, as it either was lost or had never been received by **Meritxell**. Instead, **Meritxell** sent a copy of the debenture with a faxed signature page. (*See Id.*)

**Meritxell** did not inform SDS counsel Levine that the original debenture was lost until the February 13, 1996 conference call between the parties. (Levine Aff. ¶¶ 10–11; Levine Dep. at 88–91 .) On February 13, SDS counsel Levine demanded an affidavit of loss. (Levine Aff. ¶¶ 10–11; Levine Dep. at 88–91; Courtney Aff. ¶ 18; **Meritxell** Response to SDS Rule 56.1 Stmt. ¶¶ 26–27.) **Meritxell** signed the affidavit of loss on February 14, and SDS received it on February 15, 1996. (Courtney Aff. ¶ 18; Courtney Aff. Ex. E; **Meritxell** Response to SDS Rule 56.1 Stmt. ¶¶ 26–27.)

Shortly thereafter, SDS counsel received a phone call from the SEC enforcement division investigating one of the individuals involved in the **Meritxell** transaction.[4] (Levine Aff. ¶ 12.) SDS counsel Levine, by a March 4, 1996 letter, requested that **Meritxell** deliver an indemnity bond in addition to the affidavit of loss. (Levine Aff. ¶ 12; Courtney Aff. ¶ 18; Banner Aff. Ex. R: 3/4/96 Levine Letter.) Levine assured **Meritxell** that "[o]nce SDS receives the appropriate bond, SDS will convert the Debenture into shares of SDS Common Stock based upon the lower of the share prices as reported by NASDAQ on the five days preceding receipt of such bond or the five days preceding the date of the Debenture." (Banner Aff. Ex. R: 3/4/96 Levine Letter.)

**\*4** **Meritxell** delivered the indemnity bond to SDS counsel on or about March 26, 1996. *Meritxell v. Saliva Diagnostic Sys.*, 1997 WL 411466 at *2. (*See also* Banner Aff. Ex. J: 4/1/97 Levine Letter to **Meritxell's** Counsel.) In an April 1, 1996 letter, SDS counsel Levine informed **Meritxell's** counsel that SDS would deliver a certificate for 89,638 shares of SDS common stock. Levine further explained that she utilized as the conversion date the date **Meritxell** delivered the indemnity bond (March 26, 1996), rather than the date of the affidavit of loss (February 15, 1996), since it was more favorable to **Meritxell**. *Id.*[5] SDS delivered to **Meritxell** 89,638 shares

of SDS common stock on April 2, 1996. (SDS Rule 56.1 Stmt. ¶ 28; **Meritxell** Response to SDS Rule 56.1 Stmt. ¶ 28.)

### *Meritxell* Sells SDS Stock Short

Beginning on January 30, 1996, **Meritxell** began selling SDS common stock short via its account at Suppes. (Courtney Aff. ¶ 31; Courtney Aff. Ex. H: Suppes documents.) **Meritxell** continued to sell SDS common stock short until February 22, 1996. (Courtney Aff. ¶ 31 & Ex. H.) Since **Meritxell** did not receive SDS common stock pursuant to the conversion of its debenture until April 2, 1996, it accumulated a short position in SDS common stock of 134,100 shares. (Courtney Aff. ¶ 31.) In order to cover its short position at Suppes, **Meritxell** made a series of sales of SDS stock from its brokerage account at JDQ, from February 29 through March 21, 1996. (Courtney Aff. ¶ 32.) On March 21, 1996, **Meritxell** sold short an additional 56,765 shares of SDS stock from its JDQ account. (Courtney Aff. ¶ 33.) After that sale, **Meritxell** had a short position of 190,685 shares of SDS common stock. (*Id.*) When **Meritxell** received SDS's 89,638 shares on April 2, it was short 101,227 shares, which it purchased in a series of transactions from April 4 to April 22, 1996. (Courtney Aff. ¶ 34.)

Had SDS used January 30, 1996 (the date **Meritxell** delivered its conversion notice) as the debenture conversion date, **Meritxell** would have received 212,766 shares (Courtney Aff. ¶¶ 37–39), rather than 89,638 shares. **Meritxell's** damage claim of $309,309.10 is based on the $97,140.97 it spent purchasing shares to cover its short position, and $293,168.13 it would have made if the shares had been delivered on February 2, three days after SDS received **Meritxell's** conversion notice, rather than on April 2. (Courtney Aff. ¶¶ 29, 35, 40–41.)

## ANALYSIS

### I. *THE SUMMARY JUDGMENT STANDARD*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986);

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991); *Hernandez v. New York City Law Dep't Corp. Counsel,* 94 Civ. 9042, 1997 WL 27047 at *6 (S.D.N.Y. Jan.23, 1997) (Peck, M.J.); *Burger v. Litton Indus., Inc.,* 91 Civ. 0918, 1996 WL 421449 at *7 (S.D.N.Y. April 25, 1996) (Peck, M.J.), *report & rec. adopted,* 1996 WL 609421 (S.D.N.Y. Oct.22, 1996). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See, e .g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Services, Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994); *Hernandez v.. New York City Law Dep't,* 1997 WL 27047 at *6; *Burger v. Litton,* 1996 WL 421449 at *7.

**\*5** In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *Chambers v. TRM,* 43 F.3d at 36; *Gallo v. Prudential,* 22 F.3d at 1223; *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *7. The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489 (1987); *Hernandez v.. New York City Law Dep't,* 1997 WL 27047 at *7; *Burger v. Litton,* 1996 WL 421449 at *7. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v.. TRM,* 43 F.3d at 37; *Hernandez v. New York City Law Dep't,* 1997 WL 27047 at *7.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather to determine the existence of any disputed issues of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Watson v. McGinnis,* 96 Civ. 7212, 981 F.Supp. 815, 1997 WL 677488 at *3 (S.D.N.Y. Oct.15, 1997) (Peck, M.J.); *Ruiz v. Selsky,* 96 Civ.2003, 1997 WL 137448 at *3 (S.D.N.Y. March 24, 1997). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *Anderson*

*v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted); *see also, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11–12; *Watson v. McGinnis,* 981 F.Supp. 815, 1997 WL 677488 at *3; *Shaw v. City of New York,* 95 Civ. 9325, 1997 WL 187352 at *2 (S.D.N.Y. April 15, 1997) (Peck, M.J .); *Ruiz v. Selsky,* 1997 WL 137448 at *3.

## II. *THE DEBENTURE'S CONVERSION PROCEDURES ARE CLEAR AND UNAMBIGUOUS, AND THE COURT THEREFORE DOES NOT CONSIDER PAROL EVIDENCE*

Pursuant to the debenture's terms, Delaware law governs this action. (Banner Aff. Ex. G & Courtney Aff. Ex. A: Debenture ¶ 13: "This Debenture shall be governed by and construed in accordance with the laws of the State of Delaware.")[6]

Under Delaware law, the "proper construction of any contract ... is purely a question of law." *Rhone–Poulenc Basic Chems. Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992); *see also, e.g., Pellaton v. Bank of New York,* 592 A.2d 473, 478 (Del.1991); *Aetna Cas. & Sur. Co. v. Kenner,* 570 A.2d 1172, 1174 (Del.1990); *MHM/LLC, Inc. v. Horizon Mental Health Management, Inc.,* No. 14465, 1996 WL 592719 at *2 (Del.Ch. Oct.3, 1996), *aff'd,* 694 A.2d 844 (1997); *Geico v. Morris,* No. 95C–09–081–WTQ, 1997 WL 527982 at *2 (Del.Super.Ct. Feb.19, 1997); *W & G Seaford Assocs., L.P. v. Eastern Shore Mkts., Inc.,* 714 F.Supp. 1336, 1339 (D.Del.1989) ("the construction of the terms of a written agreement is a task for the court and not the jury"). The purpose of contract construction is to enforce the parties' agreement, as reflected in their written contract:

> **\*6** In construing the meaning of written contracts, the court's first obligation to the parties is to determine the nature and scope of the contractual rights and obligations [the parties] created and to enforce those rights and obligations in accordance with law. Of course, the nature and scope of the rights and obligations created will often be the primary issue to resolve. The court's ultimate guide in determining those legal entitlements is to attempt to fulfill,

to the extent possible, the reasonable shared expectations of the parties at the time they contracted.

*US West, Inc. v. Time Warner Inc.,* Civ. A. No. 14555, 1996 WL 307445 at *9 (Del.Ch. June 6, 1996) (footnotes omitted).

Meritxell argues that SDS's interpretation of the debenture, as shown by parol evidence, should be controlling. (Meritxell Br. at 6.) Meritxell points to the only other instance in which SDS received the original debenture more than five days after the conversion notice. (*Id.* at 6–7.) Debenture holder RBB Bank submitted a conversion notice on December 14, 1995, but did not supply the original debenture until January 2, 1996. (Courtney Aff. Ex. B: 1/16/96 Levine Letter.) SDS delivered the SDS common stock to RBB Bank on January 3, 1996, and explained that "[s]ince [the] conversion notice was effective on December 14, 1995, you are not entitled to receive additional shares based on the difference from the date of conversion and the date RBB Bank received its share certificate." (*Id.*)

Meritxell claims that under "settled principle[s] of contract law," because SDS converted RBB Bank's debenture as of the date it received the conversion notice, SDS interprets the conversion date as the date it receives the conversion notice, regardless of when it receives the original debenture (or an affidavit of loss in lieu thereof). (Meritxell Br. at 5.) Meritxell misconstrues basic principles of contract law.

The primary rule of contract construction is:

> [W]here the parties have created an unambiguous integrated written statement of their contract, the language of that contract (not as subjectively understood by either party but) as understood by a hypothetical reasonable third party will control. In essence, this is an assessment of whether the reasonable expectations of the parties are convincingly established by the words of the contract standing alone—the language being so unequivocal that no reasonable person could have expectations inconsistent with such language.

*US West v. Time Warner,* 1996 WL 307445 at *9; *see*

*also, e.g., Demetree v. Commonwealth Trust Co.,* No. Civ. A. 14354, 1996 WL 494910 at *3–5 (Del.Ch. Aug.27, 1996); *Bell Atlantic Meridian Sys. v. Octel Communications Corp.,* No. Civ. A. 14348, 1995 WL 707916 at *3 (Del.Ch. Nov.28, 1995); *R.E. Haight & Assocs. v. W.B. Venables & Sons, Inc.,* No. 94C–11–023, 1996 WL 658969 at *3 (Del.Super.Ct. Oct.30, 1996); 1 Arthur L. Corbin, *Corbin on Contracts* § 1.1 (Joseph M. Perillo ed., West 1993). This principle is commonly referred to as the "clear meaning" or "plain meaning" rule. *E.g., Demetree v. Commonwealth Trust Co.,* 1996 WL 494910 at *4; *US West v. Time Warner,* 1996 WL 307445 at *9.

**\*7** Under the clear meaning rule, "courts must first examine the language of the instrument. When the language chosen by the parties is plain and subject to only one meaning, courts should simply state that meaning and go on." *American Original Corp. v. Legend, Inc.,* 652 F.Supp. 962, 967 (D.Del.1986) (citations omitted). *See also, e.g., Rhone–Poulenc Basic Chems. Co. v. American Motorists Ins. Co.,* 616 A.2d at 1195 ("Clear and unambiguous language in [a contract] should be given its ordinary and usual meaning."); *Demetree v. Commonwealth Trust Co.,* 1996 WL 494910 at *4 ("Under the plain meaning rule of contract construction, if a contract is clear on its face, the Court should rely solely on the clear, literal meaning of the words.... Where parties have entered into an unambiguous integrated written contract, the contract's construction should be that which would be understood by an objective reasonable third party."); *Bell Atlantic Meridian Sys. v. Octel Communications Corp.,* 1995 WL 707916 at *5 ("When the contract language ... is not reasonably susceptible to more than one meaning, this 'objective' meaning will govern."); *Rainbow Navigation, Inc. v. Yonge,* No. Civ. A. 9432, 1989 WL 40805 at *2 (Del.Ch. April 24, 1989) ("Unless the context in which the negotiation and contracting occurs otherwise requires, the words of the contract are to be accorded their ordinary meaning and that if, when so read, the contract as a whole supplies an answer to a disputed question, that is the answer.").

Thus, it is axiomatic that courts will not consider parol evidence if the contract language is unambiguous; only if the contract language is ambiguous will courts consider parol evidence bearing upon the contract's negotiation or the intent of the contracting parties. *See, e.g., Eagle Indus. Inc. v. DeVilbliss Health Care, Inc.,* No. 51 of 1997, 702 A.2d 1228, 1997 WL 742034 at *4 (Del. Nov.25, 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."); *Northwestern Nat'l Ins. Co. v. Esmark, Inc.,* 672 A.2d 41,

Meritxell, Ltd. v. Saliva Diagnostic Systems, Inc., Not Reported in F.Supp. (1998)

43 (Del.1996) ("Courts consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract."); *Rhone–Poulenc Basic Chems. Co. v. American Motorists Ins. Co.,* 616 A.2d at 1195; *Citadel Holding Corp. v. Roven,* 603 A.2d 818, 822 (Del.1992) ("It is an elementary cannon of contract construction that the intent of the parties must be ascertained from the language of the contract.... Only when there are ambiguities may a court look to collateral circumstances."); *Pellaton v. Bank of New York,* 592 A.2d at 479 ("if the instrument is clear and unambiguous on its face, neither this [appellate] Court nor the trial court may consider parol evidence"); *Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Sys. Co.,* No. C.A. 15388, 1997 WL 525873 at *3–4 (Del.Ch. Aug.13, 1997) ("[Delaware] law precludes [the] Court from considering extrinsic evidence to interpret the terms of a contract without first determining that the contract is ambiguous"); *US West v. Time Warner,* 1996 WL 307445 at *10 (courts will admit parol evidence to construe a contract "where the language of a written integration is susceptible to more than one reasonable interpretation"); *Demetree v. Commonwealth Trust Co.,* 1996 WL 494910 at *4 ("In cases where the language of a contract is clear and unambiguous, [the] Court may not consider parol evidence to interpret the intent of the parties."); *Bell Atlantic Meridian Sys. v. Octel Communications Corp.,* 1995 WL 707916 at *6 (where contract language is unambiguous, "parol evidence ... that contradicts or varies this meaning will not be considered."). An ambiguity exists "when the language in a contract permits two or more reasonable interpretations." *Hallowell v. State Farm Mut. Auto. Ins. Co.,* 443 A.2d 925, 926 (Del.1982).

**\*8** Moreover, a "contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone–Poulenc Basic Chems. Co. v. American Motorists Ins. Co.,* 616 A.2d at 1196; *see also, e.g., Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1997 WL 742034 at *4 n. 8 ("Contract language is not ambiguous simply because the parties disagree concerning its intended construction. The true test is what a reasonable person in the position of the parties would have thought it meant."); *Bell Atlantic Meridian Sys. v. Octel Communications Corp.,* 1995 WL 707916 at *6 n. 5.

Meritxell never argues that the debenture's language is ambiguous. Because the Court finds that the debenture's language is clear and unambiguous, the Court will not consider the parol evidence proffered by Meritxell about SDS's conversion of RBB Bank's debenture.

The debenture clearly states that the date of conversion is:

the date on which the Holder has delivered this Debenture, with the conversion notice duly executed, to the Company or, if earlier, the date set forth in such notice of conversion if the Debenture is received by the Company within five (5) business days thereafter.

(Banner Aff. Ex. G & Courtney Aff. Ex. A: Debenture ¶ 4(a).) The form of conversion notice attached to the debenture reiterates that "[t]his original Debenture and Notice of Conversion must be received by the Company by the fifth business date following the Date of Conversion." (Banner Aff. Ex. I: Notice of Conversion.) Thus, the debenture language is straight-forward and unambiguous: production of the original debenture is a condition precedent to conversion.

A condition precedent is "an act or event, other than a lapse of time, that must occur before a duty to perform a promised performance arises." *W & G Seaford Assocs., L.P. v. Eastern Shore Mkts., Inc.,* 714 F.Supp. at 1340. Occurrence of a condition precedent triggers the parties' duties under the contract. *Id.* In other words, a " 'condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance.... If the condition is not fulfilled, the right to enforce the contract does not come into existence." ' *American Original Corp. v. Legend, Inc.,* 652 F.Supp. at 968 (quoting 5 Samuel Williston, *A Treatise on the Law of Contracts* § 663 (3d ed.1961)); *accord, e.g., Marker v. United States,* 646 F.Supp. 433, 436 (D.Del.1986).

Because production of the original debenture is a condition precedent to conversion, SDS's obligation to convert the debenture was excused when Meritxell failed to produce the original. " 'It is a general rule, in an action on a contract obligation, that the plaintiff must allege [the occurrence] ... of conditions precedent. Thus where the benefit of a clause in a contract will inure to the plaintiff only on the [occurrence] of certain [[[conditions], he must allege ... that [those conditions existed]." ' *Pobst v. Nanticoke Mem'l Hosp.,* No. Civ. A. 90C–JA25, 1991 WL 166073 at *5 (Del.Super.Ct. July 30, 1991) (brackets and ellipsis in original). Meritxell did not fulfill the condition precedent to conversion—production of the original debenture—on January 30 or within five days thereafter; therefore, unless Meritxell can prove that production of the original debenture is an immaterial term of the contract, or that SDS should be estopped from enforcing the debenture's terms, Meritxell's breach of contract claim must fail. The Court addresses these two points in the next two sections.

## III. *PRODUCTION OF THE ORIGINAL DEBENTURE IS A MATERIAL TERM*

**\*9** Meritxell claims that production of the original debenture is immaterial to determining the conversion rate. (Meritxell Br. at 7–8 .) According to Meritxell, production of the original debenture is unnecessary to protect SDS from a subsequent holder-in-due-course, because SDS is required under the debenture to maintain a Debenture Register.[7] (Meritxell Br. at 7–8.) And the Register entitles SDS to "treat the record owner as the debenture holder for all purposes, unless a transfer of the debenture was made on the books of the company." (*Id.* at 8.) Thus, according to Meritxell, the Register greatly reduces any risk that the debenture would be negotiated more than once, and makes production of the original immaterial. (Meritxell Br. at 8.)

In contrast, SDS maintains that production of the original debenture is material, observing that "[i]n the event [a] third party presents the Debenture to SDS for payment and SDS refuses, it is extremely unlikely that court would find the Debenture Register controlling." (SDS Reply Br. at 5.)

The Court agrees that production of the original debenture is a material term of the debenture contract.

The debenture is a negotiable instrument. *See* 6 Del.Code. Ann. § 3–104(1)(1997). SDS thus could be liable to a subsequent holder in due course who seeks to negotiate it. *See* 6 Del.Code. Ann. § 3–301. A company that issues a negotiable security has an interest in reclaiming the original security upon conversion, to prevent it from being renegotiated. *See, e.g.,* 5A Ronald A. Anderson, *Anderson on the Uniform Commercial Code* § 3–301:8 (3d ed. 1994) ("The payor pays at its risk when the recipient of the payment does not have possession of the [instrument].") SDS's forethought in providing the extra safety of the Debenture Register does not eliminate its interest in obtaining the original debenture on conversion.

Thus, the debenture's requirement that the debenture holder surrender the original debenture on conversion is a reasonable and useful provision of the agreement. Meritxell's position would read that provision out of the contract. There is no reason in law or under the facts presented here to do so. Moreover, allowing late production of the original debenture to "relate back" to the conversion notice date would allow a debenture holder to see how the market price of SDS common stock moves, and withdraw its conversion notice if the stock's movement makes it better for the debenture holder not to

convert at that time. The Court cannot say that the unambiguous provision requiring a debenture holder to produce the original debenture on conversion (or within five days thereof) is not a material contract term.

## IV. *MERITXELL HAS NOT PROVED EQUITABLE ESTOPPEL*

Meritxell asserts that SDS should be equitably estopped from enforcing the terms of the debenture. Meritxell claims that it relied upon SDS counsel Levine's statements that the date of conversion would be January 30, 1996, as well as SDS's failure to respond to Meritxell counsel Steinman's March 19, 1996 letter to Levine (declaring the applicable conversion date to be January 30). (Meritxell Br. at 9; Courtney Aff. Ex. E: 3/19/96 Steinman Letter.)

**\*10** The doctrine of equitable estoppel may be invoked " 'when a party by [[[its] conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment.' ' *American Family Mortgage Corp. v. Acierno,* No. 290 of 1993, 1994 WL 144591 at \*5, 640 A.2d 655 (Del. March 28, 1994) (quoting *Waggoner v. Laster,* 581 A.2d 1127, 1135 (Del.1990)); *accord, e.g., Wilson v. American Ins. Co.,* 209 A.2d 902, 903–04 (Del.1965); *Monterey Invs., Inc. v. Healthcare Properties, L.P.,* No. 15519, 1997 WL 367038 at \*4 (Del.Ch. June 26, 1997); *In re Central Banking Sys., Inc.,* No. C.A. 12497, 1993 WL 410421 at \*5 (Del.Ch. Oct.6, 1993); *Centaur Partners IV v. National Intergroup, Inc.,* No. Civ. A. 11572, 1990 WL 96248 at \*5 (Del.Ch. July 5, 1990); *Great Am. Credit Corp. v. Wilmington Housing Auth.,* 680 F.Supp. 131, 134 (D.Del.1988).

"To establish estoppel it must be shown that the party claiming estoppel [1] lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; [2] relied on the conduct of the party against whom estoppel is claimed; and [3] suffered a prejudicial change of position as a result of his reliance." *Waggoner v. Laster,* 581 A.2d at 1136; *accord, e.g., Wilson v. American Ins. Co.,* 209 A.2d at 904; *Cheng v. D'Onofrio,* No. Civ. A. 12617, 1994 WL 560866 at \*2 (Del.Ch. Sept.20, 1994); *Farkas v. Jarrell,* No. Civ. A. 1197, 1993 WL 401878 at \*2 (Del.Ch. Sept.17, 1993); *In re Central Banking,* 1993 WL 410421 at \*5; *Cravero v. Holleger,* 566 A.2d 8, 21 (Del.Ch.1989); *Two South Corp. v. City of Wilmington,* No. Civ. A. 9007, 1989 WL 76291 at \*7 (Del.Ch. July 11, 1989); *Delmar News, Inc. v. Jacobs Oil Co.,* 584 A.2d 531, 535 (Del.Super.Ct.1990).[8]

The party asserting estoppel " 'has the burden of proving

it by clear and convincing proof. An estoppel may not rest upon mere inference." ' *Collins v. Sussex Trust Co.,* No. 88C–JN21, 1989 WL 70901 at *2 (Del.Super.Ct. June 15, 1989) (quoting *National Fire Ins. Co. v. Eastern Shore Lab, Inc.,* 301 A.2d 526, 529 (Del.Super.Ct.1973)); *see also, e.g., Great Am. Credit Corp. v. Wilmington Housing Auth.,* 680 F.Supp. at 134 ("Under Delaware law, proof of estoppel must be clear and convincing.... 'An estoppel may not rest upon an inference that is merely one of several possible inferences.' ... [T]he party asserting estoppel ... must bear the burden of establishing proof that rises to this standard."); *Employers' Liab. Assurance Corp. v. Madric,* 183 A.2d 182, 188 (Del.1962).

It is "elementary that [Meritxell] cannot be permitted to use the doctrine [[[] of ... estoppel to make a new contract or change the terms of the old." *Harmony Mill Ltd. Partnership v. Magness,* 1990 WL 58149 at *5; *see also, e.g., Brandywine Shoppe Inc. v. State Farm Fire & Cas. Ins. Co.,* 307 A.2d 806, 809 (Del.Super.Ct.1973).

*11 Meritxell has not satisfied either of the first or second estoppel elements. First, Meritxell had "knowledge or had the means of obtaining knowledge" that, in order to effect conversion, Meritxell needed to surrender to SDS the original debenture within five days of the conversion notice. The debenture, of which Meritxell admits it had a copy (Courtney Aff. ¶ 18), clearly requires that the original debenture be produced. (Courtney Aff. Ex. A & Banner Aff. Ex. G: Debenture ¶ 4(a).) Moreover, the conversion notice, which Meritxell's Mr. Courtney signed and faxed to SDS counsel Levine, clearly states that "[t]his original Debenture and Notice of Conversion must be received by the Company by the fifth business date following the Date of Conversion." (Banner Aff. Ex. I: Notice of Conversion.)

Estoppel is inappropriate when the asserting party has been "misled though his or her 'own ... want of attention to proper means of information." ' *American Family Mortgage Corp. v. Acierno,* 1994 WL 144591 at *5. The proper means of information in this case is the debenture, or secondarily, the conversion notice. "One cannot bury one's head and hope that equitable estoppel will prevent the assertion of another's right." *Id.; see also, e.g., Great Am. Credit Corp. v. Wilmington Housing Auth.,* 680 F.Supp. at 137. Accordingly, Meritxell failed to fulfill the first requisite of estoppel.

Meritxell failed to satisfy the second requisite of estoppel as well. Meritxell has the burden of proving that "reliance upon the conduct of the party against whom the estoppel is raised [is] reasonable and justified under the circumstances." *Two South Corp. v. City of Wilmington,* 1989 WL 76291 at *7; *see also, e.g., Realty Growth Investors v. Council of Unit Owners,* 453 A.2d 450, 457 (Del.1982); *Monterey Invs., Inc. v. Healthcare Properties, L.P.,* 1997 WL 367038 at *5; *Great Am. Credit Corp. v. Wilmington Housing Auth.,* 680 F.Supp. at 134. Meritxell claims that it relied upon Levine's statement that the conversion date would be January 30. Yet, Meritxell began selling SDS stock on January 30 (Courtney Aff. ¶ 16 & Ex. H: Suppes docs.), the same day it faxed in its conversion notice, and at least seven days before it claims to have had any conversations with Levine, who was out of her office from February 1 through 6. (Levine Dep. at 159.) Thus, before it could have relied upon any Levine statement, Meritxell already had sold short 59,100 shares of SDS stock. More important, Meritxell admits that during an initial conversation, SDS counsel Levine requested production of the original debenture. (Courtney Aff. ¶ 18.) Meritxell therefore could not have relied upon Levine's actions as exempting it from producing the original debenture, since Meritxell admits that Levine affirmatively requested the original debenture. Accordingly, Meritxell has failed to prove reasonable reliance on any SDS statement.

## CONCLUSION

*12 For the reasons set forth above, defendant SDS's summary judgment motion is granted and plaintiff Meritxell's cross-motion is denied.

The Clerk of Court is directed to enter judgment for SDS dismissing the complaint.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1998 WL 40148

Footnotes

1      In support of its assertion that Anthony received the original debenture, SDS submitted a December 11, 1995 letter
       from Globerman to Anthony which Anthony signed to confirm receipt of the original debenture. (Banner Aff. Ex. H.)
       Globerman testified that he is "confident" that he sent Anthony an original debenture with that cover letter. (Globerman

Dep. at 24–25.) SDS also submitted testimony by Anthony in which he affirmed he received a debenture with the December 11, 1995 letter. (Anthony Dep. at 44.)

**Meritxell** denies that Anthony duly acknowledged receipt of the original debenture and subscription agreement. **Meritxell** claims that Anthony "testified at deposition that he did not recall receiving an original debenture" (**Meritxell** Response to SDS Rule 56.1 Stmt. ¶ 17), and submitted a page from the deposition in which Anthony stated, when asked whether he had received the original debenture, "I don't recall." (Anthony Dep. at 43.)

The fact that Anthony did not now recall receiving the original debenture does not, without more, call into question the validity of his signature on the letter from Globerman, acknowledging receipt of the original debenture. In any event, even if this is a disputed fact, it is not material to determination of the summary judgment cross-motions.

2    Mr. Courtney's letter originally was dated January 17, 1996, but when sent, he changed the "17" by hand to "27." (*See* Banner Aff. Ex. I; Courtney Dep. at 31–32; Courtney Aff. ¶ 16; SDS Rule 56.1 Stmt. ¶¶ 18–21; **Meritxell** Response to SDS Rule 56.1 Stmt. ¶¶ 18–21.)

3    Ms. Levine testified:

Q. Did you have any discussions with [**Meritxell** counsel] Mr. Steinman as to the need for an original signature page?

A. I told everybody that I needed an original debenture.

....

I have a general recollection of telling either Mr. Anthony or Mr. Steinman or both that I needed an original debenture. The reason I remember telling Mr. Globerman, because I told it to him the day I got the conversion notice, and I said, and I need an original debenture.

I assumed he would contact the people, get the original debenture, and tell them that they converted on the wrong date.

After that, when all of those other people called, I probably—they were actually more calling me about the conversion price, but I am sure that I said to them, "and by the way I need an original debenture."

....

Q. I am not talking about several times later?

A. Now, I am talking about the same period of time as you are, when they started calling me. They called me on a number of occasions, and I have had the same conversation with them a number of times.

Q. What is the basis of your general recollection that you told either Mr. Steinman or Mr. Courtney that you would require an original debenture?

A. Because I would not convert the debentures without an original.

....

I would not have converted without the original. And in the beginning they were really more concerned about the conversion price, but it was always an aside for me that I needed the original, and I always said that at the end of probably the conversations about the price, which was probably the bulk of the conversations.

Q. Did either of them tell you that they would produce an original signature page on the debenture?

A. I don't think they responded until a few weeks later when they told me that the debenture was lost.

(Levine Dep. at 81–86.)

4    On January 15, 1997, the SEC permanently barred Anthony from trading securities. (*See* Anthony Dep. at 5.)

5    The letter stated:

Pursuant to Section 4(a) of the Debenture, the conversion rate is determined by averaging the lower of the closing prices of SDS Common Stock for the five days preceding (i) the receipt of the notice of conversion (*only* if the original debenture is received within five days of such notice) or (ii) the date of the convertible debenture (November 27, 1996), as reported by Nasdaq, less 30%.

Therefore, the Debenture was converted at the rate of $1.1156 per share since we received the bond in lieu of the Debenture on March 26, 1996. Alternatively, we might have used the five days preceding the receipt of the affidavit of loss, but this would have resulted in a higher conversion rate.

(*Id.*)

6    New York law is consistent with Delaware's general principles of contract interpretation. *See, e.g., Bell Atlantic Meridian **Sys**. v. Octel Communications Corp.*, No. Civ. A. 14348, 1995 WL 707916 at *5 n. 3 (Del.Ch. Nov.28, 1995).

7    The Debenture states in relevant part:

[t]he interest ... will be paid to the person in whose name this Debenture (or one or more predecessor Debentures) is registered on the records of the Company regarding registration and transfers of the Debentures (the "Debenture Register") .... The Company will pay the principal of and all accrued and unpaid interest due upon this

Debenture on the Maturity Date, less any amounts required by law to be deducted or withheld, to the Holder of this Debenture as of the tenth (10th) day prior to the Maturity Date and addressed to such Holder at the last address appearing on the Debenture Register.

(Banner Aff. Ex. G & Courtney Aff. Ex. A: Debenture at p. 1.)

8      *See also, e.g., Muzzi v. Lewis,* No. 95C–01–017, 1997 WL 127010 at *4 (Del.Super.Ct. Jan.23, 1997), *aff'd mem.,* 700 A.2d 736 (1997); *Council of Wilmington Condominium v. Wilmington Ave. Assocs., L.P.,* No. Civ. A. 94C–09–004, 1996 WL 527392 at *3 (Del.Super.Ct. Aug.8, 1996); *Bailey v. Milford Mem'l Hosp.,* No. Civ. A. 94A–03–001, 1995 WL 790986 at *11 (Del.Super.Ct. Nov.30, 1995); *Harmony Mill Ltd. Partnership v. Magness,* No. C.A. 84C–0C–40, 1990 WL 58149 at *5 (Del.Super.Ct. May 1, 1990), *aff'd mem.,* 586 A.2d 1202 (1991); *Collins v. Sussex Trust Co.,* No. 88C–JN21, 1989 WL 70901 at *2 (Del.Super.Ct. June 15, 1989); *Great Am. Credit Corp. v. Wilmington Housing Auth.,* 680 F.Supp. at 134.

---

**End of Document**                                                                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 4245740
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

The ST. PAUL FIRE AND MARINE INSURANCE
COMPANY, Plaintiff
v.
The NOLEN GROUP, INC., et al., Defendants.
Zurich American Insurance Company, Plaintiff
v.
The Nolen Group, Inc., et al., Defendants
Federal Insurance Company, et al., Plaintiffs
v.
The Nolen Group, Inc., et al., Defendants.

Civil Action Nos. 02-8601, 03-3192, 03-3651. | Nov.
30, 2007.

**Attorneys and Law Firms**

Patrick J. Keenan, Thomas J. Duffy, Duffy & Keenan,
Peter G. Rossi, Hayes A. Hunt, Cozen O'Connor,
Philadelphia, PA, for Plaintiffs.

Joseph F. Van Horn, Holly L. McReynolds, Bodell, Bove,
Grace & Van Horn, Edward J. Tuite, Jeffrey J. Chomko,
Marshall Dennehey Warner Coleman and Goggin, Louis
J. Brown, Wayne Partenheimer, Edward M. Koch,
William J. Schmidt, White & Williams, LLP,
Philadelphia, PA, for Defendants.

*MEMORANDUM AND ORDER*

GENE E.K. PRATTER, District Judge.

**\*1** More than six years ago Tropical Storm Alison led to
destructive, though mercifully localized, flooding in
Whitemarsh Township. The adversarial aftermath of that
event continues virtually unabated, almost matching the
natural phenomenon in intensity, if not in ultimate cost
and disarray. The flood of motions and counter-motions
has raised a myriad of issues. Presently pending before
the Court is the Motion of Plaintiffs, St. Paul Fire and
Marine Insurance Company ("St.Paul") and Zurich
American Insurance Company ("Zurich") for Summary
Judgment against garnishee, Selective Way Insurance
Company ("Selective Way") (Doc. No. 297), and

Selective Way's Motion to Set Aside the Writ of
Execution and to Dissolve the Attachment or, in the
Alternative, to Release the Bond (Doc. No. 283). These
motions relate to the parties' respective efforts to
maximize or minimize, depending upon their roles, the
financial impact of the results of the jury trial that
assessed liability for the flood damage and the bifurcated
damages computation that followed the liability trial.[1]

Selective Way is the primary and excess ("umbrella")
liability insurer for Warren W. Baringer, Jr., i/t/a Baringer
Land Clearers and Baringer Land Clearing ("Baringer"),
the sole remaining non-settling defendant from the
underlying litigation. The aggregate limits of liability of
the two Selective Way insurance policies issued to
Baringer amount to $2 million. Baringer, though found by
the jury to have been 1% liable for the damage suffered
by Plaintiffs' insureds, remains jointly and severally liable
for the as-yet unsatisfied approximately $8.9 million from
the aggregate $28,265,167.55 verdict ultimately entered
in favor of all four insurer plaintiffs in the underlying
case. Baringer[2] is appealing the verdict.

As part of the formal post-trial proceedings, Baringer
filed a motion (Doc. No. 257) on December 4, 2006 to
stay proceedings to enforce the judgment against its
pending disposition of post-trial motions and appeal.
Baringer asked, in the alternative, for approval to post
security in an amount less than the outstanding judgment.
The Court, by Order dated December 20, 2006 (Doc. No.
265), granted that motion in part and denied it in part,
allowing the requested stay but conditioning it upon the
posting of a bond in the full amount of the unsatisfied
judgment, to wit, approximately $9 million. Without
either the Court's permission or Plaintiffs' assent,
Baringer, apparently through the efforts of Selective Way,
posted a bond in the amount of $2,856,307.02, which
amount was calculated as the total amount of the limits of
liability amounts available from the two insurance
policies, i.e., $2 million plus delay damages and interest.
There is no dispute as to the mechanics of that calculation
as far as it goes.

It would be an understatement to say that Baringer's
insurer, Selective Way, was intimately involved in the
machinations relating to the posting of the bond.
Notwithstanding the Court's December 20, 2006 Order,
and apparently in spite of its insured's (Baringer's)
protestations and appeals for greater protection and
assistance in complying with the Court's Order,[3] on behalf
of Baringer Selective Way arranged, through its affiliated
company, Selective Insurance Company of America, to
post Bond No. B 203131 dated January 5, 2007, in the

amount of $2,856,307.20. Presumably, if Selective Insurance Company as the surety is ever obligated to pay on the bond, it will look to Baringer and/or Selective Way to reimburse it as would be *de rigeur* in such arrangements. The asset that would customarily be the security against the risk of a call upon the Bond is the pair of insurance policies issued to Baringer.

**\*2** As would be expected in circumstances presented here, Selective Way indeed has been involved in this case "behind the scenes." The Baringer-Selective Way relationship relating to this litigation appears to have been contentious enough to engender a dispute that is now characterized as a potential bad faith claim by Baringer against Selective Way, a claim that Baringer assigned early in 2007 to St. Paul and Zurich, along with all of Baringer's rights under the two insurance policies.[4]

Meanwhile, the two insurer plaintiffs that did not participate in the assignment/delayed execution agreement (Federal Insurance Company and Great Northern Insurance Company) sought to enforce their judgments against Baringer, prompting Baringer to move for a protective order to prevent those enforcement efforts (Doc. No. 273). In the same motion, Baringer again asked the Court to reduce the amount of the required bond, but gave no explanation whatsoever for having posted a bond in a significantly reduced amount that represented roughly one-third of the amount ordered by the Court. Moreover, in that motion Baringer did not inform the Court about the assignment that had already been executed in favor of the other two insurer plaintiffs, and Selective Way made no effort to explain to the Court why the bond it had arranged for its insured was not posted in the full amount of the molded verdict. Thus, the Court was left at that point with a circumstance of an unexplained non-compliance with its Order, something that the Court now sees was an incomplete picture of the parties' and interested third parties' rights and obligations *inter se* on issues relevant to the issues presented for resolution. As a result, Baringer was again admonished[5] by way of the Court's March 13, 2007 Order to post a bond for the full amount of the judgment against it or risk execution proceedings by Federal and Great Northern.[6]

With, and largely as a result of, this background, having the assignment of Baringer's rights under the two insurance policies in hand and with the "underfunded" $2,856,307.02 bond on file, St. Paul and Zurich proceeded with undeniably inventive advocacy to attempt both (1) to garnish the approximately $2.8 million in coverage from the two insurance policies issued by Selective Way to Baringer and (2) oppose Selective Way's motion (Doc. No. 283) to have the bond released if

the garnishment proceedings move ahead. Selective Way argues that St. Paul and Zurich are trying to subject Selective Way to double exposure, i.e., the $2 million limits of liability (plus interest) via the execution and/or garnishment gambit while preserving their potential F.R.C.P. 65.1 rights to collect the face amount of the bond in the event Baringer's appellate efforts are unsuccessful. In response, St. Paul and Zurich argue that they have satisfied all requirements attendant to invoking the garnishment powers which are now ripe because the supersedeas bond is not in the full amount of the judgment plus interest. As to the bond itself, St. Paul and Zurich argue that Selective Way is not the bond issuer, but its corporate affiliate, Selective Insurance Company of America is, and, the plaintiff insurers contend, the bond is a separate contractual obligation, untethered as it were from any other document or agreement, other than the underlying judicial proceedings. The insurers argue that precisely because the bond is for less than the amount of the verdict, they are entitled to collect on the garnishment and still ultimately look to collect on the bond if and when the Baringer appeal is unsuccessful.

**\*3** The parties to this specific dispute certainly have presented an interesting and engaging exchange of arguments. All of them essentially acknowledge that case law provides little guidance for resolving what surely seems to be a rather rare situation, at least as the parties have portrayed it in their arguments. In the final analysis, however, this superficially unusual intersection of rights and obligations is best resolved by going "back to basics"-something none of the interested parties have done as far as the Court can discern from their submissions. In other words, fundamentally, this dispute starts and ends with the insurance contracts between Baringer and Selective Way and the language of those agreements. *See, e.g., Britamco Underwriters, Inc. V. Weiner,* 431 Pa.Super. 276, 636 A.2d 649, 651 (Pa.1994).*See also Forum Ins. Co. v. Allied Sec. Inc.,* 866 F.2d 80, 81 (3d Cir.1989).

The insuring agreement in Coverage A of the Commercial General Liability policy set forth the insurer's obligation to pay "those sums that the insured becomes legally obligated to pay" up to the limits of liability amount shown in the Declarations and subject to the provisions of Section III of the policy. None of the provisions of Section III undermine this analysis, but Section III underscores that the number of insureds, claims, suits, or claimants does not affect the limits of insurance. Under the provisions relating to Supplementary Payments for Coverage A at page 7 of 15 of the policy, Selective Way also agreed to pay the cost of bonds to release attachments, "but only for bond amounts *within the*

*applicable limit of insurance.*"[7](Emphasis added) The insurer also undertakes the obligation to pay "[a]ll interest on the full amount of any judgment that accrues after entry of the judgment and before [Selective Way has] paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance."While neither the cost of a bond nor the accrual of interest on a judgment increase the contractual limits of liability, likewise neither reduces the limits of insurance. The Selective Way "umbrella" policy issued to Baringer included identical provisions. *See* Commercial Umbrella Liability Coverage, Section 1C3b and f at page 5 of 13.

Finally, for purposes of this dispute the insurance contract addresses Selective Way's exposure in a civil action. In its entirety, this provision states:

> 3. Legal Action Against Us
>
> No person or organization has a right ...
>
>> b. To sue us on this Coverage Part unless all of its terms have been fully complied with.
>> A person or organization may sue us to recover ... on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance....[8]

Thus, under the insurance contract governing its obligations, Selective Way had no duty to secure any bond on behalf of Baringer and no duty to arrange for one in for an amount greater than the policy limits (plus applicable interest). Selective Way's exposure to others purporting to sue it for its obligations to Baringer for coverage under the policy is similarly limited. In short, Selective Way was under no compulsion to post a bond for the full (or any) amount of the judgment against Baringer.[9]

**\*4** Plaintiffs St Paul and Zurich themselves acknowledge that if Selective Way had posted a bond in the amount of the judgment then they would be unable to pursue Selective Way via the garnishment and would be limited to awaiting the outcome of the appeal, protected by the bond. *See* October 16, 2007 N.T. 9. In the absence of any legal requirement for Selective Way to have arranged for a bond in an amount greater than its contractual obligation, the Court perceives no basis on which to expose Selective Way to the garnishment as long as the bond remains in place. To do so would indeed expose Selective Way to double liability under the policy, once via the garnishment and also by way of the use of the

insurance contract limits of liability as security for the bond that protects Baringer from execution on the asset of the insurance limits during the pendency of the appeal processes. Although research has revealed no governing case law from Pennsylvania on this point, this conclusion is consistent with the array of opinions from other states that Selective Way has cited, namely *Merritt v. J.A. Stafford Co.,* 68 Cal.2d 619, 68 Cal.Rptr. 447, 440 P.2d 927, 929 (Cal.1968); *Cansler v. Harrington,* 231 Kan. 66, 643 P.2d 110, 114, 115 (Kan.1982); *Bowen v. Gov't Employees Ins. Co.,* 451 So.2d 1196, 1198 (La.Ct.App.1984); *O'Donnell v. McGann,* 310 Md. 342, 529 A.2d 372, 377 (Md.1987); *Missouri ex rel Brickner v. Saitz,* 664 S.W.2d 209, 214 (Mo.1984); *Courvoisier v. Harley Davidson of Trenton, Inc.,* 162 N.J. 153, 742 A.2d 542, 544-548 (N.J.1999); *Rosato v. Penton,* 442 A.2d 6546, 657 (N.J.Super.1981). Moreover, as the New Jersey Supreme Court has observed in *Courvoisier,* this result does not visit any unexpected harm or prejudice upon the party in St. Paul's and Zurich's position.

Therefore, the St. Paul and Zurich Motion for Summary Judgment (Doc. No. 297) will be denied and Selective Way's Motion To Set Aside The Writ Of Execution And To Dissolve The Attachment (Doc. No. 283) will be granted in accordance with this Memorandum. An Order consistent with this Memorandum follows.

### *ORDER*

AND NOW, this 30th day of November, 2007, for the reasons delineated in the accompanying Memorandum of even date,

1. The Motion of The St. Paul Fire and Marine Insurance Company and Zurich American Insurance Company for Summary Judgment (Doc. No. 297) is **DENIED;**

2. The Motion of Selective Way Insurance Company To Set Aside The Writ of Execution And To Dissolve The Attachment (Doc. No. 283) is **GRANTED;**

3. The Writ of Execution served on or about July 10, 2007 is set aside and the Attachment attendant thereto is hereby **DISSOLVED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 4245740

Footnotes

1   The procedural history of the bifurcated proceedings is described at some length in the Court's Memoranda of August 21, 2006 (Doc. No. 241), November 3, 2006 (Doc. No. 247), November 14, 2006 (Doc. No. 250), December 20, 2006 (Doc. No. 265) and, most recently, August 31, 2007 (Doc. No. 294). Hence, it will not be repeated unnecessarily here.

2   Mr. Warren Baringer is now deceased. His Estate has been properly substituted as a party in this litigation and now is separately represented by independent counsel. Throughout the underlying litigation, Mr. Baringer was represented by trial counsel appointed by Selective Way in accordance with Selective Way's duty to defend the Baringer businesses as outlined in the insurance policies.

3   At the October 16, 2007 oral argument on the pending motions, separate counsel for Baringer informed the Court that he "personally pleaded" with Selective Way to post a bond in the full amount as ordered by the Court, but Selective Way declined to do so. (Oct. 16, 2007 N.T. at 38).

4   The Court only became aware of this bad faith dispute and assignment in the course of the October 16, 2007 oral argument. A copy of the assignment was thereafter attached as an exhibit to Plaintiffs' Supplemental Brief Addressing Issues Raised By The Court During Oral Argument on October 16, 2007 (Doc. No. 319). According to the text of the assignment, Baringer has also assigned to the two insurers Baringer's potential claim, if any, against its trial counsel in the underlying litigation. In exchange, St. Paul and Zurich agreed, *inter alia,* to pursue other avenues before executing on its judgment as against Baringer.

5   At the October 16, 2007 oral argument the Court expressed criticism of Selective Way specifically for not having sought the Court's permission to post a bond in an amount far below the amount required by the Court's Order. As expressed during the oral argument, the Court posited that Selective Way had an obligation to the Court to explain the bond amount discrepancy. The Court indeed was technically incorrect (as Selective Way understandably and accurately was at pains to point out in footnote 1 its post-argument submission at Doc. No. 320) in describing the Court's March 13, 2007 Order as being addressed to Selective Way. However, Selective Way had already formally interposed itself in these proceedings to seek the Court's protection from the St. Paul and Zurich execution and garnishment proceedings or to release the bond, and there could be no question that Selective Way was well aware of Baringer's late 2006 and early 2007 efforts to stay execution proceedings and reduce the bond amount-and, indeed, *could* have come out of the shadows at that time to help its insured explain itself to the Court. With that background, the Court's comments at the October 16, 2007 oral argument were reflective of the realities of the litigation rather than the precise formalities of it at that moment. Suffice it to say, the Court observes that if Selective Way had stepped up to confront the issue of the bond amount at the earlier opportunity in February 2007 when its insured needed to explain the situation to the Court, then the costly and time-consuming motion practice represented by the current flurry of motions, briefs, submissions and oral argument could well have been avoided. Moreover, Selective Way and its insured would have had the benefits of this Order perhaps eight months earlier.

6   All of the plaintiff insurers filed a Praecipe for Writ of Execution on July 10, 2007 (Doc. No. 279) and a writ of execution issued that same day. St. Paul and Zurich pursued the assignment; Federal and Great Northern pursued other options.

7   The policy expressly states that the insurer "[does] not have to furnish these bonds."Supplementary Payments, 1.c.

8   Selective Way's possible exposure for bad faith damages are outside of this provision and emanates from a wholly different duty to its insured.

9   Of course, Selective Way could have secured a bond in a greater amount and may have considered doing so if it (or its affiliate Selective Insurance Company of America) had evaluated Baringer as financially able to post security for a greater bond amount, something that appears not feasible (or at least financially unattractive) to not only Selective Way or its affiliate, but to others as well. *See* Oct. 16, 2007 N.T. 38, 41-42. To be sure, based upon the facts as presented to the Court, it would not have been commercially reasonable for any surety to post a bond in an amount greater than that which the surety could be sure to collect if payment on the bond must eventually be made. Here, it appears that Baringer's financial wherewithal was limited to the two insurance policies. While Selective Way may have been in the best position to evaluate the extent to which it would do business with a firm in as possibly financially precarious a position as Baringer, that opportunity itself does not operate to expose the liability insurer to an amount above the limits of liability *as a matter of contract.*Whether the insurer has additional exposure for bad faith liability is an unrelated matter.

**St. Paul Fire and Marine Ins. Co. v. Nolen Group, Inc., Not Reported in F.Supp.2d (2007)**

2007 WL 4245740

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.